**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WILLIAM DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:21-cv-1773-GBW |
| | ) | |
| KIRK NEAL, et al., | ) | CONSOLIDATED |
| | ) | |
| Defendants. | ) | **PUBLIC VERSION FILED** |
| | ) | **JUNE 13, 2025** |

**<u>OPENING BRIEF IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF
DEFENSE EXPERT JEFFREY S. CARTER</u>**

*/s/ Daniel A. Griffith*
Daniel A. Griffith, Esquire (#4209)
WHITEFORD, TAYLOR & PRESTON, LLC
600 N. King Street, Suite 300
Wilmington, DE 19801
(302)357-3254
DGriffith@whitefordlaw.com
*Attorneys for Plaintiffs*

Dated: May 30, 2025

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

NATURE AND STAGE OF PROCEEDINGS .......................................................................... 3

SUMMARY OF ARGUMENT .................................................................................................. 4

STATEMENT OF FACTS ......................................................................................................... 6

   Mr. Carter's Qualifications .................................................................................................. 7

   Mr. Carter's Application of Legal Standards to Opine on the Ultimate Legal Conclusion ..................... 8

   Mr. Carter's Misapplication of DOC Policies and Industry Standards ................................ 9

LEGAL ARGUMENT ............................................................................................................. 11

   A.   Legal Standard ......................................................................................................... 11

   B.   Mr. Carter's Opinions Impermissibly Supplant the Role of the Jury ....................... 13

   C.   Mr. Carter Misconstrues or Misapplies National Standards and DOC Policy ......... 15

   D.   Mr. Carter's Opinions Are Outside the Scope of His Expertise And Do Not Assist the Jury ... 17

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page**

*Berckeley Inv. Grp. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006)........................................................................................................13, 14

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)......................................................................................................................12, 17

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717, 741-42 (3d Cir. 1994) ..........................................................................................11, 12

*Kumho Tire Co., Ltd., v. Carmichael*,
526 U.S. at 150.............................................................................................................................4, 11, 12

*Patrick v. Moorman*,
536 Fed. App'x 255 (3d Cir. 2013)..........................................................................................4, 5, 13

*Ponzini v. Monroe County*,
786 Fed. Appx. 313 (3d Cir. 2019) ...............................................................................................11

*Ponzini v. Primecare Med, Inc.*,
269 F.Supp.3d 444 (M.D. Pa. 2017) ........................................................................................11, 15

*United States v. Leo*,
941 F.2d 181 (3d Cir. 1991)..............................................................................................................13

*Waldorf v. Shuta*,
142 F.3d 601 (3d Cir. 1998)..............................................................................................................12

*Wood v. Showers*,
822 Fed. App'x 122 (3d Cir. 2020)....................................................................................1, 13, 15

**Rules**
Fed. R. Evid. 702 ............................................................................................................................12

ii

## INTRODUCTION

Testimony at trial from Defendants' liability expert, Jeffrey S. Carter, should be excluded since it impinges on the province of the jury by opining about the applicable legal standards to be applied by the jury and then the ultimate legal conclusion to be determined by the jury. Mr. Carter even acknowledges the fact that he applied the law in order to reach his conclusions:

> Q.    Wouldn't you agree that an opinion as to whether or not a particular incident violates the Eighth Amendment is a legal conclusion?...
>
> A.    No, sir…
>
> Q.    So your opinions regarding excessive force in this case are applying the Eighth and Fourteenth Amendment to the officer's conduct?
>
> A.    They are taken into consideration with the Fourth, Fourteenth and Eighth, as all opinions should relating to uses of force. (*See*, Transcript of Jeffrey S. Carter Deposition, attached as Exhibit "A", pp. 328-7 to 329-2)

It is well-established that these opinions are inadmissible. *Wood v. Showers*, 822 Fed. App'x 122 (3d Cir. 2020) (excluding opinion of expert purporting to explain governing law on use of force), citing *United States v. Leo*, 941 F. 2d 181, 196 (3d Cir. 1991) (explaining that "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury").

In addition, Mr. Carter's opinions misconstrue or misapply the other standards he cites, rendering the opinions entirely barren of any indicia of reliability. *See*, *Wood,* 822 Fed. App'x. at 124-125 (Without an explanation of the organizations that establish industry standards, "the process by which they develop those standards, or the general acceptance of those standards," there is no basis for concluding that the "proposed testimony was the product of reliable principles and methods for determining whether an officer used excessive force").

1

Finally, Mr. Carter's opinions are based almost entirely upon a review of videos and his acceptance of the officers' account of events (also the province of the jury) and include opinions outside his field of expertise.

The Supreme Court has held that Rule 702 of the Federal Rules of Evidence imposes "a special obligation" on the trial court to ensure that all expert testimony is not only relevant but reliable. *See Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

Mr. Carter's testimony is inherently unreliable and should be excluded.

2

## NATURE AND STAGE OF PROCEEDINGS

1.      This action was commenced by the filing of Plaintiffs' Complaint on December 17, 2021 (D.I. 1) followed by an Amended Complaint on February 16, 2022 (D.I. 3), a Second Amended Complaint on July 21, 2022 (D.I. 28) and a Third Amended Complaint on September 19, 2023 (D.I. 60).

2.      Discovery is complete and trial is scheduled for January 12, 2026.

3.      This is Plaintiffs' Motion *in Limine* to Exclude Trial Testimony from Mr. Carter.

## SUMMARY OF ARGUMENT

Mr. Carter's testimony should be excluded because it supplants the role of the jury. In his report and in his testimony, Mr. Carter acknowledges that his analysis consists entirely of applying his understanding of constitutional law to the underlying facts, ultimately concluding that the correctional officers' use of force was reasonable based on these constitutional standards. That is the precise role of the jury. "While (Federal Rule of Evidence) 704 allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 Fed. App'x 255, 258 (3d Cir. 2013) (citation omitted) (affirming the District Court's decision to exclude the testimony of an expert as to the reasonableness of police conduct).

Mr. Carter's testimony should also be excluded because he either misapplies or confuses the standards he purportedly applies. Specifically, Mr. Carter both miscomprehends applicable DOC policies and misapplies national standards. The United States Supreme Court has held that Rule 702 of the Federal Rules of Evidence imposes "a special obligation" on the trial court to ensure that all expert testimony is not only relevant but reliable. *See, Kumho Tire Co., Ltd., v. Carmichael*, *supra*. Mr. Carter's opinions lack any indicia of reliability.

In addition, Mr. Carter's opinions are based almost entirely upon a review of videos and his acceptance of the officers' account of events. There is nothing about these opinions that assist the jury and the opinions amount to nothing more than Mr. Carter substituting his determination for that of the jury. Mr. Carter offers the legal conclusion that the applicable standard is whether

4

the officers' conduct was reasonable under the circumstances and then renders his verdict on that issue. His subjective conclusion regarding the reasonableness of the officer's conduct is an inadmissible usurpation of the jury's role. *Patrick v. Moorman*, 536 Fed. App'x 255, 258 (3d Cir. 2013) (affirming District Court's decision to exclude the testimony of an expert as to the reasonableness of police conduct).

Finally, Mr. Carter should be precluded from testifying outside of his expertise. Although he holds himself out as an expert in virtually all fields even tangentially related to corrections (including withdrawal symptoms in offenders, prison rape-elimination and how to transport prisoners), he acknowledges a lack of expertise in use of force de-escalation techniques, the very issue at the heart of this litigation.

**STATEMENT OF FACTS**

1.     This case involves allegations of serial assaults upon defenseless incarcerated persons at SCI, many of which were captured by video, as part of a systemic culture at SCI where excessive force was both tolerated and condoned. (D.I. 60).

2.     On August 16, 2024, Plaintiffs served their opening expert reports, which included:

    a.  A report from use of force and corrections expert Jeffrey Sinclair ("the Sinclair Report") (A copy of the Sinclair Report is attached as Exhibit "B"); and

    b.  A report from an expert in investigation technique, methods and practices, Keith Rohman ("the Rohman Report"). (A copy of the Rohman Report is attached as Exhibit "C")

3.     Generally, Mr. Sinclair opined that the defendant correctional officers' use of force upon the plaintiffs was excessive and part of a systemic practice at SCI created and/or fostered by SCI's Warden and Deputy Warden.  (Ex. "B")

4.     Generally, Mr. Rohman opined that the DOC's investigation of the underlying incidents after this action was commenced was self-serving and deficient in many material respects. (Ex. "C")

5.     On January 22, 2025, Defendants served the expert report of Jeffrey S. Carter ("the Carter Report") purporting to be a response to both the Sinclair Report and the Rohman Report. (A copy of the Carter Report is attached as Exhibit "D")

6.     On February 28, 2025, Plaintiffs served reports from both Mr. Sinclair ("the Sinclair Rebuttal Report" a copy of which is attached as Exhibit "E") and Mr. Rohman ("the

Rohman Rebuttal Report" a copy of which is attached as Exhibit "F") rebutting the opinions expressed in the Carter Report.

7.      Mr. Carter's deposition was conducted on March 11, 2025.

**Mr. Carter's Qualifications**

8.      Mr. Carter's practical experience in law enforcement consists almost entirely of service at the Fayette County (Kentucky) Detention Center, where he worked from 1999 to 2018. (*See,* Mr. Carter's *curriculum vitae*, attached as Exhibit "G", p. 1) Although Mr. Carter cites the American Correctional Association ("ACA") and the National Commission for Correctional Health Care ("NCCHC") as the main correctional organizations for "best practices" (Ex. "D", p. 45), the Fayette County Detention Center is not accredited by either the ACA or the NCCHC.[1] For the past seven (7) years, Mr. Carter has worked through an entity called the Legal and Liability Risk Management Institute ("LLRMI"). (Ex. "A", pp. 34-21to 35-2)

9.      Through his association with LLRMI, Mr. Carter has held himself out as an expert in virtually everything related to corrections, including:

- Jail suicide;

- Sexual abuse in prison;

- Prison search and contraband recovery;

- Prison internal affairs investigations;

- Cell searches and shakedowns;

- Mental health awareness for correctional officers;

- How to conduct transports of prisoners; and

- Identifying intoxication and withdrawal among incarcerated persons. *Id*. at pp. 54-56.

10.     According to its Use of Force Policy, the touchstone of the Delaware Department of Correction's approach to the use of force upon incarcerated persons is the concept of "de-escalation.":

> The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available. If possible, *staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force.* (*See*, Policy 8.36, attached as Exhibit "H")

11.     However, notwithstanding his self-proclaimed expertise in the areas described above, Mr. Carter has acknowledged that he is not an expert in the concept of de-escalation as it pertains to correctional officers' use of force:

> MR. CARTER: Well, I think de-escalation is part of use of force training…
>
> Q. You just mentioned the term de-escalation techniques. What do you mean by that? What are some of those?
>
> A. There are all – I don't teach de-escalation techniques. We have folks that work with us that do. I don't teach those. (Ex. "A", p. 87-3 to 16)

**<u>Mr. Carter's Application of Legal Standards to Opine on the Ultimate Legal Conclusion</u>**

12.     In his report, Mr. Carter includes a "**Use of Force Methodology**" section which purports to describe his approach to his ensuing opinions. (Ex. "D", pp. 48-50.) In describing this "methodology" Mr. Carter expresses his understanding as to the standards applied by unidentified "courts". (Ex. "D", ¶¶41, 41 (p. 48))

13.     Specifically, Mr. Carter identifies the Eighth Amendment as the applicable standard in analyzing the use of force toward prisoners and the Fourth and Fourteenth Amendments as the applicable standard in analyzing the use of force toward pretrial detainees. *Id*. at ¶¶42, 44 (pp. 48-49)

14.     Mr. Carter then opines that courts apply an "objective reasonableness" standard under the Fourth and Fourteenth Amendments (for pretrial detainees) and a "deliberate indifference" standard under the Eighth Amendment (for sentenced prisoners). *Id*.

15.     During his deposition, Mr. Carter confirmed that his methodology in forming his opinions was the application of these constitutional standards to the correctional officers' conduct:

> Q.     So your opinions regarding excessive force in this case are applying the Eighth and Fourteenth Amendment to the officer's conduct?
>
> A.     They are taken into consideration with the Fourth, Fourteenth and Eighth, as all opinions should relating to uses of force. (Ex. "A", pp. 328-7 to 329-2)

16.     That is, Mr. Carter's opinions applied purely legal, i.e., constitutional, standards to reach an opinion on the ultimate legal conclusion to be reached by the jury.

**Mr. Carter's Misapplication of DOC Policies and Industry Standards**

17.     Mr. Carter acknowledges that correctional officers are required to use the lowest level of force on a "use-of-force continuum" to obtain compliance by the subject. (Ex. "A", p. 106-4 to 8) Here, the vast majority of underlying incidents involve the officers' deployment of OC spray to the subject's face. (D.I. 60). Consequently, Mr. Carter's opinions required an understanding of whether the use of OC spray to the subject's face (rather than manual or other control methods without resort to OC spray), was the lowest level of force on the continuum available to the officer.

9

18.     However, Mr. Carter not only failed to explain his methodology or reasoning in each case where he found OC spray to be appropriate (beyond the equivalent of "every case is different" and "it depends on the officer's perception") he did not even know whether manual control is higher or lower than OC spray on the Department of Corrections' ("DOC") use of force model.

19.     Specifically, in addressing this issue, the Carter Report interprets DOC policy as the deployment of OC spray being a <u>lower</u> level of force than manual control, stating "I conclude that intermediate weapons (i.e., OC spray) fall between verbal directives and soft control techniques. This means that OC spray can be the next choice after verbal direction fails". (Ex. "D", ¶94 (p. 63)) Therefore, according to Mr. Carter, it was consistent with DOC policy for the correctional officers to use OC spray before attempting manual control.

20.     However, during his deposition, while actually reviewing the DOC's Use of Force policy, Mr. Carter conceded that, according to the policy, the deployment of OC spray is actually a *higher,* more serious level of force than manual control, thereby undermining his opinion that the deployment of OC spray was the lowest level of force available to the officers:

Q.     Mr. Carter…would you agree that on the DOC's use of force continuum, "Control Modes without Weapons" (i.e., manual control) is lower on the use of force continuum in terms of less serious than "Control Modes with Weapons" (i.e., OC spray)?

A.     I would agree to that, yes. (Ex. "A", p. 99-10 to 16)

21.     This admission directly undermines Mr. Carter's opinion as expressed in his report that "OC spray can be the next choice after verbal direction fails."

22.     In the same way, Mr. Carter acknowledged that the standards promulgated by the National Commission on Correctional Health Care ("NCCHC") apply to the correctional officers.[2] However, perhaps understanding that the Defendants' conduct did not meet NCCHC standards, Mr. Carter proclaimed the NCCHC standards to be merely aspirational, representing a "best practices" approach and referring to them only as "recommended" and "ideal" but not "mandatory" or "required." (Ex. "D", at ¶¶29-31 (p. 45))

23.     However, District Court case law from within the Third Circuit has made clear that the NCCHC standards actually represent the *minimum* standards to which the correctional officers are held. *Ponzini v. Primecare Med, Inc.*, 269 F.Supp.3d 444 (M.D. Pa. 2017), affirmed in part, vacated in part by *Ponzini v. Monroe County*, 786 Fed. Appx. 313 (3d Cir. 2019) (NCCHC standards "set the minimum acceptable standard of care in a correctional environment").

24.     Finally, in addressing the adequacy of the investigation undertaken by the DOC following the filing of this action, Mr. Carter went to great lengths to defend the fact that it took the filing of this action to trigger an investigation. Specifically, Mr. Carter emphasized that, according to DOC policy, investigations are not triggered until the filing of a complaint, a practice that Mr. Carter exalted as industry standard. (Ex. "D", ¶¶54-59 (pp. 51-53))

25.     However, as explained in the Rohman Rebuttal Report, that is not actually the DOC policy. In fact, according to DOC policy, all uses of force are subject to review and investigation and need not await the filing of a complaint. (Ex. "F", pp. 2-4)

## LEGAL ARGUMENT

A. **Legal Standard**

The United States Supreme Court has held that Rule 702 of the Federal Rules of Evidence imposes "a special obligation" on the trial court to ensure that all expert testimony is not only relevant but reliable. *See Kumho Tire Co., Ltd., supra.* In the Third Circuit, the trial court's role as a "gatekeeper" requires that the party putting forth the expert prove that: (1) the proffered witness is qualified as an expert in the field in which he testifies; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-42 (3d Cir. 1994) (discussing the requirements of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579-93 (1993)). "[A]t a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . ." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998).

Under Rule 702, an expert witness may offer opinion testimony if "(a) the expert's... knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Reliability requires the trial court to determine whether an expert witness' testimony is based upon a reliable methodology, rather than subjective belief or unsupported speculation. *See Kumho Tire*, 526 U.S. at 150-52. In particular, a court should consider the following eight factors in determining reliability:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli*, 35 F.3d at 742 n.8.

12

**B.  Mr. Carter's Opinions Impermissibly Supplant the Role of the Jury**

Mr. Carter makes no secret of his methodology, boldly highlighting it as a "Use of Force Methodology" section in his report. (Ex. "D", p. 48) That methodology, however, renders his opinions inadmissible as a matter of law.

As he unabashedly makes clear in both his report and his deposition testimony, Mr. Carter's methodology is to apply his understanding of Fourth, Eighth and Fourteenth Amendment standards to his understanding of the facts and then render a subjective opinion regarding whether the officers used excessive force under these constitutional standards. In other words, Mr. Carter's opinions play the exact same role as the jury will in this case. Well-established law requires preclusion of this testimony.

"It is the province of a judge – not an expert witness – to instruct a jury about governing law." *Wood v. Showers*, 822 Fed. App'x 122 (3d Cir. 2020), citing *Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (explaining that "the District Court must ensure that an expert does not testify as to the governing law of the case ... because it would usurp the District Court's pivotal role in explaining the law to the jury"); *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991) (explaining that "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury").

The Third Circuit applied these principles to a proffered use of force expert in *Patrick v. Moorman,* 536 Fed. App'x 255. In *Patrick*, an expert was retained to offer his opinion that the police action at issue was unreasonable and to explain what a reasonable officer would have done under the circumstances. *Id*. at 258. Noting the "district court's 'pivotal role in explaining the law to the jury", the Third Circuit held that the exclusion of the testimony by the trial court was

13

appropriate since "in a §1983 suit, 'reasonableness is practically interchangeable with 'excessiveness'". *Id.*

Here, Mr. Carter explicitly outlines his understanding of Fourth, Eighth and Fourteenth Amendment case law on excessive force and then uses that understanding as the methodology supporting his opinions. (Ex. "D", ¶¶41-44). Specifically, Mr. Carter identifies the Eighth Amendment as the applicable standard in analyzing the use of force toward prisoners and the Fourth and Fourteenth Amendments as the applicable standard in analyzing the use of force toward pretrial detainees. Mr. Carter then opines that courts apply an "objective reasonableness" standard under the Fourth and Fourteenth Amendments (for pretrial detainees) and a "deliberate indifference" standard under the Eighth Amendment (for sentenced prisoners).

This is the precise approach, *i.e.*, explaining what the law is and then rendering an opinion on whether the officer complied with that law, that courts refuse to allow. *See Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (explaining that "the District Court must ensure that an expert does not testify as to the governing law of the case ... because it would usurp the District Court's pivotal role in explaining the law to the jury").

Indeed, given the chance to recant his impermissible interpretation and application of constitutional standards to his opinions, Mr. Carter instead doubled down:

> Q.    Wouldn't you agree that an opinion as to whether or not a particular incident violates the Eighth Amendment is a legal conclusion?...
>
> A.    No, sir…
>
> Q.    So your opinions regarding excessive force in this case are applying the Eighth and Fourteenth Amendment to the officer's conduct?
>
> A.    They are taken into consideration with the Fourth, Fourteenth and Eighth, as all opinions should relating to uses of force. ( Ex. "A", pp. 328-7 to 329-2)

14

Here, at trial, the court will explain the law to the jury and the jury will decide based on that law whether the correctional officers' conduct was reasonable or excessive. For Mr. Carter to assume the role of both the court (in explaining the standards under the constitution) and the jury (in deciding whether the correctional officers' conduct was reasonable) is impermissible under well-established law.

### C.  Mr. Carter Misconstrues or Misapplies National Standards and DOC Policy

Where a proffered expert relies upon or references industry or government standards, that expert must "describe those organizations, the process by which they developed their standards, or the general acceptance of those standards" as an element of establishing the reliability of those standards. *Wood v. Showers, supra*, at 124. Here, Mr. Carter's opinions are largely based on vague references to his "training and experience". Where he does refer to standards beyond the United States Constitution (see, Section A., *supra*), he either misconstrues or misapplies them.

As an initial matter, although Mr. Carter cites the NCCHC standards as a "resource" for "best practices" for correctional officers, he blithely discounts any requirement that correctional officers adhere to them inasmuch as, according to Mr. Carter, these standards are "ideal" and recommended" and opposed to required or mandatory. (Ex. "D", at ¶¶29-31 (p. 45)) Mr. Carter acknowledges that his opinion on this issue is disputed in the industry ("Many corrections experts like to refer to these standards as if they are mandatory, but this approach is misleading and inaccurate."). (Ex. "D", ¶30 (p. 45)) This alone is an admission that Mr. Carter's opinion is not "generally accepted" in the corrections community.

In fact, the NCCHC standards are not only required standards for correctional officers, but the United States District Court for the Middle District of Pennsylvania has identified them as

15

"the *minimum* acceptable standard of care in a correctional environment". *Ponzini v. Primecare Med, Inc., supra.*

Even when confronted with this fact, Mr. Carter stood firm in his opposition to both the industry and the court:

> Q.    Then the Court refers to the NCCHC standards as "…which set the minimum acceptable standard of care in a correctional environment." Is that wrong?
>
> A.    I find that wrong, yes. They have determined that in the Third Circuit, but that's not across America…(Ex. "A", p. 174-16 to 21)

Again, Mr. Carter acknowledges that his opinion is not "generally accepted", either by the industry or by courts in the Third Circuit.

In the same way, Mr. Carter's opinions flip-flop on the critical issue of whether DOC policy permits correctional officers to use OC spray before attempting manual control of a subject on the DOC's use of force continuum. In his report, Mr. Carter explained that, according to his understanding of the policy, OC spray was a lower level of force than manual control and therefore permitted before attempting manual control. ( Ex. "D", ¶94 (p. 63))

However, during his deposition, while actually reviewing the DOC's Use of Force policy, Mr. Carter conceded that, according to the policy, the deployment of OC spray is actually a *higher, more serious* level of force than manual control, thereby undermining his opinion that the deployment of OC spray was the lowest level of force available to the officers:

> Q.    Mr. Carter…would you agree that on the DOC's use of force continuum, "Control Modes without Weapons" (i.e., manual control) is lower on the use of force continuum in terms of less serious than "Control Modes with Weapons" (i.e., OC spray)?
>
> A.    I would agree to that, yes. (Ex. "A", p. 99-10 to 16)

16

This admission directly undermines Mr. Carter's opinion as expressed in his report that "OC spray can be the next choice after verbal direction fails." (Ex. "D", ¶94 (p. 63))

In addition, Mr. Carter's opinions reflect an inaccurate understanding of DOC policy concerning when investigations of use of force incidents are required to commence

These misunderstandings and misapplications of standards and policies remove any indicia of reliability from Mr. Carter's opinions.

D. **Mr. Carter's Opinions Are Outside the Scope of His Expertise And Do Not Assist the Jury**

Despite his self-proclaimed expertise in virtually all areas touching upon correctional facilities (ranging from jail suicide to rape-elimination to transport of prisoners), Mr. Carter acknowledges that "de-escalation techniques" is an area where he relies upon the expertise of others:

MR. CARTER: Well, I think de-escalation is part of use of force training…

Q.      You just mentioned the term de-escalation techniques. What do you mean by that? What are some of those?

A.      There are all – I don't teach de-escalation techniques. We have folks that work with us that do. I don't teach those. ( Ex. "A", p. 87-3 to 16)

De-escalation techniques are at the very heart of this case inasmuch as it is undisputed that correctional officers are required to use the lowest level of force necessary to obtain compliance and the DOC policy requires the correctional officers to employ de-escalation techniques. (*See*, Ex. "H"). In short, the DOC's Use of Force continuum cannot be understood without a corresponding understanding of the principles and techniques of de-escalation. Federal Rule of Evidence 702 requires that an expert witness be "qualified as an expert by knowledge, skill, experience, training, or education." Mr. Carter cannot testify about the central issue of correctional

17

officers' de-escalation obligations in the absence of expert qualifications on the issue, which he admittedly lacks.

Finally, a review of Mr. Carter's report and opinions with respect to the specific incidents at issue make clear that Mr. Carter simply reviewed videos of the underlying incidents along with the correctional officers' reports and, drawing inferences in favor of the officers, concluded that their actions were reasonable under the circumstances. Those conclusions are within the exclusive province of the jury, who will be ultimately asked to determine whether the correctional officers acted as reasonable officers would under the presented circumstances.

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that this Honorable Court hold that Mr. Carter does not qualify as an expert under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579-93 (1993) and exclude his testimony and written reports from the record in this case.

**WHITEFORD, TAYLOR & PRESTON LLC**

*/s/ Daniel A. Griffith*
Daniel A. Griffith, Esquire (#4209)
600 N. King Street, Suite 300
Wilmington, DE 19801
P:  302-357-3254
F:  302-357-3274
dgriffith@whitefordlaw.com

*Attorneys for Plaintiffs*

18

## CERTIFICATE OF SERVICE

I, Daniel A. Griffith, Esquire hereby certify that on this 30th day of May, 2025, the attached Sealed Opening Brief in Support of Motion to Exclude Testimony of Jeffrey S. Carter was served upon all counsel of record via Electronic Mail.


/s/ Daniel A. Griffith
Daniel A. Griffith, Esquire (#4209)