# JA_01704-JA_01994

# PUBLIC VERSION

**EXPERT REPORT OF RYAN QUIRK, PH.D, JUSTICE & LIBERTY GROUP, LLC**

I, Ryan Quirk, Ph.D., declare as follows:

## I.    QUALIFICATIONS

I am a Clinical Psychologist licensed in the state of Washington. I am currently the Interim Director of Behavioral Health for the Washington State Department of Corrections (WADOC). I have held that position since June 1, 2024.

I have over 14 years of experience working in correctional settings (both prison and jail) as a psychologist. I have both consulted on and developed mental health treatment plans for incarcerated individuals. In my previous positions, I have provided direct mental health care to incarcerated individuals in both jails and prisons, in addition to fulfilling administrative responsibilities. I have conducted hundreds of mental health related screenings and assessments.

I have both reviewed and written correctional mental health policies and procedures, and protocols for correctional mental health and social services. I have also published and presented on topics pertaining to correctional mental health care, Restrictive Housing, self-harm/suicide, individualized behavior management plans, and correctional classification.

I have served as an expert on the subjects of Restrictive Housing, mental health treatment, as well as suicide prevention and intervention in incarcerated settings. I have reviewed and developed training materials, as well as provided technical assistance to national correctional agencies.

A copy of my current curriculum vitae, which includes a list of publications authored, previous expert experience, and positions held, is attached to this report.

Plaintiff's counsel retained me as an expert to review documents pertaining to the case of Davis, et al., v. Neal, et al., Case No. 1:21-cv-01773-GBW, conduct mental health assessments of plaintiffs, and to provide a report concerning my opinions as an expert. I followed the typical methodology I use in my practice as a psychologist in reviewing all available materials and applying my education and experience to my analysis of the mental health concerns relevant to this matter.

## II.    COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY

My rate of compensation for this case is $300 per hour for records/document reviews and for report writing. My rate of compensation for any deposition or testimony that may take place is $350 per hour.

### III.    FACTS AND INFORMATION RELIED UPON IN FORMING OPINIONS

Below is the list of the documents I have relied upon developing the opinions I express in this report:

#### Delaware Department of Corrections Documents and Materials:

- Bill Davis Assault Photos

- Delaware.gov. "Sussex Correctional Institution"- https://doc.delaware.gov/views/about.blade.shtml & "About Department of Corrections"- https://doc.delaware.gov/views/sussexci.blade.shtml

- Memorandum. Allegation, Excessive Use of Force. Chris J. Morales SBI# 00960606. Sergeant Kirk J. Neal. 03/24/2022.

- Memorandum. Alleged Assault of Inmate Charles Turner, SBI# 00187612. Lt. Brett Hamstead et al. 04/08/2022.

- Memorandum. Alleged Assault of Inmate Danny Harding, SBI# 00566738. Lieutenant Gregory Callaway et al. 11/07/2022.

- Memorandum. Alleged Assault of Inmate Kyle Bullock SBI# 00655438. Staff Lieutenant Allen Adams et al. 10/31/2022.

- Memorandum. Alleged Assault of Inmate Jimmie Moore, SBI# 00341984. Sergeant Tanner Russell, Corporal Tyson Jefferson, Corporal Kameron Spencer, and Correctional Officer Jenkins. 01/24/2023.

- Memorandum. Alleged Assault of Inmate Luke Erixson, SBI# 00572491". Sergeant Kirk Neal. 04/11/2022.

- Memorandum. Alleged Assault of Inmate William Davis, SBI# 00301806. Lieutenant Frank Outten et al. 04/19/2022.

2

JA_01705

- Memorandum. Alleged Unprovoked Violence. Bradley M. Zahner, SBI# 00595661. 01/17/2023.

- Memorandum. Alleged Unprovoked Violence. Charles G. Robinson, SBI# 00907480. 11/17/2022.

- Memorandum. Alleged Unprovoked Violence. Donald R. White, SBI# 00722672. 01/27/2023.

- Memorandum. Excessive Use of Force Against Inmate Aaron Givens, SBI# 00672382. Sergeant Kirk Neal. 08/17/2022.

- Memorandum. Excessive Use of Force. Timothy W. Newcomb, SBI# 00326888. Correctional Officer Isaac S. Mitchel et al. 06/21/2022.

- Memorandum. Use of Force: Lack of Adequate Medical Evaluation and Treatment. Donbray Durham, SBI#00971754. Corporal Hunter Simpson. 07/05/2022.

- Policy 1.1: Mission of the Department.

- Policy 5.1: Offender Rights.

- Policy 5.2: Rules for the Treatment of Offenders.

- Policy 16.1: Employee Development.

- Policy A-01: Access to Care.

- Policy A-10: Grievance Process Policy C-04: Health Training for Correctional Officers.

- Policy E-02: Intake Screening.

- Policy E-04 Initial Health Assessment.

- Policy E-05: Mental Health Screening and Evaluation.

- Policy F-03: Mental Health Services.

- Policy F-04: Medically Assisted Withdrawal and Treatment.

- Policy G-01: Restraints.

- Policy G-02: Segregated Offenders.

- Policy 8.30: Use of Force

- SCI Use of Force Review- Sgt. J. Mears (09/19/2022). Case: 22-06-03. Bennett, Jason (00598961).

- Videos 003-006: Bullock, 06/13/2020

- Videos 042-054: Davis, 10/18/2021

- Videos 055-060: Durham, 10/29/2021

- Videos 063-069: Erixson, 02.06.2020

- Videos 100-112: Givens, 05/25/2021

- Videos 213-214: Moore, no date

- Videos 215-242: Morales, 08/21/2021

- Videos 272-299: Robinson, 11/02/2021

- Videos 321-334: Turner, 02/24/2021

- Videos 335-348: Zahner, 05/03/2021

- Videos 366-375: Bennett, 02/13/2022

- Videos 377-390: Newcomb, 12/06/2021

- Videos 393-407: Harding, 02/17/2022

<u>Additional Documents and Resources</u>:

- American Correctional Association (ACA). Using Force with Inmates. https://www.aca.org/ACA_Member/ACA/ACA_Member/Marketplace/It

4

JA_01707

em_Detail.aspx?iProductCode=EL-USINGFORCE&Category=E-LEARNING

- Diagnostic and Statistical Manual of Mental Disorders (5th Ed., text revision; 2022). *American Psychiatric Association (APA).*

- National Commission on Correctional Health Care (NCCHC) (2016). Position Statement: Solitary Confinement (Isolation).

- National Commission on Correctional Health Care (NCCHC) (2018). Standards for Health Services in Prisons.

- U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing: Full Report, Report Summary, and Guiding Principles (2016).

- Using the PTSD Checklist for DSM-5 (PCL-5). National Center for Posttraumatic Stress Disorder (PTSD).

## IV.    REASONABLE PSYCHOLOGICAL CERTAINTY

The following opinions are expressed to a reasonable degree of psychological certainty, based on my training, experience and knowledge that is generally accepted within the psychological community. It is a clinical and scientific opinion, but not a legal opinion and it is intended to assist the trier of fact. If additional facts, documents, or other data become available to me, I reserve the right to review the new information and modify or supplement my opinions, if necessary.

## V.    NOTIFICATION AND AGREEMENT TO PARTICIPATE

Plaintiffs' counsel provided this writer with the names and contact information of plaintiffs to be assessed. Further, plaintiffs' counsel assisted this writer in scheduling appointments to assess plaintiffs who were formerly incarcerated in Sussex Correctional Institution (SCI)- Georgetown and were living in the community at the time of the assessment. All assessments took place via video

5

format, unless otherwise indicated (for example, some assessments took place via telephone due to an individual's lack of access to digital technology).

At the beginning of all assessments, this writer explained that I had been retained by plaintiffs' counsel to provide an assessment of their psychological functioning and to gather information about their potential mental health history. This writer explained the purpose of assessment, and the non-confidential nature of our encounter and resulting report that would be provided to plaintiffs' counsel.

This writer explained that my role was that of an evaluator, and not a treatment provider. This writer informed all plaintiffs that I had been provided with documents and media pertaining to this case. This writer informed plaintiffs that their participation in the assessment was voluntary, and that they could decline to answer questions or terminate the interview at any time. All plaintiffs who were assessed responded that they understood and verbally agreed to participate in the assessment.

## VI.   DATA AND FINDINGS ON WHICH OPINIONS ARE BASED

I have formed the following opinions in this case at this time, with reasonable psychological certainty. In doing so, I have relied on my training and experience in general, clinical, forensic, and correctional psychology.

## VII.  EVALUATION PROCESS AND SOURCES OF INFORMATION

This writer's assessment of an individual's psychological functioning is a process that integrates clinical, historical, and other information from multiple data sources. This process includes a comprehensive review of available medical records and other relevant records, as well as any existing and available past evaluations and records from previous or outside providers. When possible, this writer also reviewed available media, such as photographs and videos. If any information in this report is found to be incorrect and/or if additional information becomes available, it may be corrected in subsequent reports or, if necessary, an addendum may be written.

For the purposes of assessing an individual's psychological functioning, this writer utilized the following protocol with all plaintiffs: Psychiatric History (prior to the use of force incident), Psychiatric History (after the use of force incident), administration of the PTSD Checklist for DSM-5 (PCL-5), current mental status and associated behavioral observations, the individual's description of use of

6

JA_01709

force incident, the individual's perceived harm resulting from the use of force incident, any subsequent interventions that alleviated the perceived harm, and review of available collateral information.

**Relevant Background Information:**

Delaware Department of Corrections:
According to their official website, the Sussex Correctional Institution (SCI), which is located in Georgetown, Delaware, was opened in 1931. It is considered one of Delaware's oldest facilities, incarcerates men only, and has minimum, medium and maximum security levels. The total capacity of the institution was listed as "1206", following an expansion project that was completed in April 2000. It is the understanding of this writer that the majority of the use of force incidents that are described below took place in the pre-trial section of SCI. The state of Delaware utilizes a unified correctional system, meaning that the Delaware Department of Correction manages incarcerated individuals from pre-trial detention (jail) through prison and community supervision. On their website, the Delaware Department of Corrections includes the following as their mission: "To protect the public by supervising adult offenders through safe and humane services, programs and facilities", and lists the following as their values: "Integrity", "Courage", "Accountability", "Respect", and "Diversity" (I-CARD).

Diagnostic and Statistical Manual of Mental Disorders- Fifth Edition- Text Revision (DSM-5-TR):
The following is the current diagnostic criteria for Posttraumatic Stress Disorder (F43.10) in individuals older than 6 years of age:

"A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:
1. Directly experiencing the traumatic event(s).
2. Witnessing, in person, the event(s) as it occurred to others.
3. Learning that the traumatic event(s) occurred to a close family member or friend, the event(s) must have been violent or accidental.
4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s)…

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event occurred:
1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).

7

JA_01710

2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).
3. Dissociative reactions (e.g., flashbacks in which the individual feels or acts as if the traumatic event(s) were recurring…
4. Intense or prolonged psychological distress at exposure to the internal or external cues that symbolize or resemble an aspect of the traumatic event(s).
5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:
1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).
2. Avoidance of or efforts to avoid external reminders…

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more of the following:
1. Inability to remember an important aspect of the traumatic event(s)…
2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world…
3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.
4. Persistent negative emotional state…
5. Markedly diminished interest or participation in significant activities.
6. Feelings of detachment or estrangement from others.
7. Persistent inability to experience positive emotions…

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:
1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects.
2. Reckless or self-destructive behavior.
3. Hypervigilance.
4. Exaggerated startle response.
5. Problems with concentration.
6. Sleep disturbance…

8

F. Duration of the disturbance (Criteria B, C, D, and E) is more than 1 month.

G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition" (pgs. 301-303).

PTSD Checklist for DSM-5 (PCL-5):
The PCL-5 is a 20-item self-report measure that assesses both the presence and severity of PTSD symptoms (corresponding with DSM-5 criteria). The scores can range from 0-80. When considering a diagnosis of PTSD, this writer also utilized clinical interviewing skills and the above-described structured protocol to determine a diagnosis. This writer provided each participant with a description of this measure and instructions regarding the response choices (0- "Not at all", 1- "A little bit", 2- "Moderately", 3- "Quite a bit", and 4- "Extremely"). This writer then administered it by reading each item aloud and the participant providing their response (which was recorded by this writer). The questions pertain to symptoms that may be present within the past month. In terms of scoring this measure, a user's guide (National Center for PTSD), included the following, "Initial research suggests that a PCL-5 cutoff score between 31-33 is indicative of probable PTSD across samples..." (p. 1) and "Treating each item rated as 2 = "Moderately" or higher as a symptom endorsed, then following the DSM-5 diagnostic rule which requires at least: 1 Criterion B item (questions 1-5), 1 Criterion C item (questions 6-7), 2 Criterion D items (questions 8-14), 2 Criterion E items (questions 15-20)..." (p. 2).

**Individual Assessments:**
Name:



9



JA_01713



11



JA_01715



13



14

JA_01717



15

JA_01718



JA_01719



17

JA_01720



18



**Name: Bullock, Kyle Bullock**
Date/Time of Assessment: 06/29/2024- 02:00pm (EST)
Duration: approximately 60 minutes
Note: The current assessment took place via computer, but Mr. Bullock reported that the camera function did not work. Therefore, there was no visual aspect to the assessment.

-Psychiatric History (Prior to the incident):
Mr. Bullock denied a history of mental health treatment, to include Psychiatric medications and hospitalization, prior to the use of force incident. Mr. Bullock said that he was "untreated".

-Psychiatric History (After the incident):
Mr. Bullock reported that on the night of the use of force incident at SCI, bail was paid and he reportedly had to wait five days until he was released. Mr. Bullock reported that three days following his release he was transported for "observation" to a "mental health hospital" due to "concerns about my well-being". In response to follow-up questions, Mr. Bullock said, "I was in solitary confinement for five days and was then released on to the street. I was trying to somehow figure out what to do with my life." He reported that his mother had called the police, which then led to being psychiatrically hospitalized. Mr. Bullock reported that he was "voluntarily" hospitalized on a "locked ward" in June of 2020. In terms of treatment, Mr. Bullock reported that he had been prescribed Zyprexa and did not receive any counseling.

This writer asked Mr. Bullock about his report of his mother calling the police. In response, Mr. Bullock reported, "I was very concerned about way things were being handled locally." Mr. Bullock reported that at that time he had been "Very verbal" and "Highly emotional". This writer continued to ask for more details and Mr. Bullock reported that he had been upset by, "the way that law enforcement was treating protestors" and reported that he had "witnessed excessive force" from the police. This writer asked Mr. Bullock if his reaction had been heightened due to his use of force incident and Mr. Bullock denied any connection.

19

In total, Mr. Bullock reported four psychiatric hospitalizations following the use of force incident. Mr. Bullock reported that approximately 18 months following the incident (approximately February of 2022) he was found "unfit for court", ordered for competency restoration, was booked temporarily into SCI again, and later transferred to the "state mental hospital". Mr. Bullock reported that the competency restoration process lasted 110 days. Following the 110 days, Mr. Bullock was found competent, pled guilty, and received 1 year of probation and community-based mental health treatment.

-PTSD Checklist for DSM-5 (PCL-5): 22 (out of 80)

Current Mental Status and Behavioral Observations-
Current Diagnoses (per Mr. Bullock): "acute psychosis". Mr. Bullock reported previously receiving a diagnosis of schizoaffective disorder. Mr. Bullock added that he did not agree with the diagnosis, "I believe that I'm neurodivergent. I believe it's a gift".
Current Psychotropic Medications: None
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: no visual; not able to assess.
Alertness: Alert and engaged.
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: no visual; not able to assess.
Behavior: Mr. Bullock presented as guarded and suspicious. At one point, Mr. Bullock commented, "I don't understand the purpose of this".
Speech: clear, coherent, somewhat monotone, and soft.
Attention: Mr. Bullock presented as attentive and was not distracted easily.

Mental Status-
Perception: Mr. Bullock denied experiencing auditory or visual hallucinations; unremarkable.
Affect: no visual; unable to assess.
Mood: Mr. Bullock reported that his mood was euthymic; denied the presence of either depressed or elevated mood.

Thoughts-
Harm to Self and/or Others: Mr. Bullock denied experiencing ideation or intent to harm himself and/or others, at this time.

20

JA_01723

Delusions: In response to this writer's questions in this area, Mr. Bullock responded, "I think outside of the box and my opinions are extreme." This writer asked Mr. Bullock for examples, and he said, "I had conflict with my mother in the past four years due to the way I believe the world functions. I believe that we are being very closely monitored by systems that we don't understand; that are subtle and we don't see. She believes that it is a paranoid delusion." Mr. Bullock went on to describe his mother as "archaic" and a believer in maintaining the "status quo". This writer asked Mr. Bullock about his camera function not being activated during the assessment, specifically asking if his camera was intentionally turned off. Mr. Bullock responded that his camera was not working and demonstrated his attempts to get it to work. Mr. Bullock then shared his belief that his camera may have been "shadow banned" and said, "There are people that know the inner workings" of technology.

Sleep: Mr. Bullock denied experiencing any sleep disturbances.

-Description of the incident:
Mr. Bullock reported that late in the evening on either June 12th or 13th of 2020, he had been booked into the pre-trial area of SCI. While in the intake area, Mr. Bullock said that he had asked Corrections Officers for water so that he could wash his hands. Mr. Bullock said that he was informed that he could not wash his hands and was directed to "stand on the X" on the floor. Mr. Bullock said that the Corrections Officers asked him questions (which he said he could not recall) and described the Officers as becoming "upset". Mr. Bullock said, "I don't think I was being uncooperative." Mr. Bullock said that he felt "scared for my life" and "panicked" when a "guy behind the desk" (Mr. Bullock did not know the Officer's name) became "upset" and sprayed OC in Mr. Bullock's face. Mr. Bullock said that the same officer then punched him in the face, punched him in the back of the head once Mr. Bullock was on the ground, and then tightly applied handcuffs.

Mr. Bullock reported that he was taken to Segregation housing and washed himself in the cell. He reported that he was otherwise not provided with the means to decontaminate following the use of force. Mr. Bullock said that he received a "piece of paper" indicating that "there was an incident". Mr. Bullock reported, "I was placed in solitary" and believes he was the only individual housed in that location at the time.

-Perceived harm after the event:
Mr. Bullock reported that the use of force had been the "consequence for a series of events". This writer attempted to obtain more detail regarding this statement, but

21

Mr. Bullock did not provide more information in response. Mr. Bullock did, however, report that all of his psychiatric hospitalizations took place following the use of force incident.

-Subsequent interventions that alleviated the perceived harm:
Mr. Bullock reported that he did not specifically seek any mental health or medical treatment in response to the use of force incident. However, as described above, Mr. Bullock was psychiatrically hospitalized four times following the incident. Mr. Bullock reported that he "actively works on relaxation techniques to find an inner peace." Mr. Bullock reported that over the course of the past month he had been "doing well". Mr. Bullock reported, "I've been working very hard to get out of the deep hole I was in while I was incarcerated. The whole process was a very dark and difficult time for me." Mr. Bullock said that he has made, "Great strides in therapy. I work so hard at it. I'm clean and sober, and focused on my health." Mr. Bullock went on to report, "I've outlived fear." In terms of mental health treatment, Mr. Bullock said that he meets with a "therapist" "once every other week" and has a goal to progress to meeting "once a month" with a mental health professional.

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Alleged Assault of Inmate Kyle Bullock SBI# 00655438" dated 10/31/2022. In the report, Sgt. Keen reported that when Mr. Bullock "…came into the receiving (area) he was argumentative with the police" (p. 4). Sgt. Keen also reported, "…Inmate Bullock refused to answer most of the questions or gave vulgar answers to us." Most notably the report contained the following, also on p. 4: "C/O McMahon gave him multiple orders to go over to the shower, but Inmate Bullock just stood there. At that point C/O McMahon sprayed him with Saber red and takes him to the ground. We were trying to secure him with handcuffs." In addition, this writer reviewed Videos 003-006. Video 006 demonstrates what is described by C/O McMahon. Mr. Bullock is shown no moving and an officer is speaking with him (there is no audio). An Officer appears to motion for Mr. Bullock to enter the shower area. Mr. Bullock does not appear either agitated or hostile; there are no pre-attack indicators evident (Mr. Bullock actually has his arms folded across his chest). At the 0:06:17 mark of the video, Mr. Bullock is sprayed with OC and then taken to the ground. The Memorandum concluded that "the allegation is unfounded" (p. 30), and acknowledged that OC spray had been disseminated, but did not review whether that had been necessary. Instead, the focus was on their review that indicated that "no punches were thrown" and that an officer used a "leg sweep".

22

JA_01725

-Summary:

Regarding the current case, Mr. Bullock said, "There is an aspect where I could walk away from it". However, he said that he remains involved in the case because, "This is about the long road to reform that I think is necessary. They failed in their responsibility to do their job. There's a line; serving the community and excessive force. I don't blame the person; I think these were systematic failings. They probably still believe what they did was right."

Mr. Bullock reported that the use of force incident was "difficult to talk about" during the current assessment and he had felt "stress" in anticipation of our meeting. Mr. Bullock reported that he was reminded of his past incarceration since the 4-year anniversary (summer of 2020) of the past Presidential election was coming and that he was noticing many "online reminders".

In the clinical opinion of this writer, Mr. Bullock evidences multiple symptoms of PTSD, but does not currently meet full DSM-5-TR criteria for PTSD. Mr. Bullock also did not have an elevated PCL-5 total score. More specifically, Mr. Bullock did not describe, nor did this writer detect the presence of, symptoms included in Criterion E ("Marked alterations in arousal and reactivity…), other than experiencing hypervigilance. However, Mr. Bullock did directly experience a traumatic event that took place approximately four years ago [Criterion F] and had been "scared for my life" during the incident [Criterion A], and described experiencing elevated symptoms of repeated, disturbing, and unwanted memories of the incident [Criterion B]. He also reported avoidance of both memories, thoughts, and feelings related to the incident, as well as external reminders of the incident [Criterion C]. In terms of Criterion D, Mr. Bullock endorsed difficulty in remembering important parts of the incident, having strong negative beliefs about himself, and feeling estranged from others. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Givens [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

However, it is also my clinical opinion that Mr. Bullock was generally underreporting symptoms of serious mental illness, specifically the experience of a psychotic disorder. As described above, during the current assessment a question about the camera on his computer appeared to elicit paranoid (conspiratorial) ideation from Mr. Bullock. Mr. Bullock also endorsed a significant interest in politics, citing the most recent Presidential election, specifically. Since Mr.

23

Bullock was psychiatrically hospitalized and found not competent to stand trial within approximately five days of the use of force incident in SCI, it is the opinion of this writer that it is probable that Mr. Bullock was experiencing difficulty with reality testing and could have had impairment in his ability to follow directions, track a conversation, and understand a situation overall, at the time of the use of force incident. In my clinical opinion, there is therefore evidence, that the SCI Corrections Officers involved in Mr. Bullock's use of force failed to detect this significant impairment and adjust their approach to an individual who was suffering from a serious mental illness and would, therefore, have significant difficulty following directions. There is no evidence that SCI Corrections Officers took into account Mr. Bullock's impairment, and they did not respond with sensitivity and understanding and/or attempt any less intrusive methods of engagement.

**Name: Davis, Bill**
Date/Time of Assessment: 06/29/2024- 03:00pm (EST)
Duration: approximately 60 minutes
Note: The current assessment took place via telephone, but video capabilities were utilized.

-Psychiatric History (Prior to the incident):
Mr. Davis reported that prior to the use of force incident he had what he described as, "a clean bill of health". Mr. Davis denied any history of mental health treatment, including Psychiatric medications or hospitalization.

-Psychiatric History (After the incident):
Mr. Davis reported that following the use of force incident, "It took a while for it to kick in, to figure out that something is wrong with me. I have issues. I have isolated myself to the house. I lose track of what I'm talking about. It seems to be getting worse. I'll be driving a car and have no idea where I'm at." Mr. Davis reported that he sometimes sees "streaks" and "shadows" in his peripheral vision.

-PTSD Checklist for DSM-5 (PCL-5): 51 (out of 80)

Current Mental Status and Behavioral Observations-
Current Diagnoses (per Mr. Davis): none
Current Psychotropic Medications: none
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-

24

JA_01727

Appearance: Mr. Davis presented as consistent with stated age, wearing seasonally appropriate clothing, and was unshaven.

Alertness: Alert.

Orientation: Oriented x 3 (person, place, time, and situation). Mr. Davis provided the correct month and year, but not the correct day.

Eye Contact: appropriate

Behavior: Mr. Davis presented as restless; this writer observed Mr. Davis constantly move throughout his home, then outside, and later smoked a cigarette during the assessment.

Speech: increased rate and loud volume.

Attention: focused

Mental Status-

Perception: As mentioned above, Mr. Davis described experiencing seeing the following in his peripheral vison: "shadows", "streaks" and "like I see rats". Mr. Davis also reported, "I hear some things. Not sure. Maybe it's voices carrying?"

Affect: full range of emotional expression present.

Mood: Mr. Davis reported, "I try to be happy go lucky. I'm a good time dude". Mr. Davis also reported frequently feeling "anger" when remembering the use of force incident.

Thoughts-

-Harm to Self and/or Others: not present.

-Delusions: not present.

Sleep: Mr. Davis described experiencing "sometimes 2-3 days without sleeping" and he reported that due to "the anger" he only sleep "5-6 hours in a week".

-Description of the incident:

Mr. Davis reported that he had experienced "One, long incident" that took place on October 18, 2021, at approximately 11:00am at the pre-trial section of SCI. Mr. Davis said that he was "Past my 72 hour hold" and "I was asking if they are going to release me". Mr. Davis said that he was approaching the desk to speak with a Corrections Officer, but, "I was not crossing over the line". Mr. Davis said that a Corrections Officer named "Neal" began "cursing" at him and was "berating" him. Mr. Davis reported that he was placed into a "Half-nelson" hold and then taken down a hallway. Mr. Davis said that Corrections Officers were "screaming" at him and he did not want to resist since he believed he could be released from SCI.

25

JA_01728

Mr. Davis reported that he was then "slammed into wall" as Corrections Officers shouted "stop resisting!". Mr. Davis reported that he believed that there were at least four Corrections Officers present. Mr. Davis reported that when he had been "slammed into the wall" he had been handcuffed behind his back and "went into survival mode". Mr. Davis said, "I saw a big, bright light". Mr. Davis reported that while restrained a Corrections Officer sprayed OC into his nose and mouth. Mr. Davis said that he was able to bite the nozzle of the OC can and disable it.

After the use of force incident, Mr. Davis said he had a "spit hood" placed on his head and was taken "to the fence line" and thought that he was going to be shot by the Corrections Officer in the guard tower. Mr. Davis said that he briefly met with medical staff and was not decontaminated. Mr. Davis said that he was placed in a shower area to change his clothes, but was not permitted to use the water to decontaminate from OC. Mr. Davis said that he was summarily placed into Segregation, where he remained for approximately 7-8 hours. Mr. Davis was released the night of the incident.

-Perceived harm after the event:
As mentioned above, Mr. Davis reported that he believes he has experienced memory difficulties because of the use of force incident. Mr. Davis said, "I don't know where I am. Sometimes I feel like I'm going to fall off the edge of the earth. Mr. Davis said that he believes he has "lost a step" due to "brain damage" he sustained when "my head bounced off the floor".

Mr. Davis reported, "Not a day goes by when I don't feel anger. It infuriates me that I let that happen to me." Mr. Davis reported experiencing "Pent up anger" and said, "I'm worried that I'm going to get a stroke". Mr. Davis said, "I try to keep my mind occupied" and has fears that SCI staff will harm him because of his involvement in the current case. Mr. Davis said, "I swear that I see these officers in the community".

Mr. Davis said, "I almost died on the prison floor. If I hadn't broken that mace can, they were not going to stop. They are going to kill somebody. I couldn't breathe. I felt like George Floyd." Mr. Davis said that the death of "Jerry Spence" at SCI was "an indicator that I would have died if I hadn't broken" the OC can.

Mr. Davis reported that he has been "in and out" of SCI and has previously observed SCI Corrections Officers engaging in excessive uses of force. Mr. Davis said that approximately one month prior to his incident, he observed Corrections Staff use OC spray on a "young kid talking when not permitted to during

26

breakfast". Mr. Davis said that he believes that the SCI Corrections Officers are "on steroids" and that SCI is "a testing ground for feats of strength" and "using prisoners as punching bags".

Mr. Davis has previously worked as a Union plate fitter, and he reports noticing that his memory difficulties and feelings of "panic" have impaired his ability to function at work.

-Subsequent interventions that alleviated the perceived harm:
Once released to the community, Mr. Davis reported that he went to a hospital due to experiencing "back spasms", which he believes was the result of the use of force incident.

Mr. Davis said, "I need mental health help. I tried to get help, but to no avail. I don't know." Mr. Davis added that his mother is "concerned about me".

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Alleged Assault of Inmate William Davis, SBI# 00301806", which was dated 04/19/2022. The Memorandum included the following conclusion: "The allegation of alleged assault is UNSUBSTANTIATED. While there was a physical altercation between Inmate Davis and Sergeant Neal, their conflicting statements as to the cause of the altercation and scant visual evidence leads to this conclusion" (p. 41).

In addition, this writer reviewed Videos 0042-0054. In Video 0042, Mr. Davis can be seen escorted into a shower area to change his clothes, but does not receive a shower. At the end of that video, Mr. Davis appears to receive a brief medical examination. Mr. Davis reports, "I can't breathe". There is no further medical intervention, including a follow-up question to Mr. Davis' comment. A dog can be heard throughout the video, especially during escort. In Video 0046, Mr. Davis can be seen escorted into a holding cell. There is the presence of one long bench and multiple chairs. Instead of being placed in a seated position, Mr. Davis is placed prone on the ground while he is still restrained behind his back. On Video 0051, Mr. Davis can be seen speaking with an Officer outside of his cell on the unit (there is no audio). Mr. Davis is escorted (not in restraints) and it appears that Mr. Davis and the Officer continue to speak with each other. At approximately the 0:02:01 mark of the video, the escorting Officer grabs on to Mr. Davis and tosses Mr. Davis to the ground. The view of this act is somewhat obscured by a staircase. Additional Corrections Officers run towards Mr. Davis, who is on the ground at the

27

JA_01730

time, but the application of restraint cannot be observed due to the staircase obstructing the view.

"Bill Davis Assault Photos" which contained eight photographs. In the photos the following could be observed: Mr. Davis had bruising around both eyes; with prominent swelling on his right eye. There were also photos in which there appeared to be swelling present on Mr. Davis' left leg and right arm.

-Summary:
In the clinical opinion of this writer, Mr. Davis currently meets DSM-5-TR criteria for PTSD. Mr. Davis directly experienced a traumatic event and reported that he believed that his life was in danger during the use of force incident [Criterion A]. Approximately three years later [Criterion F] Mr. Davis still experiences recurrent and intrusive memories of the incident and intense and psychological distress and physiological reactions to both internal and external cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B], evidence of avoidance of distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident [Criterion C]. In addition, it is my clinical opinion that there was evidence of Mr. Davis experiencing persistent negative emotional states, markedly diminished participation in significant activities, and feelings of detachment from others [Criterion D]. Mr. Davis described previously being social and outgoing. This area appeared to be of primary concern, with Mr. Davis reporting frequent and intense "anger" when thinking about the use of force incident. In particular, Mr. Davis believes he was victimized and decided not to "defend myself" so that he could release to the community. In addition, Mr. Davis described experiencing hypervigilance, as well as sleep disturbance [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Davis [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

**Name:**
Date/Time of Assessment: 06/29/2024- 04:00pm (EST)
Duration: approximately 60 minutes

-Psychiatric History (Prior to the incident):
Mr. Bennett described a history of experiencing symptoms of "depression" and "anxiety", adding "ADD was my biggest problem". Mr. Bennett reported that he may experience symptoms of "bipolar disorder" because, "I switch into a mood

every 5 seconds." Mr. Bennett said that he has previously been prescribed psychiatric medications such as "Wellbutrin".

-Psychiatric History (After the incident):
As detailed in sections below, Mr. Bennett reported receiving substance use and mental health treatment following the incident. In addition, Mr. Bennett said that he had attempted suicide on at least one occasion, via intentional overdose, following the incident.

PTSD Checklist for DSM-5 (PCL-5): 72 (out of 80)

Current Mental Status and Behavioral Observations:
Current Diagnoses (per Mr. Bennett): "ADD, Bipolar, Anxiety, and Depression"
Current Psychotropic Medications: none
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: Mr. Bennett presented as consistent with his stated age, with long hair, and was not wearing a shirt as he reported swimming immediately prior to the current assessment. At times during the current encounter Mr. Bennet presented as tearful and distraught.
Alertness: Alert
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: occasional; poor, at times
Behavior: Mr. Bennett presented as restless, at times. He was slouched, with his hair covering parts of his face, at times. Mr. Bennett discussed his music career, as well.
Speech: unremarkable.
Attention: Attentive, but also needed some redirection towards the questions that were being asked.

Mental Status-
Perception: Mr. Bennett denied experiencing either auditory or visual hallucinations, at this time. He endorsed past experiences of visual hallucinations in the form of "hellish, demonic" entities, during a suicide attempt.
Affect: Mr. Bennett demonstrated some emotional lability over the course of the current assessment. There was at least one instance in which the assessment needed to be paused in response to Mr. Bennett presenting as distraught/despondent.
Mood: Mr. Bennett described his mood as "withdrawn", "miserable" and "not happy".

29

Thoughts-

Harm to Self and/or Others: Mr. Bennett denied current ideation and/or intent to harm himself or others, at this time. Historically, Mr. Bennett reported at least one suicide attempt that took place in 2022. Mr. Bennett described being in Tennessee when he took a "gram" of cocaine and went into "cardiac arrest". Mr. Bennett said that he had engaged in this behavior with the intention of overdosing and was neither medically nor psychiatrically hospitalized. Mr. Bennett said that he had been found by his wife, who started CPR, and then EMT's arrived to take over life saving measures. Mr. Bennet said that leading up to the suicide attempt he had feelings of "depression" and "anxiety". He said that it was during this suicide attempt that he was also experiencing hallucinations of "hellish, demonic" entities and being pulled "into the water of the bathtub" (Mr. Bennett was in the bathtub at the time of the incident).

Delusions: not present.

Sleep: Mr. Bennett endorsed sleeping only two to three hours a night, most nights, and said, "I wake up in sweats."

-Description of the Incident:

Mr. Bennett reported that on either February 12th or 14th of 2022, he experienced "one, long use of force" incident within an hour of his arrival into SCI. Mr. Bennett reported that the incident had lasted approximately one-hour in duration. Mr. Bennett said that in the pre-trial section of SCI he was housed on the bottom floor in a cell next to a Corrections Officers' desk which was near a staircase. Mr. Bennett said that his cell was designed to house two individuals, but was actually housing four at the time. Mr. Bennett reported that when arriving on the unit, he was on crutches and said that he was "being pushed by an Officer" from behind. Mr. Bennett reported that he was requesting to receive his inhaler and said that he had recently had surgery to remove a tumor. Mr. Bennett reported that the Officer escorting him on to the unit called Mr. Bennett a "faker" and said, "you're full of shit". Mr. Bennett said that he had replied, "I'm injured, I'm disabled, I'm a veteran. Could you have some kind of respect?". Mr. Bennett reported that the Corrections Officer said, "Welcome to prison".

Mr. Bennett reported that he did meet with a nurse, but had been "pushed into a chair forcefully" by a Corrections Officer. Mr. Bennett said that he looked up at the Officer and said, "don't touch me". Mr. Bennett described the nurse as acting "jittery and twitchy" and added, "It looked like she was 'on something'". Mr. Bennett reported, "I tried to have conversation with nurse about medications, but

30

JA_01733

she didn't listen, didn't care." Mr. Bennett said that he was next taken to his assigned cell. Mr. Bennett reported that once he was in his cell, due to "COPD, "asthma", and "claustrophobia", "I started hyperventilating. I had trouble breathing. The other inmates started asking for help by tapping on the cell window".

Mr. Bennett reported that he recalled Corrections Officers entering his cell, picking him off the bunk by the collar of his shirt, twisting his collar, choking him, and lifting him up. Mr. Bennett said that he again requested to receive his inhaler. Mr. Bennett reported that he was again called a "faker" and was thrown across the cell by a Corrections Officer. Mr. Bennett reported that he was then "picked up" and "thrown into a wheelchair". As a result of this action, Mr. Bennett said that he sustained a bruise and cut on his left hip. Mr. Bennett was still not provided with an inhaler and he said, "I just tried to keep calm". Mr. Bennett reported that he was taken to a "medical station" and Mr. Bennett believes, "They thought I was on heroin. I was on cocaine. They thought I was just trying to get drugs." Mr. Bennett said that he received an injection in his arm and "I was never told what it was."

Mr. Bennett reported that while he was being pushed in the wheelchair he was also being punched by Corrections Officers, including an individual named "Mears". Mr. Bennett said that he was trying to protect himself from the punches, but was being repeatedly hit in locations where he had recently had surgery. Mr. Bennett reported that he was punched directly in the face twice by Corrections Officers.

Mr. Bennett reported that he was informed by a Corrections Officer that he was "going to get a charge" and that one Officer said, "I'm writing you up for insubordination. Sign." Mr. Bennett reported that he had responded, "I'm not signing shit". Mr. Bennett said that he was then pushed out of the chair he had been sitting in and into a cell. Mr. Bennett reported that he was then "punched and kicked" by Corrections Officers. Mr. Bennett said that as a result of these strikes his surgical incisions had "busted open" and "I had knots on my head". Mr. Bennett said that for the rest of the night the Corrections Officers were taunting him and harassing him by keeping the lights on in his cell. Mr. Bennett said that he had attempted to ask questions, but Corrections Officers would not respond to his basic requests such as "What time is it?", "How do I use the phone?", and "How do I bail out"?

-Perceived harm after the incident:
Mr. Bennett said, "This whole incident ruined my life". Mr. Bennett was tearful throughout the current encounter and described feeling "paranoid" and "afraid to

31

go back to jail". Mr. Bennett reported that he often cannot turn the light off in the room he is sleeping in and locks the room due to having the following persistent thought: "I'm afraid they are gonna rush in on me." Mr. Bennett reported "I feared for my life" when he was incarcerated in SCI. Mr. Bennett said that while incarcerated he had heard rumors that Corrections Officers had "hung a guy" and had "thrown someone down steps".

-Subsequent interventions that alleviated the perceived harm:
Mr. Bennett reported that he receives substance abuse and mental health treatment through "BrightView". Mr. Bennett reported that he continues to receive individual counseling. He did not say what the frequency of the sessions were, but reported that the sessions were thirty minutes in duration. Mr. Bennett added, "I get through day to day" with support from friends and family.

-Collateral information/records review:
This writer reviewed a document entitled "SCI Use of Force Review- Sgt. J. Mears (09/19/2022). Case: 22-06-03. Bennett, Jason (00598961), as well as videos 366-375. On the first video (366), it is difficult to see due to the camera angle, but it appears that Mr. Bennett is dropped into a wheelchair by one or more Corrections Officers in his assigned cell. On video 374, which takes place in Unit #4 Max Hallway, Mr. Bennett is being wheeled down a hallway by one Sergeant. At approximately the 00:02:04 point of the video, Mr. Bennett appears to slump in the wheelchair and the Sergeant grabs Mr. Bennett by the collar and pull him up. The Sergeant appears to continue holding on to Mr. Bennett's collar as they approach another door. Mr. Bennett appears to be attempting dialogue with the Sergeant (there is no audio on the video) and at approximately the 00:02:10 point of the video the Sergeant can be seen using his left, closed hand to punch Mr. Bennett in his head, and then return to grab Mr. Bennett's collar. Inconsistent with the video footage, in this writer's opinion, the "SCI Use of Force Review" described Sgt. Mears' use of force as "…objectively reasonable under the circumstance as it was only his intention to push away Inmate Bennett's hand." There was no mention of the punch to Mr. Bennett's head and Sgt. Mears' actions of grabbing Mr. Bennett's collar were portrayed as an effort to prevent injury.

-Summary:
Mr. Bennett described experiencing several personal losses and challenges, in addition to the use of force incident. For example, Mr. Bennett described ten years of military service (Army) at the end of which he reportedly returned home with physical injuries. In addition, Mr. Bennett said that he has had family members die and reported that his sister and mother financially "disinherited" him. Mr. Bennett

32

said that he once had a promising music career, involved in a band named "Silence No More", but reported that the bands' success became derailed due to these losses and challenges. So distraught I checked in with him to ensure that he was ok and did not have thoughts of harming himself. However, the current assessment focused on Mr. Bennett's experience of symptoms specifically associated with the use of force incident. It is my clinical opinion that Mr. Bennett may have been less resilient and more susceptible to the effects of trauma at the time of the use of force incident; however, it is my clinical opinion that the symptoms described below were the result of the incident. Mr. Bennett presented as highly distraught during parts of the current assessment, so much so that breaks were needed during the assessment. In addition, at the end of the assessment this writer ensured that Mr. Bennett had immediate family support (wife), intended to continue attending mental health counseling, and was not experiencing ideation and/or intent to engage in self-harm (Mr. Bennett denied any such ideation and/or intent).

In the clinical opinion of this writer, Mr. Bennett currently meets DSM-5-TR criteria for PTSD. Mr. Bennett also had a highly elevated score on the PCL-5 (72). Mr. Bennett directly experienced a traumatic event [Criterion A]. Approximately two years later [Criterion F] Mr. Bennett still experiences recurrent and intrusive memories of the incident, and intense and psychological distress and physiological reactions to both internal (thoughts) and external cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B]. There is also evidence of Mr. Bennett attempting to avoid distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident [Criterion C].  In addition, it is my clinical opinion that there was evidence of Mr. Bennett experiencing persistent negative emotional states, markedly diminished participation in significant activities, and feelings of detachment from others [Criterion D]. In addition, Mr. Bennett described experiencing hypervigilance, as well as sleep disturbance [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Bennett [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

**Name: Morales, Chris**
Date/Time of Assessment: 06/30/2024- 02:00pm EST
Duration: approximately 52 minutes

-Psychiatric History (Prior to the incident):

33

Mr. Morales reported that around age 4 or 5 he had almost drowned while swimming in the Dominican Republic and described this as a traumatizing event. In addition, Mr. Morales said that while incarcerated in Rikers Island (New York City, NY) he had been the victim of assault by Corrections Officers and was part of a class action lawsuit in 2006.

-Psychiatric History (After the incident):
Mr. Morales reported that while he has experienced symptoms of "depression", he has not received any mental health services since the incident.

PTSD Checklist for DSM-5 (PCL-5): 75 (out of 80)

Current Mental Status and Behavioral Observations-
Current Diagnoses (per Mr. Morales): "Bipolar"
Current Psychotropic Medications: None. Mr. Morales reported past prescriptions for psychotropic medications such as "Remeron" and "Haldol". Mr. Morales said that he had discontinued the medications due to experiencing muscle stiffness and "Feeling like my body is being crippled".
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: Mr. Morales appeared to be sitting a car, with his shirt off, during the current assessment. Mr. Morales was well groomed and wore his hair in braids.
Alertness: Alert
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: Appropriate
Behavior: Mr. Morales presented as talkative and was passionate as he spoke.
Speech: Mr. Morales spoke at an elevated volume.
Attention: Mr. Morales was attentive throughout the current assessment, but also demonstrated the tendency to become very passionate when discussing the incident and some redirection was required.

Mental Status-
Perception: Mr. Morales denied experiencing either auditory or visual hallucinations.
Affect: Mr. Morales evidence the full-range of emotional expression.
Mood: Mr. Morales endorsed experiencing feelings of "depression".

Thoughts-

JA_01737

Harm to Self and/or Others: Mr. Morales reported that he has experienced "thoughts about suicide", but said that he has no intention to harm himself, at this time. Mr. Morales said his daughter represented his reason for living. Mr. Morales reported at least two suicides in the past, with the most recent attempt in either 2003 or 2004. Mr. Morales described one attempt as "jumping off a bridge at the Bronx Zoo" after his mom "robbed" him and the most recent attempt involved "hanging". Mr. Morales also said that he had engaged in "cutting" behavior when he was "younger".
Delusions: not present.

Sleep: Mr. Morales described experiencing sleep disturbance; typically sleeping 5 to 6 hours most nights.

-Description of the Incident:
Mr. Morales reported that he entered SCI, pre-trial section, in August of 2021. Mr. Morales reported that at the time of his arrest he was travelling through Delaware and had not previously been incarcerated in SCI.

Mr. Morales reported that soon after his arrival and entry into the living unit, he became involved in a discussion with a Corrections Officer. Mr. Morales reported that since he is 6'5'', he stands out and believes that Corrections Officers wanted to "make an example" of Mr. Morales. Mr. Morales reported that as he was about to climb a stairwell, a Corrections Officer was speaking to him in a "hostile" manner. Mr. Morales said that he informed the Corrections Officer that "I know my rights" and further engaged in dialogue. Mr. Morales reported "I stand up for myself", but added with his past experiences with law enforcement and Corrections Officers, "I'm going to be respectful". Mr. Morales said that he was "given a command" to go up the steps. Mr. Morales said that he did not to be placed in the cell and said that he was then sprayed with OC in his nose and mouth, and was then tackled to the ground and restrained. Mr. Morales reported that Corrections Officer "Neal" was involved in the use of force. Mr. Morales believes that he was intentionally sprayed with OC in his nose and mouth in order to inflict pain. Mr. Morales was tearful and highly emotional as he described the OC Spray as "Lucifer's piss". Mr. Morales went on to explain that the spray was red/orange and he believed it was different, more potent, than other forms of OC spray. Mr. Morales said that he was repeatedly hit by Corrections Officers while on the ground, as they shouted "stop resisting". Mr. Morales said, "I couldn't breathe. I was fighting for my life. I was trying to take the mask off my face."

35

Mr. Morales reported that following the use of force incident he was taken to Segregation. During the processing, Mr. Morales said that he was required to be "strip search again", even though he had just gone through processing/intake at the facility. Mr. Morales reported that during the "strip search", since he had not been decontaminated, Mr. Morales still had OC spray on his body, including his hands. Mr. Morales said that when he was directed to "lift my scrotum and spread my buttocks", OC spray from his hand was placed in these sensitive areas causing pain. Mr. Morales reported that his placement in Segregation was over 30 days. Mr. Morales said that he had "no access to nothing" and believed that Corrections Officers were "trying to break me down".

Mr. Morales reported that he had been permitted a knee brace by a nurse at intake, but did not receive the knee brace following the use of force incident. Mr. Morales reported that he had submitted at least one grievance pertaining to the use of force incident, but said that the grievance went directly to the Corrections Officer that he was grieving.

Mr. Morales reported that following the use of force incident, on September 6th, the mother of his child died and Mr. Morales said that he was not permitted to get in contact with her family. Mr. Morales said that Corrections Officers taunted him as he remained in SCI custody, reportedly making comments such as "You are still here" and "Nobody loves you".

-Perceived harm after the event:
Mr. Morales was tearful throughout this assessment, describing how his "Self-confidence is shot" and believing that he was going to die during the use of force incident. Mr. Morales said that during the use of force incident it felt, "Like being thrown into water while shackled" and his heart had been "pounding". Mr. Morales reported that he was "sweating" during the current assessment as he recounted the use of force incident. Mr. Morales said that he felt "disempowered" and that the actions of the Corrections Officers were intended to exert power and control, intimidate, and demean him.

Mr. Morales reported, "I'm scared of the authorities" and "Petrified by taking risks" because he fears being incarcerated and mistreated again. Mr. Morales said that he currently lives in a storage unit and encounters "police officers everywhere, every day" in the neighborhood where he is currently located in Virginia. Mr. Morales reported that he does not want to return to Delaware.

-Subsequent interventions that alleviated the perceived harm:

36

As described above, Mr. Morales has not received any mental health or medical treatment since the use of force incident. Mr. Morales also expressed that he currently has limited access to care.

-Collateral information/records review:
This writer reviewed Videos 215-242 and a Memorandum that was entitled "Allegation, Excessive Use of Force", which was dated 03/24/2022. The report contained the following conclusion: "Based on my investigative findings, I do not find clear violation of excessive use of force and find Mr. Morales' claim Unsubstantiated. However, what appeared to be unusual in this incident was how quickly Sergeant Kirk Neal resorted to using pepper spray and elevating this into a physical confrontation. His decision triggered multiple officers to also engage Mr. Morales physically. I believe interpersonal skills would seem more prudent given that Mr. Morales posed no immediate physical threat. Mr. Morales was the only inmate on the floor at the time. My review of grievance reports against Sergeant Neal from 2014-2022 show a pattern of excessive inmate complaints with alleged verbal and physical confrontation. ███████████████, a 2019 performance valuation and a 2019 210 [sic] investigation for unprofessional conduct raise behavior concerns" (p. 22).

-Summary:
Mr. Morales reported, "This jail is hell", referring to SCI. He said that he believed that SCI and the associated staff were "corrupt" and added, "corruption does not last". Mr. Morales reported that he has experienced thoughts about retribution against the Corrections Officers and "the system".

Mr. Morales reported that he has experienced previous traumatic events in the form of a near drowning at age four or five, as well as experiencing prior assaults by Corrections Officers while Mr. Morales was incarcerated in New York City. During the current assessment these experiences were discussed, but there was a particular focus on his experiences during the use of force incident at SCI and its specific impact on Mr. Morales.

Mr. Morales had a highly elevated score on the PCL-5, with most of his responses falling into the "Extremely" category (4, on a scale of 0 to 4). In addition, Mr. Morales presented as tearful and highly emotional as he described his experiences at SCI. In the clinical opinion of this writer, Mr. Morales currently meets DSM-5-TR criteria for PTSD. Mr. Morales directly experienced a traumatic event and reported that he believed that he was going to die during the use of force incident [Criterion A]. Approximately three years later [Criterion F] Mr. Morales still

37

experiences recurrent and intrusive memories of the incident, recurrent distressing dreams related to the incident, intense and psychological distress and physiological reactions to both internal (thoughts) and external (law enforcement) cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B]. Mr. Morales said that approximately twice a week he feels as if the traumatic experience were happening again. There was evidence of Mr. Morales attempting to avoid distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident [Criterion C]. In addition, it is my clinical opinion that there was evidence of Mr. Morales experiencing persistent negative emotional states, markedly diminished participation in significant activities, and feelings of detachment from others [Criterion D]. In addition, Mr. Morales described experiencing hypervigilance, as well as sleep disturbance [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Morales [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

**Name:**



38



JA_01742



40



JA_01744



42

JA_01745



**Name: Zahner, Bradley**
Date/Time of Assessment: 07/13/2024- 01:00pm (EST)
Duration: approximately 55 minutes
Note: The current assessment took place via telephone, but video capabilities were utilized.

-Psychiatric History (Prior to the incident):
Mr. Zahner described receiving mental health services since approximately seven or eight years old in response to him acting "super-hyper". In addition, Mr. Zahner described his mother having difficulty managing his behavior and on at least one occasion, when Mr. Zahner was in middle school, had "called an ambulance" because Mr. Zahner was "beating myself". Mr. Zahner also reported that he has received mental health services from "Delaware Behavioral Health" (DBH) and has received the following diagnoses: "ADHD/ADD" and "Bipolar". Mr. Zahner said that he has attempted suicide on either four or five occasions, with the most recent attempt taking place approximately seven years ago.
Suicide: 4 or 5, 7 years ago.

-Psychiatric History (After the incident):
Mr. Zahner reported that he had been taking psychotropic medications in the community, but they were discontinued when he had a "falling out" with a

43

JA_01746

psychiatrist. Mr. Zahner said that he is currently in the "Process of waiting to get another psychiatrist." Mr. Zahner also reported that he has been taking Suboxone for approximately two years, and has found it to be beneficial.

PTSD Checklist for DSM-5 (PCL-5): 47 (out of 80)

Current Mental Status and Behavioral Observations-
Current Diagnoses (per Mr. Zahner): "ADHD/ADD" and "Bipolar". When this writer asked Mr. Zahner if he believed he experiences symptoms of a serious mental illness, Mr. Zahner responded, "I don't like taking the medicine, I have bad mood swings."
Current Psychotropic Medications: Mr. Zahner reported past prescriptions of Depakote and Seroquel. This writer asked Mr. Zahner if he noticed any difference when he takes psychotropic medications, and he responded, "I feel doped up and like a zombie. They do help me with mood swings. I have a bad anger problem and I can't pay attention." Mr. Zahner reported that he is not currently prescribed psychotropic medications because he had a "falling out with my doctor" at "Mind and Body" in Dover, DE.
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: Mr. Zahner was sitting in a car and was not wearing a shirt during the current assessment. Mr. Zahner had short hair on his head and there was the presence of facial hair.
Alertness: Alert
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: Appropriate
Behavior: Mr. Zahner presented as restless; frequently shifting in his seat and was smoking a cigarette towards the end of the current encounter.
Speech: Mr. Zahner spoke at a somewhat accelerated rate.
Attention: Mr. Zahner appeared to have difficulty staying on one topic. This writer provided re-direction on occasion.

Mental Status-
Perception: Mr. Zahner reported that he "sometimes" hears "voices of people telling me to do stuff that isn't nice." When this writer asked for more information, Mr. Zahner said, "Like to hurt myself and other people". Mr. Zahner became tearful and said, "I don't like to talk about it."
Affect: Mr. Zahner presented as somewhat blunted.
Mood: Mr. Zahner described his mood as "up and down".

44

Thoughts-
Harm to Self and/or Others: Mr. Zahner denied any ideation and/or intent to harm himself and/or others at this time. Mr. Zahner had endorsed a history of suicide attempts, at described above.
Delusions: Not present

Sleep: Mr. Zahner reported, "It's hard for me to sleep because I'm so hyper".

-Description of the Incident:
Mr. Zahner reported that the use of force incident took place in 2022, after approximately four or five days after entering SCI. Mr. Zahner said that he had been housed in the pre-trial section of SCI. On the morning of the incident, Mr. Zahner reported that he had woken up and was hungry since he had not had anything to eat for four days. More specifically, Mr. Zahner described experiencing painful withdrawal symptoms (from opiates) that were untreated by SCI medical staff. Mr. Zahner said that he had "put in a sick call" and had been experiencing fainting, shaking, vomiting, "skin was crawling", and loose stool. Mr. Zahner said that breakfast was called and he knew to stand by his door to await the cell door being opened ("popped"). Mr. Zahner reported that on this occasion he attempted to hold the door for his cellmate because if the door shuts closed, it locks. Mr. Zahner reported, "They maced me and threw me on the ground" for having held the cell door open. Mr. Zahner said he believes the name of the Corrections Officer who sprayed him with OC was "Smith". Mr. Zahner reported that while on the ground a Corrections Officer placed their "knee on my back" and Mr. Zahner lost control of his bowels. Mr. Zahner said, "I wasn't resisting at all. Other officers came. It was hurting was real bad. My head hit the concrete. They busted eye open. There was blood everywhere. They dragged me out". Mr. Zahner reported that he was seen briefly by a nurse; "She only checked my eye bone". Mr. Zahner said that the Corrections Officers were "laughing at me" and "making fun of me". Even though Mr. Zahner had OC spray on his body and had defecated himself, he said that he was not provided with a shower or otherwise decontaminate until approximately two and a half days later. Mr. Zahner said that he was placed in Segregation and "I had blood, mace, and shit all over me". Mr. Zahner reported that he remained in Segregation for approximately one week.

When he was released from Segregation and returned to a unit, Mr. Zahner reported that Corrections Officers taunted him and made comments such as "Look, see what I did to him" (referring to Mr. Zahner's "black eye"). Mr. Zahner said

45

JA_01748

that he was returned to the "same tier with the Officer that assaulted me. I didn't come out. I didn't eat. Made me uncomfortable."

-Perceived harm after the event:
Mr. Zahner reported that he had suffered from MERSA, specifically sores on buttocks and legs, which were the result of feces remaining on his body while in Segregation.

Mr. Zahner described general hypervigilance, but prominent concerns about law enforcement. Mr. Zahner described himself as feeling "nervous" when observing law enforcement in the community, adding, "I feel uncomfortable. My stomach starts to flip. I start to hide, get out of the way." Mr. Zahner said that he has had at least one instance in the community where law enforcement was "trying to talk to me" and Mr. Zahner said that he was immediately reminded of the use of force incident and became preoccupied with the memories. Mr. Zahner said that he was "paranoid about police. You never know what they are going to do after what happened to me. They are supposed to help you." Mr. Zahner said that he had significant fears that he would be mistreated again by law enforcement. Mr. Zahner said, "I don't like to talk about it" and was tearful during his description of the use of force incident. Mr. Zahner reported, "It's embarrassing. It brings back bad memories". Mr. Zahner described experiencing intrusive thoughts about the use of force incident at least "once or twice a day." Mr. Zahner said that the thought that is most prominent was having a knee on his back and believing that his life was in danger as a result. He said that he feels "On edge", "Shaky", and "Nervous".

-Subsequent interventions that alleviated the perceived harm:
As described above, Mr. Zahner had been receiving mental health services in the community in the form of psychotropic medications, but said that the medications were discontinued when he had a "falling out" with a psychiatrist. Mr. Zahner reported that he believed, based on the "tone of her voice", that the psychiatrist had "looked at me like I was a piece of junk." Mr. Zahner added, "I didn't feel comfortable talking with her about my life story. I couldn't relate to her." Mr. Zahner described that he was "waiting to get another psychiatrist". Mr. Zahner also described that he did not have health insurance and had experienced significant barriers to receiving access to mental health care in the community.

Mr. Zahner reported that he was prescribed Suboxone at the time of his release from SCI and has continued to take the medication for approximately two years. Mr. Zahner said that he has found the treatment helpful.

46

JA_01749

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Alleged Unprovoked Violence", which was dated 01/17/2023. The report included the following: "…Corporal Wise knocked the styrofoam [sic] plate out of Inmate Zahner's hands. Inmate Zahner's actions created a security issue with other inmates loose in the chow hall. He became a nonmoving resister and was defiant of orders. Corporal Wise sprayed him with sabre [sic] red and 'escorted him to the ground'. He did not throw him to the ground. Inmate Zahner could have simply turned around and placed his hands behind his back. He chose not to" (p. 4). The report concluded, "…The officers exhausted all reasonable attempts for voluntary compliance through verbal commands and hand gestures. Inmate Zahner created a potentially serious security issue. I find that Sergeant Jones and Corporal Wise's actions were justified, legal and proper. They are therefore Exonerated" (p. 8).

In addition, this writer reviewed Videos 335-348. On Video 335, Mr. Zahner can be seen being escorted out of a holding cell and into a shower. There is either blood or some form of an abrasion visible on the left side of his face and forehead. He is taken to a shower area for search and to receive a change of clothing, but does not get access to a shower despite having been sprayed with OC and with the presence of mucus and possibly blood on his face.

While Mr. Zahner had informed this writer that he had been unexpectedly the victim of a use of force for holding his cell door open. The Memorandum above and the videos place Mr. Zahner out of his cell at the time of the use of force. It appears that Mr. Zahner was not permitted to be out of his cell at the time and was directed not to leave his cell. On Video 343, Mr. Zahner appears to clandestinely attempt to obtain food, but is detected when he obtains a food tray. In addition, the Officer's behavior of knocking the food plate out of Mr. Zahner's hands is provocative, aggressive, and unprofessional (Video 343, at approximately 0:01:13). Almost immediately following the food plate being knocked away, the Officer disseminates OC spray and at very close range into Mr. Zahner's face and takes him to the ground (landing and remaining directly on top of him). The use of OC spray, and at close range, on an individual who is acting "defiantly" and not violently is excessive in this writer's opinion

-Summary:
Mr. Zahner reported that he had been incarcerated in SCI previously and highlighted, "I know the rules". Mr. Zahner also had the experience of observing Officer "Neal" and other Corrections Officer in the pre-trial section of SCI, "hang the phone up, throw the tray away, make fun of people, come by and beat on your

47

JA_01750

cell door" and initiate use of forces on other individual. Mr. Zahner said, "It was like an everyday thing." Mr. Zahner reported that he did not have concern because, again, he was aware of the rules. Mr. Zahner expressed disbelief that he had been sprayed with OC for a holding a door for his cellmate; "I think it's crazy. Why would they do that?" Mr. Zahner added, "I wasn't trying to resist or nothing". "No need to put their knee on my back. I really couldn't believe it."

From Mr. Zahner's perspective, even though the rules were the same in all of the housing units at SCI, the "Officers on the compound don't at like they do in pre-trial. It's like a night and day". Regarding Officer "Smith", Mr. Zahner said, "I hope he gets fired and that he goes to jail. Because he assaulted me."

In the clinical opinion of this writer, Mr. Zahner currently meets DSM-5-TR criteria for PTSD. Mr. Zahner directly experienced a traumatic event and reported that he believed that his life was in danger (knee on his back while he was on the ground) during the use of force incident [Criterion A]. Approximately two years later [Criterion F] Mr. Zahner still experiences recurrent and intrusive memories of the incident and psychological distress and physiological reactions to both internal (thoughts) and external (law enforcement) cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B]. There was evidence that Mr. Zahner has attempted to avoid distressing memories and thoughts of the incident as well as avoid external reminders of the incident [Criterion C].  In addition, it is my clinical opinion that there was evidence of Mr. Zahner experienced persistent negative emotional states, negative thoughts about himself including humiliation, and markedly diminished participation in significant activities, and feelings of detachment from others [Criterion D]. In addition, Mr. Zahner described experiencing hypervigilance, as well as sleep disturbance [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Zahner [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

**Name: Newcomb, Timothy**
Date/Time of Assessment: 07/14/2024- 11:00am (EST)
Duration: approximately 55 minutes
Note: The current assessment took place via telephone, but no video capabilities were available or utilized.

-Psychiatric History (Prior to the incident):

Mr. Newcomb reported that in 2012, when he was 38 years-old, he "wasn't feeling right" and received mental health treatment in the community. Mr. Newcomb described specifically experiencing feelings of depression and anxiety. Mr. Newcomb reported a history of being prescribed Buspar.

-Psychiatric History (After the incident):
Mr. Newcomb described that since the use of force incident he has felt "real jumpy. I like to be up against a wall." Mr. Newcomb reported that he has a "fear of someone coming up behind me" and said that feelings of anxiety increase when he's "in an area where my back isn't covered by a wall or someone is behind me that I don't know."

PTSD Checklist for DSM-5 (PCL-5): 65 (out of 80)

Current Mental Status and Behavioral Observations-
Current Diagnoses (per Newcomb): "Depression and anxiety"
Current Psychotropic Medications: none
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: No visual; not able to assess.
Alertness: Alert
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: No visual; not able to assess
Behavior: Mr. Newcomb presented as cooperative and engaged.
Speech: unremarkable
Attention: Attentive; no evidence of distraction.

Mental Status-
Perception: Mr. Newcomb denied experiencing auditory and/or visual hallucinations.
Affect: No visual; not able to assess.
Mood: Euthymic

Thoughts-
Harm to Self and/or Others: Mr. Newcomb denied experiencing ideation or intent to harm himself and/or others, at this time.
Delusions: Not present

49

JA_01752

Sleep: Mr. Newcomb described difficulties falling asleep due to "my head constantly feels like I have a headache all the time. I'm ok once I fall asleep." Mr. Newcomb described his "body jumping" during dreams about the use of force incident.

-Description of the Incident:
Mr. Newcomb reported the use of force incident took place in the pre-trial section of SCI in December of 2021 (approximately 5.5 months after entering SCI). Mr. Newcomb said that he had been prescribed Subutex and at 5:00 am a Corrections Officer walked around the unit calling names for individuals that were to provide a urine sample. Mr. Newcomb said that due to COVID-19 protocols that were in place at the time, incarcerated individuals could not leave the unit and nursing staff came around to the living units to collect curing samples. Mr. Newcomb reported that he had informed a Corrections Officer that he recently had urinated and expected that he would have difficulty providing a sample as a result. Mr. Newcomb said that the Correction Officer had responded, "When they get here you got to produce sample. We have other things to do. Go drink water." Mr. Newcomb said that he stood up and walked to an Officer's desk to request a cup. Mr. Newcomb reported that a Corrections Officer told him to "stop being a smartass" and directed him to sit at a table. Mr. Newcomb said that he had commented out loud that he was asked "to do one thing" (obtain water) and directed "to do another" (sit at a table). Mr. Newcomb reported that as he went to sit at a table, his shoulder was grabbed from behind by a Corrections Officer and he wrists were placed in handcuffs. Mr. Newcomb described nursing staff arriving to the unit with a Sergeant, and nursing staff begins to call the names of incarcerated individuals who need to provide urine samples. Mr. Newcomb reported that he had attempted to obtain the attention of nursing staff and heard a Corrections Officer ask, "Excuse me what did you say?". Mr. Newcomb said that a Corrections Officer then came up from behind, lifts him, and then uses a "hip toss" to throw Mr. Newcomb while restrained. Mr. Newcomb said that he believes he was lifted over "waist level" of the Corrections Officer and said, "The only thing that stopped my fall was my face on the concrete. I couldn't brace myself. The officer stays on top of me. The nurse was hysterical. They dragged me across the prison to up front. I waited. My face and ear are bleeding. I'm taken to medical. My tooth was chipped, my shoulder felt broke, my face was pounding, and medical didn't send outside." Mr. Newcomb reported that he was placed in Segregation for approximately 17 days and "Never got anything but Tylenol" to address his medical needs. Mr. Newcomb reported an increase in his heart rate as he provided a description of these events to this writer.

50

Mr. Newcomb described experiencing pain in his head and he remaining in SCI for approximately 8 months following the use of force incident. For the remainder of his time in SCI, he would occasionally encounter the Corrections Officer who he said had thrown him to the ground. Mr. Newcomb said that such encounters would "bring back flashbacks". Mr. Newcomb reported that he would often remain in his cell to avoid the particular Corrections Officer. Mr. Newcomb said, "I was scared to do anything when that Officer was on the tier" and reported that he had written a letter requesting a formal separation from the Officer. Mr. Newcomb said that he had received a response indicating that SCI would not create any such separation. Mr. Newcomb said he remained in SCI for 8 months following the use of force incident. Mr. Newcomb reported that every time he encountered the Officer at SCI it would cause "flashbacks" of the incident. Instead of encountering the Officer, Mr. Newcomb said that he often stayed in his cell.

Mr. Newcomb believes that the Corrections Officer involved in the use of force was named "Mitchell". Mr. Newcomb said that following the incident he was taunted by Officer Mitchell which comments such as "What happened to you?" Mr. Newcomb reported "other Officers were making fun of me and making jokes. Where do you see the humor in that? It was like the Officers got off on it." Mr. Newcomb said that once he had retained an attorney he experienced harassment and retaliation in the form of "repeat cell searches, they would mess up my room, and the guard would stand at the door and listen to legal conversation. There was no more physical violence, but there was mental abuse".

-Perceived harm after the incident:
Mr. Newcomb reported that because of being thrown and his head landing on concrete, "I get real bad headaches. My jaw and eye are messed up (right side of his face). My eye twitches. I see a passing light once in a while". Mr. Newcomb reported that since the use of force incident he has experienced frequent headaches. In addition, Mr. Newcomb described himself as "not as sharp as I once was" and said that he has difficulty "remembering something that just happened".

Mr. Newcomb said that because of the use of force incident, "It's hard to trust any kind of authority. Am I going to have to go through what I went through last time? I get real paranoid when someone is behind me. In a store when someone tapped me on the shoulder, I jumped. I'm on alert all the time." Mr. Newcomb said that it is difficult for him to "trust police officers".

Mr. Newcomb reported that he is more withdrawn and less social since the use of force incident; "It feels like I am shutting my life down". Mr. Newcomb said that

51

JA_01754

he avoids public and crowded places, "Unless I'm with family or a real good friend." He said that if he is in a restaurant, "I have to sit where there is a wall behind me. In casinos I have fears about what is behind me; I just don't go there anymore." Mr. Newcomb said that he also used to walk on the boardwalk in Ocean City, but would only go now "If I could walk and hold a mirror up". Mr. Newcomb added, "It's hard for me to be on my own in a public area without someone I trust. I get real paranoid when someone is behind me."

-Subsequent interventions that alleviated the perceived harm:
Mr. Newcomb expressed his experience of his "Right eye is not as strong as my left eye". Mr. Newcomb has not sought medical treatment yet.

Mr. Newcomb has not yet sought mental health care yet, either. Mr. Newcomb said, "It's really expensive. I'd like to, you know? I'd work on anxiety. I don't like being paranoid all the time that something bad is going to be happen behind me and I can't protect myself. I have a constant jumpy feeling. Have you ever seen a dog that has been beat and has a hand raised at them?

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Excessive Use of Force", which was dated 06/21/2022. The report included the following conclusion: "I completed an investigative review of all available incident reports, medical reports, grievances reports, video recordings of both static and handheld audio/video and telephone conversations of an incident at Sussex Correctional Institute involving inmate, Timothy W. Newcomb. Mr. Newcomb's allegations of unprovoked violence by Officer Mitchell and lack of medical attention is unsubstantiated" (p. 17).

In addition, this writer reviewed Videos 377-390. Of particular importance, video 383 depicts the events that were described in the following manner in the Memorandum: "Unexpectedly, Mr. Newcomb, who was still handcuffed behind his back, stood up and walked to the redline on the floor where Mrs. Stevens was standing. Officer Mitchell ordered Mr. Newcomb to sit back down. He encountered resistance from Mr. Newcomb as he pushed down on his shoulder. Fearing that he was losing control of Mr. Newcomb, he pulled Mr. Newcomb to the floor and called a code 11. He remained on top of Mr. Newcomb until escort officers arrived. No other physical force or Sabre Red was used" (p. 17). The Memorandum's assertion that Correction Officer was losing control of Mr. Newcomb is contradicted by the video footage. Mr. Newcomb can be observed standing up, but is steady and not off balance. From this writer's perspective, the

52

JA_01755

Correction Officer has firm control of Mr. Newcomb, with a right had gripped on Mr. Newcomb's left arm. Then, at approximately the 0:05:33 mark, the Correction Officer quickly turns his hip and flips Mr. Newcomb to the floor. Again, Mr. Newcomb was in wrist restraints which were applied behind his back. Mr. Newcomb had no means by which to break his fall with his hands and instead landed on the ground head or face first (some of the visual was obstructed by the presence of a unit staircase).

-Summary:

Mr. Newcomb had been incarcerated previously at SCI. From his perspective, the Corrections Officers that work in the pre-trial section of SCI deliberately cause "intimidation" and "fear" on the units. He added that "message" sent by the behavior of the Corrections Officers is, "You'd better do what we say or else…". Mr. Newcomb also said that the Corrections Officers at the pre-trial section of SCI, "treat you like shit, cuss at you, and they really make you feel like you are nothing." Compared to the pre-trial section, Mr. Newcomb said that the Corrections Officers in general population "are more laid back". Mr. Newcomb reported that the Corrections Officers at the pre-trial section of SCI have a reputation for "beating up inmates. The Officers pack together". Mr. Newcomb said that he witnessed instances in which one or more Corrections Officers entered a cell in the pre-trial section of SCI, could not see what took place inside the cell, and then observed a person "dragged out of the cell like they were dead".

Mr. Newcomb said, "I want all of it to be done with", in reference to this case, and said that until there is a conclusion, "I'm going to have to think about it all day, since there are constant reminders of it." Mr. Newcomb added, "I think that something needs to be done to the monsters; how they get away with it. What he did to me and he was still able to work there. Where is the punishment for that? They are not trained to do that. There are so many ways to handle the individual."

In the clinical opinion of this writer, Mr. Newcomb currently meets DSM-5-TR criteria for PTSD. Mr. Newcomb directly experienced a traumatic event and witnessed other individuals experience use of force incidents, as well [Criterion A]. Approximately three years later [Criterion F] Mr. Newcomb still experiences recurrent, intrusive, and involuntary memories of the incident, intense and psychological distress and physiological reactions to both internal (thoughts) and external (people behind him) cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B]. Mr. Newcomb evidenced avoidance of distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident [Criterion C].  In addition, it is my

53

JA_01756

clinical opinion that there was evidence of Mr. Robinson experiencing persistent negative emotional states, markedly diminished participation in significant activities, and feelings of detachment from others [Criterion D]. In addition, Mr. Newcomb described experiencing significant hypervigilance, sleep disturbance, a significant startle response, and withdrawal from significant activities and detachment from others [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Newcomb [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

**Name: Durham, Donbray**
Date/Time of Assessment: 07/27/2024- 11:00am (EST)
Duration: Approximately 50 minutes
Note: Assessment took place via computer with audio capability only until the end of the assessment. Mr. Durham turned on his camera at the end of the assessment; no explanation was provided by Mr. Durham.

-Psychiatric History (Prior to the incident):
Mr. Durham denied any history of mental health symptoms and treatment, to include medications and hospitalization.
-Psychiatric History (After the incident):
Mr. Durham denied any current mental health treatment, including medications and hospitalization.

PTSD Checklist for DSM-5 (PCL-5): 47 (out of 80)

Current Mental Status and Behavioral Observations:
Current Diagnoses (per Mr. Durham): none
Current Psychotropic Medications: none
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: Mr. Durham turned his camera on towards the end of the current encounter. This writer observed that Mr. Durham wore a head covering, had a large beard, and was wearing headphones. Mr. Durham showed this writer the specific locations where his mouth and teeth had been damaged by the use of force incident.
Alertness: Alert

54

JA_01757

Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: Mr. Durham made occasional eye contact when his camera was turned on.
Behavior: Mr. Durham presented as cooperative and engaged.
Speech: Mr. Durham spoke clearly and softly.
Attention: Attentive; no signs of distractibility.

Mental Status-
Perception: not present
Affect: Mr. Durham presented with a somewhat blunted affect when his camera was turned on.
Mood: Mr. Durham described his mood as "moderate" and said, "I'm a chill person".

Thoughts-
-Harm to Self and/or Others: Mr. Durham denied any ideation and/or intent to harm himself and/or others, at this time.
-Delusions: Not present.

Sleep: Mr. Durham described his sleep as "kinda bad". He said that he typically works from 2:30pm-11:00pm, and has "trouble falling asleep". Mr. Durham reported working "the night shift for three years". When he has trouble sleeping, Mr. Durham said that he often "exercises" to become tired.

-Description of the Incident:
 Mr. Durham described experiencing multiple incidents with law enforcement personnel on the evening of either October 30th or 31st in 2021. Mr. Durham reported that he had been drinking in a bar in Dover, DE and "I wasn't feeling good." Mr. Durham reported that he left his car at the bar and started to walk home. Mr. Durham said that he "passed out" as he entered "my development". Mr. Durham reported, "I've never passed out before. Dover PD wake me up with a flashlight in my face and ask to see my ID in my pocket. I try to continue to walk home; I'm not trying to go to jail. I guess I pushed him out of the way. They Tazed me. There were two police officers. They ran my name and said that I had a case in Maryland for an unpaid fine in Ocean City. They took me to Georgetown (SCI). I was giving them a hard time when I got there; I didn't think I should be there. I didn't belong there. They took me to a cell that wasn't a regular cell. I had handcuffs on. Then they abused me by emptying a whole can of pepper spray on me." Mr. Durham said that he was taken down to the ground and had his front teeth chipped and pushed through his lip. Mr. Durham described a knee placed on

55

JA_01758

his neck, multiple staff entering the cell, and then he "passed out". Mr. Durham reported that one of the Corrections Officers who was involved in the use of force was named "Neal". Mr. Durham said that while he was conscious his face was bleeding, "I cried for help and nobody was helping", "I can't breathe", and "I was thinking about George Floyd. I was crying. I've got cuffs on." Mr. Durham was tearful as he described this part of the incident during the current assessment.

Mr. Durham reported that he did not receive any medical attention for his injury nor opportunities to decontaminate from OC spray. Mr. Durham said that he believes he was next escorted into Segregated housing, in a cell that he described has having only a mat (no bed). Mr. Durham reported that he was bailed out either the same day or next morning by his father. He said that when his father picked him up from SCI and saw the damage to Mr. Durham's face, his father went into SCI to complain and obtain the names of the Corrections Officers who had been involved in the use of force. Mr. Durham's father next took Mr. Durham to a local hospital for medical attention.

-Perceived harm after the incident:
Mr. Durham described sustaining scarring on his lip and needing "caps" on his front teeth because of the use of force incident. Immediately following the incident and following a hospital visit, Mr. Durham described wearing a surgical mask at work to hide his face. Mr. Durham said that he "lacked confidence" because of the damage to his face and teeth.

Mr. Durham said, "I get teary eyed thinking about it [use of force incident]. I was treated like less than a human. I thought that I was going to die. Just when I think about it- it hurts my confidence. My body, my back, my wrists were on fire, my neck."

-Subsequent interventions that alleviated the perceived harm:
As described above, soon after his father picked him up from SCI, Mr. Durham was taken to a local hospital for examination and treatment of his injuries to his face, lip, and teeth. Mr. Durham said that he eventually received dental care, and had to pay approximately $5,000 to repair two of his front teeth.

Mr. Durham reported that he has not sought any other interventions, including mental health treatment. Mr. Durham explained, "It would be hard to talk about that type of stuff." This writer asked how it felt for Mr. Durham to discuss the use of force incident during the current assessment and he said, "I don't know the word, I don't feel better talking about it. It brought back bad memories. I spoke

56

with my dad when it first happened when he picked me up. My friends asked me what happened to my face in the first days." Mr. Durham reported that he has pictures of his face following his release from SCI, but he does not look at those pictures.

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Use of Force: Lack of Adequate Medical Evaluation and Treatment", which was dated 07/05/2022. The Memorandum included the following conclusion regarding the use of force incident: "The charge of use of force is unsubstantiated. Overhead Video in the receiving room shows Inmate Donbray Durham and the correctional officers at the AFIS machine go to the ground. You are unable to see when Inmate Donbray Durham is sprayed at the AFIS machine. Once the inmate is handcuffed, he is being escorted to the holding cell, Durham becomes very limp and goes to the ground. Donbray Durham was brought to Sussex correctional institution because he was arrested for resisting arrest and public intoxication. The handheld video allows you to hear the yelling and screaming of the inmate. The inmate is ordered numerous commands but refuses to comply with their direct orders" (pgs. 6-7). The Memorandum then goes on to similarly find that Mr. Durham's "…charge of lack of adequate medical evaluation and treatment is unsubstantiated." Mr. Durham was described as having been "examined twice in the morning by medical, but he was very uncooperative to the medical staff." The Memorandum claims that Mr. Durham had been released to the community "…when a secondary examination was scheduled" (p. 7).

In addition, this writer reviewed Videos 055-060. Video 058 depicts the use of force incident. Mr. Durham can be seen in the booking area and he is flanked by two Corrections Officers. Mr. Durham is quickly taken to the ground, face first, by three Corrections Officers (at approximately the 0:03:45 mark). The three Officers are seen on top of Mr. Durham and blood is visible on the ground. It is not clear what happens next, but in attempting to left Mr. Durham while he is restrained behind his back, it appears that the Corrections Officers move too quickly, do not often firm support in lifting Mr. Durham, lose their balance, and Mr. Durham falls forward and face first into the floor, again, as a result. Blood is visible on the floor for a second time. OC Spray was visible on Mr. Durham's shirt, but it was difficult to observe when he had been sprayed and for what reason use of force was necessary. Mr. Durham can then be seen being dragged out of the booking area, with his arms pulled and lifted in a manner that appears to put a lot of stress on his shoulders.

JA_01760

-Summary:

Mr. Durham reported that his main strategy in response to his experiences at SCI is to "block it out", he notices that he is still mostly "on alert or on guard". Mr. Durham explained, "I watch my surroundings. I try to avoid going back to Georgetown." Mr. Durham said that he has encountered law enforcement in the community since his release from SCI and has noticed that his voice becomes "shaky" and "my legs shake". Mr. Durham said that when engaging with law enforcement he has attempted to explain that his presentation and behavior is the result of having "problems with police in the past", including being Tazed in the community and sprayed with OC in SCI. Mr. Durham reports, "I don't want a problem".

Mr. Durham said that the reputation of the Corrections Officers in the pre-trial section of SCI is, "they don't play" and there were a "couple of officers notorious for not following regulations."

As described above, Mr. Durham has specific concerns regarding encounters with law enforcement. Mr. Durham said, "One bad minute can mess up your whole day". Mr. Durham reported that he avoids law enforcement and continues to have fears about "going back to Georgetown." Mr. Durham added that at the time of his arrest and booking into SCI, he had a wallet with $175 in it, and he has not gone back, out of fear, to collect his property.

In the clinical opinion of this writer, Mr. Durham currently meets DSM-5-TR criteria for PTSD. Mr. Durham directly experienced a traumatic event and reported that he believed that he was going to die during the use of force incident [Criterion A]. Approximately three years later [Criterion F] Mr. Durham still experiences recurrent and intrusive memories of the incident, recurrent distressing dreams related to the incident, intense and psychological distress and physiological reactions to both internal (thoughts) and external (law enforcement) cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B]. There was evidence of Mr. Durham attempting to avoid distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident. Mr. Durham reported that his main strategy in response to the use of force incident was to "block it out" [Criterion C].  In addition, it is my clinical opinion that there was evidence of Mr. Durham experiencing a loss of interest in activities that he used to enjoy and experiencing feelings of being distant and cut-off from other people [Criterion D]. In addition, Mr. Durham described experiencing significant hypervigilance, as well as sleep disturbance [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described

58

disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Durham [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

**Name:**



59

Mental Status-



JA_01763



61

JA_01764



62

JA_01765



**Name: Turner, Charles**
Date/Time of Assessment: 07/27/2024- 03:00pm (EST)
Duration: Approximately 52 minutes
Note: The current assessment took place via telephone, but no video capabilities were available or utilized.

-Psychiatric History (Prior to the event):
Mr. Turner denied a history of mental health treatment, to include Psychiatric medications and hospitalization, prior to the use of force incident.

-Psychiatric History (After the event):
Mr. Turner denied a history of mental health treatment, to include Psychiatric medications and hospitalization, after the use of force incident.

PTSD Checklist for DSM-5 (PCL-5): 33 (out of 80)

63

JA_01766

Current Mental Status and Behavioral Observations:
Current Diagnoses (per Mr. Turner): none
Current Psychotropic Medications: none
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations:
Appearance: no visual; not able to assess
Alertness: Alert
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: no visual; not able to assess
Behavior: cooperative and engaged
Speech: Mr. Turner spoke with a drawl, at a slightly slowed rate
Attention: attentive

Mental Status:
Perception: Mr. Turner denied experiencing either auditory or visual hallucinations.
Affect: no visual; not able to assess
Mood: Mr. Turner reported that he feels, "On the edge. I don't know what people might do around me because of what happened". Mr. Davis said, "I don't trust people. I feel jumpy."
Thoughts:
-Harm to Self and/or Others: Mr. Turner denied experiencing ideation or intent to harm himself and/or others, at this time.
-Delusions: not present

Sleep: Mr. Turner said, "I don't sleep. I'm up most of the time. My eyes water all the time."

-Description of the incident:
Mr. Turner reported that in 2022, when he was either 51 or 52 years-old, he had been housed in the pre-trial section of SCI. Mr. Turner reported that leading up to the incident, there had been a lock-down for two days. Mr. Turner and others had been eager to come out of their cells. In particular, Mr. Turner was eager to use the phones. Once allowed out of his cell, Mr. Turner said that he obtained a "phone sheet" and "commissary sheet". Next, Mr. Turner said that he tried to approach a female Corrections Officer at a desk so that he could obtain some assistance in "getting in touch with my people from the outside." Mr. Turner said that he heard a Corrections Officer yell "5 minutes to lock in", so he went to a mailbox to try to

64

JA_01767

put in the sheets. Mr. Turner said, "All of a sudden, from behind, there was a can of mace sprayed in-between my eyes and glasses." Mr. Turner said that he was placed in restraints, "thrown on the ground", "had knees on the back", and "elbows in the head". Mr. Turner recalled that over the course of the incident Corrections Officers shouted "Get the F down!", "Who the F do you think you are?", and other verbal threats. Mr. Turner reported that he did not know or remember the name of the Corrections Officers Staff, but remembered that his cell-ate had said the following on the morning of the incident in reference to a Corrections Officer, "Oh my God, he's working today, he's crazy. It's going to be chaos". Mr. Turner said that his cellmate warned him that the staff member had a reputation for engaging in acts of excessive force.

Mr. Turner said that he had recently had arm surgery (right arm) and during the use of force incident he experienced pain as his arms were forced behind his back. Mr. Turner reported that two sets of handcuffs were placed on him and then he was "dragged to the hole" (Segregation). Mr. Turner reported, "I was told to stand the fuck up, stand like you have some sense or I'll mace you again." Mr. Turner reported that he was briefly seen by medical staff, but said, "They only checked my pulse." Mr. Turner reported that he was only wearing underwear and once in Segregation had to use that underwear to try to wash his face. Mr. Turner said that he was otherwise not afforded the ability to decontaminate.

Mr. Turner reported that after 30 days in Segregation, he met with staff who requested to know "my side of the story". Mr. Turner said, "My side of the story doesn't matter in here", but he said he told the staff member "what happened". Mr. Turner said that after the staff member declared, "I will investigate it and get back to you in a couple of days", Mr. Turner was released and returned to pre-trial housing. Mr. Turner said that he was not told anything about the incident or investigation. In addition, Mr. Turner reported that at no time did he receive medical access and attention.

Mr. Turner reported that a distressing aspect to the use of force incident was that upon entering SCI, he said that staff had "thrown out" his prescribed "blood pressure medication". Mr. Turner reported, "I could not get it for months. My fiancé was trying to help.". Mr. Turner said his fiancé contacted a woman in the community who was able to contact SCI and gain Mr. Turner access to the medication again. Mr. Turner said that he does not know the identity of the woman in the community. Mr. Turner reported that when he was without access to the medication, "My head was banging for days. My blood pressure was up real high."

Following the use of force incident, Mr. Turner reported that he had submitted nine grievances. Mr. Turner said that he did not receive any formal responses.

-Perceived harm after the incident:
Mr. Turner said that because of being sprayed with OC directly in his eyes, "My eyes water all the time. I can't see everything clearly now. I have to focus."

In addition, Mr. Turner said that since the Corrections Officer "came up from behind me and sprayed me in the face without warning", he feels "uptight" and "jumpy". Mr. Turner reported that prior to the incident he did not have difficulty sleeping, but he has ever since the time of the incident (continuing to the present day). Mr. Turner said, "At night when I sleep, I jump awake. I'm having a dream about something. I'm fighting something. I can't remember what it is."

Mr. Turner reported the following about the use of force incident, "I couldn't breathe. I had mace in my mouth too. A knee on my neck. I thought I was going to die." Mr. Turner estimated that four to five Corrections Officers were involved in the use of force incident. Mr. Turner provided this writer with a recent example of an intense physical reaction he had while becoming hot in a "dump truck" he was driving for work. Mr. Turner said that the heat had made it difficult for him to breathe. As he started having difficulty breathing, "it took me back to the incident when I couldn't get my breath. I had guys all on top of me." Mr. Turner said that his response had been so intense that "I had to pull over. Get myself together. It just felt weird. It was just the other day."

-Subsequent interventions that alleviated the perceived harm:
Mr. Turner said that he had only six months to serve at SCI, and when he was released to the community, he went to visit an "eye doctor". Mr. Turner reported that the prescription had to be changed on his glasses.

This writer asked Mr. Turner if he had sought mental health treatment and he responded, "I don't think I need it."

Mr. Turner said that as compared to prior to the incident, he has since become "really nervous" when he observes law enforcement in the community. When asked for more information, Mr. Turner reported, "I get really nervous because I don't know what they might do. I may get mased or tased." Mr. Turner said that he knew some Corrections Officers in SCI because he had grown up with them. Once incarcerated, Mr. Turner said that he had sought assistance from them, but reported that the Officers had ignored him and "never helped."

66

JA_01769

Mr. Turner reported that Corrections Officers at SCI "Were known to mace you", "F-up inmates real bad, and "take their problems out on the inmates. Instead of defusing a situation they escalate it even more." Mr. Turner said that he witnessed one incident in which "A guy wasn't getting out of the chair fast enough; they assaulted him." Mr. Turner said that he observed a pattern in which incarcerated individuals who had just been involved in a use of force were taken to Segregation so that the Corrections Officers could "hide you for a while until you heal up". Mr. Turner said, "They all swole up and in the hole so nobody will see it". Mr. Turner added that in Segregation, incarcerated individuals did not have any visitation and no access to the phone, so individuals could not communicate with their family and friends about their experiences. Mr. Turner said that he believes the Corrections Officers involved in excessive uses of force "should lose their jobs" and added, They need to get some therapy."

Mr. Turner reported that he used to socialize often; play pool or play basketball. Since the use of force incident, Mr. Turner said, "I stay around the house. I feel safer at home."

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Alleged Assault of Inmate Charles Turner, SBI# 00187612", which was dated 04/08/2022. The report included the following which was based on an interview with Lt. Long: "…stated there were inaccuracies in the report about him (Charles Turner) refusing orders. You could see in the video that his back was turned (when was sprayed). He is following directions of the female sergeant, taking his commissary slip to the box and he is approached from behind, sprayed and taken to the ground. It was not justified" (p. 3) and "Lieutenant Long stated, in his opinion, the officer did not use IPC (interpersonal communication skills); he could have addressed it differently, he could have spoken to the inmate. Take some time to figure the situation out before he went to the 'next step' in the Use of Force Policy (p. 5). The conclusion of the report was the following: "Based on the totality of circumstances, allegation is founded" (p. 81).

This writer reviewed Videos 321-334. Video 332 shows a Corrections Officer come up from behind Mr. Turner and spray him in the face with OC (at approximately the 0:00:30 mark). There was no audio, but there did not appear to be any attempts at communication by the Corrections Officer prior to disseminating OC spray. Video 329 shows Corrections Officers clearing out the dayroom and directing individuals to their cells. At approximately the 0:00:24

67

mark of the video, a Corrections Officer can be observed looking towards the bottom of the screen and moving quickly towards Mr. Turner (who is off-screen). This is the Officer that sprays Mr. Turner with OC, and at approximately the 0:00:24 mark of the video this Officer can be seen removing his OC spray from its holster as he quickly walks to the bottom of the screen. In this writer's opinion, this suggests that the Corrections Officer had decided, in advance, to spray Mr. Turner and without warning. Video 332 also contains footage of this use of force, but from another angle. This video also shows that four Corrections Officers were on top of Mr. Turner at one point, including one who appears to put entire body weight on Mr. Turner's back. This writer has never heard of an individual being sprayed in the face, at close range, from behind in a correctional setting. Mr. Turner was not hostile nor acting aggressively. Instead, and consistent with the version of events that he had provided to this writer during the assessment, Mr. Turner can be seen in video 331 approaching a female Corrections Officer with some documents.

-Summary:
Mr. Turner's PLC-5 score of 33 is right at the cut-off for probable diagnosis of PTSD. However, in reviewing his responses on the PLC-5 and the other aspects of the current assessment, it is the clinical opinion of this writer that Mr. Turner does not meet full DSM-5-TR criteria for PTSD, at this time. Mr. Turner clearly evidenced some significant symptoms of PTSD and related impairment, but Mr. Turner did not appear to have symptoms other than social withdrawal in Criterion D ("Negative alterations in cognitions and mood associated with the traumatic event(s)…"), for example. While Mr. Turner described experiencing sleep disturbance, there appeared to be no other symptoms included in Criterion E ("Marked alterations in arousal and reactivity associated with the traumatic event(s)…").

Mr. Turner did experience a traumatic event [Criterion A]. Approximately three years later [Criterion F] Mr. Turner still experiences recurrent and intrusive memories of the incident, recurrent distressing dreams related to the incident, intense and psychological distress and physiological reactions to both internal (thoughts) and external (heat that led to difficulty breathing) cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B]. There was evidence of avoidance of distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident [Criterion C].

**Name: Robinson, Charles**
Date/Time of Interview: 08/04/2024- 11:30am (EST)
Duration: approximately 50 minutes

68

JA_01771

Note: The current assessment took place via telephone, but no video capabilities were available or utilized.

-Psychiatric History (Prior to the incident):
Mr. Robinson described himself as "stable" prior to the incident and denied receiving any mental health services previously, including Psychiatric medications or hospitalization.

-Psychiatric History (After the incident):
Mr. Robinson reported that he has received a referral, from his primary care physician, to meet with a mental health professional, but has not received any mental health care since the incident.

PTSD Checklist for DSM-5 (PCL-5): 66 (out of 80)

Current Mental Status and Behavioral Observations:
Current Diagnoses (per Mr. Robinson): none
Current Psychotropic Medications: none
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: no visual; not able to assess.
Alertness: Alert, not easily distracted.
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: no visual; not able to assess
Behavior: Cooperative
Speech: clear, conversational, expressive when discussing the use of force incident.
Attention: Attentive.

Mental Status-
Perception: denied experience auditory or visual hallucinations.
Affect: no visual; not able to assess.
Mood: Mr. Robinson described his mood as "cloudy" and reported that he felt that way due to "one of my uncle's died" recently.

Thoughts-
-Harm to Self and/or Others: Mr. Robinson denied experiencing ideation or intent to harm himself and/or others, at this time.
-Delusions: not present

69

Sleep: Mr. Robinson described his sleep as "bad" and said, "I maybe get 4-5 hours of sleep, I've been in jail so long. I think something still could happen." He endorsed having dreams in which it "sometimes feels like I'm still incarcerated". Mr. Robinson reported having dreams about being incarcerated and some that were specifically about the use of force incident. Mr. Robinson discussed both trouble falling and staying asleep at night.

-Description of the incident:
Mr. Robinson reported that he had been admitted to SCI when he was seventeen-years-old since he had been "charged as an adult". Mr. Robinson described the use of force incident as taking place in the medium security section of SCI in 2021 (when Mr. Robinson was eighteen years-old).

Mr. Robinson said, "I was in the shower and the officers said 'code red'. I was getting out of the shower. A CO came on the tier and said, 'Who the fuck is in my shower, it's code red'? I said, 'It's me, Robinson'. I was putting on my boxers to get some clothes on and the CO says, 'You got five seconds until I spray you.' Then the shower curtain moves and I was sprayed in the face with OC." Mr. Robinson reported that the name of the Corrections Officer who sprayed him in the face was "Sgt. Hastings".

Mr. Robison reported that he had only been able to place his right leg into his underwear and was otherwise naked. Mr. Robinson said that after being sprayed with OC "right in face", he was forced to the ground and felt a knee on his back. Mr. Robinson remembered hearing shouts to "get on the ground" and "stop resisting". Mr. Robinson said that he was escorted to "chow hall" and waited there for 15-20 minutes. Mr. Robinson reported that he was then taken to another location that he said was called the "CRU". Mr. Robinson said that while at the "CRU" he was being "processed into the hole" (Segregation). Mr. Robinson reported that he was placed in Segregation for five days and was placed on "bunk confinement" (CTQ) for approximately twenty-five additional days. Mr. Robinson reported that he did not have any phone access for 30 days as a result. Mr. Robinson highlighted that despite being sprayed in the face with OC, he had to try to decontaminate himself and was not provided with new clothing. Mr. Robinson informed this writer that he had asked multiple staff for new clothing, even reporting that his skin was burning and that his body was hot. Mr. Robinson said that he had asked "everyday" for a change of clothes while he was in Segregation.

In addition, Mr. Robinson said that while he met with a nurse soon after the use of force incident, he reported that the nurse only took his vitals, including heart rate.

70

JA_01773

Mr. Robinson reported that he had made additional, subsequent requests for "sick call", but was never seen. Mr. Robinson remained in custody for two years following the incident. He said that a "couple of the CO's mentioned" the incident and had made "slick comments" to him. Mr. Robinson was released to the community on October 25, 2023.

-Perceived harm after the incident:

Mr. Robinson said that during the incident, "I thought they were going to try to kill me. I couldn't see. There was a knee in my back. They were forcing my arms behind my back. I thought they were going to break my arm. They were picking me up and bending my arms back." Mr. Robinson reported that the sounds of keys jangling reminded him, generally, of being incarcerated and has triggered memories of the use of force incident.

Mr. Robinson reported that prior to the incident, "I was living my best life. I was playing football and going to school." Following the incident, Mr. Robinson said, "I now move with caution; I don't confront people. I let them come to me. I have flashbacks of them spraying me. I always think somebody is going to jump me. I don't know like what's going to happen." Mr. Robison described having to "Know my surroundings" and said, "I'm always looking around". Regarding his current hypervigilance, Mr. Robinson said, "I wasn't like that before. But after I was sprayed in the face, I think anything could happen." Mr. Robinson said that when he sees law enforcement in the community, "it makes me nervous."

Mr. Robinson reported that upon arriving at SCI, some other incarcerated individuals had informed him that the Corrections Officers at SCI "spray people, beat them up, hurt them bad, and then put them in the same tier". This writer asked Mr. Robinson if he had witnessed other use of force incidents while incarcerated at SCI. In response, Mr. Robinson reported, "They would come on the tier, take the hot pots, shut the power off when they thought people were making too much noise". Mr. Robinson reported that when the power was shut off, CPAP machines that were used by some incarcerated individuals were turned off in the process. Mr. Robinson said that the Corrections Officers "did not care" about the CPAP machines being turned off.

Mr. Robinson report, "Talking about it today, it brings back memories; I try to push it to the side." Mr. Robinson said that his recollection of the point at which he was sprayed in his eyes was the most frequent, intrusive, and distressing memory.

-Subsequent interventions that alleviated the perceived harm:

71

 As described above, Mr. Robinson reported that he had made multiple "sick call" requests after the incident and was not seen. Mr. Robinson described his symptoms as, "I couldn't see" during the "first couple days in the hole. I could see up close, I couldn't see far away. I put in a sick call. Heard nothing about it. They didn't diagnose me with anything." Once released to the community, Mr. Robinson reported that he met with an "Eye doctor" and there was the clinical opinion that "my right eye was good and my left eye was bad". When this writer asked Mr. Robinson about the presence of current visual impairment, he denied any difficulties at this time.

Mr. Robinson reported that he had not yet met with a mental health professional, but had received a referral from his primary care physician. Mr. Robinson reported that the referral took place after he had described his use of force experience to the primary physician. Mr. Robinson reported that he is seeking mental health treatment because, "I have so much pent-up energy and anger. They sprayed me for no reason". In addition, Mr. Robinson described that many of his family and friends had died, including while he was incarcerated. Mr. Robinson described experiencing feelings of guilt because he was not present in the community and added, "I'm trying to keep it all together." Mr. Robinson added, "I feel like all that time I been in jail it was weighing terror on me; my family and friends were dying."

Mr. Robinson reported that he hopes his involvement in this case can help to "Stop the violence" at SCI. He said, "They are just using their force too much, their police status. They come on the tier. Overboard with it. They don't have no control at home. They want to control stuff. They bring their problems from home to the workplace". Mr. Robinson reported that he believes that the Corrections Officers at SCI are continuing to engage in excessive use of force at this time. Mr. Robinson said, "They are ready to spray you for no reason. They are trying to intimidate people. They think that they are above the law."

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Alleged Unprovoked Violence" which was dated 11/17/2022. The report concluded, "Inmate Charles G. Robinson's allegation of 'unannounced and unprovoked' violence by Lieutenant Harry P. Hastings on November 2, 2021, is Unfounded. Lt. Hastings did deploy sabre [sic] red in the face of Inmate Robinson while in the shower of Medium Building. Inmate Robinson refused multiple orders, refused to lock in and interfered with a code red headcount. He was found guilty on all administrative

72

JA_01775

charges. Lt. Hastings is Exonerated for deployment of sabre [sic] red. His actions were justified, legal and proper" (p. 5).

In addition, this writer reviewed Videos 272-299. There was no footage contained in these videos that depicted Mr. Robinson being sprayed with OC. Contrary to the conclusions described in the Memorandum, this writer's concerns center on the necessity of the use of force in Mr. Robinson's case. Even if he was refusing orders or slow to comply in a shower area, such behaviors most typically receive a disciplinary "write-up" in a correctional setting and not the dissemination of OC in order to gain compliance.

-Summary:
In the clinical opinion of this writer, Mr. Robinson currently meets DSM-5-TR criteria for PTSD. Mr. Robinson directly experienced a traumatic event and reported that he believed that his life was in danger during the use of force incident [Criterion A]. Approximately three years later [Criterion F] Mr. Robinson still experiences recurrent and intrusive memories of the incident, recurrent distressing dreams related to the incident, intense and psychological distress and physiological reactions to both internal (thoughts) and external (the sounds of keys) cues that symbolize or resemble aspects of the incident and the associated environment [Criterion B], evidence of avoidance of distressing memories and thoughts of the incident as well as avoidance of external reminders of the incident [Criterion C]. In addition, it is my clinical opinion that there was evidence of Mr. Robinson experiencing persistent negative emotional states, markedly diminished participation in significant activities, and feelings of detachment from others [Criterion D]. In addition, Mr. Robinson described experiencing hypervigilance, as well as sleep disturbance [Criterion E]. In the clinical opinion of this writer, there was evidence that the above-described disturbances have caused clinically significant distress and impairment in multiple areas of functioning for Mr. Robinson [Criterion G]. In the clinical opinion of this writer, this disturbance is not attributable to the physiological effects of a substance or another medical condition [Criterion H].

It is also important to note that at the time Mr. Robinson was incarcerated at SCI he was 17 years old and placed in an adult correctional institution. At the time of the use of force incident, he was 18 years old. Since adolescence is a formative time for one's brain development, it is reasonable to expect that those experiences had a detrimental impact on Mr. Robinson.

Name: **Harding, Danny**

73

Date/Time of Assessment: 08/13/2024- 09:30 am (EST)
Duration: approximately 60 minutes
Note: The current assessment took place via telephone, but no video capabilities were available or utilized.

-Psychiatric History (Prior to the incident):
Mr. Harding denied a history of mental health treatment, to include Psychiatric medications and hospitalization, prior to the use of force incident. Mr. Bullock said that he was "untreated".
-Psychiatric History (After the incident):
Mr. Harding said that he has considered mental health treatment, but has not received any since the use of force incident.

-PTSD Checklist for DSM-5 (PCL-5): 35 (out of 80)

-Current Mental Status and Behavioral Observations:
Current Diagnoses (per Mr. Harding): None
Current Psychotropic Medications: None
Psychotropic Medication Utilization/Compliance: N/A

Primary Observations-
Appearance: no visual; not able to assess.
Alertness: Alert and engaged.
Orientation: Oriented x 4 (person, place, time, and situation)
Eye Contact: no visual; not able to assess.
Behavior: no visual; not able to assess.
Speech: Mr. Harding presented as very talkative, and this writer redirected him on a few occasions during the current assessment to focus the conversation.
Attention: Mr. Harding presented as attentive.

Mental Status-
Perception: Mr. Harding denied experiencing auditory or visual hallucinations; unremarkable.
Affect: no visual; not able to assess.
Mood: Mr. Harding described his current mood as "alright".

Thoughts-
Harm to Self and/or Others: Mr. Harding denied a history of self-harm and/or suicide attempts. Mr. Harding denied experiencing ideation and/or intent to harm himself and/or others at this time.

74

JA_01777

Delusions: not present.

Sleep: Mr. Harding denied experiencing any sleep difficulties.

-Description of the incident:
Mr. Harding reported that on 02/17/2022, approximately six days after entering SCI, he was seated at a table for a meal. Mr. Harting said that his mother had died on the evening of the day he had entered SCI, and he had been having difficulties, emotionally, in response to the loss. Mr. Harding reported that "Sgt. Purnell" had declared "No talking at the table", to Mr. Harding. Mr. Harding reported that he had responded, "I wasn't talking". Sgt. Purnell reportedly said, "Oh, then I'm a liar then? Just shut up and eat your food." Mr. Harding reported that he started to open his meal tray when he saw another officer, Corporal Anthony Corea coming towards him with a can of OC spray. Mr. Harding reported that he had seen Corporal Corea shake the can of OC spray, so Mr. Harding believed he was about to be sprayed.  Mr. Harding said he heard Corporal Corea yell, "Drop your fucking tray right now" and then Mr. Harding said that he was sprayed in the face with OC.

Mr. Harding reported that he was immediately taken to the ground, and remembered receiving an Officer's knee in the side of his face. Mr. Harding reported that he was taken into Segregation for nine days. Mr. Harding said, "They forgot they were back there." Mr. Harding said that he did not receive the means to decontaminate from OC spray, and only was able to use the small sink in his Segregation cell. Mr. Harding said that his body felt like it was "burning" and described the brand of OC spray, "Sabre Red" as "extreme fire". Mr. Harding said that he had filed a grievance and "I couldn't use the phone". As a result, Mr. Harding said, "I felt cut-off from the outside world."

When Mr. Harding was released from Segregation, Mr. Harding said that he was returned to the same as the officers who were involved in the use of force worked. Mr. Harding reported that on at least one occasion Corporal Corea "threatened to pepper spray me again." Mr. Harding described experiencing fear and anxiety when Corrections Officers were walking behind him.

-Perceived harm after the incident:
In terms of harm caused by the use of force incident, Mr. Harding emphasized that his most significant concern was losing three teeth in the back of his mouth. Mr. Harding said that his teeth had "broken off at the gums." Mr. Harding said that he has experienced persistent pain and infections due to the damage to his mouth. He

75

described missing work one day due to experiencing pain in his mouth and then being fired from a job.

Mr. Harding focused his other comments on his lack of trust in and fear of SCI and many of the Corrections Officer staff. Mr. Harding reported, "It's not all of the staff, but I don't trust none of them. I think it was wrong. I think it [SCI] should be shut down. I think that the Officers should do time. Delaware has issues. They are breaking laws. They are assaulting people. They are robbing people. It's like a gang up there." Mr. Harding reported that because of the use of force incident, "I stay far away from police. I don't want no trouble. No problems." Mr. Harding described, "Checking the demeanor" of any law enforcement he encounters in the community to see if they intend him any harm.

Mr. Harding said, "I don't like to talk about it, but it's necessary", when this writer asked him about the current assessment. Mr. Harding went on to report that he has had self-critical thoughts because, "I was taken advantage of, and I let it happen." Mr. Harding said that he has had thoughts of retribution against the Officer who sprayed him with OC. Mr. Harding said that he was "shocked" by the use of force incident and remembered being "furious" when placed in Segregation. Mr. Harding said that he was upset thinking about the SCI Corrections Officers that "take advantage of people; abuse their power".

-Subsequent interventions that alleviated the perceived harm:
Mr. Harding reported that he did not seek mental health care while at SCI because, "I didn't trust them." Mr. Harding reported that he has considered seeking mental health treatment, but has not received any mental health or medical treatment post-incident. Mr. Harding described that focusing on "work" was his "strategy to take my mind off of things". Mr. Harding added, "Yeah, I think I need mental health. I don't like to admit to things like that". Mr. Harding said, "I've got a baby due in October. I've overlooked my mental health. I get stressed out a lot.

Since the use of force incident, Mr. Harding reported that he has seen a dentist on at least two occasions. Mr. Harding said that he has been informed that it will cost at least $1,500 to perform surgery on the damaged area. Mr. Harding reported that he does not have the financial means to pay for the surgery.

-Collateral information/records review:
This writer reviewed a Memorandum entitled "Alleged Assault of Inmate Danny Harding, SBI# 00566738", which was dated 11/07/2022. The Memorandum contained the following conclusions: "Based on the totality of circumstances and

76

Inmate Harding's denial of injury directly after the incident, this portion of the allegation is UNFOUNDED" and "Inmate Harding did not receive a disciplinary hearing with regard to this incident; his disciplinary charges were nullified by Captain Adrienne Hanna on 3-3-22 according to policy because of the amount of time he was on the THA unit without a hearing, pages 14, 15, 16, and 17. Based on the information above, the allegation is UNFOUNDED" (p. 26).

In addition, this writer reviewed Videos 393-407. Video 397 contains footage of the use of force incident, including the events that preceded it. Mr. Harding can be seen seated at a table with other incarcerated individuals during a mealtime. The individuals have meal trays in front of them and it appears that Sgt. Purnell is speaking with Mr. Harding (there is no audio). Sgt. Purnell can be seen leaving the area near Mr. Harding and walking past Corporal Corea (at approximately the 0:01:02 mark). As Corporal Corea quickly moves towards Mr. Harding, he removes a can of OC spray from his holster and places it in his left hand (at approximately the 0:01:02 mark). Corporal Corea appears to be speaking to Mr. Harding (or other individuals at his table) and continues to hold the OC spray in his outstretched left hand. Corporal Corea gets close enough to Mr. Harding that he is behind him, and then disseminates OC spray from behind Mr. Harding and on the left side of his face at close range (at approximately the 0:01:08 mark). Mr. Harding is taken to the ground, face first, with three Corrections Officers eventually on top of him during the application of restraints behind his back. This writer cannot recall an instance, in my experience, in which an individual has been sprayed by OC in a correctional environment while they were in a seated position at a table. This writer questions the necessity of this use of force, especially when Mr. Harding does not appear to have presented an imminent threat towards others and less intrusive alternatives were readily available (including verbal de-escalation) to Correctional Officers.

At approximately the 0:01:32 mark of the footage, there is a second use of force on another individual (whose identity is unknown to this writer, at this time).

-Summary:
As described above, Mr. Harding expressed his mistrust and disdain for SCI, the Corrections Officers involved in mistreating incarcerated individuals, and what he described as "the system". Mr. Harding described SCI Corrections Officers as "bullies" and went on to say, "They have no respect. They wouldn't answer questions about requests for basic information." Mr. Harding reported that he had so much concern about returning to SCI, that he moved out of Delaware to live in Georgia.

77

Mr. Harding described being sprayed with OC for "no reason at all." Mr. Harding reported that he had been sprayed with OC in SCI during a previous booking, but understood the use of force in that instance because, "I had been in fight at the time." Mr. Harding believes that many of the Officers in SCI "oppress" incarcerated individuals. Mr. Harding reported being witness to numerous use of force incidents while incarcerated. In addition, Mr. Harding said that he had observed SCI Officers making threats to use force on incarcerated individuals. Mr. Harding said that he had witnessed a Corrections Officer yell the following at an incarcerated individual, "Take your fucking clothes off or I'm going to stick this can of mace up your ass and spray every drop!"

Mr. Harding's PLC-5 score of 35 is above the cut-off score (of 33) for probable diagnosis of PTSD. However, in reviewing his responses on the PLC-5 and the other aspects of the current assessment, it is the clinical opinion of this writer that Mr. Harding does not meet full DSM-5-TR criteria for PTSD, at this time. For Mr. Harding, there was the presence of repeated and unwanted memories of the use of force incident ("every time" he experiences pain in his mouth), but there did not appear to be other symptoms relevant to Criterion B ("…intrusion symptoms associated with the traumatic event(s). Mr. Harding demonstrated having negative beliefs about himself, but he did not appear to have any additional symptoms in Criterion D ("Negative alterations in cognitions and mood associated with the traumatic event(s)…"). While Mr. Turner described experiencing some hypervigilance, there appeared to be no other symptoms included in Criterion E, such as sleep disturbance ("Marked alterations in arousal and reactivity associated with the traumatic event(s)…").

## VIII.  CONCLUSION

The American Correctional Association (ACA), a standard bearer for operations in both jails and prisons, offers the following statement in their description of an online training they offer entitled "Using Force with Inmates": "Force is used as a last resort when all other options have failed, unless there is an immediate danger to life." The Delaware Department of Correction's Use of Force Policy (8.30) cites ACA standards and echoes the description above: "The use of force must be reasonable under the circumstances and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use force. The use of force may not be used as a retaliatory or disciplinary measure" (p. 2).

JA_01781

Consistent with this guidance, in my correctional experience (both in jail and prison), it is common for use of force related procedures to emphasize that force should only entail what is minimally necessary to accomplish a correctional interest. Force should be incremental, with alternatives to force being considered first such as verbal communication and other forms of de-escalation. Delaware's Department of Correction's Use of Force Policy specifically includes mention of "The Use of Force Model", which is described as a "graduated approach" and is intended to, "…guide staff in making use of force decisions" (p. 2).

According to Delaware Department of Corrections policy 16.1 ("Employee Development"), "All new Correctional Officers and Correctional Officer/Series employees must successfully complete Correctional Officer Employee Initial Training (CEIT) as mandated by Delaware Code. After initial training, each officer must complete 40 hours of annual in-service training…" (D. 1., p 3). Included among the list of annual trainings is "Use of force" and "Standards of conduct/ethics". The policy goes on to describe two other areas relevant to the current case: "All personnel authorized to use chemical agents and/or oleoresin-capsicum based products shall receive thorough training in their use and in the treatment of individuals exposed to them" and "All Correctional Officers and Probation and Parole Officers are training in approved methods of self-defense and the use of force continuum."

Based on my assessments of the individuals and review of available collateral information, including video, that is available to this writer at this time, it is the opinion of this writer that Correctional staff at SCI evidenced a tendency to use force when it was not needed nor appropriate and were too quick to use force instead of attempting to verbally de-escalate situations. Despite what is included in the "Employee Development" policy, the many of the acts described by plaintiffs were not humane and represented abuse to the point of representing assault, in my opinion. It is a common correctional practice to strive to avoid uses of force. Instead, Correctional staff at SCI appeared to seek opportunities to use force. In a number of cases they appeared to instigate individuals in an effort to escalate towards violence. Plaintiffs also reported that SCI Corrections Officers used OC spray in a dangerous manner, disseminating spray at close range, in their mouth, and/or in their nose. Plaintiffs also described Corrections Officers utilizing restraint tactics that were painful and/or obstructed their ability to breathe.

This writer believes that the behaviors of concern and associated culture were well summarized in a Memorandum that was cited in Mr. Morales' use of force incident describe in detail in a section above. The document contained the following

79

JA_01782

conclusion, which is repeated here to emphasize the themes present in many of the use of force incidents that this writer reviewed: "…However, what appeared to be unusual in this incident was how quickly Sergeant Kirk Neal resorted to using pepper spray and elevating this into a physical conformation. His decision triggered multiple officers to also engage Mr. Morales physically. I believe interpersonal skills would seem more prudent given that Mr. Morales posed no immediate physical threat. Mr. Morales was the only inmate on the floor at the time. My review of grievance reports against Sergeant Neal from 2014-2022 show a pattern of excessive inmate complaints with alleged verbal and physical confrontation. Domestic police reports, a 2019 performance valuation and a 2019 210 [sic] investigation for unprofessional conduct raise behavior concerns" (p. 22).

While it is common for individuals who are involved in a use of force to be taken to a Segregated housing setting, multiple plaintiffs described their belief that there was a more concerning motive behind some of the Segregation practices they experienced and/or observed. Specifically, once in Segregation it was reported that there was no or limited phone access and, therefore, no contact with anyone outside of SCI. As a result, individuals could not communicate with their friends and family regarding their treatment. In addition, if an individual had sustained any physical injuries during a use of force, then Segregation placements lasting up to 30 days could lead to healing that would hide or obscure any physical harm that the individual had sustained.

Also of concern were consistent reports of individuals not receiving access to adequate water to decontaminate from OC spray following a use of force incident (despite many of the videos demonstrating that plaintiffs were taken into a shower area to be searched and to receive a change of clothing, but received no shower despite having been sprayed with OC). Such decontamination is humane, necessary, and standard practice in corrections following the dissemination of OC spray (to at least offer decontamination). To not provide it, leads to unnecessary pain and suffering by the individual who had been sprayed with OC. This writer observed, via video, of some medical screening that took place after use of force incidents, but I did not observe or hear any reports that individuals had received access to mental health staff following a use of force incident, including while placed in Segregation.

This writer has not previously encountered staff and an associated system that contained all of the above-described tendencies and practices. These deficiencies suggest failures in training, supervision, and/or other forms of accountability. These abuses also lead to psychological consequences to those who were the

80

victims of such uses of force and to those who were witnesses, including continued medical and dental related concerns.

This writer assessed fourteen individuals who were formerly incarcerated at SCI and were living in the community at the time of their assessment. All fourteen of the individuals had experienced at least one use of force within the last four years while incarcerated at SCI. Of the fourteen individuals, all but one of the individuals had a score on the PLC-5 at or above the cut-off of 33, which indicated the presence of probable PTSD. All fourteen individuals evidenced symptoms of PTSD that were related to a use of force incident at SCI. This writer went on to review the responses on the PLC-5 and integrated the information with the additional responses provided by the individual during the assessment. The resulting clinical information led this writer to opine that eleven out of fourteen individuals met DSM-5-TR criteria for PTSD.

Over the course of the assessments, a number of themes stood out. It was common for individuals to express that they believed that the force that had been used on them was unnecessary and that there had been clear alternatives to force in their situations. There was also the view held by some of the individuals that they had been mistreated because they had been viewed as less than human. Individuals reported surprise that force had been used at all, and expressed experiencing significant, subsequent hypervigilance and fear as a result. In terms of hypervigilance, the most common comment was that because of their experiences individuals had intense, negative reactions when observing law enforcement in the community. Their fears associated with Corrections Officers had extended to law enforcement more generally. Individuals described withdrawing socially and tending to spend their time at home. This behavior appeared to be the result of one or more of the following symptoms: individuals expressing a lack of interest in activities they used to enjoy, withdrawing socially, becoming estranged from others, and having fears that if they leave the house they may come into contact with law enforcement and return to SCI.

In the clinical opinion of this writer, the above-described deficiencies have resulted in needless pain, suffering, and trauma to the plaintiffs. The plaintiffs were victims of the systemic problems at SCI, problems that can and should be immediately addressed. There are several repositories of information on the subjects highlighted above, as well as the presence of national organizations that can provide technical assistance to a requesting agency.

81

JA_01784

RESPECTFULLY SUBMITTED AND DATED this 15th day of August, 2024.

By: _____
     Ryan Quirk, Ph.D.

82

JA_01785

# REGISTER'S ORDER
REGISTER'S OFFICE

Sussex County, Delaware, **May 13, 2024**

Upon the application of **Patricia Klein, Administrator** of the estate of **Michael A. Klein (deceased July 4, 2022)** late of **Sussex** County DE, **Millsboro**, in said county, deceased, it is ordered and directed by the Register that the **Administrator** aforesaid give notice of granting of Letters **Administration** upon the estate of the deceased, with the date of granting thereof, by causing advertisements to be posted within forty days from date of such Letters on the County website, requiring all persons having demands against the estate to present the same, or abide by an Act of Assembly in such case made and provided; and also cause the same to be inserted within the same period in the **Delaware State News** and to be continued therein for three  (3) consecutive weeks.

SEAL

Given under the hand and seal of office of the Register aforesaid, at Georgetown, in Sussex County aforesaid, the day and year above written.

_____
Register

## NOTICE

Notice is hereby given that Letters **Administration** were in due form of law granted unto the undersigned, on **May 13, 2024**, and that all persons having claims against the estate of the deceased must present the same duly attested; to the said **Administrator** of the estate of **Michael A. Klein**  on or before **March 4, 2023,** or abide the Act of Assembly in such case made and provided.

Address,

PURSUANT TO CHANCERY COURT
RULE 190

**34146 Colony Drive North, Millsboro, DE 19966**

_____
**Patricia Klein**

SCRW-6 (2-86)

JA_01716

# REGISTER'S ORDER
REGISTER'S OFFICE

Sussex County, Delaware, **December 19, 2024**

Upon the application of **John Klein, Administrator** of the estate of **Patricia Ann Klein (deceased September 4, 2024)** late of **Sussex** County DE, **Millsboro,** in said county, deceased, it is ordered and directed by the Register that the **Administrator** aforesaid give notice of granting of Letters **Administration** upon the estate of the deceased, with the date of granting thereof, by causing advertisements to be posted within forty days from date of such Letters on the County website, requiring all persons having demands against the estate to present the same, or abide by an Act of Assembly in such case made and provided; and also cause the same to be inserted within the same period in the **Delaware State News** and to be continued therein for three (3) consecutive weeks.

SEAL

Given under the hand and seal of office of the Register aforesaid, at Georgetown, in Sussex County aforesaid, the day and year above written.

_____
Register

## NOTICE

Notice is hereby given that Letters **Administration** were in due form of law granted unto the undersigned, on **December 19, 2024,** and that all persons having claims against the estate of the deceased must present the same duly attested; to the said **Administrator** of the estate of **Patricia Ann Klein** on or before **May 4, 2025,** or abide the Act of Assembly in such case made and provided.

Address,

PURSUANT TO CHANCERY COURT
RULE 190
_____
**John Klein**

**34146 Colony Drive North, Millsboro, DE 19966**

SCRW-6 (2-86)

JA_01717

**IN THE DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WILLIAM DAVIS, et al.,

               Plaintiffs,

        -vs-

KIRK NEAL, et al.,

               Defendants.

C.A. No. 1:21-cv-01773 TLA

**REBUTTAL REPORT OF STEPHEN SINCLAIR**
**February 20, 2025**

1

## Table of Contents

I.    OVERVIEW AND PURPOSE ..............................................................................3

II.   RECAP OF DDOC'S POLICY AND TRAINING STANDS .............................................3

    DDOC USE OF FORCE POLICY ...........................................................................................3
    DDOC USE OF FORCE TRAINING MATERIALS. ................................................................4

III.  DDOC'S VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS UNDER THE "OBJECTIVE REASONABLENESS" STANDARD ........................................8

    VIOLATIONS OF THE OBJECTIVE REASONABLENESS STANDARD IN DDOC USE-OF-FORCE INCIDENTS ........................................................................................................................10
    USE OF FORCE WITHOUT IMMEDIATE THREAT OR JUSTIFICATION..................................11
    FAILURE TO ATTEMPT DE-ESCALATION OR USE OF NON-FORCE ALTERNATIVES ......................11
    EXCESSIVE AND PROLONGED USE OF OC SPRAY WITHOUT JUSTIFICATION ................................11
    FAILURE TO PROVIDE MEDICAL ATTENTION IN THE FORM OF DECONTAMINATION AFTER OC SPRAY USE ....................................................................................................................12
    THE DDOC'S VIOLATIONS OF THE FOURTH AND FOURTEENTH AMENDMENTS SUMMARY ........12

IV.   VIOLATIONS OF THE EIGHTH AMENDMENT IN DDOC USE-OF-FORCE INCIDENTS ........................................................................................................................13

    UNNECESSARY AND EXCESSIVE FORCE APPLIED TO RESTRAINED OR COMPLIANT INMATES .....13
    PATTERN OF UNCHECKED EXCESSIVE FORCE: FAILURE TO INTERVENE ...................................14
    OVERUSE OF OC SPRAY WITHOUT JUSTIFICATION OR DECONTAMINATION ..............................14
    USE OF FORCE AS PUNISHMENT RATHER THAN FOR SECURITY ...................................................15
    DDOC'S VIOLATIONS OF THE EIGHTH AMENDMENT SUMMARY...................................................15

V.   CONCLUSION ...................................................................................................16

VI.  SIGNATURE ..................................................................................................17

2

## I. Overview and Purpose

1. I reviewed Mr. Clark's Expert Report dated January 22, 2025. It appears that Mr. Clark and I have many areas of disagreement related to individual incidents and what he saw or didn't see, as well as systemic failures and potential *Monell* Liability by the DDOC administration.

2. Mr. Clark emphasizes what the officers reported. My method began with reviewing the DDOC Use of Force policy requirements, expectations, training materials, videos, related documents, and reports. I agree that the officers' statements in their written reports are essential. However, I strive to remain objective when considering them because, during these incidents, staff reviewed the video footage and then wrote their reports, sometimes collaboratively. My professional experience suggests that officers may attempt to justify their actions in their reports rather than simply recounting the events, including what actions the inmate suspect took to escalate the situation and necessitate the use of force.

3. Rather than creating another 100-plus-page report or rebuttal to identify the actions I observed in the videos versus those Mr. Carter did, I will leave it to the jury to decide once they have been informed of DDOC policy expectations and training versus what they will see with their own eyes.  My rebuttal expert report has three major categories based on Mr. Clark's Report, which are:

      a. Recap of DDOC's Policy and Training Standards

      b. DDOC's Violations of Fourth and Fourteenth Amendment Rights on pre-sentenced detainees.

      c. DDOC's Violations of the Eighth Amendment in Use-of-Force Incidents involving sentenced inmates.

## II. Recap of DDOC's Policy and Training Stands

**DDOC Use of Force Policy**

4. In support of my perspective, I believe it is essential to acknowledge DDOC's Use of Force Policy and training. DDOC Policy 8.30 Use of Force:

3

"**II. PURPOSE:** It is the intent of the Department of Correction (DOC) to provide a single source of reference for its employees concerning the authorization, documentation and control of the use of physical force by Department employees. Employees of the Department may encounter situations that <u>necessitate the use of physical force or a weapon to provide for the safety and welfare of the public, departmental employees, contractors, offenders and themselves. All employees are responsible for understanding existing procedures and directives concerning the use of force and reporting requirements.</u>"

"**V. POLICY:**
<u>The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force.</u> The use of force may not be used as a retaliatory or disciplinary measure."

**DDOC Use of Force training materials.**

5.  On the first slide of the DDOC Use of Force PowerPoint the instructor notes state:

"It should be noted that our policy/model included many of the stipulations regarding neck restraint, <u>de-escalation</u> etc. BEFORE the George Floyd incident."

Based on this prideful emphasis on "de-escalation," I would expect the DDOC administration to prioritize it. However, after reviewing the incidents noted in my initial report, it does not appear this is true.

6.  Slide 5 of this same PowerPoint titled Graham v Connor, explains:

"Factors determining objective reasonableness:

-Severity of the crime at issue [*No crimes were committed, only minor rule violations*]

-Whether the suspect poses an immediate threat to the safety of officers or others [*There was no immediate threat to staff or others*]

-Whether he/she is actively resisting arrest or attempting to evade arrest by flight. [*In the cases I reviewed, the force was initiated by staff without active resistance or attempts to evade arrest*]

I note these were spelled out in relation to *Graham v Conner*, but they were also used to define objective reasonableness for DDOC staff, so I have included them here.

7.  Slide 13 - Instructor note:

"<u>Stress De-escalation and Reasonableness</u>!"

4

8.  Based on DDOC policy and training, specifically the underlined portions above, it is reasonable to expect staff to follow and be held accountable to agency policy and the training they receive. This would require all staff to use force only when necessary and after reasonable steps have been taken to de-escalate the situation and prevent the need to use force.

9.  The DDOC policy does not emphasize time permitting, but I believe an officer's actions must also be influenced by the time available or the urgency of their actions. For example, suppose the officer confronts an out-of-control or aggressive inmate who is approaching the staff member and giving pre-attack indicators. In that case, the officer probably does not have time to use de-escalation, and force may be required due to the immediacy of the situation. In all the incidents I reviewed and commented that there was unnecessary force, that force was unnecessary because there was time to attempt de-escalation, and it was not reasonable to resort to using OC (force) immediately. DDOC policy states, "[force] should be used only when no other reasonable alternative is available." In my professional opinion, the staff had time and reasonable alternatives available in these incidents.

10. DDOC staff were trained in the harmful effects of pepper spray but used it without justification or before attempting reasonable alternatives.

Corrections officers are trained to know that OC spray can cause:

- Respiratory distress
- Severe eye pain
- Skin burning
- Potential suffocation in confined areas
- And much more [See DDOC Training Slides on OC][1]

In corrections and Law Enforcement training, to be authorized to carry and use OC products, the common practice is for everyone to experience exposure to the effects of OC. I am including links to law enforcement training videos to show the effects the staff experienced from OC. Also, it is important to note that decontamination was immediately available for the exposed officers in all

---

[1] *See* DOC_SCI_0041435,

5

of the example videos provided. This was not the case for any of the incarcerated people who were exposed to OC.

https://www.youtube.com/watch?v=f0NZ_h45czQ

https://www.youtube.com/watch?v=XHAOP4rgZPo

https://www.youtube.com/watch?v=6AGfkPRzthg

11. It is disappointing that after the defendant's experience of exposure to the painful effects of $OC^2$ and specific DDOC training about Decontamination, DDOC staff ignored these requirements and prolonged the suffering of the plaintiffs by not decontaminating them. Two slides from the DDOC Use of Force Training PowerPoint exemplify the expectation for decontamination.



*Figure 1 DOC_SCI_0041943*

---

[2] DDOC uses the common training practice for certification in OC, which requires exposure to the product.

6

*Figure 2 DOC_SCI_0041944*

12. In summary, all staff involved in these incidents were aware of the DDOC policy and training regarding the reasonable use of force. They understood Objective Reasonableness but failed to adhere to their training and policy expectations by not attempting reasonable alternatives before resorting to force. Consequently, their actions were objectively unreasonable.

13. Mr. Clark's opinion relies heavily on using OC as an acceptable practice for DDOC staff when encountering non-moving resistors. Even if this is true, Mr. Clark and I would probably agree that using OC is a form of force. DDOC policy and training would dictate that reasonable alternatives be taken before using it. This, coupled with the fact that they intentionally prolonged the Plaintiffs' suffering from OC exposure by not decontaminating them immediately following, does not demonstrate Objective Reasonableness.

14. My training and experience are not much different than the DDOC training I reviewed. Based on both of these, the reasonable alternatives to force that existed for DDOC staff were to maintain a safe distance, put barriers between themself and the resistor, use de-escalation (communication), call for back-up, then once responders arrive, and if resistance persists, draw OC and give warning that if the resistor does not comply, then force will be used against them.

7

JA_01794

Also, my experience and training required decontamination as soon as possible after exposure to OC, the same as DDOC's training.

15. A review of the videos will show that the staff were the primary aggressors in most cases, which is contrary to their policy expectations and training. I often observed staff closing the distance between themselves and the individuals they were using force against, deploying their OC spray, and then immediately taking the individual to the ground using physical force.[3] The staff did not follow their training, which says to allow the OC to take effect; in the video they did not appear to give directions for the OC-exposed person to get on the ground,[4] nor did they maintain a safe distance or place barriers between themselves and the alleged aggressive inmate. Instead, I noted mild non-physical resistance to directives, followed by almost immediate use of force by the staff. The staff were trained to avoid using force but exhibited none of these behaviors. By its nature, unnecessary force is excessive force.

16. I believe the intent of DDOC's policies and training is to give staff the tools to defend themselves and others and resolve situations without the need to use force. If staff had followed their training and the DDOC administration had enforced its policies and standards, they may have avoided violations of the Fourth, Eighth, and Fourteenth Amendments. Unfortunately, that is not what I have determined in my analysis.

### III. DDOC's Violation of the Fourth and Fourteenth Amendments Under the "Objective Reasonableness" Standard

17. There are some areas where Mr. Clark and I agree. He cites case law and the widely accepted standard of 'objective reasonableness' regarding the Fourth and Fourteenth Amendments and their relevance to pre-sentence detainees. Additionally, Mr. Clark discusses the relevance of the Eighth Amendment for post-sentenced inmates and emphasizes the need to

---

[3] Note: In Mr. Clark's report, he states the use of OC is preferable to going hands-on, and I agree, but only when the application is performed in such a way as to prevent the need for physical force. If the accepted practice is to spray and immediately use physical force, then the OC serves no purpose.

[4] Note: Most videos provided did not have audio to determine if directions were provided after the OC was dispensed. My belief is based on the time from the deployment of OC to when staff went hands-on, which did not appear to be enough time for the exposed individual to comprehend any instruction.

8

apply the "deliberate indifference" standard when evaluating claims of excessive force. I agree both standards are applicable here.

18. Mr. Clark said this about Objective Reasonableness:

"*When assessing claims of excessive force involving pre-sentenced inmates, courts apply an "objective reasonableness" standard. This standard examines whether the use of force by law enforcement or correctional officers was "reasonable" at the moment, taking into account the context, the level of threat posed by the inmate, and the necessity of the force used. The focus is primarily on the perspective of the officer at the time of the incident and whether a reasonable officer would have acted in the same manner when faced with the same circumstances*."

19. I understand that for individuals who have not yet been convicted of a crime, the Fourth and Fourteenth Amendments govern the use of force. The Supreme Court, in *Kingsley v. Hendrickson, 576 U.S. 389 (2015)*, established that pretrial detainees do not need to prove subjective intent; they only need to demonstrate that the force used was objectively unreasonable. My understanding is that the courts analyze the following factors to determine whether the force was objectively unreasonable for a pretrial detainee:

1. The need for the use of force.
2. The relationship between the need and the amount of force used.
3. The extent of the injury.
4. Any efforts made to limit the amount of force used.
5. Whether the officer's force was applied in good faith to maintain order or maliciously to cause harm.

Force used against a pretrial detainee must be necessary and proportionate, and officers should provide verbal warnings when feasible before employing force. A number of the use-of-force incidents I observed involved pre-trial detainees, and because of this, they would require the courts to analyze the factors mentioned above.

20. In my opinion, these use-of-force incidents were excessive based on the following:

9

1. The need for the use of force – There was time and reasonable alternatives to the use of force available at the time of the incidents.

2. The relationship between the need and the amount of force used – In all instances I reviewed, the plaintiffs allegedly refused to follow directions, which is a minor rule violation, and for this minor offense, they were subjected to the painful effects of OC and physical force.

3. The extent of the injuries – this does not apply to all incidents reviewed, but some incidents resulted in notable injury for minor offenses.

4. any efforts made to limit the amount of force, and 5. whether the officer's force was applied in good faith to maintain order or maliciously to cause harm. – review of the incidents demonstrates little to no effort to de-escalate and avoid using force. Despite the fact officers were trained on the use of force policy and the expectation to avoid the use of force, there did not appear to be any immediate threat to the staff person who used force, nor was there an impression of disorder that would require force, all of which makes me questions what the logic was for the harm caused to the plaintiffs.

5. Whether the officer's force was applied in good faith to maintain order or maliciously to cause harm –The fact DDOC staff failed to follow their own policy and training on the use of force, failed to give warning, failed to attempt de-escalation and other reasonable alternatives to avoid the need for force, is not acting in good faith in my opinion. All of this, coupled with the fact that in every incident, they prolonged the painful effects of OC exposure by not decontaminating the plaintiffs, even when their training required it, is malicious and caused harm.

**Violations of the Objective Reasonableness Standard in DDOC Use-of-Force Incidents**

21. The video evidence, use-of-force reports, and DDOC policy violations demonstrate that DDOC officers consistently violated the Fourth and Fourteenth Amendments in multiple ways:

10

**Use of Force Without Immediate Threat or Justification**

22. The objective reasonableness standard prohibits officers from using force unless necessary to control a legitimate threat.

Video evidence shows multiple instances where pretrial detainees were subjected to OC spray and physical force despite:

- Not posing an active threat to staff or others.
- Being already restrained or compliant.
- Showing no attempt to flee or resist.

Violation Example:

> Officers used OC spray immediately on verbally defiant detainees without attempting de-escalation, which escalates force unnecessarily rather than controlling a safety threat.

**Failure to Attempt De-Escalation or Use of Non-Force Alternatives**

23. The objective reasonableness standard requires officers to use the least intrusive means necessary to control a situation.

DDOC policies state that officers must attempt de-escalation or other reasonable alternatives before escalating force. Still, video evidence shows OC spray and physical force being used as the first response rather than after de-escalation attempts.

Violation Example:

> Pretrial detainees were sprayed with OC spray despite being seated, compliant, or restrained. After OC exposure, detainees were not provided medical aid in the form of decontamination.

**Excessive and Prolonged Use of OC Spray Without Justification**

11

24. The continued application of OC spray beyond what is necessary to neutralize resistance is objectively unreasonable. Courts have ruled that using OC spray repeatedly or on restrained detainees is unconstitutional.

Video evidence shows officers deploying OC spray on detainees who had already ceased resistance.

Violation Example:

In multiple incidents, DDOC officers deployed OC spray on individuals already on the ground or not actively resisting, which is objectively unreasonable.

**Failure to Provide Medical Attention In the Form of Decontamination After OC Spray Use**

25. The failure to decontaminate detainees after OC spray exposure exacerbates the suffering caused by force and constitutes deliberate indifference under the Fourteenth Amendment.

Video evidence shows detainees being left in cells without access to running water or medical care in the form of decontamination.

Violation Example:

DDOC officers left sprayed detainees in holding areas while restrained without access to decontamination procedures, then failed to decontaminate detainees even when they were changing their clothes in a shower they were not allowed to use, leading to prolonged suffering that was entirely avoidable.

**The DDOC's Violations of the Fourth and Fourteenth Amendments Summary**

26. Based on the review of policies, reports, and video evidence, it is my opinion DDOC officers engaged in unconstitutional use-of-force practices against pretrial detainees. These violations include:

- Using force against detainees who posed no immediate threat.
- Failing to attempt verbal de-escalation before deploying force.
- Deploying OC spray excessively, including on already restrained detainees.

12

- Failing to provide adequate medical attention and decontamination after OC exposure.

## IV.  Violations of the Eighth Amendment in DDOC Use-of-Force Incidents

27. Another area of agreement is Mr. Clark's mention of the relevance of the Eighth Amendment for post-sentenced inmates and his emphasis on the need to apply "deliberate indifference" or malicious & sadistic standards when evaluating claims of excessive force.

Mr. Clark defines the requirements of deliberate indifference as;

"*In such cases, courts assess excessive force claims by applying a "deliberate indifference standard. This requires showing that the use of force was applied in a manner that was grossly disproportionate to the situation, or that correctional staff acted with a "malicious or sadistic intent" to cause harm. Courts look for evidence of unnecessary and wanton infliction of pain during the use of force, as well as whether the force was necessary to maintain order and security."*[5]

28. While I agree with Mr. Clark on some levels of his "deliberate indifference" analysis, I believe it falls short when considering the complete disregard for DDOC Policy and training requirements by DDOC staff. When staff act outside of agency policy and their training to apply force before attempting any other reasonable and available alternatives as required in policy and training, it shows they know what they should do but choose not to. In my opinion, this shows deliberate indifference. Then, when they have crossed this line and perpetuated the plaintiff's pain and suffering by failing to provide medical care in the form of decontamination, shows malicious & sadistic intent.

Here are some examples.

### Unnecessary and Excessive Force Applied to Restrained or Compliant Inmates

29. The malicious and sadistic standard prohibits the use of force solely to cause harm or as punishment. Video evidence shows DDOC officers using force on inmates who were already restrained, compliant, or not resisting.

---

[5] *See* 53784882-v1-Expert Report of J. Carter (DOC_Davis), Pg 49, ¶ 44-45

13

Violation Example:

> In multiple DDOC incidents, officers continued using OC spray and physical force after an inmate was fully restrained or substantially controlled, which is unnecessary and punitive rather than a justified security measure.[6]

**Pattern of Unchecked Excessive Force: Failure to Intervene**

30. Deliberate indifference occurs when officers fail to stop or report known excessive force incidents. DDOC officers observed but did not intervene when other officers used unnecessary force.

Violation Example:

> Officers stood by as other officers repeatedly used OC spray on a restrained inmate, violating both DDOC policy and constitutional protections.

**Overuse of OC Spray Without Justification or Decontamination**

31. Repeated or unnecessary OC spray deployment can constitute cruel and unusual punishment.

Video evidence shows DDOC officers deploying OC spray multiple times against passive resistive or non-aggressive inmates.

Failure to provide decontamination after OC spray exposure exacerbated harm and prolonged suffering.

Violation Example:

> DDOC failed to decontaminate all inmates and detainees after using OC spray, leaving them in cells without fresh air, running water, or medical treatment-including decontamination, leading to prolonged pain and breathing difficulties.

---

[6] *See* Expert Report of Stephen Sinclair, Davis v. Neal C.A. Np. 1:21-cv-01773; 33:86; 43:121 &129; 55:164; 66:205; 79:244 & 245; 91:292

14

**Use of Force as Punishment Rather Than for Security**

32. The malicious and sadistic standard prohibits force from being applied as punishment.

Evidence shows that DDOC officers used force after inmates engaged in verbal defiance but did not pose a physical threat.

Violation Example:

> Officers used OC spray on an inmate solely for refusing to obey an order, even though the inmate was not posing an active threat.

**DDOC's Violations of the Eighth Amendment Summary**

33.     Based on the review of policies, reports, and video evidence, it is my opinion that DDOC officers engaged in deliberate indifference and acted with maliciousness and sadistic intent while using force against convicted inmates. These violations include:

- Applying force to substantially controlled or compliant inmates without justification (Malicious & Sadistic Standard).
- Failing to intervene or stop excessive force when it was occurring (Deliberate Indifference Standard).
- Using OC spray excessively, even when the security threat was minimal (Malicious & Sadistic Standard).
- Denying medical care through decontamination after OC spray exposure (Deliberate Indifference Standard).
- Using force for punishment rather than legitimate security needs (Malicious & Sadistic Standard).

In my opinion, these actions violate the Eighth Amendment's standards of deliberate indifference and malicious & sadistic intent, making them unconstitutional. I do not proclaim to be a constitutional law expert and ultimately leave that conclusion to the courts.

15

## V.  Conclusion

34.     I reiterate that I do not consider myself an expert in constitutional law. However, I do have 32 years of experience in corrections, having served as a correctional officer and held many positions of authority, including agency leader. In several of these roles, one of my primary responsibilities was evaluating use-of-force incidents against agency policy and training. I then took corrective action when necessary to ensure staff understood and could operate within those expectations, knowing that failing to do so would create substantial risk for the agency I represented. I also knew that if I did not take action to correct the missteps of the staff, I would be doing them a disservice by allowing them to perpetuate a false understanding of agency expectations until they crossed the line of no return, potentially costing them their careers.

35.     In addition to my experience since my employment with the Washington State Department of Corrections and now as a Corrections Expert, I have had exposure to and gained an understanding of methods of operation, policy, and procedures from many correctional jurisdictions. Because of all this, I offer my opinions of the Eighth, Fourth, and Fourteenth Amendment violations in this case based on my professional view.  I also accept that, ultimately, it is the courts that decide.

36.     In the instance where OC and physical force were used on pre-sentence detainees, I believe the actions taken against these individuals were objectively unreasonable and, therefore, a violation of the Fourth and Fourteenth Amendments. Because DDOC staff failed to follow agency policy expectations, which resulted in unnecessary force.  DDOC staff ignored necessary medical needs in the form of decontamination for the individuals suffering from the painful effects of OC, even when it was a requirement they were trained to perform.

37.     The elements of deliberate indifference related to the Eighth Amendment have been met in the cases involving post-sentenced individuals I have reviewed. Because DDOC staff failed to follow agency policy expectations, which resulted in unnecessary force.  DDOC staff ignored necessary medical needs in the form of decontamination for the individuals suffering from the painful effects of OC, even when it was a requirement they were trained to perform.

16

38.    As much as the acts of individual officer(s) resulted in these incidents, the more significant concern is that DDOC administrators either knew or should have known agency policy and training expectations were not being followed and failed to act to correct these deficiencies and stop these types of actions. The fact that these activities continued for months, and may even continue today, is an act of deliberate indifference.

## VI.  Signature

39. I certify that, to the best of my knowledge and belief:

    a.   The statements of fact in this report are true and correct;

    b.   The reported analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, unbiased, and professional analyses, opinions, and conclusions;

    c.   I reserve the right to modify or supplement my opinions should additional information become available;

    d.   I have no personal interest or bias with respect to the parties involved; and

    e.   My compensation is not contingent on an action or event resulting from the analyses, conclusions, or opinions of this report.

**Stephen Sinclair** _____*Stephen Sinclair*_____          Dated: 2/21/2025

17

JA_01804

# IN THE DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

WILLIAM DAVIS, et al.,

          Plaintiffs,

       -vs-

KIRK NEAL, et al.,

          Defendants.

)
)
)
)
)
)
)
)
)

C.A. No. 1:21-cv-01773 TLA

## EXPERT SUPPLEMENTAL REPORT OF STEPHEN SINCLAIR
### November 18, 2024

JA_01805

## Table of Contents

I.    SUPPLEMENTAL REASONING.................................................................... 3

II.   SUPPLEMENTAL FOR BASHON H. MCIVOR-BOSMAN ...................... 3

III.  SUPPLEMENTAL FOR KEVIN IGNUDO.................................................. 5

IV.   SIGNATURE............................................................................................... 7

## I.  Supplemental Reasoning

1.      After submitting my expert report on August 14, 2024, additional discovery was received from the defendants related to Mr. Ignudo and Mr. McIvor-Benson. Based on this new information, I am supplementing my initial expert report to include new information received in discovery.

## II.  Supplemental for Bashon H. McIvor-Bosman

2.      On page 78 of my initial expert report, I stated;

As described in the Use of Force packet on this incident,[1] Mr. McIvor-Bosman and his cellmate were engaged in horseplay when leaving the cell and moving to a recreation period. Defendant Sgt. Neal describes this and redirects them back to their cell for the behavior. Once Mr. McIvor-Bosman and his cellmate returned to their cell, defendant officers reported they heard loud conversations from the cell and decided to investigate. Defendant officers describe the engagement at the cell front, saying they directed Mr. McIvor-Bosman's cellmate to leave the cell while they talked to him. (McIvor).

3.      Mr. McIvor-Bosman describes this differently, stating defendant Sgt. Neal said, "We are going to teach you the rules and regulations of this institution," then forcefully punched Mr. McIvor-Bosman twice in the chest and stated, "Hit me, bitch.".  Mr. McIvor-Bosman then goes on to describe a Prison Rape Elimination Act (PREA) committed by Defendant Sgt. Neal, where Defendant Sgt. Neal pulled at Mr. McIvor-Bosman's clothing and made statements consistent with a probable sexual assault.[2]

4.      **Supplemental:** The videos provided by the defendants do capture some of the activity at the cell front and are well situated for me to evaluate exchanges between defendant Sgt. Neal and

---

[1] *See* McIvor UOF report, DOC_SCI_0040788 - 0040826
[2] *See* 2022.5.11 McIvor Amended Complaint_djb editsits.pdf, Page 4, Line 16 -23

Mr. McIvor-Bosman. However, the videos provided begin too late and do not allow me to see what happened earlier in the cell.[34]

5.      All involved indicate Mr. McIvor-Bosman exited the cell at this time. Defendants Officers indicate Mr. McIvor-Bosman pushed past Defendant Sgt. Neal in the process. Mr. McIvor-Bosman indicates he was trying to escape a possible sexual assault. Mr. McIvor-Bosman was on the second floor at the time he left the cell, and a third officer intercepted him and physically restrained him while descending the stairs. Defendant Sgt. Neal responded to that location and used OC on Mr. McIvor-Bosman because he was resisting the restraints.

6.      It is difficult to make a thorough analysis of this incident. The Defendants have failed to provide a video, so my analysis is based on Mr. McIvor-Bosman's complaint and the incident reports provided. The video would help clarify actions in the cell and even during the physical takedown. I can reasonably assume that staff failed to follow their training on the use of OC because the defendants reported using the OC on Mr. McIvor-Bosman when he had already been taken down. The training material I reviewed states that officers should dispense the OC from no less than three feet and give it time to take effect while simultaneously directing the incarcerated person to get on the ground to avoid using physical force.

7.      **Supplement:** The video confirms that when the OC was used, three staff were holding him on the stairs when Sgt. Neal deploys the OC from inches away.[5]

8.      Also, as described by Defendant Sgt. Neal, he was on Mr. McIvor-Bosman when he used the OC, so I feel safe in assuming he did not abide by the manufacturer's recommendations not to use OC at less than three feet because of the risk of "Hydraulic Needling"[6]

9.      **Supplemental:** The video of the incident confirmed that Sgt. Neal did dispense the OC within inches of Mr. McIvor-Bosman's face and eyes, contrary to the manufacturer's recommendation and training provided by DDOC.[7]

---

[3] *See* CTRL0000011359_Mcivor-Bosman 00758002 09.16.20 1 - 85 - 447-452 & 433 - 438
[4] *See*
[5] *See* CTRL0000011358_Mcivor-Bosman 00758002 09.16.20 1 - 86 - 458-460 & 444-446, @ 00.23
[6] *See* ¶ 17, 18
[77] *See* Ibid., @ 00.29

Justice & Liberty Group LLC                                                    Page 4 of 8

10.    It is also my assumed opinion that the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. McIvor-Bosman by failing to decontaminate.  I understand that discovery is ongoing. If I am provided sufficient evidence upon which to base an opinion, I will supplement my report.

11.    **Supplemental:** The provided video confirms Mr. McIvor-Bosman was not allowed to be decontaminated after the use of OC.[8]

## III.  Supplemental for Kevin Ignudo

12.    Based on the additional discovery provided by the defendants, my previous opinion stands and is not supported by the video. Unfortunately, the video provided did not show when it was alleged Sgt. Neal was physically aggressive and threatening to Mr. McIvor-Bosman. It is assumed that the disclosure of this video shows what predicted the use of force on Mr. McIvor-Bosman.

13.    My previous report related to Mr. Ignudo stated the following on page 63.

"196.  At this time, I cannot provide an opinion on Mr. Ignudo's incident due to a lack of evidence to review. I understand that discovery is ongoing. If I am provided sufficient evidence upon which to base an opinion, I will supplement my report."

14.    **Supplemental:** On November 25, 2021, Mr. Ignudo was confined in a close observation cell, presumably because of some demonstrated behavior requiring more intense observation. He was expected to have a behavioral health/wellness check.[9]  Mr. Ignudo smeared feces in this cell and on the window. Because of this, he was temporarily moved to a holding cell while inmate porters were cleaning his original cell. Multiple videos of this escort were provided, and Mr. Ignudo appeared compliant and unharmed. Later, following the use of force incident, there was a notable wound on the top of his head.[10]

---

[8] *See* CTRL0000011350_Mcivor-Bosman 00758002 09.16.20, entire video
[9] *See* DOC_SCI_001256, Medical Review Section, "On November 22, 2021…"
[10] *See* CTRL0000011388_Ignudo 00927098 11.25.21 4 - Channel 10, @ 00:32

15.    While Mr. Ignudo was in the holding cell, staff reported that Mr. Ignudo was banging in the cell and making a lot of noise. At one point, staff heard a "large crash," which prompted them to look in the cell. Defendant Steven Long described the situation by saying, "We looked in the cell but could not see inside the cell because it was dark."[11]

16.    Because of the noise and darkened cell Sgt. Long, Corporal Steele, and Sgt. McCarthy decided to enter the cell. A fish-eye camera view of the cell entry showed three custody staff approaching Mr. Ignudo's holding cell.[12] The staff appeared to initiate dialogue but entered the cell only nine seconds later.[13] Corporal Steel, one of these three staff, stated in his IA Interview.

> "*Corporal Steele attempted to turn on the light switch, but the light switch was on, the light was busted. Unbeknownst to the officers, Inmate Kevin Ignudo was able to get his handcuffs in front of his body. The officers saw Inmate Kevin Ignudo hanging from the light from the ceiling.*"[14]

17.    Staff present indicated orders were given and ignored by Mr. Ignudo, so Sgt Long deployed OC on Mr. Ignudo. There were at least two deployments of OC on Mr. Ignudo in the cell.[15] The staff descriptions of what transpired in the cell are documented in the IA report. Mr. Ignudo's description of what transpired in the cell differs from the staff accounts, and unfortunately, no video was provided for the use of force inside the cell.

18.    I am concerned about the cell entry of corrections staff based on what I observed in the video. When they made entry, Mr. Ignudo was known to be acting out both verbally and physically inside the cell and would not respond to dialogue before the cell was opened. Staff could not see what was happening in the cell because it was dark. In my experience, this is a very dangerous situation for all involved, staff and the incarcerated; this should have resulted in a pre-planned use of force.

---

[11] *See* DOC_SCI_0001253
[12] *See* CTRL0000011364_Ignudo 00927098 11.25.21 3 - 1232 - MSB Bldg. THA 360 Cam
[13] *See* Ibid., @ 00:19 -00:28
[14] *See* DOC_SCI_0001252
[15] *See* Ibid.

Justice & Liberty Group LLC                                                          Page 6 of 8

19.    In a pre-planned use of force or cell entry, the cell would remain locked, and a staff member or two would be assigned to continue to dialogue with Mr. Ignudo to encourage compliance. Other staff would be gathered to plan a cell entry and be equipped with the appropriate safety equipment before entering the cell. Also, in a pre-planned use of force/cell entry, a staff member must document the incident with a handheld camera. Recording the incident is essential for several reasons, not the least of which is documenting the incident to defend against excessive force claims.

20.    Because of the approach taken for this incident, Mr. Ignudo and staff were injured. A delayed and more thoughtful approach to the incident would have significantly mitigated the risk of injury for all involved. In my initial expert report, I opined on the DDOC Use of Force Policy and associated training. The DDOC Use of Force Policy lacks the specific language to define emergent and pre-planned uses of force and the action staff should take for each. In the paragraph above, I describe some of the language I would expect to see in a use-of-force policy to describe non-emergent planned uses of force. Absent this language, the policy implies that staff can rush into a situation and try to use the force level described in the Integrated Use of Force Model, which is a dangerous practice. Policy language should define a planned use of force and expected actions.

21.    The DDOC Training material covered the use of Quick Response Teams (QRT), and it addresses what I would expect to see for pre-planned cell entries.[16] The only problem is that QRT was not activated in the incident involving Mr. Ignudo, so no one benefited from a more reasoned and planned approach. Failing to deploy QRT for this type of situation was a significant oversight.

## IV.  Signature

I certify that, to the best of my knowledge and belief:

    a.  The statements of fact in this report are true and correct;

    b.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, unbiased, and professional analyses, opinions, and conclusions;

---

[16] *See* DOC_SCI_0041947 - 0041978

c.  I reserve the right to modify or supplement my opinions should additional information become available;

d.  I have no personal interest or bias with respect to the parties involved; and

e.  My compensation is not contingent on an action or event resulting from the analyses, conclusions, or opinions of this report.

**Stephen Sinclair**  *Stephen Sinclair*  Dated: 11/21/2024

JA_01812

**IN THE DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WILLIAM DAVIS, et al.,

              Plaintiffs,

       -vs-

KIRK NEAL, et al.,

              Defendants.

)
)
)
)
)
)
)
)
)
)

    C.A. No. 1:21-cv-01773 TLA

**<u>EXPERT REPORT OF STEPHEN SINCLAIR</u>
August 14, 2024**

1

## Table of Contents

I.     **INTRO AND QUALIFICATIONS** ..................................................................... **4**

II.    **SUMMARY OF OPINIONS** ......................................................................... **6**

III.   **REPORT APPROACH** ............................................................................... **8**

IV.   **OVERVIEW** .............................................................................................. **9**

     RATE OF USE OF FORCE AT SCI .................................................................... 11

V.     **AREAS OF OVERALL CONCERN** ............................................................ **12**

     USE OF FORCE POLICY AND TRAINING ........................................................... 12
     USE OF FORCE REVIEW REQUIREMENTS ........................................................ 16
     LACK OF DECONTAMINATION ....................................................................... 18
     LACK OF DE-ESCALATION ........................................................................... 20
     USE OF OC ............................................................................................. 26

VI.    **INDIVIDUAL INCIDENT ANALYSIS** ...................................................... **31**

     PATRICIO BAUTISTA SUMMARY .................................................................... 31
     JASON BENNETT SUMMARY ........................................................................ 32
     KYLE BULLOCK SUMMARY .......................................................................... 33
     ADAM CALLOWAY SUMMARY ....................................................................... 35
     KEITH CAMPBELL SUMMARY ....................................................................... 36
     BARRY CLINE SUMMARY ............................................................................ 37
     WILLIAM DAVIS SUMMARY .......................................................................... 42
     DONBRAY DURHAM SUMMARY ..................................................................... 49
     RICHARD EDWARDS SUMMARY .................................................................... 53
     LUKE ERIXSON SUMMARY .......................................................................... 53
     NASIER GIBBS SUMMARY ........................................................................... 54
     NEKI T. GIBBS SR. ................................................................................... 56
     JUSTIN ERSKINE SUMMARY ........................................................................ 58
     AARON GIVENS SUMMARY .......................................................................... 58
     DANNY HARDING SUMMARY ........................................................................ 58
     AUGUSTINE HAYMOND SUMMARY ................................................................. 60
     KEVIN IGNUDO SUMMARY ........................................................................... 63
     LAQUAN JOHNSON SUMMARY ...................................................................... 63
     MICHAEL KLEIN SUMMARY ......................................................................... 65
     NATHAN LEWANDOWSKI SUMMARY ............................................................... 74
     GERALD LUSBY SUMMARY .......................................................................... 77
     RICHARD S. MADDUX SUMMARY .................................................................. 77
     ATIBA MAYFIELD SUMMARY ........................................................................ 78
     BASHON H. MCIVOR-BOSMAN SUMMARY ....................................................... 78
     ISAAC MONTAGUE SUMMARY ...................................................................... 79
     JIMMIE MOORE SUMMARY .......................................................................... 82
     CHRIS MORALES SUMMARY ........................................................................ 83
     TIMOTHY NEWCOMB SUMMARY .................................................................... 90
     REUEL RAY SUMMARY ............................................................................... 91
     JACOB REECE SUMMARY ............................................................................ 95
     CHARLES ROBINSON SUMMARY .................................................................... 95

2

WARREN SELBY SUMMARY .................................................................................................... 96
JAMAL SOLOMON SUMMARY ................................................................................................ 97
GEORGE STURGIS SUMMARY ............................................................................................... 98
SHAMIR SUDLER SUMMARY .................................................................................................. 98
CHARLES TURNER SUMMARY ............................................................................................... 99
DONALD WHITE SUMMARY.................................................................................................. 101
BRADLEY ZAHNER SUMMARY .............................................................................................. 101

**VII.    SIGNATURE .................................................................................................... 104**

3

## I.  Intro and Qualifications

1.	My name is Stephen Sinclair, CEO of the Justice & Liberty Group LLC. I have been retained by Whiteford Law In the matter of Davis et al. v. Neal et al., case No. 1:21-cv-01773 TLA. The plaintiffs' counsel has sought my expert opinions based on my extensive corrections experience and multiple use-of-force incidents at Sussex Correctional Institution (SCI). In this capacity, I have been retained at $300 an hour.[1] The matters I present are my independent opinions, based on my personal and professional knowledge, and are stated to a reasonable degree of professional certainty. If called upon to testify, I am fully prepared to do so with competence.

2.	My experience in adult corrections includes the 32 years I spent as an employee of the Washington State Department of Correction ("WADOC"). I began as a Correctional Officer at the Washington State Penitentiary in September 1988 and concluded my career as the agency Secretary. I was appointed Secretary of WADOC in April 2017, confirmed by the Washington State Senate in January 2018, and served until May 2021.

3.	Throughout my career, I have spearheaded numerous significant changes within WADOC, many of which are detailed in my Curriculum Vitae (Attachment A). These experiences have taught me that while creating change and new policy is important, the real challenge lies in implementing those changes and ensuring sustainable outcomes. My extensive experience implementing change in carceral settings is a testament to this.

4.	My career has been marked by my involvement in shaping policy and practice related to safety and security matters. As a WADOC's Captain's Committee member, I reviewed agency safety and security policies and implemented approved changes at a facility level. For a significant period, I served as co-chair of the WADOC Statewide Security Advisory Committee, which involved evaluating safety and security suggestions from staff at all levels of the organization. The changes we adopted were implemented in policy, procedures, and practice, and the committee also served as a platform for discussing agency-initiated changes related to safety and security.

---

[1] Attachment B is the JALG Rate Sheet, which provides complete detail on compensation related to this case.

4

5.      In various roles during my career, beginning as a Correctional Investigator, I received ongoing training related to criminal investigation. This training included, but was not limited to, training received at the Washington State Patrol Investigators Academy, the Walla Walla Reserve Police Officer Academy, and numerous other investigator training provided by WADOC, the Washington Criminal Justice Training Center, and other organizations.

6.      When I began my career, as soon as possible, I competed for and was selected to be a member of the Washington State Penitentiary's Special Weapons and Tactics team. Later, the name was changed to the Special Emergency Response Team (SERT). I served with SERT for 11 years until being promoted to an administrative level, which hindered my direct involvement. However, I was able to continue teaching tactical team members at the agency's SERT and Inmate Recovery Team Academy. Because of my involvement with SERT, I was often called upon to participate in disturbance and other emergency response actions. As an administrator with a SERT background, I routinely led large-scale responses to emergencies and was called to assist other correctional facilities in responding to their emergencies. I have participated in several large-scale responses to disturbances, escapes, and mass incarcerated person transports.

7.      As a Sergeant, Lieutenant, Captain, Associate Superintendent, Superintendent, Deputy Prison Director, and Prison Director, I had duties requiring the creation and review of use-of-force reports. As a sergeant and lieutenant, my role was to compile and review the initial reports for completeness and policy compliance. As A Captain, Associate Superintendent, and Superintendent, my role was reviewing all use-of-force incidents for policy compliance and initiating employee discipline when necessary. As a Deputy Prison Director and Director of Prisons, my role was limited to significant use-of-force incidents, some requiring Critical Incident Review and Corrective Action Plans to address deficiencies. During these periods of time in my career, I easily reviewed hundreds, if not thousands, of use-of-force incidents.

8.      My career with WADOC includes several years as an Emergency Response Auditor, Emergency Management Instructor, and member of the Agency's Emergency Management Committee. In these roles, I helped shape WADOC's Emergency Response and Preparedness for many years.

5

9.      In addition to my work experience, I possess a Master of Public Administration degree from the University of Washington; I have attended thousands of hours of training sponsored by WADOC, the Washington State Criminal Justice Training Commission, the Washington State Patrol Investigator Academy, Washington State Tactical Officers Association, and the Walla Walla Police Department. My experience includes training and hours worked as a Reserve Police Officer for the Walla Walla Police Department.

10.     Since my retirement in May 2021, I have remained involved in the corrections field, researching, analyzing, and providing expert opinions in cases related to confinement in city, county, and state-operated confinement facilities. In summary, I have spent much of the past 35 years working with, thinking about, and analyzing the field of adult corrections on topics to include, but not limited to, the use of force, the use of administrative segregation and restrictive housing, prison regulations, correctional operations and the policies required to operate a safe and humane corrections systems/facilities.

11.     I have served four years as a Commissioner of the Washington State Criminal Justice Training Commission (2017-2021), overseeing curriculum development for basic academies for Law Enforcement and Corrections and certification standards. I also spent four years as a member of the Washington State Sentencing Guidelines Commission (2017-2021).  I am an active member of the Correctional Leaders Association (CLA) and the American Correctional Association (ACA).  I received the 2020 Tom Clements Award for Innovation from CLA and was recognized by Washington Governor Christine Gregoire in 2009 for excellence in management. In addition to the experience cited here, attachment A is my Curriculum Vitae, which identifies additional training and experience.

## II.  Summary of Opinions

12.     Based on my more than 35 years of experience in the field of adult corrections and review of the materials provided to me, it is my opinion that:

> a.  The Correctional Officer Defendants routinely used unnecessary and excessive force on incarcerated persons confined at the Sussex Correctional Institution

6

JA_01818

b.  Defendants Beck, Mears and the other management-level Defendants were aware of the exceptionally high rates of use of force incidents at the Sussex Correctional Institution and failed to take reasonable actions to determine the root cause and correct deficiencies, which resulted in a significant number of unnecessary and excessive uses of force and injuries to incarcerated persons

c.  Defendants Beck, Mears and the other management-level Defendants ("Management Defendants") failed to adequately train and supervise its staff in the commonly accepted practice of decontamination, resulting in numerous incidents of unnecessary pain and suffering by incarcerated individuals in their care and supervision.

d.  Defendants Beck, Mears and the other management-level Defendants failed to adequately train and supervise its staff in the commonly accepted practice of de-escalation and other alternatives used to avoid uses of force.

e.  In my opinion, all individuals who were subjected to the use of Oleoresin Capsicum (OC) were subjected to unnecessary pain and suffering because the defendants failed to follow their training on decontamination.

f.  In my opinion, the following plaintiffs were subjected to unnecessary and excessive use of force:

| | |
|---|---|
| JASON BENNETT | MICHAEL KLEIN |
| KYLE BULLOCK | NATHAN LEWANDOWSKI |
| ADAM CALLOWAY | ISAAC MONTAGUE |
| KEITH CAMPBELL | JIMMIE MOORE |
| BARRY CLINE | CHRIS MORALES |
| WILLIAM DAVIS | TIMOTHY NEWCOMB |
| DONBRAY DURHAM | REUEL RAY |
| NASIER GIBBS | CHARLES ROBINSON |
| NEKI T. GIBBS, SR | WARREN SELBY |
| DANNY HARDING | SHAMIR SUDLER |
| AUGUSTINE HAYMOND | CHARLES TURNER |
| LAQUAN JOHNSON | BRADLEY ZAHNER |

7

## III.   Report Approach

13.     This case is unique in my experience because of the volume of Plaintiffs, all requiring critical review of their individual cases, the majority of which, in my opinion, involved unnecessary and excessive force. When force is used unnecessarily, it is excessive. I have summarized my review of each in the **Individual Incident Summaries** section of this report. In addition to these summaries in section **Areas of Overall Concern** I will provide my overall view of SCI policy and practice of the uses of force based on my experience and knowledge of commonly accepted practices in corrections. Based on my experience, the pattern of unnecessary and excessive use of force incidents denotes the Management Defendants allowed a troubled culture to flourish at SCI.

14.     Where applicable, American Correctional Association (ACA) references may be made. ACA is a nationally recognized association that provides accreditation for correctional facilities that can show compliance with their national standards. While I have the utmost respect for the organization and its efforts, I know ACA accreditation does not always ensure all policy and practice are performed at the established standard.

15.     The ACA accreditation process is conducted every three years and requires proof of standard compliance and even process indicators. However, it does not require an in-depth review of practice/incidents as I have conducted in this case. For example, SCI is listed as an ACA-accredited facility on the ACA Member Website.[2] This indicates they have met the requirements for the ACA mandatory standard for Use of Chemical Agents, which states:

> "5-ACI-1D-21 (Ref. 4-4092) – (MANDATORY) All personnel authorized to use chemical agents receive thorough training in their use and in the treatment of individuals exposed to chemical agents.

---

[2] *See*
https://www.aca.org/ACA/ACA_Member/Standards_and_Accreditation/SAC_AccFacHome.aspx?WebsiteKey=139 f6b09-e150-4c56-9c66-284b92f21e51&hkey=f53cf206-2285-490e-98b7-66b5ecf4927a&5940f470ebf4=2#5940f470ebf4

8

Comment: A special training curriculum should be established that includes both individual and group instruction by competent authorities.

Protocols: Written policy and procedure. Job description. Training curriculum. Training records forms and formats.

Process Indicators: Personnel records. Training records."[3]

16.     It should be noted that to achieve this standard, all that is required is a written policy, training curriculum, and individual training records. This standard does not have process indicators to demonstrate "and in the treatment of individuals exposed to chemical agents." DDOC training material includes language about decontamination after exposure to OC, but not once in reviewing the available videos did I observe any effort to provide decontamination for the OC-exposed incarcerated individuals. The point is that SCI is an ACA-accredited facility, and its policy and curriculum meet the ACA standard, but its application does not reflect the standard's intent and does not conform to expected correctional practice for a safe and healthy environment. In my experience, ACA accreditation is a good foundation for any correctional facility, but it does not assure that everything is as it should be.

## IV.  Overview

17.     All incidents I reviewed occurred while the plaintiffs were incarcerated at the Sussex Correctional Institution (SCI). SCI is one of the state correctional facilities administered and operated by the Delaware Department of Correction (DDOC). DODC is one of few state correctional agencies that has a dual responsibility for the confinement of pretrial detainees and post-conviction incarceration. The pre-trial individuals are awaiting trial and have not been convicted of a crime. They are presumed innocent until proven guilty. The primary reason for detaining pre-trial inmates is to ensure they appear in court and to protect the community from harm from individuals who have been charged with serious or violent crimes. Their detention is not meant to be punitive and could be based solely on socioeconomic reasons like not being able

---

[3] *See* ACA Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, March 2021.

9

to make bail.[4] Many of the plaintiffs who experienced unnecessary use of force were in pre-trial confinement. In my opinion, using unnecessary force on pre-trial detainees when there is no threat of harm to anyone makes these incidents even more egregious.

18.    DDOC has three similar institutions, and presumably, pre-trial detainees are confined at all three institutions. I reviewed the description of these three facilities on the DDOC website to gain a better understanding of the incarcerated populations held at each. My impression is that these three facilities house similar classes of incarcerated persons at various custody levels.

Sussex Correctional Institution (SCI)

19.    "The Sussex Correctional Institution (SCI) is located in Georgetown, Delaware. Opened in 1931, SCI is one of Delaware's oldest correctional facilities. SCI houses maximum, medium, and minimum security inmates. SCI houses an all-male population.

20.    A major expansion project was recently completed at SCI. Between April 1997 and April 2000, 760 beds were added to the facility for a total capacity of 1,109 beds. The expansion brought the total capacity of the institution to 1206."[5]

Howard R. Young Correctional Institution (HRYCI)

21.    "The Howard R. Young Correctional Institution (also known as Gander Hill Prison due to the neighborhood in which it is located) is a Level 5 facility in the northeast section of Wilmington, Delaware …"

22.    The original facility, now called the West Wing, was designed to hold 360 detainees, individuals who are awaiting trial/sentencing or unable to make bail. In 1992, a new section, the East Wing, opened. This construction project added 480 beds for sentenced offenders. Additional construction projects have increased the capacity to 1,180. The facility now averages 1,500 offenders."[6]

---

[4] *See* https://jlm.law.columbia.edu/files/2017/05/46.-Ch.-34.pdf
[5] *See* https://doc.delaware.gov/views/sussexci.blade.shtml
[6] *See* https://doc.delaware.gov/views/hryci.blade.shtml

10

James T. Vaughn Correctional Center (JTVCC)

23.    "The JTVCC is a Level 5 (prison) facility for men located near Smyrna, Delaware, in southern New Castle County. The James T. Vaughn Correctional Center is the state's largest adult, male correctional facility. Currently, JTVCC houses approximately 2,500 inmates. JTVCC houses minimum, medium, and maximum security inmates. It also houses inmates sentenced to the death penalty. Executions are carried out at the JTVCC.

24.    JTVCC opened in 1971 with a capacity of 441. Expansions since then have increased the total bed capacity to over 2,600."[7]

### Rate of Use of Force at SCI

25.    The rate of use-of-force incidents at SCI is concerning. Compared to similar DDOC correctional facilities (HRYCI & JTVCC), the SCI rate of use of force is exceptionally high. Data was provided on the number of incidents reported per facility, the number of institutional reviews per facility, the number of administrative reviews per facility, and the number of administrative investigations per facility. I do recognize rates of use of force can vary greatly based on the classes of incarcerated persons at various custody levels. Higher custody levels generally correlate to more use of force. In my opinion, based on the information available, SCI, HRYCI and JTVCC all confine similar classes of confined individuals.

26.    SCI represents only approximately 25 % of DDOC's population of similar facilities but accounts for almost 50% of the use-of-force incidents. As a correctional administrator, I routinely used similar data to administer the 13 prison facilities I was responsible for, and this would have been a significant indicator that something was wrong with the culture at a facility, showing the disproportionate number of incidents that SCI routinely demonstrates.  There are numerous strategies that could and should have been applied to identify the root causes and corrective actions

---

[7] *See* https://doc.delaware.gov/views/jtvcc.blade.shtml

11

to rectify the situation.[8] Management Defendants ignored or failed to recognize the alarming trends of use-of-force incidents at SCI and make necessary changes.

## V.  Areas of Overall Concern

### Use of Force Policy and Training

27.      The DDOC Use of Force Policy 8.30/ Use of Force Training Material I reviewed is lacking in my opinion. The DDOC Use of Force policy is a minimalist approach. It purports to achieve many ACA standards, which it apparently has based on SCI's ACA Accreditation status. This does not mean it is effective, as explained in paragraphs 14-16.

28.      In my experience and based on commonly accepted correctional practice, before an officer uses force, several actions and considerations are typically required to ensure that the use of force is justified and appropriate. These are commonly accepted alternatives to the use of force that would be expected to be attempted, time permitting.  They include:

Presence: The officer's presence, including their uniform and badge, can often deter inappropriate behavior without the need for physical intervention.

Verbal Commands: Officers should attempt to de-escalate the situation using clear and calm verbal commands. This involves directing the inmate to comply with rules or instructions. It can also include warning of the consequence of continued non-compliance.

Assessment of the Situation: Officers must assess the totality of circumstances, including the behavior of the inmate, the potential threat to safety, and the environment. This includes considering the inmate's history and any known propensity for violence.

---

[8] Examples of corrective actions could include dispatching use-of-force specialists to review practices, training, and review processes.

12

Department Policy: Officers must follow department policies and procedures regarding the use of force. This includes understanding the levels of force authorized and the conditions under which each level can be applied.

Light Control Techniques: Officers confronting a non-moving suspect can guide the suspects hands for the application of restraints. If the suspect physically resists or attempts to escape, elevated levels of force may be used.

29.    These steps help ensure that force is used only as a last resort and is applied in a controlled and justified manner. In general, officers are required to avoid using force when reasonable alternatives exist. In all of the videos that I reviewed, where I could observe the use of force, I never saw attempts to use alternatives before using force. In all of these situations, and even reviews conducted on cases with only IA reports, I saw immediate use of OC and physical force and no application or attempts at alternatives.

30.    DDOC defines the Use of Force with the following language:

"Use of Force: An action involving direct or indirect physical contact as employed by Department staff to obtain compliance of offenders and other individuals with orders from staff to (1) control disruptive or violent offenders, (2) enforce or restore order, (3) defend oneself against unwanted physical contact or harm, (4) protect other persons from imminent death, serious bodily harm, or physical harm, (5) protect state property, (6) prevent escape or capture escaped/ing inmates, (7) administer non-emergent and emergent involuntary medications prescribed by a qualified health professional and (8) apply clinical or therapeutic restraints authorized by a qualified health professional."[9]

I have concerns with the statement, "*An action involving direct or indirect physical contact as employed by Department staff to obtain compliance of offenders and other individuals with orders from staff to (1) control disruptive or violent offenders, (2) enforce or restore order.*" An officer could take this to mean force is allowable when incarcerated individuals defy orders from

---

[9] *See* DOC_SCI_0041886, DDOC Use of Force Policy, Policy No. 8.30, IV DEFINITIONS

13

staff based on the staff's perception of order by simply being a non-moving resistor. This happens to be the case in most incidents I reviewed.

31.     The DDOC's definition of "Use of Force" also appears to offer some guidance on when it is appropriate for correctional officers to use force in very general terms. In my experience, this policy approach relies heavily on the training provided, which means the subjective views and delivery methods of any given instructor may not be consistent. This would also have implications for the review process because it allows for a very subjective perspective by the reviewer. DDOC policy states:

> "The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force. The use of force may not be used as a retaliatory or disciplinary measure."[10]

> "Use of excessive force by Department employees or other persons is prohibited. Any violation of this policy may result in disciplinary action, up to and including termination."[11]

32.     In the vast majority of incidents I reviewed, the application of force was not reasonable under the circumstances, and no reasonable steps were taken to de-escalate the situation. In most incidents, the incarcerated individuals were, at most, non-moving resistors and, in some cases, not even given time to be compliant.

33.     DDOC's policy does contain some more language indicating a need for reasonableness in the use of force.

---

[10] *See* DOC_SCI_0041887, DDOC Use of Force Policy, Policy No. 8.30, IV POLICY
[11] *See* DOC_SCI_0041888, DDOC Use of Force Policy, Policy No. 8.30, IV POLICY

14

> "V. POLICY: …All employees responsible for offender supervision are trained regarding the Use of Force Model and this policy as a means to reduce and prevent the need to use force and to establish guidelines of reasonableness when force is required."[12]

As stated previously, this implies the DDOC Use of Force Training will provide all staff with alternatives to using force. It should be noted that DDOC has 92 PowerPoint slides in their "Use of Force" training material; not one was dedicated to de-escalation. In all of the training materials provided related to DDOC's policy and training, I did not see any emphasis placed on de-escalation, what it is, or even a definition.  If DDOC has other training material associated with specific de-escalation training, it was not provided as part of the use of force training materials I reviewed. Should it exist, I reserve the right to review and supplement my opinions

34.     DDOC uses an integrated use-of-force model (fig 1). From my interpretation of it, it appears the use of OC on a non-moving resistor is not an appropriate use of force. My interpretation is apparently contradictory to Management Defendants' interpretation because all[13] of the incidents I reviewed were reviewed and were found to be appropriate. As stated previously, in my experience, immediately using OC on a non-moving resistor without attempting any alternatives would make it unnecessary and excessive. In my opinion, this would violate DDOC's policy where it states.

> "The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available."

In my opinion, in all of the incidents I reviewed that I determined were unnecessary or excessive there were many reasonable alternatives to the use of force and none were used by Correctional Officer Defendants.

35.     Internal Investigator Huttie appears to share my opinion about using OC as a force option on a non-moving resistor. During his deposition, when asked, "..according to DOC's use of force policy, CAP [OC] is probably excessive for a non-moving resister." His response was "Yes." As

---

[12] See DOC_SCI_0041887, DDOC Use of Force Policy, Policy No. 8.30, IV POLICY
[13] Note: There is one exception with the IA Report on Mr. Turner's incident.

15

much as this supports my belief it is unfortunate he did not carry this belief in his investigations and findings.

*Figure 1*

**Use of Force Review Requirements**

36.     It is common correctional practice, as well as an ACA standard, to have review processes for use-of-force incidents. Based on my experience this is a critically important part of ensuring

16

uses of force do not become excessive. As with all policies, they are only as good as the level of accountability placed on ensuring staff follow them. The DDOC Use of Force Reviews, Policy No. 8.36 dated December 15th, 2014 has the following requirements:

"IV DEFINITIONS:

A. Institutional Review: An internal process, at the site level normally conducted by the Shift Commander, to evaluate all Use of Force incidents to ensure completeness of reports and policy compliance."

B. Administrative Review: An internal process at the site administrative level by the Warden, to evaluate all Use of Force incidents to ensure policy compliance."[14]

"G. Use of Force: Use of force is defined as action involving physical contact as employed by Department staff to obtain compliance of offenders and other individuals with orders from staff to (1) control disruptive or violent offenders, (2) enforce or restore order, (3) defend oneself against unwanted physical contact or harm, (4) protect other persons from imminent death, serious bodily harm, or physical harm, (5) protect state property, (6) prevent escapes or capture escapee/ing inmates, (7) administer non-emergent and emergent involuntary medications prescribed by a qualified health professional, and (8) apply clinical or therapeutic restraints authorized by a qualified health professional."[15]

"V. POLICY:

It is BOP Policy to review all incidents involving the use of force to determine if the use of force was appropriate."

"All incidents will require an Institutional and Administrative Review."[16]

---

[14] *See* DOC_SCI_0000701, Pg 1
[15] *See* DOC_SCI_0000702, IV Definitions, G, Pg 2
[16] *See* DOC_SCI_0000702, Pg 2

17

37.    Based on this policy language, I would expect that every incident would minimally receive an Institutional Review and an Administrative Review. I was surprised to see that from January 2020 to December 2021 SCI had a total of 289 use-of-force incidents, all received Institutional Review as required, but only 11 of those received an Administrative Review, which is not in compliance with DDOC policy.[17]

38.    Based on my experience as a Superintendent (Warden) of a large multi-custody correctional facility, I also had a policy requirement to review all use-of-force incidents, which I did.  Because of this requirement, on occasion, I would recognize incidents that did not comply with agency policy, and I would initiate corrective action. At one point, I noticed a trend in the use-of-force incidents where the incarcerated individuals were routinely experiencing secondary uses of force during escort or were falling down during escort. I recognized this as a problem, so I required every escort to be videotaped, have a Sergeant present, and the incarcerated person to be moved either on a gurney or wheelchair. Not surprisingly, these secondary uses-of-force and falling incidents stopped entirely. In all of these situations, the incident reviews had already been done at a lower level, similar to DDOC's Institutional Review.

39.    I share this to exemplify the importance of Administrative Reviews, which I believe are critical to maintaining policy compliance and ensuring an institutional culture does not slip into that of brutality. Unnecessary, excessive, or poorly performed incidents must be identified and rectified immediately for staff to have a clear understanding of the appropriate boundaries and acceptable staff behaviors. This is critical to defining institutional culture. This failure by Management Defendants is significant and leads me to opine that they have allowed this to occur through deliberate indifference.

### Lack of Decontamination

40.    In my experience, every time OC was used in an incident on an incarcerated person, the person sprayed was decontaminated as soon as possible. Depending on the location of the incident,

---

[17] *See* UOF Review - DOC_SCI_0051503

18

decontamination could be accomplished with copious amounts of water applied to the individual by staff or showering.

41.    It was surprising that Correctional Officer Defendants' practice did not include this type of decontamination practice. Even more startling was that in every reviewed incident, the incarcerated person was placed unsupervised/unattended in a holding cell for unspecified periods of time, which is contrary to DDOC training (fig. 2).

42.    In all the cases I reviewed where OC was used, the OC-exposed individuals were not decontaminated. When they were removed from the holding cell, the incarcerated persons were taken to a shower area, where a strip search was performed by staff. The incarcerated persons were not allowed to use the shower for decontamination and instead were required to perform the strip search procedure and receive a change of clothing. It was noted in some of the Plaintiff's complaints that they were required to touch their genital areas with the OC still present on their bodies and hands. I saw this in almost all the incidents I reviewed. The Correctional Officer Defendants' practice I observed was callous and unprofessional.

43.    This practice is also contrary to DDOC training. One slide used in DDOC training exemplifies these two areas of concern.



*Figure 2 DDOC Use of Force Training Power Point*

19

44.    Correctional Officer Defendants had a reasonable alternative approach they could have used to comply with their own training expectation. They should escort the OC-exposed individual directly to the shower area for decontamination, strip search, and change out of clothing, then place the decontaminated person in the holding cell. Instead, Correctional Officers Defendants chose the exact opposite, which caused unnecessary pain and suffering because the OC-exposed people were required to be restrained and exposed to OC for presumably long periods of time "unattended" in a holding cell. The fact this was an element of DDOC's training, and the fact they failed to follow it demonstrates deliberate indifference to the infliction of pain and suffering, in my opinion.

### Lack of De-escalation

45.    De-escalation is critical and necessary in most incidents because most use-of-force incidents can be avoided with effective de-escalation techniques. It is also true that officers, including correctional officers, are sometimes in situations where quick and immediate action is required. However, in the videos I reviewed and analyzed, there was no sign of de-escalation being attempted when the circumstance allowed ample opportunity for it. In most cases, Correctional Officer Defendants gave a couple of directives, closed the distance between themselves and the incarcerated person, then used OC and quickly took the incarcerated individual to the ground.

46.    I believe de-escalation/communication is a critical step in preventing the need for force, DDOC Lieutenant (LT) Long appears to agree with my view when he stated it during his interview with the investigator.

"...in his opinion, the officer did not use IPC (interpersonal communication skills): he could have addressed it differently, he could have spoken to the inmate, taken time to figure the situation out before he went to the "next step" in the Use of Force Policy."[18]

47.    LT Long's statement leads me to believe DDOC does have some type of de-escalation training in the form of IPC; however, I was not provided any documents to support this for my

---

[18] *See* IA TURNER, DOC_SCI_0001264

20

review. As stated elsewhere in this report, simply providing the training is worthless if officers are not held accountable for following it. Of all the incidents I reviewed, this is the only one where anyone acknowledged a need for IPC (de-escalation), and the perpetrating Defendant Correctional Officer was given a written reprimand for his callous actions against the incarcerated person.[19]

48.     It should be noted that the IA investigation (IA Turner) did determine this incident and allegations of staff misconduct to be founded, and Defendant CPL. Kraft (the officer who initiated the unnecessary force) purportedly received a written reprimand. The Use of Force review was initially determined to be within DOC Policy.

SECTION 6:
Are reports completed, answering all relevant questions?   ☒YES  ☐NO
Was the Use of Force within DOC Policy guide lines?        ☒YES  ☐NO
Comments:   None

*Figure 3 IA Investigation of Turner*

49. The ACA standard for de-escalation is.

> "5-ACI-3A-35 (Ref. 4-4206) – (MANDATORY) Written policy, procedure and practice restrict use of physical force to instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort and in accordance with appropriate statutory authority. In no event is physical force justifiable as punishment. A written report is prepared following all use of physical force and is submitted to administrative staff for review."[20]

50.     The Correctional Officer Defendants' practices I reviewed contradicted the ACA (MANDATORY) standard, DDOC policy, and training. All these incidents went through an Institutional Review process and, most importantly, in some cases, a secondary review by the

---

[19] *See* IA TURNER, DOC_SCI_0001263
[20] *See* ACA Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, March 2021.

21

Internal Affairs unit. Of all these uses of force, with one exception,[21] were deemed appropriate. Allegations of unnecessary and excessive force were determined to be "Unsubstantiated" by IA investigators. I strongly disagree with these findings. These findings shocked me based on the obvious failures by involved Correctional Officer Defendants to follow agency policy and training. This is discussed further in the section on "OC Use".

51.    Also of note, based on the use-of-force data provided from January 2020 to December 2021, SCI had a total of 289 use-of-force incidents. All received an Institutional Review as required, but the Management Defendants required only 11 of those to receive an Administrative Review, which is not in compliance with DDOC policy or the ACA standard. Also on note from this same data set is that only one incident of the 289 was forwarded for Administrative Investigation. This is a strong indication that the Management Defendants do not place a level of importance on de-escalation/communication before the use of force.

52.    In my experience, all correctional and even law enforcement policies, training, and practices emphasize training staff to use communication and safe distancing (de-escalation). I believe that, where there is time permitting, de-escalation should be the first and one of the most important approaches for non-compliant individuals. Based on the incidents I reviewed, I did not observe legitimate or expected de-escalation efforts, and often, Correctional Officer Defendants took on the role of aggressor by closing the safety gap (distance between them and the individual) and immediately dispensing OC and applying physical force.

53.    De-escalation is important because there is always an overriding priority to avoid using force whenever possible and a staff safety need.  When physical force is required, only use the amount necessary to control the individual. Control is generally understood to be achieved when the suspect individual is compliant or in wrist restraints and could include when the suspect individual is clear of a hostile area.[22]

54.    DDOC has addressed, to some degree, de-escalation and a reasonable level of force with the following policy language:

---

[21] *See* IA TURNER, DOC_SCI_0001260-0001340
[22]. A Hostile area may be an angry mob or even a victim, like in cases of domestic violence when there is a risk the victim will become the aggressor towards arresting officers or the suspect.

22

"V. POLICY: …All employees responsible for offender supervision are trained regarding the Use of Force Model and this policy as a means to reduce and prevent the need to use force and to establish guidelines of reasonableness when force is required."[23]

"The use of force must be reasonable under the circumstances and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to de-escalate a situation or otherwise prevent the force. The use of force may not be used as a retaliatory or disciplinary measure."[24]

"Use of excessive force by Department employees or other persons is prohibited. Any violation of this policy may result in disciplinary action, up to and including termination."[25]

55.    This policy language does touch on the key elements I described in paragraph 28, although some correctional agencies use even more definitive language to ensure staff know force should be avoided whenever possible.

56.    I found locations in the DDOC Use of Force training material where these topics were addressed, as well as another important topic related to the time given for compliance by the suspect.

---

[23] S*ee* DOC_SCI_0041887, DDOC Use of Force Policy, Policy No. 8.30, IV POLICY
[24] *See* DOC_SCI_0041887, DDOC Use of Force Policy, Policy No. 8.30, IV POLICY
[25] *Se*e DOC_SCI_0041888, DDOC Use of Force Policy, Policy No. 8.30, IV POLICY

23



This slide also includes instructor notes on "Stress De-escalation and Reasonableness."[26]

Related to the time given for the suspect to comply.



---

[26] *See* DOC_SCI_0041902

24

57.     I highlight giving the inmate time to comply because, because in all the incidents I reviewed when Correctional Officer Defendants gave directions, they rarely gave sufficient time for the inmate to comply before using OC and immediately taking the incarcerated person to the floor. In my opinion Defendants were overly aggressive, failed to follow their training and in the end caused unnecessary uses of force.

58.     It should also be noted that DDOC has 92 PowerPoint slides in their "Use of Force" training material; not one was dedicated to de-escalation. In all of the training materials provided related to DDOC's policy and training, I did not see any emphasis placed on de-escalation, what it is or even a definition.  If DDOC has other training material associated with specific de-escalation training, it was not provided as part of the use of force training materials I reviewed. Should it exist, I reserve the right to review and supplement my opinions.

59.     Based on my experience, including my tenure as a Commissioner of the Washington State Criminal Justice Training Commission and all the notable national attention on de-escalation by law enforcement, I know de-escalation is a critical aspect of corrections and law enforcement officer training. Numerous training materials are available to any criminal justice agency willing to receive and implement them. As an example, in one of many online articles on the topic of corrections and law enforcement de-escalation training, Corrections1.com posted an article titled "Verbal de-escalation: The most important skill an officer can have, part 1."[27] One quote from the article that stood out to me is:

> "With no effort at all, your mouth can get you into a lot of trouble. All too often officers say all the wrong things at the wrong time, serving only to escalate a situation to the point of physical confrontation. Anyone can go hands-on; it takes skill to de-escalate a situation with words. In order to be truly effective, verbal de-escalation, like any skill, requires practice."[28]

---

[27] *See* https://www.corrections1.com/corrections-training/articles/verbal-de-escalation-the-most-important-skill-an-officer-can-have-part-1-zFU1OhS5OdS1OVRS/
[28] *See* Ibid.

25

60.    I could not agree more with this statement, which is why significant emphasis in correctional officer training must be devoted to this topic. In my opinion, this is the responsibility of the Management Defendants. It is their responsibility to propagate necessary policy and provide effective training to ensure staff knowledge, understanding, and a demonstrated skill to apply the policy expectations. From my own experience, I know writing the policy and even creating the training is the easiest part, the most difficult is holding staff accountable to them. Without accountability, policy and training just become words on a page. As stated previously, if DDOC does have de-escalation material that was not shared, it is still blatantly obvious and my opinion that the Management Defendants are significantly negligent in accountability to those standards.

### Use of OC

61.    For the purposes of this report, I refer to Oleoresin Capsicum (OC) when referring to the pepper spray used by Correctional Officer Defendants. OC is a general term rather than the brand name of the actual OC product used by DDOC, which is "Sabre Red."

62.    OC is described as: "Oleoresin capsicum (OC) is the oil taken from the placenta near the stem of a pepper. Although OC is the active ingredient used in most pepper sprays, the percentage of OC within the formulation does NOT indicate pepper spray strength. The OC percentage only measures the amount of red pepper contained in the pepper spray, not the pungency or effectiveness of the product."[29]

63.    OC is commonly used in correctional settings for self-defense or defense of another, to restore order in riotous incidents, destruction of state property, etc. It can be used preemptively in situations where, in the officer's judgment, there were pre-attack indicators, and a physical attack is imminent. I am not familiar with the use of OC as the first and only step to responding to non-compliant/nonmoving resistors.  In my experience, when an incarcerated person moves to try and avoid control, this is called active resistance; DDOC's definition would be "moving resistor."

---

[29] *See* https://www.sabrered.com/pepper-spray-frequently-asked-questions

26

64.     In my opinion, the threshold for a correctional officer to use OC would be when a person becomes actively resistant/moving resistor, or it is an act of self-defense based on pre-attack indicators displayed by the subject.

65.     I would expect, time permitting, when confronting a non-moving resistor any reasonable officer would maintain a safe distance and attempt to de-escalate the situation with communication. Call for assistance or backup,[30] begin clearing the area of non-involved individuals by directive, and whenever possible, wait for backup to arrive before using any force options. Directives should be given to the individual to assume a position for the application of restraints; if non-compliance continues, a warning that force or OC will be used if the subject does not comply. If no other reasonable alternatives exist, apply the appropriate force, which could be OC. Throughout this, the officer should maintain safe distancing, allow the OC to take effect, and give directives for the person to get down on the floor.

66.     This may seem drawn-out in writing, but I have done and seen this done countless times in my career. The vast majority of times, compliance is achieved, and force is avoided when other staff arrive.

67.     In contrast, the approach used by Correctional Officer Defendants I observed in the vast majority of the incidents I reviewed was substantially different than my expectations or commonly accepted correctional practices for the use of force. In general, there were other staff in the immediate area who could have assisted and been a "show of force."[31] The Correctional Officer Defendant initiating the use of force (OC) would give some directives, and the person involved would argue and not be compliant. The Correctional Officer Defendants would close the safety gap with the individual and then immediately draw and dispense OC, often simultaneously. Their next action was an immediate takedown using physical force. Followed by prolonged struggles to restrain the incarcerated individual, causing unnecessary injury.

---

[30] Note: In the majority of the DDOC incidents I reviewed there were numerous officers in the immediate area available to assist. Even when other officers are not in the immediate vicinity, a radio call for an "officer needs assistance" will generate an immediate response, generally within seconds.

[31] Note: Show of force is often considered to be a part of the use of force continuum. Suspects seeing they are outnumbered and surrounded often become compliant when they see the futility of resistance.

27

68.    The actions I observed by Correctional Officer Defendants were not consistent with the training materials I reviewed, which included.

"Note: It is important to remember that after you deploy the product [OC] you keep a safe distance and allow the product to work. Spraying the subject and immediately engaging the subject is not the correct technique. The entire purpose of deploying at a distance is to attempt to gain compliance at a distance before going hands on, Obviously there are times when this might [be} unavoidable but the basic concept is to control at a distance"[32]



69.    Based on these materials, it seems clear to me that the expected approach for DDOC officers, when dispensing the OC, would be to pause and give directives to get down and not immediately apply physical force. It is disappointing that Correctional Officer Defendants failed to follow their training. For the Management Defendants who reviewed these use-of-force incidents, it is negligent for them not to address these shortcomings in their review. At a minimum, I would expect to see remedial training on the appropriate use of force and have this noted on the

---

[32] *See* DOC_SCI_0041446, 0096 DX - DDOC Power Point OC Aerosols

28

incident review. Management Defendants failed to address this and more often approved the use of force by checking the box YES associated with the "Was the Use of Force within DOC Policy guidelines?"[33] In my opinion, this failure to hold Correctional officer Defendantss accountable for their training perpetuated unnecessary/excessive uses of force.

70.    Another area of concern is the minimum distance at which OC was deployed. DDOC training, which includes manufacturer requirements for safe use, states there is a minimum stand-off distance of three feet.



71.    With few exceptions, the minimum range requirement was not followed. Based on my review, Correctional Officer Defendants primarily closed the distance (safety gap) between themselves and the incarcerated person and deployed the OC much closer than the required three feet. In several situations, Defendants  deployed OC inches from the face and eyes. As mentioned previously in the DDOC training materials, the intent of the OC is to incapacitate so the incarcerated person can be restrained without the need for going hands-on (using physical force). Often, the exposed person would stand stunned by the OC and then be tackled to the ground by

---

[33] *See* DOC_SCI_0000953 (As one example)

29

the dispensing officer without ever being given the command to get on the ground. This failure to follow their training resulted in prolonged wrestling matches, which caused unnecessary harm. The fact this was the routine practice used by Correctional Officer Defendants and then approved by the Management Defendants essentially made this the accepted practice.  Knowing what the expected practice is and ignoring it when it is not followed is deliberate indifference, in my opinion.

72.     In several of the incidents I reviewed, incarcerated persons were on the ground, sometimes trying to be compliant, when Correctional Officer Defendants would spray second and third bursts of OC directly in their faces. This is not a safe practice, as stated by the manufacturer, "because of hydraulic needling." At times, Defendants were so preoccupied with trying to dispense more OC that they failed to recognize the person was trying to be compliant. In my opinion, this was abusive and unnecessary in most incidents.

73.     On occasion, Correctional Officer Defendants would try to justify these actions by stating the incarcerated person was resisting. In my opinion, Defendants mischaracterized situations to justify their actions. Imagine being blinded, your skin burning, eyes watering, breathing painful and constricted, when you are forcefully thrown on the ground. Then someone puts their body weight, or that of many, on your back, and they are grappling with you. I guarantee your fight-or-flight instincts will kick in because it feels like you are in extreme peril. Then, once or if your mind catches up to what is going on, you realize you can't breathe because of the extreme pressure on your back, neck, or shoulders, so you try to push up so your chest has room to expand, and you can breathe. This is not a theoretical description because I have occasionally experienced this, acting as a role player in training exercises. Even when you know it is just an exercise, the physiological reactions are real. Even if your actions are intended to be compliant, they are not perceived that way by the chaotic pile of officers on top of you. Your efforts to get your hands under you so you can create chest space and breathe will be perceived as hiding your hands under your body or as trying to push the officer off of you as resistance.

74. Plaintiff Turner described his experience of being sprayed with OC and tackled:

30

*"The next thing I know I am getting sprayed. I don't see anything. I am thrown to the floor and they are jacking my arms around and cuffing me up."[34]*

75.    In my experience, and confirmed by research,[35] when officers fail to de-escalate or pause for effect and immediately initiate physical force, injuries to all involved are more likely to occur. This is why, consistent with my own experience and training, DDOC trains their officers to maintain a safe distance, pause for effect, and give directives for the individual to get on the ground to avoid other physical force that can cause injuries. In every case I reviewed, Correctional Officer Defendants failed to follow their training, and in all cases, with the exception of one (Turner), Management Defendants failed to hold them accountable for these failures.

## VI.  Individual Incident Analysis

### Patricio Bautista Summary

76.    The lack of video footage makes it difficult for me to assess the alleged situation with Mr. Bautista. It is surprising that the video was not retained, considering it was related to a staff misconduct grievance. The grievance officer viewed it and gave a verbal account, but there is still no video for third-party review. In my experience, video associated with alleged staff misconduct would be retained in case there is future litigation associated with the incident. In cases where the allegation was not substantiated, it is even more critical to maintain a copy; this litigation is an example of why. The lack of video and third-party review undercuts the credibility of the grievance officer's determination.

---

[34] *See* DOC_SCI_0001263

[35] *See* Holliday, S. B., Martin, L. T., & Towe, V. L. (2019). De-escalation training for law enforcement officers: A systematic review. *RAND Corporation*.; Caldwell, M. F., & Van Rybroek, G. J. (2001). Reducing violence in juvenile corrections: Evaluating the use of de-escalation training. *Journal of Interpersonal Violence, 16*(4), 380-391.; James, D. J., & Glaze, L. E. (2006). Mental health problems of prison and jail inmates. *Bureau of Justice Statistics Special Report*. U.S. Department of Justice.

31

**Jason Bennett Summary**

77.     The video does show some unprofessional conduct by one of the officers escorting Mr. Bennet in a wheelchair.

78.     Mr. Bennett was moved out of his cell in a wheelchair. Actions within the cell are not observable. He is escorted/pushed by one officer out of the unit. At some point, not captured on video, the escorting/pushing officer was transitioned to someone else. When Mr. Bennet was at a doorway, presumably a medical clinic, the escorting officer could be seen handling Mr. Bennet roughly and sharply jerking him back into the wheelchair.[36]

79.     As the escorting officer pushed Mr. Bennet back to the living unit, they were near a slider door and control point. The officer sharply jerked Mr. Bennet back in the wheelchair and held him by the collar. Mr. Bennet appeared to be protesting somewhat as they moved forward. At the next doorway, the escorting officer paused and struck Mr. Bennet in the head with an open hand.[37]

80.     Once they had returned to the living unit, the escorting officer paused at the officer's station and once again jerked Mr. Bennet sharply.[38]

81.     No audio was associated with my reviewed videos, so my opinions are based only on observable actions and what is stated in the investigator's report.

82.     The one escorting officer's treatment of Mr. Bennet was callous and unprofessional. The rough handling of Mr. Bennett while he was confined in a wheelchair and being escorted to see a healthcare provider should not have been cause for the rough handling and certainly not justification for an open-handed head strike.

83.     A hand strike such as the one used by the escorting officer was a use of force and should have been documented and reported. The incident was investigated by the facility investigator, who presumably reviewed the same video I did. The investigator concludes the use of force was justified under the policy because Sgt. Mears used force to prevent Mr. Bennet from falling out of

---

[36] *See* VIDEO373_Bennett 00598961 02.13.22 - 1661 - Pretrial HU4 Hallway Entr, @ 1:48
[37] *See* VIDEO374_Bennett 00598961 02.13.22 - 3219 - Unit #4 Max Hallway, @ 2:10
[38] *See* VIDEO367_Bennett 00598961 02.13.22 - 92—Pretrial HU4—Cam #2, @ 7:08

32

the wheelchair. I question this logic because the jerking of Mr. Bennett's shirt could have been for this purpose, although more aggressive than what was required. In my opinion, the head slap was in no way associated with trying to keep Mr. Bennett in the wheelchair.

84. When interviewed, Sgt. Mears said he accidentally contacted Mr. Bennett's face while trying to prevent him from grabbing his hand. That is not the way it appeared to me. Also, it appears Sgt. Mear failed to follow policy because there is no indication he submitted a use of force report as required. Had this been an accidental use of force, the prudent thing for Sgt. Mears to do was immediately file a report.

85. It is my opinion, Sgt. Mears acted unprofessionally and used unnecessary force on Mr. Bennett.

### Kyle Bullock Summary

86. Mr. Bullock is in the holding/booking area being processed. He is standing in front of the officer's station, having what appears to be a nonchalant conversation with an officer. The Correctional Officer Defendant does make two hand motions towards the shower/strip area. Mr. Bullock does not move, so the Defendant draws his OC and sprays Mr. Bullock in the face. Mr. Bullock turns his head slightly but is just standing there.[39] The Defendant grabs Mr. Bullock by the shirt on both shoulders while simultaneously tripping Mr. Bullock and taking him to the ground on his back. Two other Correctional Officer Defendants respond; Mr. Bullock is now on his stomach with his hands behind his back. After the Defendants have Mr. Bullock restrained, they lift his entire body off the floor. It appears his head is driven into the metal window frame and window.[40] Defendants take him to the ground again. Two Correctional Officer Defendants are holding his restrained arms, and the third has Mr. Bullock's feet, one in each hand, so Mr. Bullock is being carried face down back to a holding cell.

87. In the holding cell, Mr. Bullock is placed on the floor face down, and the officer holding his legs has them elevated in an awkward position; they are near the kneeling officer's head while

---

[39] *See* VIDEO006_Bullock 00655438 06.13.20_Station_, @ 5:59
[40] *See* Ibid., @ 7:12

33

Mr. Bullock's face is on the ground.[41] All three Correctional Officer Defendants are on top of Mr. Bullock and are wrestling with him.[42]

88.     After an unknown period, a hand-held video is taken of Mr. Bullock in the holding cell with four officers in entry gear.[43] It appears the entry team is performing a strip search of Mr. Bullock. Once it is complete, he is escorted out of the holding cell. On the right side of his head, there appears to be blood. He is taken to see a nurse and then escorted to a segregation cell without further incident.

89.     During the IA investigation, Defendant Lt. Pusey stated he did not remember if Mr. Bullock had said he was injured; if he had, then it would have been on the incident report.  The blood on the side of Mr. Bullock's face was evident in the video. Defendant Officer McMahon stated in his incident report written on the day of the incident that he ordered Mr. Bullock to get on the ground after he sprayed him with OC.[44] From my observation of the video, it does not appear this took place. The officer dropped the OC canister and then immediately and forcefully threw Mr. Bullock to the ground. It was one fluid motion. There was no hesitation where an order could be given, let alone complied with. My review indicated it was two seconds after dispersing the spray to the officer employing the tripping technique.

90.     Defendant Officer McMahon also said Mr. Bullock was resisting and putting his hands under his body, which conflicts with the video where it appears Mr. Bullock placed his hands behind his back almost immediately.[45] In the video, Mr. Bullock can be seen with his left hand out to his side, which he or someone immediately places behind his back where it appears to remain; a few seconds later, his right hand can be seen behind his back, not being held there by any staff. These observable facts lead me to conclude he was trying to comply with the restraint process. It should also be noted Mr. Bullock had three officers on top of him, which would cause him to react reflexively to their actions.

---

[41] *See* VIDEO004_Bullock 00655438 06.13.20_Station_, @ 1:40
[42] *See* Ibid., @ 1:50
[43] Entry Gear – is the equipment used when corrections staff perform a pre-planned use of force or cell entry. It typically consists of helmets, face shields, stab-resistant vests, elbow and knee pads.
[44] *See* IA BULLOCK. DOC_SCI_0001751 & VIDEO006_Bullock 00655438 06.13.20_Station_, 06:18 – 06:20
[45] *See* VIDEO006_Bullock 00655438 06.13.20_Station_, @ 06:26 - 06:40

34

91.     My concern with the incident involving Mr. Bullock is the initial use of force with OC spray. It does not appear any warning was given that force would be used if he did not comply. The video of the initial incident does not have audio, so I cannot hear what was said. Still, there is no indication in the incident report prepared by the involved officers that a warning was given. It appears the officer gave several directives for Mr. Bullock to move the shower/strip area. Mr. Bullock remained where he was standing with his arms crossed across his chest as he was when he was sprayed. This made Mr. Bullock a non-moving resistor, and Mr. Bullock gave no pre-attack indicators.

92.     I also have concerns about the conflicts between the Correctional Officer Defendants' reports and the facts observable in the video. The officers stated Mr. Bullock was refusing to walk, which is why they carried him in the way they did; absent audio, I cannot determine if this is true. I do know the appearance was less than professional and caused Mr. Bullock's head to impact the window and steel frame. Once he was placed in the holding cell, he was face down, with his hands restrained behind his back, and one officer was holding his legs up in the air, which appeared awkward and probably painful. Later, when Mr. Bullock was strip searched and removed from the holding cell, recorded on a hand-held camera with audio, Mr. Bullock was respectful and compliant throughout the process. No decontamination was performed throughout the incident.

93.     It is my opinion, that Defendants McMahon, Corey Keen, and Manaraze were unprofessional and used unnecessary and excessive force on Mr. Bullock.  It is my opinion that the escorting Defendant Correctional Officers failed to decontaminate Mr. Bullock and therefore inflicted unnecessary pain and suffering.

**Adam Calloway Summary**

94.     The only video available for the incident with Mr. Calloway was from his escort outside the building where the use of force occurred. There was also a hand-held video recording of Mr. Calloway's strip search in the holding cell area and subsequent escort to segregation. Because of the lack of video, I cannot opine based on my own observations. Based on the allegations made by Mr. Bullock, I assume the use of OC was similar to what I have seen in other use of force incidents. At SCI, it appears the Management Defendants routinely allowed officers to immediately use their

35

OC spray if they perceive an incarcerated person is being non-compliant with verbal direction and without first giving a verbal warning before dispensing OC. Based on all written descriptions of the initial incident, including those made by involved staff, it appears this is the case.

95.    In the hand-held video of the strip search and medical assessment made after the use of force, all indications are that Mr. Calloway was compliant with all staff. Like all other incidents, no attempt was made to decontaminate Mr. Calloway following the use of OC.

96.  In my opinion, Defendant Corrections Officers likely used unnecessary force on Mr. Calloway and also inflicted unnecessary pain and suffering by failing to decontaminate.

### Keith Campbell Summary

97.    The videos of the incident involving Mr. Campbell show that officers are searching his bunk area. He approaches and hands something, later identified as bleach, to another incarcerated person, then walks away. An officer identified as Sgt Neal calls Mr. Campbell back and directs him to a location behind Sgt Neal. Mr. Campbell appears verbally resistive but is moving in the directed direction. When Sgt. Neal and Mr. Campbell are approximately 5-6 feet from each other, Mr. Campbell pauses briefly, then takes a step forward, and Sgt. Neal sprays him with OC. Mr. Campbell turns away from the spray and is tackled by Sgt Neal, taking them both to the ground. Mr. Campbell is on his back, and it appears he made some rapid hand and arm movements. Then Mr. Campbell gets Sgt. Neal in a headlock, which prompts Sgt Neal to do three head strikes to Mr. Campbell. This caused Mr. Campbell to release Sgt Neal's head. The struggle continues, and several other Correctional Officer Defendants join in. Sgt. Neal does 4-5 more head strikes after his head has been released. He and others involved state Mr. Campbell was trying to bite them. From the video provided, I could not establish if this took place.

98.    Because Mr. Campbell appeared to be fighting back against the officers and likely struck Sgt. Neal, portions of this use of force are justified. I do have concerns with the 4-5 head strikes after Sgt. Neal was released from the headlock but saw nothing to refute the claim staff were being bitten by Mr. Campbell. Also, another Officer who responded immediately initiated body strikes.

36

JA_01848

When there are so many staff involved in an incident like this, it is difficult to have a full understanding of what is transpiring in the pile because of the level of resistance being shown by Mr. Campbell; it is possible he was resisting in the way described.

99.    Like many others, my primary concern with this use of force is how quickly Correctional Defendant K. Neal resorted to OC.  It was also noted that Mr. Campbell was not decontaminated by the involved Correctional Officer Defendants. The amount of head strikes used is concerning, but admittedly, I do not know the extent of what was happening in the pile. Head strikes are generally considered a much higher level of force reserved for the direst of circumstances like life safety.

100.    It is my opinion that defendant K. Neal, was unprofessional and used unnecessary and excessive force on Mr. Campbell.  It is also my opinion that Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. Campbell by failing to decontaminate.

**Barry Cline Summary**

101.    Mr. Cline is standing on the red line near the officer's podium and starts backing up. Defendant Officer Vernet grabs him by his clothing and starts escorting him away.[46] Mr. Cline has his arms raised because of the way he is being escorted. He does turn and look at the officer. It is difficult to determine if he moved his elbow towards the officer's face or if it was a reflex while he was being pulled backward.[47] Sgt. Lindale says he saw in the video Mr. Cline elbowed Officer Vernet and got on top of him. From my observation of the video, I can say there was no time when Mr. Cline was on top of Officer Vernet.[48] Officer Vernet says Mr. Cline aggressively turned towards him, so he took him to the ground. He also said, "I truly don't remember if he (Cline) elbowed me in the jaw."[49] In Officer Vernet's Disciplinary Report on Mr. Cline, from the same day. The officer says Mr. Cline turned into him aggressively, and that is what caused him to take him down. There is no mention of an attempt to elbow, which was only made by other staff after viewing the video.[50]

---

[46] *See* VIDEO039_Cline 00498274 08.31.21_Station_, @ 2:45
[47] *See* Ibid., @ 2:48
[48] *See* DOC_SCI_0000935
[49] *See* COD_SCI_0000938
[50] *See* DOC_SCI_0000944

37

102.    Officer Vernet then throws Mr. Cline to the floor. Mr. Cline lands on his back but rolls onto his stomach, and another officer joins in.[51] The second Defendant Correctional Officer responds by removing his OC and having it in his right hand. When he gets to Mr. Cline, the second officer sprays OC on Mr. Cline's facial area.[52] The first officer, Defendant Officer Vernet takes out his OC and starts spraying Mr. Cline directly in the face. The first officer does not appear to be trying to restrain Mr. Cline but rather seems focused on his head and spraying the OC. It appears that after he used the OC spray, officer Vernet continued to push Mr. Cline's head into the floor with his upper body weight. When Mr. Cline later saw the Nurse, he had two contusions on his head, one which is explained later and another over his right eye, which may have been the result of the extreme pressure on his head. [53] As the second officer repositioned himself, residue from the OC he used could be seen on the floor.[54] Mr. Cline surrendered his left hand and the second officer had it controlled behind his back.[55] Mr. Cline's right hand is exposed and beside him, not under his body as reported,[56] but Officer Vernet is taking his OC spray out and spraying Mr. Cline in the face.[57]

103.    At this point, there was no need for additional OC as Mr. Cline was trying to surrender his hands for restraining. Mr. Cline's right hand was exposed and behind his back, but Officer Vernet took his OC spray out and sprayed Mr. Cline in the face. He could have been focused on the task of restraining Mr. Cline instead of needlessly using his OC. A third Correctional Officer Defendant joined in, and the first two responders had their body weight on Mr. Cline. [62] The third officer had control of Mr. Cline's right hand.[58] The first officer continues to do something near Mr. Cline's head, I assume this was pressure on his head, and does not appear to be trying to restrain him. A fourth Correctional officer Defendant joins and controls Mr. Cline's legs. Mr. Cline's left hand is in a restraint, and the third officer is controlling his right.[59] The second Officer is able to restrain

---

[51] *See* Ibid., @ 2:49
[52] *See* VIDEO038_Cline 00498274 08.31.21_Station_, @ 2:53
[53] *See* VIDEO028_Cline 00498274 08.31.21_Bodycam_, @ 17:10
[54] *See* Ibid., @ 3:06
[55] *See* VIDEO039_Cline 00498274 08.31.21_Station_, @ 3:01
[56] *See* DOC_SCI_0000939 - The Investigator says, based on the reports of involved staff, Mr. Cline rolled onto his stomach and locked his hand and arms under him. This is not what is viewable in the video.
[57] *See* VIDEO039_Cline 00498274 08.31.21_Station_, @ 3:02 & @ 3:07
[58] *See* Ibid., @ 3:20
[59] *See* Ibid., @ 3:29

38

Mr. Cline's right hand behind his back. He is lifted to his feet in a come-along position, and as they leave, the location of the assault, OC residue, and possibly blood can be seen on the floor.[60]

104.    While Mr. Cline is being escorted and attempting to walk under his own power, he is in stocking feet and unable to get traction; because of the pace at which he is being escorted, this appears consistent throughout the escort.[61] When they reach the holding cell area, Mr. Cline loses his footing and falls face forward. This is Mr. Cline simply losing his footing because of the rate and odd position in which he is being escorted.[62] The DDOC investigator recounts what the escorting staff said: Mr. Cline was not supporting his own weight during the escort and that he intentionally went limp-leg at the holding cell, which caused him to go down and hit his head. The video shows a rapid escort where Mr. Cline loses his footing because of his fast pace and awkward position. This was not a willful act on Mr. Cline's part.

105.    At the holding cell door, Mr. Clines falls face-first and hits his head on the open door before his face hits the ground. He is bleeding, and droplets of blood are falling from his head as the officers drag him by his restrained arms into the holding cell.[63] He is placed in a chair but slides out. One of the escorting officers reported that he didn't see that Mr. Cline was bleeding, and the other officer said he saw some blood but didn't know when it happened, so he didn't report it.[64] It should be noted that the video clearly shows both officers seeing the blood.[65]

106.    It is unclear to me how long Mr. Cline remained in the holding cell without medical attention for his wounds. The hand-held video shows that it was 8 minutes and 30 seconds before he saw the nurse and was treated. The video from the front of the holding cell at the time of the injury to its end was another 1 minute and 46 seconds, which is technically close to ten minutes, but this assumes the videos happened sequentially and there was no time in between. I do not believe this to be the case. The DDOC investigator says he confirmed Mr. Cline was treated within ten minutes of his injury. I cannot concur with this based on the information provided.

---

[60] *See* Ibid., @ 3:36
[61] *See* VIDEO031_Cline 00498274 08.31.21_Station_, @ 2:54
[62] *See* VIDEO033_Cline 00498274 08.31.21_Station_, @ 4:30
[63] *See* VIDEO032_Cline 00498274 08.31.21_Station_, @ 1:24
[64] *See* DOC_SCI_0000933
[65] *See* VIDEO032_Cline 00498274 08.31.21_Station_, @ 1:28 & 1:39

39

107.    Mr. Cline is taken to the commonly used shower area to be strip searched and given different clothing, no decontamination is given. He is then taken on a long escort to a nurse's station. During the exam and treatment of his most serious wound, Mr. Cline initially refused treatment because he was "burning."[66] Mr. Cline is placed in a segregation cell from the nurse's station.

108.    The incident with Mr. Cline is another example of unnecessary and excessive force. Surprisingly, Officer Vernet was either incapable or unwilling to resolve the situation with Mr. Cline using personal communication tactics. The situation Officer Vernet faced was one that most correctional officers face multiple times a day without the need for force. Incarcerated persons routinely push the boundaries and argue their points with correctional staff. Appropriately trained staff will give directives and pause for compliance. If compliance is not achieved, you restate the directives and inform the incarcerated person of the adverse outcomes if they don't comply. Then, give them a choice by saying, "Mr. Cline, if you don't comply by returning to your cell now, you could be placed in segregation and lose all recreation time, or you could just return to your cell." This is a basic correctional verbal tactic to get compliance.

109.    Officer Vernet instead immediately resorted to a physical approach that, in my experience, is more likely than not to result in the use of force. Once the force was initiated, Mr. Cline almost immediately tried to assume the surrender position, and rather than focus on restraining him and ending the situation, Officer Vernet focused on inflicting more damage. The escort technique used by responding staff was unsafe. It outpaced the restrained person's physical abilities to keep up and caused an injury that should have been avoided. I admit I am uncertain of the time it took for Mr. Cline to receive treatment for his injuries, but I do know there are medical staff routinely available in the holding area where Mr. Cline was held. It is appalling the Correctional Officer Defendants who caused and were aware of Mr. Cline's head injury didn't immediately report it so they could be assessed and treated. Instead, Mr. Cline was required to sit bleeding and soaked with OC until he could be escorted a substantial distance to another nurse's station. Throughout this situation, Correctional Officer Defendants acted with callousness and cruelty towards Mr. Cline's safety.

---

[66] *See* VIDEO028_Cline 00498274 08.31.21_Bodycam_, @ 12:45

40

110. Of note in the IA investigation in the IA investigation the Investigator says Mr. Cline rolled on to his stomach and locked his hand and arms under him. This is not what is viewable in the video.[67]

111. The investigator recounts the escorting staff's statement that Mr. Cline was not supporting his own weight during the escort and intentionally went limp-leg at the holding cell, which caused him to go down and hit his head. The video shows a rapid escort during which he lost his footing because of the fast pace and awkward position he was in

112. The investigator points out Mr. Cline refused treatment but failed to mention that his stated reason was that he was burning and it hurt.

113. Defendant Vernet says he deployed two bursts of OC because Mr. Cline was resisting and holding his arms under his body. He says he applied a single knee strike to Mr. Cline's side because of this. He says he gave orders and met continued resistance, so he sprayed him for a 3rd time. In the video (VIDEO039_Cline 00498274 08.31.21_Station), Mr. Cline can plainly be seen trying to place his hands behind his back in a surrender fashion.

114. DOC_SCI_0000975 Investigators note in the video review that Mr. Cline rolls to his stomach and locks his hands under him. Officer Vernet remains focused on Mr. Cline's head where he is dispensing OC and the second officer secure the presented left hand.

115. The investigator says Cline landed on top of Vernet, and he did not. He landed beside the officer.

116. As with all situations I have reviewed involving the use of OC, the lack of decontamination is unacceptable and will be addressed in a specific section of this report.

117. It is my opinion that Defendant Vernet used unnecessary and excessive force on Mr. Cline. It is my opinion that the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. Cline by failing to decontaminate.

---

[67] *See* DOC_SCI_0000939

41

### William Davis Summary

118.    On October 18, 2021, William Davis was confined at SCI when he was assaulted during an unnecessary use of force. He entered confinement on October 15th, 2021, was set for release on October 18th, 2021, and eventually was.  I do not know the charges he faced, but based on the length of confinement, I would assume they were minor charges. On the 18th at approximately 12:00 PM, correctional staff provided him with a document about his incarceration status; he saw inaccurate information based on his understanding of his release date. This caused him to question this with the corrections officer present at the officer's station.

119.    A video of the incident shows Mr. Davis approaching the officer's station, waiting for his turn, and receiving what is presumed to be his status sheet, presumably with incorrect release information.[68] After reading and processing the document, he waits for another incarcerated person to finish and approaches the officer's station again. He appears to ask the officer present what to do, and the officer says something to him where he raises both hands in front of him, palms out, giving the impression he is saying fine or okay. This exchange does not appear to be hostile in any way. As Mr. Davis turns and walks away, Defendant Sergeant (Sgt) K. Neal, who was standing behind the first officer, aggressively directs Mr. Davis to come to his location. Mr. Davis pauses at the "Out of Bounds" line painted on the floor.[69] Within a second or less from giving Mr. Davis the directive, Sgt. Neal aggressively approaches Mr. Davis, grabs him by the shirt with his left hand, and pulls him back towards the officer's station.

120.    When they stopped only a few feet from where it started, Sgt. Neal continued to hold Mr. Davis's shirt while pulling him nose to nose and pointing his finger in his face. Here, they exchanged words and referenced the paper Mr. Davis received earlier. Sgt. Neal then grabbed Mr. Davis's shirt again with his right hand, turned him around, and started pushing him away from the officer's station. Mr. Davis appears slightly off balance and nearly runs into a door another incarcerated person is opening, which causes Mr. Davis to turn into Sgt. Neal. Only a step or two

---

[68] *See* VIDEO051_Davis 00301806 10.18.21_Station_, @ 0:00
[69] It is a common correctional practice to have "Out of Bounds" markings around the Officer station to prevent the incarcerated from lingering there and distracting the officers. The incarcerated know they are to stop on this line and wait to be called to approach the officer's station. If they fail to do this, they could be cited for being in an out-of-bounds area and sanctioned to a loss of privileges.

42

JA_01854

from the door, Mr. Davis says something to Sgt. Neal. Sgt. Neal pushes his left shoulder, then grabs the front of Mr. Davis's shirt with his left hand and wraps his right arm behind the back of Mr. Davis's neck. At the same time, Sgt. Neal places his foot and hip in front of Mr. Davis and performs a hip toss. Mr. Davis is entirely airborne, and Sgt. Neal's body weight is on him when he impacts the hard floor.[70]

121.    A third officer behind the officer's station, believed to be Defendant Officer Vernet, ran to where Mr. Davis and Sgt. Neal has impacted the floor; ███████████████████████ ██████████ but it is apparent there was a struggle. Sgt. Neal is on top of Mr. Davis when the third officer engages in the struggle. At one point, it appears to me the third officer used three knee strikes or kicks on Mr. Davis's upper body or head.[71] At this point, it does not appear they have placed the wrist restraints on Mr. Davis, which does happen seconds later when you can see both Mr. Davis's hands going behind his back.[72] From my own experience in similar situations when trying to restrain someone, the officer will get an arm/wrist secured in a restraint, then use the restraint so you can more easily control that appendage while you bring the second hand around and restrain it to the one that is already restrained. When it appears Mr. Davis is restrained, the third officer can be seen reaching for his left hip with his left hand; he then takes what appears to be OC from his holster. ███████████████████████████████, but it is safe to assume it was directed at Mr. Davis's facial area because a few seconds later, the OC canister is dropped near Mr. Davis's head.[73] This can be seen just under the staircase.

122.    Mr. Davis is then lifted to his feet, Sgt. Neal has his arm under Mr. Davis's arm and over his shoulder, which would be a reasonable way to lift a restrained person to their feet. The third Defendant Officer is holding Mr. Davis by his arm near his wrist, which is a dangerous approach because it can cause pain and shoulder injuries.[74] Other Correctional Officer Defendants respond and take over the escort; they also appear to be putting unnecessary leverage on Mr. Davis's shoulders. Mr. Davis can be seen in other videos during the escort and is walking with the escorting staff but does appear to have difficulty keeping up with their pace. The escorting Defendants both

---

[70] *See* Ibid., @ 2:02
[71] *See* VIDEO050_Davis 00301806 10.18.21_Station_, @ 2:22-2:31; See also, DOC_SCI_0001720.
[72] *See* Ibid., @ 2:39-2:42
[73] *See* Ibid., @ 2:42-2:52
[74] *See* Ibid., @ 2:54

43

have their hands up under his arms with their hands on his shoulders, which causes his face to be directed at the floor. In this position, it is difficult for the restrained person to see where they are going, and because of the positioning, it would be extremely difficult to spit on the officer conducting the escort.[75]

123.    From other camera angles of the escort with a frontal viewing, the OC residues and blood can be seen on his right shoulder, as well as blood droplets on his pants legs. His face is pointed towards the floor. When the escort reaches a doorway, Davis is under escort with his hands restrained behind his back. When all three are trying to navigate the doorway, Mr. Davis appears to stumble. When they are approximately in the center of the frame, one of the Defendant officers places his hand on the back of Davis's head and pushes him face forward to the ground.[76] While he is being held on the ground, another staff person is summoned by the officer who pushed Mr. Davis's head onto the floor. It was apparently a request for a spit hood, which was subsequently put on his head.

124.    After the spit hood was placed on Mr. Davis, the escort continued until he was placed in a holding cell. Three Correctional Officer Defendants were involved when he was placed in the holding cell. Either because he stumbled or because he was intentionally placed there, he ended up on the floor. Sometime later, there is hand-held camera footage of Mr. Davis being escorted from the holding cell to what appears to be a shower area. You can see he has blood and OC on the spit hood and his clothes. It also appears he has defecated on himself as a brown stain can be seen on his buttocks. In the shower, he is strip searched and given orange clothing, but he is not allowed to shower for decontamination purposes. He then is taken on a long escort to the nursing area, where a male nurse takes his vitals, and that is all. He has blood and mucus dripping from his nose. There was audio, but I did not hear the nurse ask about injuries. Next, he is placed in what appears to be a segregation cell. He does have access to a sink at this point.

125.    I have several concerns about this use of force, the first being that it was completely avoidable. I would concede Mr. Davis may have been upset knowing he was days past his release date, but he did not appear overly aggressive with the initial officer he encountered. It is unclear

---

[75] *See* VIDEO054_Davis 00301806 10.18.21_Station_, @ 1:02 & VIDEO044_Davis 00301806 10.18.21_Station_,
[76] *See* VIDEO054_Davis 00301806 10.18.21_Station_, @ 3:02

44

to me why Sgt. Neal became so aggressive in this situation. In my experience, unit supervisors (Sgts) are problem solvers who listen to the incarcerated person's grievance, tell them they will look into it, and then do that. In my experience, this simple approach will resolve most situations because the incarcerated person feels heard and knows someone is looking into their grievance. This will generally resolve the immediate issue. Sgt Neal didn't appear to take this approach. Instead, his overly aggressive actions resulted in an unnecessary use of force. Even if Mr. Davis was elevated about the situation, this is why staff are or should be trained in de-escalation techniques to avoid unnecessary force.  There was no indication that Sgt Neal attempted to de-escalate the situation in any way.

126.    In my experience, aggressively grabbing someone and then screaming at them with your finger pointed in their face is a sure way to escalate a situation like this. To my knowledge, no responsible correctional agency would train their staff in this intimidation tactic.  In my experience, correctional staff are trained to keep a safe distance so they have time to react should a situation escalate. Sgt. Neal's aggressive approach, where he closed this safety gap, was an unprofessional and irresponsible choice. Sgt. Neal stated Mr. Davis spat on him, which caused the use-of-force.[77] From my review, I did not note intentional spitting by Mr. Davis, but because Sgt. Neal elected to close the safety gap and engage in a heated conversation face-to-face with Mr. Davis; it is possible there was an unintentional exchange of spital. This was definitely not an allowable reason to use force.

127.    When Sgt. Neal directed Mr. Davis, he could and should have given Mr. Davis an opportunity to respond, not aggressively approach him. Later, after Sgt. Neal was screaming in Mr. Davis's face; he could have ordered Mr. Davis to return to his cell and followed him from behind a few steps instead of attempting to drag him there by his shirt.

128.    Once the assault on Mr. Davis started, Defendant Vernet joined and can be seen using multiple knee strikes on Mr. Davis. In my opinion, the knee strikes were excessive force that was not required in the situation. Both Sgt. Neal and Vernet  appeared to be large, fit men who could easily overpower Mr. Davis. Mr. Davis was face down on the ground with two staff on top of him

---

[77] *See* DOC_SCI_0001686

45

restraining him, so the knee strikes were excessive. No injuries were reported by the correctional officers following the assault, so there was no indication Mr. Davis was fighting back.

129.    The next area of concern was when Defendant Vernet  appeared to spray OC on Mr. Davis's facial area. From my review, I saw Mr. Davis's hands go behind his back, indicating he was restrained. This is likely why the third officer could take his hands away and draw his OC. At this time, there was no threat to anyone, so there was no justification for discharging the OC. Spraying OC on a restrained person is excessive force.

130.    During the escort to the holding cell following the initial use of force, the escorting Correctional Officer Defendants used another use of force on Mr. Davis, which they justified because they alleged he was attempting to spit on them.[78]  From my review of the video of this incident, Mr. Davis's face is pointing toward the floor, and the escorting staff was slightly behind him. Because of this, it is difficult for me to believe Mr. Davis is spitting at the officer. Immediately before being taken to the ground for the second time, the three people involved were attempting to navigate through a doorway, causing them to shift their positioning, which appears to put Mr. Davis off balance.  In my opinion, this likely gave the escorting officers the perception that he was resisting the escort. Instead of immediately taking Mr. Davis to the ground headfirst, they could and should have paused the escort to allow him to regain his balance and give directives. The escort's appearance all the way up to this point was that Mr. Davis was compliant but was struggling to keep up with the escorting officer's pace. The escorting officers were walking normally, while Mr. Davis was hunched over with his knees slightly bent in a duck walk position. Mr. Davis could not see what was ahead of him, so all combined, this definitely would make it difficult to keep up with the escorts and maintain one's balance.

131.    In the investigator's review of this incident and after viewing the same video, I saw. He characterized the second takedown as:

"*Officers placed Inmate Davis on the floor; Officers can be clearly seen "bracing themselves" from floor impact and Inmate Davis is lowered to the floor. There was no "throwing motion" by the Officers, nor did the officers let Davis fall unaided to the floor.*"[79]

---

[78] *See* DOC_SCI_0001694
[79] *See* DOC_SCI_0001721

46

I dispute this characterization because I saw three people falling to the ground, Mr. Davis only having his head and face to stop this fall while the staff had their hands feet and knees to brace their fall.  Their hands were bracing themselves, not lowering Mr. Davis to the ground.

132.    It should also be noted what the effects of OC are:

"Pepper spray causes irritation of the eyes, skin, and mucus membranes. Eye exposures can result in pain, redness, watery eyes, difficulty opening the eyes, and sensitivity to light. Skin exposures can cause pain, redness, swelling, and itching. Inhalation exposures can cause coughing, difficulty breathing, nasal and throat irritation, and runny nose."[80]

133.    During my career in corrections, I have experienced first-hand the effects of OC on many occasions. I know it is painful and causes choking, all the effects stated above; once you are exposed, the natural reaction is to try and clear the substance from your orifices by spitting. Typically, in training sessions, water is immediately available for staff to use to stop the effects, and it is generally known as the most effective treatment. None was offered to Mr. Davis after his exposure.

134.    When Mr. Davis was placed in the holding area, he was placed on the ground rather than in a readily available chair.  As I stated earlier, it was unclear if he stumbled or was intentionally thrown to the floor.  In either case, this gave me the impression of malice towards Mr. Davis.

135.    Because of the time-stamping method used in the provided videos, it was not possible for me to determine the length of time Mr. Davis was required to suffer from the effects of the OC spray. It was clear to me that no effort was made to decontaminate him after the use of OC. Common correctional practice would require immediate decontamination after OC is used, and I saw no attempt at decontamination. This is even more startling because the officers placed him in a shower for a strip search, and the OC, blood, and feces were clearly visible on his person, but apparently, no one cared.

---

[80] https://www.poison.org/articles/how-dangerous-is-pepper-spray-201

47

136.    After the strip search, Mr. Davis was taken on a long escort to see a nurse. The male nurse took his temperature, blood pressure, and blood oxygen level. The first thing Mr. Davis said to him was, "I can't breathe."[81] The nurse did not appear to pay any attention to this. Mr. Davis was sitting there with bloody mucus coming from his nose, and I would expect some dialogue about his injuries, but there was none. Once the nurse had completed the vitals check, Mr. Davis was immediately escorted out of the area. The exam lasted approximately 3 minutes without real dialogue between the nurse and Mr. Davis. In my experience, nursing staff are required to ask about other injuries, and the best practice is to use a full-body diagram to identify any injuries sustained during the use of force. This practice ensures a more thorough exam and appropriate documentation of injuries sustained. I understand Mr. Davis was released shortly after this and taken to the emergency room. I do not know the severity of his injuries, only that he had to seek treatment.

137.    This was an unnecessary and improper situation that reinforced my growing belief SCI has established an overly aggressive culture and has disregarded one of the basic responsibilities of any correctional professional, which is to protect the safety of others, including the incarcerated.

138.    Following the initiation of this lawsuit, DDOC performed a review of the incident, which is startling to me because, in my experience, use-of-force incidents are reviewed within a few days of the incident. In Mr. Davis's situation, Management Defendants  waited 5 months to review the incident, and then it appears they only did that because a lawsuit was filed.  I did note that an administrative review was conducted on October 26th, but it appears this was to determine the need for ongoing administrative segregation placement; none was requested.[82] In this situation, the Internal Affairs Unit Investigator who conducted the review found the alleged assault of Mr. Davis as UNSUBSTANTIATED and that Mr. Davis's claim was detained unnecessarily as UNFOUNDED.

---

[81] *See* VIDEO042_Davis 00301806 10.18.21_Bodycam_, @ 8:04
[82] *See* DOC_SCI_0001684

48

139.   The IA investigation conducted by DDOC does not address the injuries Mr. Davis received as a result of his assault by staff. The pictures that were taken by Mr. Davis's Mother, of Mr. Davis after he was released from DDOC do demonstrate the observable level of injury he received. This is not an expert medical opinion, but my impression and opinion are based on the photographs provided.

140.   I disagree with the Investigator's finding on the assault of Mr. Davis and am baffled how such a seemingly minor incident could result in multiple use of force on Mr. Davis.

141.   It is my opinion the Sgt. Neal, Officer Vernet, and other Correctional Officer Defendants were unprofessional and engaged in unnecessary and excessive force against Mr. Davis. The Correctional Officer Defendants also inflicted unnecessary pain and suffering on Mr. Davis by failing to decontaminate.

**Donbray Durham Summary**

142.   In the IA investigation, all Correctional Officer Defendants state Durham is intoxicated and uncooperative. From the videos, it was apparent he was being verbally resistant when they first took him to the AFIS machine for fingerprinting. Because the officer put their hands on him to nudge him towards the machine, I suspect he was being passive resistive as well. Up to this point I see no challenges with the staff actions.

49

JA_01861

143.    While at the AFIS machine, officers take Mr. Durham to the ground, which is difficult to see because it is only captured on a fish-eye camera.[83] It appears Durham is being verbal with the officers, which prompts a Sgt. to come over. Force begins at 3:46. Four officers are on him and restraining him. When they lift him to take him back to the holding cell, there is blood on the floor, and there is OC on his shirt. I am unsure when the spray was used, but I question why it was used. This is another example of elevating the use of force when it was unnecessary.

144.    Officer Vernet, who IA interviewed, said he was sprayed with OC because of "His [Mr. Durham's] refusal to comply with the fingerprint, I do believe he tensed his arm. He did try and do some kind of maneuver with Officer Simpson."[84] In the IA report Officer Goad, who was also present, states that Mr. Durham "was intoxicated; he was being very passive aggressive." Based on my review of the DDOC Use of Force Policy 3, Mr. Durham's actions could have been in the "Resistor" category, which would allow for holding/restraining or low-pressure impact or, if available, taser, OC, or canine bite. From Officer Goud's passive-aggressive description, the force level used would not be authorized. From my observation, the takedown was immediate, and the two staff holding him did not have time to use the OC before he went to the ground. With four staff present, I am certain they could have restrained him without using OC. My best estimate is that the OC was applied when Mr. Durham was already on the ground, which makes this questionable.

145.    When Mr. Durham is up and moving back to the holding cell at 4:14, he collapses forward. The officer wrenches his arms upward and starts dragging him by his restrained wrists, putting extreme stress on his shoulders. Eventually, Mr. Durham can reach his feet and stagger to the holding cell, where he remains for an unknown length of time. He is restrained and bleeding. There is no indication he was provided medical attention for his injury, which is surprising given the blood on the floor from the AFIS machine back to the holding cell. There was no attempt to decontaminate him.

146.    The next pertinent video shows staff retrieving him from the holding cell. He is restrained and lying face down in a pool of his own blood. This is a handheld or body camera, so it includes

---

[83] See VIDEO058_Durham T2978827 10.29.21_Station
[84] See DOC_SCI_0000783

50

audio. The camera operator questions the blood covering his face and body, but still, no medical attention is provided. While exiting the cell, he cries and says please help me, and what is happening? The officers take him to the AFSI machine for fingerprinting. He remains cuffed at this time, and when they are manipulating his hands for the prints, he begins crying out in pain. Once his prints were taken, he was taken to the shower area and continued crying and screaming. The officers are trying to take his cuffs off so he can be strip searched and placed on issued clothing.  I can't see him in the shower, but there is audio. He sits down, and the officers are trying to get him back on his feet. The officers are on him in the shower, and he is saying I can't breathe. They ask for his hands, and he says it is right here. The officer says he is not going to cooperate and get a team suited up. He is taken back to the holding cell, walking under his own power, restrained, and with a spit hood on. While he was in the shower area, there was no indication he was allowed to decontaminate or even rinse the blood off his face.

147.    The video remains on for several minutes while officers wait for the tactical team to arrive. Since Mr. Durham is restrained, I question the need for a tactical team. At approximately 9:35, officers are talking in the backdrop, and one states, "Fuck him." In the holding cell, Durham is screaming and pacing around the cell. The spit hood is soaked with blood, and the blood is being smeared on the walls. I have concerns with the practice of allowing an intoxicated individual in wrist restraints and a spit hood covered with blood and OC to remain restrained in the holding cell.

148.    At one point during this time, Mr. Durham stands on a bench or low bunk in the holding cell. An officer directs him to get down, and he complies. I question why, at this point, the officers present don't just put the clothing they want him to change into in the cell, un-restrain him, and direct him to put the clothing on. Had he chosen to be compliant, they could have avoided using the tactical team. Had he chosen not to be compliant, the tactical was on its way there and could have handled the non-compliance. It appears Defendants felt he had his opportunity, and because he was non-compliant, then it was game over, and he was going to face the tactical team.

149.    At 24:19, the tactical team arrives and starts to have a dialogue with Mr. Durham, giving him direction, and he appears to be compliant. An officer in the backdrop tells the tactical team, "he is uncooperative and trying to bust his head on the wall," but there is no indication Durham is hurting himself in that way. The tactical team gives him directions, and he follows them. The

51

tactical squad directs him to the shower to do that process again, and the officer behind the camera says get on in there. We have already tried the shower thing, and it didn't work. As the team approaches Durham, he cries out, but I cannot see what is happening.

150.    Mr. Durham is being verbal but appears to be compliant because the tactical team is able to remove the wrist restraints and have him take off his street clothes and get into the issued jail clothing. When they exit the holding cell, he is re-restrained, and the spit hood remains on him, still soaked in his blood. They escort him to a nurse station only a few feet from the holding cell. This is surprising because if medical staff were only a few feet from Mr. Durham this entire time, why couldn't they have checked his injuries before now? From the angle of the camera, when they are in the nurse's station, it's not possible to see everything that happened. It appears all the nurses did was take his vitals. Following this, they exit the nurse's station, and he is escorted somewhere else, and the video ends.

151.    Overall, I feel the Correctional Officer Defendants' approach to the situation was more aggressive than what was necessary. Mr. Durham was obviously intoxicated, which was noted by several officers who encountered him during this incident. During the initial use of force at the AFIS machine, his passive-aggressive behavior could have prompted staff to return him to the holding cell until he was sober enough to comply. In my experience, time can be your friend in these situations, and forcing issues rarely is an effective approach. Due to the absence of other detainees in the area at the time, it does not appear critical to complete the booking process immediately.

152.    Once the force was used, justified or not, and Mr. Durham was injured, he should have received immediate medical attention and been decontaminated. The nurse's station was only a few feet away, and so were the showers. I cannot determine how long the incident lasted, from when the force was used until the tactical team was escorting him away. I would estimate an hour based on the length of the pertinent videos, but it could have been much longer.  Throughout this incident, and even at the point where he is being escorted out of the area by the tactical team, Mr. Durham never received actual medical attention for his obvious wound or decontamination for the OC.

52

153.    The fact Mr. Durham was required to remain in restraints, with a blood-soaked spit hood covering his face, likely obscuring his vision, and lie in a pool of his own blood for an undetermined period of time is unprofessional and negligent. At no time did they attempt to decontaminate him nor allow him to wash the blood off his face.

154.    It is my opinion that Correctional Officer Defendants used unnecessary and excessive force on Mr. Durham. It is also my opinion that the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. Durham by failing to decontaminate.

**Richard Edwards Summary**

155.    There are only two videos of this incident, and neither shows anything negative. The IA report generally shows the staff's collaborative version of events. Based on the lack of additional videos or other material, I am unable to opine on this incident.

**Luke Erixson Summary**

156.    The grievance filed by Mr. Erixson alleges 7-9 slaps in the face by Sgt Neal during a strip search conducted as a result of a unit shakedown. The various videos provided show when Mr. Erixson was initially taken out of the living unit to be moved to a location where strip searches were being performed. All the inmates left the unit for the shakedown. In my experience, the strip searches of inmates leaving a living unit before searching is a necessary practice to ensure contraband is not secreted out of the unit on the person of an incarcerated person.

157.    When Mr. Erixson leaves his assigned bed and contacts Sgt. Neal, who grabs Mr. Erxison by the shirt and pushes him along towards the exit.[85] Mr. Erixson could have been vocal, but I cannot determine that with the video, which has no audio. Even if Mr. Erixson was vocal in some way, grabbing and pushing an inmate like Sgt. Neal did could easily cause an assault. In my experience, this modest use of force was unnecessary because even if Mr. Erixson was vocal, he

---

[85] *See* VIDEO067_Erixson 00572491 02.06.20_Station_@ 00:14 & VIDEO069_Erixson 00572491 02.06.20_Station_@ 00:13

was moving along in the direction he was directed to go. This was overly aggressive on Sgt Neal's part and dangerous because it could have caused an escalation of the incident. Fortunately, it did not because Mr. Erixson maintained his composure.

158.    Once Mr. Erixson was in the area where the strip searches were to be performed, he is directed to a side room. Sgt. Neal and another officer begin performing the strip search.[86] Once Mr. Erixson enters the small room Sgt. Neal can be seen slapping Mr. Erixson's hat from his head. I believe this was unprofessional and unnecessary. Common correctional practice would dictate the officer would direct the incarcerated person to remove their hat. Sgt. Neal's approach was aggressive and dangerous because it could have easily provoked an assault by Mr. Erixson.

159.    Of interest about this incident is that the other staff member present, Sgt Schmidt, was interviewed about it during the grievance investigation. When asked if he, Sgt Schmidt, "if he witnessed Sgt. Neal hit, slap or cause physical harm to inmate Erixson?" He stated "no."[87] In the video of this incident, it appears that Sgt. Schmidt (presumed) walked directly towards the room when Sgt. Neal slapped Mr. Erixson's hat off. He does appear Sgt. Schmidt would have witnessed this but said nothing about it to the investigator.

160.    Overall, this incident does not reflect what was alleged by Mr. Erixson's account. It does show unprofessional and overly aggressive acts by the staff involved and potential dishonesty in reporting what was witnessed by Sgt. Schmidt.

**Nasier Gibbs Summary**

161.    When Mr. Nasier Gibbs arrived at SCI, he was processed in the salle port. During the processing, he appeared intoxicated, and at one point, the officer pushed him against the wall to remove the wrist restraints and perform a pat search. He is taken to the AFIS machine for fingerprinting, and it does not appear there were any problems. Next he was getting his picture taken and did appear non-compliant, so staff had to position his head a couple of times to take the photos.

---

[86] *See* Common correctional practice dictates performing strip searches in a private location with two staff of the same gender present. This is done in order to protect staff and the incarcerated from false allegations.
[87]  *See* DOC_SCI_0001002

54

162.    After the photos, he is told to sit in the chairs, which he does for a few minutes. Later he gets up and heads towards the phone. Based on staff statements Mr. Gibbs had asked several times to use the phone and was told not at this time. A Correctional Officer Defendant approaches him from the opposite direction and appears to be giving him directions to return to his seat. It appears he is pleading to use the phone. The Defendant Officer continues to approach, sprays Mr. Gibbs in the face with OC, performs a leg sweep, and hurls Mr. Gibbs to the floor. Mr. Gibbs is in the prone position with the officer holding him down when two other Correctional Officer Defendants respond. They restrain Mr. Gibbs and lift him by his arms, picking him completely off the ground. He is placed in a holding cell until he is strip-searched and checked by medical.

163.    From my observation, Mr. Gibbs was verbally uncooperative, but I do question the need for immediate use of the OC. Like most cases I have reviewed, there was no warning before the use of force, and the situation did not require urgency. Had the officer paused, then removed the OC and given a directive and warning, I believe Mr. Gibbs would have been compliant.

164.    Once Mr. Gibbs was restrained and presented no threat to anyone, he should have been brought to his feet and escorted to the holding cell. Instead, Defendant Officers elected to risk harm by lifting his arms that were restrained behind his back. Because of the risk of injury, this is not a sound practice, and the Defendants had the benefit of time to perform a professional escort. The DDOC training materials I received after my analysis of Mr. Gibb's incident show staff have been trained in the appropriate techniques to use when required to carry a restrained individual.[88] The Defendant Officers involved did not follow their training.

165.    In my opinion, this is another incident where the Defendant Correctional Officers were overly aggressive and moved to use force before considering or trying non-force options.  In addition, Defendant Correctional Officers inflicted unnecessary pain and suffering on Mr. Gibbs by failing to decontaminate.

---

[88] *See* DSOC_SCI_0041969 - 73

55

**Neki T. Gibbs Sr.**

166.    The video review shows Gibbs and a Defendant Correctional Officer's verbal interaction. They exchange words, and then Gibbs returns to the recreation area to retrieve his shirt and returns to where the officer is standing. There he is, putting on his shirt, and he doesn't appear to be physically threatening at any time during this exchange. Just as he finishes putting his shirt on, the Defendant Officer immediately sprays OC in his face. The video does not have audio, so I could not tell what the dialogue was. At this point, I know Mr. Gibbs's physical presence was non-threatening, so it is hard for me to understand what justified the use of pepper spray based on what I observed.

167.    In the Defendant Officer's recorded statement after viewing the video, he mentions that Mr. Gibbs was "very vocal" during their discussion. He does not say anything about Mr. Gibbs making threats. The officer did say "He started playing with the shirt which to me is pre rec he was going to do something."[89] From my review of the video all I saw was Mr. Gibbs simply trying to put his shirt on. Based on my experience, being loud and vocal does not justify using pepper spray in this context. After being unnecessarily sprayed with pepper spray, Mr. Gibbs goes on to seriously assault the officer. All actions taken by staff after that moment are appropriate based on my experience.

168.    I do not believe the amount of pepper spray used was excessive during the initial and only discharge. My primary concern is why the pepper spray was used in the first place. There were two officers present during the verbal exchange; based on my training and experience, if one officer becomes engaged with a verbally threatening individual, the other officer present will respond and react to the known threat. Had I been the second officer and heard a threatening statement being made, I would have immediately moved to a position behind or to the side of the threatening individual so I could take preemptive actions should the incident escalate to needing force. This tactic is sometimes called "L-ing out the suspect." It allows the primary officer to give directives to the suspect to continue this while I gain a tactical advantage by moving on the suspect in his periphery or out of the suspect's sight. Another benefit of this tactic is the "show of force," which can often resolve the incident by demonstrating to the suspect they are outnumbered and

---

[89] *See,* DOC_SCI_0001247, Statement of Ryan Maddox

56

outflanked. In my professional experience, these are basic correctional practices and part of most use-of-force models. The video shows the second officer reacting to a verbal exchange and moving directly towards Mr. Gibbs. The tight confines behind the Officer's station may have precluded an approach as I described.

169.    From the video, it also appears the Defendant Officer who sprayed Mr. Gibbs had already decided to use pepper spray before Mr. Gibbs even in front of the officer. It can be seen in the video that the officer gives a directive to Mr. Gibbs, likely to "Lock Up," and Mr. Gibbs then briefly steps back into the recreation area to retrieve his sweatshirt. When Mr. Gibbs returns, he talks to the officer and is in the process of putting his sweatshirt back on when the Defendant Officer sprays him. From the moment of the first verbal exchange between Mr. Gibbs and when the officer dispensed the pepper spray, only approximately 14 seconds had transpired. This is troubling because, in this limited time, I highly doubt any effort was made to de-escalate the situation or even allow Mr. Gibbs to comply with the directive. Also, rather than stepping back to try and de-escalate, the officer steps forward and can be seen unholstering the pepper spray.  Had a threatening statement been made by Mr. Gibbs at the time, common correctional practice and training would have dictated the officer to take a step or two back, which is called creating distance to increase the time-distance gap between you and a potential adversary. This increases the officer's reaction time to better respond to whatever happens next. Instead, the officer took an aggressive step forward, likely escalating the situation.

170.    Based on my review of this incident, my opinion is that the Defendant Correctional Officer did not use de-escalation tactics before using pepper spray, which likely caused the assault that followed. Common correctional training and practices would dictate de-escalation tactics and even a show of force before the use of pepper spray. In this situation, even giving a little more time for Mr. Gibbs to comply with the directives and creating distance could have resolved the situation without the need for force.

171.    From the point that Mr. Gibbs fought back after being sprayed with pepper spray, I believe staff actions were appropriate for the situation.

172.    As with the other incidents, I have reviewed where a post-litigation review of the incident was conducted. Mr. Gibbs's allegations were deemed "Unfounded," which, based on my review,

57

I can only partially agree with. My concern is about why the use of force was even necessary in the first place.

173.    It is my opinion that the Defendant Correctional Officers did use unnecessary force on Mr. Gibbs and inflicted unnecessary pain and suffering by failing to decontaminate.

**Justin Erskine Summary**

174.    At this time, I cannot provide an opinion on Mr. Erskine's incident due to a lack of evidence to review. I understand that discovery is ongoing. If I am provided sufficient evidence upon which to base an opinion, I will supplement my report.

**Aaron Givens Summary**

175.    There is nothing on the video to make me believe anything went on other than what the officers stated. I can't see activities in the cell, and they were inmate witnesses who collaborated on the officers' story.

176.    My only concern with this incident was the lack of decontamination immediately after using OC. This seems consistent with other incidents.

**Danny Harding Summary**

177.    Mr. Harding is in pre-trial holding. He and three other incarcerated persons are seated at a table eating. He communicates with Sgt. Purnell, and then Sgt. Purnell walks off. Cpl. Anthony Corea approaches Mr. Harding and appears to direct him somewhere by pointing his finger. While the Cpl. Corea is doing this, he removes an OC canister from the holder on his belt. Within two seconds of dialogue with Mr. Harding, the officer sprays Mr. Harding in the face with OC and wrestles him to the ground. Two other officers assist with restraining Mr. Harding, who does not appear to be fighting back.

58

178.    Of note is that while Mr. Harding is being restrained and removed, the officers are directing other incarcerated persons to leave the area. A fourth officer approaches and directs people away; while doing so, he removes his OC canister. An inmate seated at another table is trying to collect his food tray and leave. The fourth officer then sprays him with OC, and he is taken to the ground and restrained.[90]

179.    Both of these incidents are shocking to me because, in both situations, the incarcerated person involved is passive and probably going to be compliant. The officers give no time for the people to be compliant before spraying them with OC. The officers are overly aggressive in using OC and give no warning before use. There is no audio for this video, so I base my last statement on the fact it was two seconds or less from initial contact with the incarcerated person to spraying them with OC. This implies the officers were not looking for compliance with their direction but rather to spray the individuals involved.

180.    In my experience, if you give an incarcerated individual directions like return to your cell, they may grumble about it but ultimately do what is directed. You must provide a reasonable amount of time for compliance before using force like OC. If the incarcerated person is not following directions, a warning should be given, like a return to your cell now, or force will be used against you. If the resistance persists or the person becomes threatening, force may be used to gain compliance. This did not happen in either of the two incidents in this video.

181.    From my review, there was no justification for the use of OC in either of these situations. Neither person made any overt action that could be viewed as aggressive. Both situations were unnecessary uses of force.

182.    Following the use of force, a body or handheld camera shows Mr. Harding in the holding area, where he is taken to the shower area for a strip search, and no decontamination is offered, even when he requested it.

---

[90] *See* VIDEO394_Harding 00566739, Atherholt 00780737 02.17.22 - 92 - Pretrial HU4 - Cam #2 –, @ 1:20 & 1:25

59

183.    Not surprisingly, the IA investigation concludes Mr. Harding's allegations are "unfounded." Following this incident, Mr. Harding was held in segregation for nine days without a hearing. In the disciplinary report was eventually "nullified" because of this oversight.[91]

184.    It is my opinion that Defendant Correctional Officers subjected Mr. Harding to unnecessary and excessive force.  It is also my opinion that the Defendant Correctional Officers inflicted unnecessary pain and suffering by failing to decontaminate.

### Augustine Haymond Summary

185.    Mr. Haymond was involved in two separate use-of-force incidents. The first happened on April 4, 2021. Mr. Haymond approached the correctional office in the first incident to seek cleaning supplies. The first officer he asks, denies his request. Then Mr. Haymond talks to Officer Vernet; they appear to have a conversation until Officer Vernet comes around the podium of the Officer's station and grabs Mr. Haymond by the shirt. Leading up to this was a verbal exchange that did not appear aggressive. When they approached Mr. Haymond's cell he seemed cooperative and indicated to Officer Vernet which cell was his. At the door to the cell, Officer Vernet pushes Mr. Haymond into the cell towards the metal bunks, and Mr. Haymond falls forward towards the bunk.[92]

186.    In the investigation of this incident conducted by DDOC, Officer Vernet described Mr. Haymond's demeanor at the Officer's station as:

> *"He came up very animated and aggressive. He was like intense."*[93]

I question the validity of this statement based on my review of the provided video and the inaction of Sgt. Klien, who was seated about 6 feet away. During the entire time, there was an alleged heated discussion taking place, and he remained seated in the chair with his arms crossed in front of his chest, giving no indication he was alarmed in any way by the exchange. Sgt. Klien remained in this posture even after Officer Vernet escorted Mr. Haymond away. In my

---

[91] *See* DOC_SCI_0032898
[92] *See* VIDEO120_Haymond 00318650 04.04.21_Station_ @ 1:42
[93]  *See* DOC_SCI_0001575, Correctional Officer Myles Vernet

60

experience, if a correctional officer is that close to a heated discussion, they would stand up and approach the escalating incident to be prepared to respond if necessary. Sgt. Klien did nothing and instead remained seated with a relaxed posture throughout the incident.

187.    Related to the shove through the doorway, Officer Vernet said.

> "*While I was taking him to his cell, he was pushing his weight back into me. When I put him in the room, he kind of intentionally threw himself to the ground. I wouldn't even call it a push. He was purposely falling to seem like he was pushed.*"[94]

In reviewing this video, I did not see the level of pushback described by Officer Vernet in his statement. In particular, I saw push-back when Mr. Haymond was pushed by Officer Vernet through the door.

188.    Following the pushing, Inmates in the dayroom outside of Mr. Haymond's cell can be seen talking and indicating towards the cell. Mr. Haymond's cellmate calls staff to the cell, and two officers approach. When the officers open the cell door, Mr. Haymond is on the ground. Mr. Haymond remains on the floor for several minutes and does appear to be in pain. Eventually, he sits up and then stands. Mr. Haymond can be seen in the cell window, moving around and occasionally looking out. At 10:44, two officers return to the cell. He is then restrained and escorted out of the view.

189.    Officer Vernet's initial actions appeared to be more aggressive than necessary. However, no audio was provided, so I could not determine the nature of the conversations. At the cell door, Officer Vernet pushed Mr. Hayward into the cell with enough force for him to go to the ground, and with enough force, Mr. Haymond could have impacted the metal bunk immediately inside the cell. This pushing action by Officer Vernet also appeared to be more aggressive than necessary.

---

[94] *See* Ibid.

61

190.    Following the incident, Mr. Haymond was escorted to the booking area, where it appears he saw a nurse. In the IA Investigation, statements made by three different Nurses indicate his ribs were examined, and he received Motrin for his pain.[95]

191.    In the second incident, on October 29, 2021, Mr. Haymond was in the bathroom/ shower area when the unit officer approached him.[96] ███████████████████████████

████████████████████████████████████████

██████████  It appears there is some altercation, but the actions of the officer and inmate cannot be observed. At one point, Mr. Hayward lies face down, and the officer restrains him.

192.    Mr. Haymond said he was rinsing his mouth out when Officer Mitchell used OC on him. Officer Mitchell stated he gave multiple orders to Mr. Haymond but he refused to comply.[97] In the video of the incident it appears Officer Mitchell specifically engaged with Mr. Haymond at :52, at 1:01 rapid movements begin, so my assumption is the exchange between Officer Mitchell and Mr. Haymond only lasted only :09 seconds. This is very short time span to require compliance before using force with a passive resistive person.

193.    In this situation, it appears Officer Mitchell was alone in the living unit when he approached the two or three inmates in the bathroom.  If Officer Mitchell was encountering passive resistance from Mr. Haymond, common correctional practice would dictate Officer Mitchell call for backup and wait for their response before engaging further with the suspect unless he or someone else was being actively assaulted. No one was being assaulted at the time. Based on Officer Mitchell's position at the time, there was no appearance he was being threatened. He stood near Mr. Haymond and then rapidly advanced at him. When faced with someone actively resistive with immediate backup available, an officer would maintain a safe distance and continue the dialogue until backup arrived. Officer Mitchell appeared to close the distance gap, moving towards Mr. Haymond when Mr. Haymond was moving away.  I believe this use of force was unnecessary and could have been easily avoided had Officer Mitchell used common sense and good correctional practice.

---

[95] *See* DOC_SCI_0001577 & 8
[96] *See* VIDEO159_Haymond 00318650 10.29.21_Station_ @ 1:05
[97] *See* DOC_SCI_0001577, Officer Isaac Mitchell

62

194.    Mr. Haymond indicates he was roughly handled when removed from the area. Because of the poor video, I cannot confirm or deny this. His escort beyond the living unit and out to the booking areas was uneventful and appropriate. In the booking area, a body camera was used, which allowed for audio to be recorded. Mr. Haymond was placed in the shower area for a strip search and a change of clothing. The OC can be seen on his neck and facial area as he is placed in the shower area. In the shower, Mr. Haymond can be heard complaining about the burning and saying he can't breathe. Officers present completely ignore these complaints and move forward with the strip search, never making any effort to decontaminate Mr. Haymond.

195.    In my opinion, Defendant Vernet used unnecessary and excessive force on Mr. Haymond. It is also my opinion that the Defendant Correctional Officers inflicted unnecessary pain and suffering on Mr. Haymond by failing to decontaminate.

**Kevin Ignudo Summary**

196.    At this time, I cannot provide an opinion on Mr. Ignudo's incident due to a lack of evidence to review. I understand that discovery is ongoing. If I am provided sufficient evidence upon which to base an opinion, I will supplement my report.

**Laquan Johnson Summary**

197.    During a meal period, Mr. Johnson is returning to his cell with another inmate. An officer goes to the cell and stands in the doorway, eventually stepping inside. Another officer opens the door and responds, as he arrives at the cell, both Mr. Johnson and the officer fall out of the door. A struggle ensues involving all three. The initial officer throws several punches toward Mr. Johnson, but because of the camera angle, I cannot determine his body positioning or where the blows struck.[98] Mr. Johnson is on his stomach, and the second officer retrieves his OC and sprays

---

[98] *See* VIDEO411_Johnson 00681390 10.18.21 - Channel 12, @ 1:44

63

Mr. Johnson in the facial area.[99]. The struggle continues, and more closed-fist punches are thrown by officers.[100]

198.    During the use of force while outside of the cell, Defendant Correctional Officers threw several closed-fist punches. In their reports, the officers characterized these as "stunning blows," which are reasonable tactics to use with a person who is actively resisting the placement of restraints. Typical correctional standards would require these blows to be directed to the body, and blows to the head would be precluded unless a self-defense situation with a risk of serious bodily injury existed. Blows to the head are an elevated use of force reserved for the most serious situations. While Mr. Johnson was actively resisting the officers, I did not see any action that would justify the use of head strikes.

199.    When taken to the holding area and strip-searched in the shower, no decontamination was provided. A nurse examined Mr. Johnson and identified cuts and abrasions on Mr. Johnson's head and face, which are an indication of strikes to the head.

200.    From the videos, it is difficult to see anyone's actions when the incident started. Another incarcerated person was in the cell when this incident took place. The IA Investigation did not include interviewing the incarcerated person who was a witness to what transpired in the cell when the use of force began. Also, several inmates watched the incident when they were outside of the cell, and none of them were interviewed. I see this as a significant flaw in the DDOCs investigative process. Had the situation been as described by the initial officer, where Mr. Johnson punched the officer in the face, this would have been a staff assault and justification for additional charges. There is no indication additional charges were pursued.

201.    It is my opinion Defendant Correctional Officer used excessive force on Mr. Johnson.

---

[99] *See* Ibid., @ 1:45 & DOC_SCI_0031657
[100] *See* Ibid., @ 2:06 & 2:15

64

**Michael Klein Summary**

202.    On November 17, 2021, Michael Klein (Mr. Klein) was temporarily held at the Sussex Correctional Institution (SCI) for a probation violation.[101] On this day, Mr. Klein was the subject of multiple uses of force, ultimately ending with severe trauma to his head and hospitalization at a community hospital. My review of this incident included reading the Internal Affairs (IA) investigation and viewing the same video provided to the IA investigator.

203.    Based on what I reviewed in the videos, my impression was shock. As a retired correctional professional who has reviewed hundreds of use-of-force situations, I was surprised by the escalation of such a minor incident. Also surprising is the fact this incident resulted in injury and outside hospitalization. Yet, DDOC only initiated an Internal Affairs Investigation after a lawsuit was filed. DDOC's Use of Force Policy 8.30 requires "a review process for all incidents involving the use of force."[102]

204.    Mr. Klein was housed in a parole violator unit of SCI. Defendant Corporal Kameron Spencer (Cpl. Spencer) entered the unit, conducting routine rounds. At the time, Mr. Klein and four or five other inmates were reclining in their bunks. SCI has a rule that no one can lie down in their beds from 5:00 AM to 9:00 PM.[103] Cpl. Spencer addresses Mr. Klein and not the others participating in the same activity. Cpl. Spencer appears to be directing Mr. Klein somewhere, but Mr. Klein remains and is engaged in dialogue with him. My impression is that Mr. Klein showed some verbal resistance and was showing compliance by folding up his mattress. Mr. Klein was rising from bending down and moving his mattress when Cpl. Spencer sprays him in the face with OC (aka Sabre Red[104]). The two had only been conversing for approximately 17 seconds, and there does not appear to be any warning given to Mr. Klein by Cpl. Spencer that force was about to be used on him.

---

[101] Note: The Internal Affairs report indicates different dates for the incident, e.g. (11/17/2021, date of videos reviewed when the incident occurred, then in staff statements they indicate 11/17/2021)

[102][102] *See* policy_8-30 U of F Delaware, Pg 3, V. Policy, C.

[103] *See* KLEIN IA, Pg 5, ¶ 2

[104] Sabre Red - is an Oleoresin Capsicum product named by the manufacturer. It is commonly referred to as OC or pepper spray.

65

205.    This was an unnecessary and excessive use of force. While Mr. Klein could have been verbally resistant, his actions demonstrated compliance. Mr. Klein made no furtive actions that would cause a reasonable correctional officer to believe there was an imminent threat requiring force. After the OC spray was used on Mr. Klein, he fell to the ground, and other Corrrectional Officer Defendants responded. Mr. Klein appears to be compliant with a request to be restrained because while he is still on the ground, he is attempting to place both of his hands behind his back.[105] When confronted with a verbally resistant inmate, the common correctional practice would have been to give verbal direction; if resistance continues, call for assistance and tell the inmate force will be used if he does not comply with directions. This did not appear to be Cpl. Spencer's actions.

206.    After being restrained, Mr. Klein was escorted to a holding cell, where he remained restrained behind his back. He is clearly in pain and suffering from the effects of the OC, and his pants slipped down, exposing his buttocks. He can be seen trying to get his pants pulled up and presumably trying to talk to correctional officers outside the locked door. No one responds to this effort by Mr. Klein. Officers did not attempt to decontaminate Mr. Klein and rinse the pain-inducing substance from his face and body.[106] Mr. Klein attempts to use the toilet sink combination unit to rinse himself but cannot operate the sink with his hands restrained behind his back.[107] In desperation, he attempts to rinse his face in the toilet bowl, but even this is a failed attempt, and he struggles to keep his balance until he falls face down on the floor. On the floor, Mr. Klein appears to be writhing in pain and calling out for help.

207.    Mr. Klein spends several minutes trying to reach his feet but cannot; eventually, he can reach his knees. In this position, he successfully puts his face into the toilet bowl to decontaminate himself. Officers entered the holding cell eight minutes later to apply leg restraints.  His hands are briefly freed from the restraints and then placed back on him with his hands in front of him. After the restraints have been applied with his hands in the front, he can reach the sink and attempt to decontaminate himself. In my experience, this is not consistent with common correctional practice, which would require staff assistance to decontaminate an individual who has been sprayed with

---

[105]  *See* VIDEO429_SVOP POD 5_Offender Klein Michael 699225, 01:07-01:19
[106] *See* Section: Lack of Decontamination
[107]  *See* VIDEO426_SVOP Holding Cell Offender Klein Michael 699225, @ 04:18

66

OC. As can be clearly seen in the video, it is nearly impossible for a restrained inmate to complete this process and stop the pain. Even with his efforts to decontaminate himself, it is clear Mr. Klein is still in pain and appears to be calling out to staff for help.

208.    After almost twenty minutes of pain and struggle, Correctional Officer Defendants reenter the holding cell, but they do not decontaminate Mr. Klein; instead, they escort him to an outside area known as the "quarterdeck." At the quarter-deck, Mr. Klein is allowed to sit in a chair, and it appears a Nurse spends a couple of minutes with him and then leaves. Still no decontamination.[108] Mr. Klein has his hand restraints removed and is still clearly in pain from the OC. He is fanning himself and attempts to wipe his face with his shirt, which appears soaked with OC. Ten minutes into this, he falls out of his chair, and staff places him back into it. Over twenty minutes later, he is provided a pair of work boots, and the chair is taken away. It appears he is being required to stand on a set of many footprints that have been painted on the asphalt. Mr. Klein is then allowed to kneel on a chair so the leg restraints can be removed, and then he is directed back to the footprints. After 30+ minutes on the quarterdeck, he is given gloves and instructed to put them on. After he has accomplished this, he is directed to another area.

209.    The other area appears to be a large Sally port area[109], where vehicles can be seen, and there is a patch of grass with log rounds lined up beside the perimeter fence. As he and two staff members approach this area, they appear to be directing him to the logs. As stated by Mr. Klein, it appears the intent was to inflict corporal punishment on Mr. Klein by making him push the log rounds around the area. As a tenured correctional professional, I am appalled by this senseless and unprofessional practice. Mr. Klein is standing and talking with one of the staff members, and a third approached from the quarterdeck area. Mr. Klein is still suffering from the effects of the OC spray and can be seen fanning his face.

210.    It appears Mr. Klein was still conversing with the officer (Defendant Chandler) when Defendant Chandler sprayed Mr. Klein, again, in the face with OC. Again, Mr. Klein made no furtive actions that would cause a reasonable correctional officer to believe there was an imminent

---

[108] *See* VIDEO423_SVOP Quarterdeck Offender Klein, @ 2:35
[109] Sally Port – can describe a secure area where there are two door to ensure there is no free access by the opening of the door, or it can be a larger area where vehicles and pedestrians can enter a secured perimeter. In this case it was the later.

67

threat requiring force. In addition to the use of OC, Defendant Chandler can be seen in the video throwing a closed fist punch to Mr. Klein's abdomen.[110] It is most probable Mr. Klein was refusing to participate in the senseless direction of rolling logs around the yard. In my professional experience, this would be considered passive resistance and would only result in the inmate being restrained and escorted to a holding cell, not a use of force.

211.    Following the use of OC Mr. Klein turns away and falls to the ground while multiple staff respond. Mr. Klein is compliant and can be seen voluntarily placing his hands behind his back so the staff can restrain him. He is returned to the same holding cell as before and remains in wrist restraints. Mr. Klein appears to be in pain and disoriented. Mr. Klein does butt his shoulder and head against the wall but doesn't appear to cause any injury. He rises to his feet, staggers towards the toilet sink combination unit, and trips over a protrusion in the bench in the cell. He then falls face-first into the concrete floor, impacting his head. He thrashes slightly, and as he raises his head in view of the camera, his face is covered in blood from a laceration to his right forehead.

212.    Staff, including nursing staff, respond to Mr. Klein, who is bleeding profusely from his head wound. Mr. Klein is moving in resistance to the two officers trying to hold him, presumably still suffering the painful effects of the OC spray and the bleeding head wound. At one point, Mr. Klein spits blood and likely OC on the ground, which then prompts staff to place a spit hood over his head. The nurse who is attempting to apply direct pressure to his head wound now has to attempt this under the hood. After approximately 15 minutes, Mr. Klein was taken to the ground by four staff members. The staff then applied leg restraints, with his hands still cuffed behind his back. Emergency Medical technicians arrive and begin their assessment; a gurney is brought into the holding cell, and Mr. Klein is strapped into it with his hands still restrained behind his back. Mr. Klein can be seen thrashing and arching his back. From professional experience, I know that being placed in this position with your hands restrained behind your back can be extremely painful. Typical practice for someone being transported on a gurney to a medical facility would require them to be placed in waist restraints to avoid the painful pressure on the hands and wrists from your body weight crushing down on them.

---

[110] *See* VIDEO430_SVOP Entry Gates Offender Klein UoF, @ 1:49

68

213.    Overall, the incident involving Mr. Klein was disturbing, considering it started over a minor incident that could have been resolved by writing a minor disciplinary report and having the incident adjudicated by an impartial in-house hearing officer. At the most, Mr. Klein would have been subjected to a few days of lost privileges. Instead, he was the subject of multiple unnecessary uses of force and neglect that resulted in serious injury.

214.    In the first use-of-force incident, Cpl. Spencer used OC in response to a minor rule violation and possible verbal resistance from Mr. Klein. Given the situation, the use of OC was unnecessary and excessive. Any reasonable correctional officer could have resolved the situation without needing OC. My opinion is based on my review of the videos provided, which did not include audio, the Internal Affairs report generated months after the incident, and the DDOC Use of Force policy 8.30. In the first use of force incident, other correctional staff were present in the immediate area and could have responded if Cpl. Spencer was encountering significant resistance from Mr. Klein, but he was not. In my review of the video of this incident, there was no indication Cpl. Spencer was confronting a situation where his or anyone else's safety was at risk.

215.    DDOC Use of Force Policy 8.30 states:

> "**II. PURPOSE:** It is the intent of the Department of Correction (DOC) to provide a single source of reference for its employees concerning the authorization, documentation and *control of the use of physical force by Department employees. Employees of the Department may encounter situations that necessitate the use of physical force or a weapon to provide for the safety and welfare of the public, departmental employees, contractors, offenders and themselves.* All employees are responsible for understanding existing procedures and directives concerning the use of force and reporting requirements."[111]

216.    Of note in the DDOC Use of Force Policy there is reference to American Correctional Association standards, specifically 5-ACI-3A-35, which states:

> "(*MANDATORY) Written policy, procedure, and practice restrict the use of physical force to instances of justifiable self-defense, protection of others, protection of property,*

---

[111] *See* policy_8-30 U of F Delaware, Pg 1, II.

69

*prevention of escapes, and to maintenance or regain control, and then only as a last resort and in accordance with appropriate statutory authority. In no event is physical force justifiable as punishment. A written report is prepared following all use of physical force and is submitted to administrative staff for review.*"[112]

217.    In my experience with WADOC and in reviewing numerous use-of-force policies across the nation, force is only applied when there is no reasonable alternative and the amount of force used is reasonable considering the circumstances and level of resistance. In this situation, Mr. Klein was at most passively resistive and potentially verbally argumentative, but at the same time, he demonstrated compliance by following the direction of the staff person to collect his mat.[113] Cpl. Spencer only spent 17 seconds in dialogue with Mr. Klein before he used OC on him. Reasonable alternatives existed for Cpl. Spencer, if he was encountering verbal resistance, could have summoned additional staff to the scene; some were mere feet away. He could have given directions to Mr. Klein to be restrained. He could have spent a few more seconds attempting to de-escalate the situation, which I assume was part of his training.[114] Instead Cpl. Spencer immediately went to the use of physical force or, in DDOC terms, indirect contact.

Following this incident, Mr. Klein was restrained behind his back and placed in a holding cell. Common correctional practice would include decontamination immediately following the application of OC. In my experience, decontamination includes copious amounts of water used by staff to rinse the OC off the affected individual to lessen its painful effects.  DDOC appears to follow the American Correctional Association (ACA) standards, which would also require treatment of individuals exposed to a chemical agent. The ACA standard states:

---

[112] *See* Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, March 2021, 5-ACI-3A-35
[113] *See* DOC_SCI_0031681
[114] *See* DDOC Policy 8.30 – use of Force, Pg 2, Sec. V., ¶ 2, The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use of force.

70

"5-ACI-1D-21 - (MANDATORY) All personnel authorized to use chemical agents receive thorough training in their use and in the treatment of individuals exposed to a chemical agent."[115]

In Mr. Klein's situation, no attempt was made to decontaminate him, and worse yet, they precluded him from having the ability to do it himself by keeping him restrained behind his back, where he couldn't operate the sink in the holding cell. Unfortunately, for Mr. Klein this was the approach used by Correctional Officer Defendantsfor his entire encounter with them that day, presumably until he was hospitalized.

218.    In addition to failing to decontaminate Mr. Klein, another significant failure was the overuse of restraints. Applying restraint immediately following a use-of-force situation is standard correctional practice because a presumably noncompliant individual will need to be escorted or transported to a more secure location, like a holding cell. I am speaking about the general use of restraints, and I am not saying any of what was previously described that occurred with Mr. Klein was appropriate.  Once Mr. Klein was placed in the holding cell, the wrist restraints should have been removed because he was no longer under escort, and there was a risk of falling. As described previously, it was also a necessity for him to decontaminate himself; Correctional Officer Defendants failed to take this step and caused unnecessary pain and suffering because of it. DDOC staff are trained "Subjects should **NEVER** be left unattended until **COMPLETELY** decontaminated!!!"[116]

219.    There is another reason to remove or adjust restraints immediately after an incident: during stressful incidents, like restraining a person after using force, there is a sense of urgency to control a perceived out-of-control individual, and because of this, restraints can and are applied too tightly to the individual's wrist, causing pain and restricting blood flow. In Mr. Klein's case, the pain he was obviously suffering in the holding cell was likely supplemented by excessively tight wrist restraints applied in an adrenaline-fueled frenzy to get him restrained. Allowing individuals to

---

[115]  *See* Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, March 2021, 5-ACI-1D-21
[116] *See* DOC_SCI_0041943

71

remain restrained while not under escort is a dangerous practice, exemplified by what ultimately happens to Mr. Klein after his second use of force.

220.    The ACA standards recognize this and state:

"5-ACI-3A-16 – Written policy, procedure and practice provide that instruments of restraint, such as handcuffs, irons, and straightjackets, are never applied as punishment and are applied only with the approval of the warden/superintendent or designee.

*Comment: Instruments of restraint should be used only as a precaution against escape during transfer, for medical reasons, by direction of a medical officer, or to prevent self-injury, injury to others, or property damage. Restraints should not be applied for more time than is absolutely necessary."*[117]

In Mr. Klein's case, the restraints were not necessary once he was placed in the holding cell. The next evolution of events for Mr. Klein is probably the most bizarre for me because I am not aware of any form of corporal punishment still being used for disciplinary purposes, and certainly not without a disciplinary hearing process, which includes due process.

221.    From the holding cell, Mr. Klein was escorted to a location known as the quarter-deck, which is outside the building and has several rows of footprints painted on the asphalt. Here, he is placed in a chair, still not having received appropriate decontamination, and sits for several minutes fanning himself. As mentioned, he has briefly interacted with a nurse, but there is still no decontamination. Eventually, he is directed to stand on a pair of painted footprints until he is escorted to the Sally port area, as described previously.

222.    Again, during this second use of OC, there appeared to be no physical threat to anyone, and the OC appears to have been dispensed simply because Mr. Klein was refusing to participate

---

[117] *See* Ibid., 5-ACI-3A-16

JA_01884

in this bizarre form of physical punishment. All of this could have been avoided by simply writing an incident report or disciplinary report and having it adjudicated. If Mr. Klein had refused a directive, he should have been restrained and escorted to a more secure setting. Instead, Correctional Officer Defendants chose to use force when it was unnecessary and excessive given the situation. In addition to the unnecessary use of OC, while Mr. Klein was incapacitated and falling away from his aggressor, the aggressor struck Mr. Klein with a closed fist punch to the abdomen. Making the incident even more excessive than the situation required.

223.    Finally, Mr. Klein was placed back in the holding cell after being sprayed with OC for a second time without any decontamination and restrained behind his back, making self-decontamination impossible. Presumably dazed, confused, and disoriented, he stumbles and falls head-first onto the concrete floor, seriously injuring himself. This could have been easily avoided by following common correctional practices, which Defendant Correctional Officers failed to do.

224.    Equally startling as this chain of horrific events is the fact there is no indication the Management Defendants conducted a review of the force incidents. This is my assumption because defendants have not provided use-of-force packets that are required by their policy.[118] As a correctional professional who has likely reviewed hundreds of use-of-force packets during my career, I cannot imagine an incident like this, which ultimately resulted in serious injury and hospitalization of an incarcerated person, not reaching the level of administrative review by Management Defendants.

225.    The documentation provided suggests that Management Defendants only viewed this incident as significant enough to investigate after litigation had been filed. In my opinion, this fact raises serious concerns about the legitimacy of Management Defendants' implementation of the use of force policy and practice.

226.    It is my opinion Defendant Correctional Officers used unnecessary and excessive force on Mr. Klein. It is also my opinion that Defendant Correctional Officers inflicted unnecessary pain and suffering on Mr. Klein by failing to decontaminate.

---

[118] *See* DDOC Policy 8.30 – use of Force, Pg 3, Sec. V., ¶ 9

73

**Nathan Lewandowski Summary**

227.    Corporal Purnell retrieves his OC from his holster at the bottom of the stairs, bounds up them, and enters cell 520.[119] From a different camera angle, I saw immediate rapid movement inside the cell.[2] This indicates that force began immediately. According to Mr. Lewandowski's account, he was immediately sprayed with OC, and Cpl. Purnell then began to assault him, including strikes with the OC can. Cpl. Purnell reported his OC canister was broken in the incident.[120]

228.    Cpl. Purnell's account says he saw Mr. Lewandowski push his cellmate against the wall. Then, he directed Mr. Lewandowski to go to the wall to be restrained, but he refused and lunged at Cpl. Purnell, which prompted the use of OC. The video shows the cellmate pausing at the cell door for approximately five seconds, and Cpl. Purnell was already moving up the stairs before the cellmate had even entered the cell. When Cpl. Purnell arrived at the cell he did not pause or look in the window. The cellmate can be seen backing away from Cpl. Purnell as he enters. Cpl. Purnell retrieved his OC before he went up the stairs, not when in the cell. The OC canister can be seen in his left hand before he enters the cell.[121] This is contrary to Cpl. Purnell's statement to the IA Investigator, Cpl. Purnell said he "took his spray out and inmate Lewandowski tried to grab his legs and take him down."[122]

229.    Approximately three seconds after Cpl. Purnell enters the cell, and the door is pushed open, you can see Cpl. Purnell on top of Mr. Lewandowski, who is trying to protect his head. Fourteen seconds later, they both emerge from the cell struggling, Mr. Lewandowski with blood on his face and OC residue on his clothing. Mr. Lewandowski is of significantly smaller stature than Cpl. Purnell. Once the struggle was on the tier Cpl. Purnell can be seen on top of Mr. Lewandowski doing head strikes with his elbow.[123] Mr. Lewandowski was not fighting back and instead gave the appearance of trying to escape the beating he was receiving.[124]

---

[119] *See* VIDEO186_Lewandowski 00541224 03.28.21_Station_ @ 00:19
[120] *See* DOC_SCI_0001598
[121] *See* VIDEO186_Lewandowski 00541224 03.28.21_Station_, @ 00:24
[122] *See* DOC_SCI_0001588
[123] *See* Ibid., @ 01:00
[124] *See* Ibid., 00:51 – 01:09

74

230.    Both Mr. Lewandowski and Cpl. Purnell indicate this all started because Mr. Lewandowski's cellmate had poor hygiene, and Mr. Lewandowski was attempting to help him and resolve this issue as best as he could. The Defendant Correctional Officers disregarded what was a legitimate concern and instead prompted a dispute. Having an unhygienic person is not uncommon in a correctional setting, and staff should attempt to resolve it to maintain order in the living unit. They could have directed the cellmate to shower; if he refused, they should have referred him to a medical call-out to attempt to resolve it that way.

231.    I am shocked that what should have been such a minor incident turned into a significant use of force against Mr. Lewandowski. In my experience, I would never expect a correctional professional to run into a cell and immediately initiate force for such an incident. In this situation, Cpl. Purnell's partner was unaware of any problem and remained at the officer's station. If, as Cpl. Purnell described, he witnessed Mr. Lewandowski attempt to prevent the cellmate from returning to the cell. Cpl. Purnell should have informed his partner of a problem and then tried to resolve it. I would expect we would go to the cell and instruct the cellmate to exit and sit by the Officer's station so he was not part of the equation. Next, he should have directed Mr. Lewandowski to come out on the tier to be restrained so it would be viewable by his partner and backup officer. This way, if there is a refusal or a need for force, it would be apparent to his partner. I have a hard time understanding how Cpl. Purnell could have witnessed a pushing incident while running up the stairs and entering the cell from the side without looking in the window.

232.    Defendant Cpl. Purnell's approach was dangerous and unprofessional, resulting in an unnecessary use of force on Mr. Lewandowski. Based on this and many of the other incidents I have reviewed, I have concerns about the training and accountability Management Defendants has for its staff. As with other incidents I have reviewed, staff routinely default to the use of force instead of attempting de-escalation and other techniques to avoid the use of force. The goal should always be to avoid the use of force. In my opinion, Management Defendants have and are encouraging a culture of violence that is unnecessary and abusive. My opinion is supported by DDOC's Internal Affairs investigation, where they found Mr. Lewandowski's claims

75

JA_01887

unsubstantiated yet didn't even bother interviewing the inmate in the cell watching the incident.[125] The investigation process lacks credibility and thoroughness.

233.    Mr. Lewandowski filed three grievances related to this incident: two regarding the assault and one regarding retaliatory statements made by Cpl. Purnell. In my experience, all three would be considered staff misconduct grievances and would require an investigation. Staff misconduct and an allegation of excessive and unnecessary force are serious allegations, which require some form of action by Management Defendants, like directing that the matter be thoroughly investigated. DDOC's responses to their grievances were.

> "This "request" is beyond the purview of the grievance officer to address."[126]

> "This is not a request for action but a statement showing the purpose of the grievance"[127]

> "As with previous request for action this is beyond the purview of the grievance officer to address."[128]

234.    If it is not the grievance officer's responsibility to receive and follow up on staff misconduct grievances, then who is it? If it is not the grievance officer's role, they should have a responsibility to refer them to Internal Affairs or whoever has the responsibility and ensure the incarcerated person is aware of the referral as part of any response. There was no indication any of the appropriate actions by Management Defendants took place in response to Mr. Lewandowski's allegations of staff misconduct.

235.    It is unconscionable that all of these reported incidents of staff misconduct were not investigated by Management Defendants until after litigation was initiated. A credible grievance system with appropriate investigation and follow-through to include staff discipline when necessary is what makes a grievance system credible and can help an agency avoid litigation.

236.    As a former Captain, Associate Superintendent, and Superintendent, I know many substantiated and unsubstantiated staff misconduct incidents come from the grievance system.

---

[125] *See*  IA LEWANDOWSKI, Conclusion DOC_SCI_0001590 - 1596
[126] *See* DOC_SCI_0001595
[127] *See* DOC_SCI_0001596
[128] *See* Ibid.

76

Because of this, I also know how critical it is to operate a safe and humane correctional facility. Absent a credible grievance process, there is no legitimate avenue for incarcerated persons to make these types of complaints with confidentiality. This also demonstrates the Management Defendants' high level of tolerance for staff acts of misconduct, including excessive and unnecessary force.

237.    It is my opinion Defendant Purnell used unnecessary and excessive force on Mr. Lewandowski.  It is also my opinion that the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. Lewandowski by failing to decontaminate.

### Gerald Lusby Summary

238.    Warden Beck issued an email directing that inmates required to be outside for long periods of time would be allowed to be in the yard or gym but then said that during COVID protocols, the gym was not allowed. He then goes on to say it was allowable, but during normal rec periods, it was not.[129]

239.    IA report substantiates Mr. Lusby did receive 2nd degree burns for the day in the sun, so this allegation was substantiated because the allowance to use the gym came after the fact once inmates began filing medical grievances.

### Richard S. Maddux Summary

240.    Based on the completed IA Investigation, all elements of Mr. Maddux's allegations were addressed and determined to be unfounded. I found nothing that would lead me to dispute the investigative determinations. Video was not retained of the attempted suicide, which seems consistent with DDOC policy because it was not a use of force incident. Some jurisdictions do have a practice of documenting and retaining information relevant to significant incidents like

---

[129] *See* DOC_SCI_0001140

77

suicide attempts. This is not a known requirement, so it could be considered a best practice, not a requirement.  I cannot confirm or deny Mr. Maddux's allegations.

### Atiba Mayfield Summary

241.    The alleged incident took place outside of the direct view of a camera. When the officer entered the cell in response to Mr. Mayfield's actions, they remained in the cell for approximately fifty-one seconds. When Mr. Mayfield exited the cell under escort, I was not able to identify any blood on him. Further, when he was examined by medical, there was no indication of any injuries. Based on the information provided, I cannot make any determination whether Mr. Mayfield was assaulted in the cell.

### Bashon H. McIvor-Bosman Summary

242.    As described in the Use of Force packet on this incident,[130] Mr. McIvor-Bosman and his cellmate were engaged in horseplay when leaving the cell and moving to a recreation period. Defendant Sgt. Neal describes this and redirecting them back to their cell for the behavior. Once Mr. McIvor-Bosman and his cellmate returned to their cell, defendant officers reported they heard loud conversations from the cell and decided to investigate. Defendant officers describe the engagement at the cell front saying they directed Mr. McIvor-Bosman's cellmate to leave the cell while they talked to him. (McIvor).

243.    Mr. McIvor-Bosman describes this differently, stating defendant Sgt. Neal said, "we are going to teach you the rules and regulations of this institution," then forcefully punched Mr. McIvor-Bosman twice in the chest and stated "hit me, bitch.".  Mr. McIvor-Bosman then goes on to describe a Prison Rape Elimination Act (PREA) committed by Defendant Sgt. Neal, where Defendant Sgt. Neal pulled at Mr. McIvor-Bosman's clothing and made statements consistent with a probable sexual assault.[131]

---

[130] *See* McIvor UOF report, DOC_SCI_0040788 - 0040826
[131] *See* 2022.5.11 McIvor Amended Complaint_djb editsits.pdf, Page 4, Line 16 -23

78

244.    All involved indicate Mr. McIvor-Bosman exited the cell at this time. Defendants Officers indicate Mr. McIvor-Bosman pushed past Defendant Sgt. Neal in the process. Mr. McIvor-Bosman indicates he was trying to escape a possible sexual assault. Mr. McIvor-Bosman was on the second floor at the time he left the cell, and a third officer intercepted him and physically restrained him while descending the stairs. Defendant Sgt. Neal, responded to that location and used OC on Mr. McIvor-Bosman because he was resisting the restraints.

245.    It is difficult to make a thorough analysis of this incident. The Defendants have failed to provide a video of it, so my analysis is based on Mr. McIvor-Bosman's complaint and the incident reports provided. The video would help clarify actions in the cell and even during the physical takedown. I can make a reasonable assumption that staff failed to follow their training on the use of OC because the defendants reported using the OC on Mr. McIvor-Bosman when he had already been taken down. The training material I reviewed states that officers should dispense the OC from no less than three feet and give it time to take effect, while simultaneously directing the incarcerated person to get on the ground, to avoid using physical force.

246.    Also, as described by Defendant Sgt. Neal he was on Mr. McIvor-Bosman when he used the OC, so I feel safe in assuming he did not abide by the manufacturer's recommendations not to use OC at less than three feet because of the risk of "Hydraulic Needling"[132]

247.    It is also my assumed opinion that the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. McIvor-Bosman by failing to decontaminate.  I understand that discovery is ongoing. If I am provided sufficient evidence upon which to base an opinion, I will supplement my report.

### Isaac Montague Summary

248.    Mr. Montague is seated with several other incarcerated people in the day room. He goes to the Officer's station and has some dialogue with the officers there. He returns to the table with

---

[132] *See* ¶ 17, 18

79

other IPs, and it appears he is continuing to dialogue with the officers at the station.[133] An officer at the officer's station appears to continue the dialogue with Mr. Montague. Then, the officer gestures with his thumb and hand, which I presume is telling Mr. Montague to return to his cell.[134]

249.    Mr. Montague appears incredulous he is being told to return to his cell, but he gathers his items and returns to his cell. At approximately the same time, the Defendant Correctional Officer moves to meet him at the cell door. Mr. Montague has complied with the directive to return to his cell, but in the doorway the officer approaches and apparently calls Mr. Montague.[135] Had the officer not stopped Mr. Montague the door was closing, and he would have been confined in his cell.

250.    In the doorway, the Officer is speaking to Mr. Montague with his finger pointed in Mr. Montague's face; a second Defendant Correctional Officer approaches the doorway. It appears the officer attempted to push Mr. Montague into the cell, and he may have resisted the push.[136] This slight resistance resulted in the officer pushing Mr. Montague harder and entering the cell with another Defendant Correctional Officer responding behind them. When the second officer is in the doorway, he retrieves his OC spray. The door closes behind them, and nothing is visible inside the cell. A third and fourth Correctional Officer Defendants enter the cell a few seconds later. Several other incarcerated persons ("IPs") are looking into the cell as they return to their cells. Thirty-three seconds after the first two Defendant Officers entered the cell, one officer emerged and directed IPs in the dayroom, then reentered the cell.

251.    Three more Defendant Officers responded and entered the cell, the last one partially closing the door and standing in the doorway. There are now seven officers in the cell with Mr. Montague. Two officers exit, and Mr. Montague can be seen being roughly yanked to his feet. He is escorted out by two, then four, officers in the come-along position.[137] It appears there is a bald spot on his head that wasn't there before.[138] While escorted near the steel stairwell, escorting officers allowed Mr. Montague's head to hit the steel stair frame.[139]

---

[133] *See* VIDEO208_Montague 00563647 09.18.21_Station_, @ 1:06
[134] *See* VIDEO209_Montague 00563647 09.18.21_Station_, @ 1:03
[135] *See* VIDEO208_Montague 00563647 09.18.21_Station_, @ 1:29
[136] *See Ibid.,* @ 1:37 – 1:44
[137] *See Ibid.,* @ 3:13
[138] *See Ibid.,* @ 3:21
[139] *See Ibid.,* @ 3:23

80

252.     Mr. Montague was initially being escorted in a come-along walking on his own feet, then outside a control room, he loses his footing and is being dragged by his restrained arms. [140] He is lifted to his feet and continues walking, but one of the officers performs a takedown, spinning him to the ground. In performing this tactic, Mr. Montague's head and face appear to impact the floor and perhaps a wall. He is being held down by four Defendant Officers, and one appears to place his knee on Mr. Montague's head.[141] He is placed in leg restraints and held here until staff respond with a gurney. When the gurney arrives, several officers lift him by his arms and legs, placing him face down on the gurney. Mr. Montague was then escorted faced down with his ankles and wrists restrained to the holding cell area. In front of the holding cell, a nurse arrives and blots substances from his head.[142] Mr. Montague is then lifted off the gurney by his restrained arms and wrists.[143] Officers placed him on the floor and then secured the door.

253.     When Mr. Montague leaves the holding cell, it is videoed by a handheld camera with audio. When the officer removed him from the cell, there appeared to be a significant hematoma on his left forehead and perhaps blood. Mr. Montague states, "I didn't do nothin."[144] He is taken to the shower area, where a strip search is performed, and he moans in pain. He has difficulty performing the procedures and states he can hardly move.[145] After a long escort to a medical area, a Nurse examines him. He continued to state he didn't do anything and said, "They beat me for no reason, man."[146] The nurse takes vitals and then treats his two notable head wounds.[147] Mr. Montague is placed in a holding cell, and the video is ended.

254.     These were unnecessary uses of force, including the initial use of force in the cell and the one in the hallway in front of the control. With the initial use of force, M. Montague was following the officer's directives; the officer's unnecessary and overzealous interactions caused the use of force. Had the Defendant Officer allowed Mr. Montague to enter the cell, none of this would have happened. If Mr. Montague was verbally resistive or abusive, he was being physically compliant,

---

[140] *See* VIDEO202_Montague 00563647 09.18.21_Station_, @ 1:44
[141] *See* Ibid., @ 1:53 - 2:06
[142] *See* VIDEO203_Montague 00563647 09.18.21_Station_, @ 3:31
[143] *See* Ibid., @ 3:38
[144] *See* VIDEO199_Montague 00563647 09.18.21_Bodycam_, @ 0:07
[145] *See* VIDEO199_Montague 00563647 09.18.21_Bodycam_, @
[146] *See* Ibid., @ 10:31
[147] *See* Ibid., @ 14:16

81

and all that was necessary was for the officer to submit a disciplinary report to address any verbal misstatements.

255.    It is my opinion Defendant Correctional Officers used unnecessary and excessive force on Mr. Montague.

**Jimmie Moore Summary**

256.    Mr. Moore alleged he was assaulted by being sprayed with OC and then being jumped on by the officer who sprayed him. Then when responding officers escorted him to the holding cell, he alleges he was pulled up by his arms, then when put in the holding cell, he was thrown in, causing him to hit his head.

257.    I reviewed the two videos provided of the incident. In one, he is in the laundry area, he is having a conversation with an officer.[148] The Defendant Correctional Officer makes several hand gestures that indicate he is telling Mr. Moore to go somewhere, but he does not.[149] Mr. Moore appears calm but is not following the officer's directions. The officer then sprays Mr. Moore with OC. Under his own initiative, Mr. Moore gets on the ground and places his hands behind his back. The officer does not appear to put any body weight on Mr. Moore, but he does apply the hand restraints.

258.    Two other officers responded, lifted Mr. Moore to his feet, and escorted him out of the area. The officers performed the escort, their arms under Mr. Moore's restrained arms and their hands on his shoulders, which is a typical practice for escorting someone who has just been involved in the use of force.

259.    In the next video, Mr. Moore can be seen being placed in a holding cell on the bench, restrained, and with OC residue on his clothing. There was no viewable indication that he was forcefully placed there, nor did his head impact the wall. The nursing staff examines him, and then the restraints are removed. The holding cell has a combination sink toilet fixture, so Mr. Moore

---

[148] *See* VIDEO214_Moore_Station_, 05:37:59 PM
[149] *See* Ibid.*,* @ 05:39:11 PM

82

can decontaminate himself, and he does to some extent. He remained there for approximately two hours and ten minutes.

260.    This incident does not entirely correspond to the allegations made by Mr. Moore. The use of force by OC was against a non-moving resistor not posing any physical threat to the officer. There is no audio, so I cannot determine if a warning was given or orders to be restrained were refused. I have overall concerns with the commonly displayed practice of using force in the form of OC on non-moving resistors.  My concern is the lack of a decontamination process. Mr. Moore eventually had access to running water and soap to decontaminate himself.

261.    While this incident was much less severe than most of the other incidents, my concern and opinion is Mr. Moore was subjected to unnecessary force.  In addition, the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. Moore by failing to decontaminate.

### Chris Morales Summary

262.    Mr. Morales was escorted unrestrained to his assigned cell in the Pre-Trial Unit. He had both hands full because he was carrying all of his supplies, bedding, and mattress. The lights in the unit were subdued, and no other inmates were out of their cells.

263.    Mr. Morales enters the unit carrying all of the items listed above. He goes to the officer's station, and there is a brief conversation. One of the officers hands Mr. Morales a roll of toilet paper, which he accepts. It does not appear anyone is elevated based on this exchange; however, as Mr. Morales turns and walks away in the direction he is being directed, all four officers present move in the same direction.[150] This seemed odd based on the observable situation.

264.    In the IA investigation, the officer's reports vary about Mr. Morales's demeanor up to this point. The RN Wong performed Mr. Morales's initial medical screening just prior to him going to the Pre-Trial Unit. She stated Mr. Morales was "loud and excitable" while interacting with officers,

---

[150] *See* VIDEO235_Morales T3547943 08.21.21_Station_, @ 00:13 – 00:38

83

so she cautioned him to "chill out" because she didn't want him to get pepper sprayed or get exposed herself.[151]

265.    Sgt. Brandon Miller was assigned as the Pre-trial Rover on the date of Mr. Morales's assault. Sgt. Miller recalls Mr. Morales during the escort to the Pre-Trial Unit, where he was assaulted. He recalls that Mr. Morales was not restrained because he was not a high-risk inmate and that he was "just talking, not acting up." He does state that at the bottom of the stairs, he recalls Mr. Morales stopped and turned and said fuck you, if you want to be hostile, I can get hostile too.[152]

266.    Sgt. Lyle Neal was assigned to the unit where Mr. Morales was being assigned. Sgt. Neal indicates Mr. Morales was a problem as soon as he entered the unit. This conflicts with the observations and statements made by the other officer who performed the escort.[153]

267.    Sgt. Townsend said, "He [Morales] was not physically non-compliant until reaching the bottom of the stairs"[154] Sgt. Spicer said, "Mr. Morales was not physically non-compliant until he reached the bottom of the stairs."[155] Based on all information about his demeanor leading up to this, including Mr. Morales's own statements, he was likely being vocal with the escorting staff.

268.    Cpl. K. Neal starts talking to Mr. Morales at the bottom of the steps and is reaching for his OC on his right hip while the other officers flank Mr. Morales on both sides. Nothing appears elevated at this time, but the positioning of the other staff gives me the impression they are anticipating something.[156] Cpl. K. Neal points upstairs with his left hand, which looks like a distraction, then immediately sprays OC in Mr. Morales's face. From the video it appears Mr. Morales is doing nothing and is simply standing there.[157] All of these actions give me the impression the staff were planning to assault Mr. Morales. During this entire situation, before the use of force, Mr. Morales kept the items he was carrying in his hands and arms. I would expect to see him drop these if he was becoming aggressive or threatening the staff in any way. He does not

---

[151] *See* DOC_SCI_0039245
[152] *See* DOC_SCI_0039246
[153] *See* DOC_SCI_0039250
[154] *See* DOC_SCI_0039249
[155] *See* DOC_SCI_0039248
[156] *See* VIDEO234_Morales T3547943 08.21.21_Station_, @ 00:39
[157] *See* Ibid., @ 00:40

84

and even maintains these items while he is being sprayed and while staff take him to the floor. No audio is associated with this video, but all the observable cues indicate Mr. Morales is compliant, and he only paused momentarily to dispute the direction he was being given.

269.    In the IA Investigation, officers gave the following descriptions of what transpired with Mr. Morales at the bottom of the stairs.

> Sgt. Lyle Neal said he was standing at the front desk when he says he saw "Mr. Morales was escalating his resistance to locking up in by "squaring up" to Kirk Neal and Sgt Sessler"[158]

270.    In the video, I observed no squaring-up behavior and instead saw Mr. Morales turn and face the person he was talking to, still with his hands full of his personal items.[159]

> Sgt Mark Sessler was part of the escort of Mr. Morales to the Pre-Trial Unit. Sgt. Sessler said, "[he] did not believe pepper spray was authorized in the force continuum for an inmate that was only verbally non-compliant. He [Sgt. Sessler] explains that Mr. Morales was physically non-compliant by refusing to move up the stairs.[160]

> Sgt Kirk Neal said Mr. Morales became a "non-moving resister," and therefore, he was justified to pepper spray him.[161]

> Sgt. Miller described Mr. Morales as a moving resistor, belligerent and angry. He believed this made him a threat without a weapon.[162]

271.    This indicates to me there were three different perspectives on when force could be used. Based on the video, Sgt. K. Neal's perspective is the most probable. I would agree with part of Sgt. Sessler's perspective when he says, "[he] did not believe pepper spray was authorized in the force continuum for an inmate that was only verbally non-compliant." Based on the video and documents reviewed, Mr. Morales was likely being verbal but was not being physically resistive

---

[158] *See* DOC_SCI_0039250
[159] *See* DOC_SCI_0039250
[160] *See* DOC_SCI_0039251
[161] *See* DOC_SCI_0039252
[162] *See* DOC_SCI_0039247

85

or threatening. My perception was supported by the disciplinary officer (Lt. Long) who dismissed the threatening charge. Morales says the hearing officer viewed the video, then returned and told him he was not guilty of threatening behavior.[163]

272.    Immediately after being sprayed with OC by Sgt. K. Neal, there are three officers on Mr. Morales for the initial takedown, and a fourth joins when he is on the ground. When the fourth officer joins, he delivers knee strikes to Mr. Morales.[164] In the IA report Sgt. George Townsend stated he delivered several stunning knees to the latissimus dorsi (large muscle of lower back) to get his hands released from under his back.[165]

273.    A fifth officer joins the pile; Mr. Morales is in the prone position, indicating no resistance. From my experience, I know that even when trying to be compliant, the physical impacts of having five people on top of you will cause reflexive movements, even though none were observable here. I estimate that Mr. Morales was restrained behind his back within 35 seconds of the initial takedown, another indication of compliance.

274.    Once restrained, three officers roughly bring him to his feet, and he is escorted out of the unit in the come-along position. Later in the escort, he continued to be in the come-along position only with his hands elevated higher above his back.

275.    Mr. Morales stated he received a head injury during this assault, however the IA report concluded there was no injury despite having the following information from individuals who interacted with Mr. Morales in the days following the assault.

> Sgt Santiago who interacted and got along with Mr. Morales the day after the incident said "He [Morales] was going through quite a bit of emotions". He found out that his daughters mother passed away. Sgt. Santiago also stated he saw some black and blue bruising on Mr. Morales's face.[166]

---

[163] *See* DOC_SCI_0039244 & DOC_SCI_0039253
[164] *See* Ibid., @ 00:44 – 00:49
[165] *See* DOC_SCI_0039249
[166] *See* DOC_SCI_0039246

86

Incarcerated person Larry Wheeler told the IA Investigator about the incident with Mr. Morales, he had heard from an officer that "Neal was under investigation, they know what he is doing."[167]Mr. Wheeler had had a similar incident with Sgt. Neal a few days prior.[168] Mr. Wheeler also indicated Mr. Morales had a bruise over his left or right eye.[169]

Incarcerated person Roberto Cantu said "He [Morales} had some lumps and bruises. He had a lump over his right eye."[170]

276.    IA Investigator (Inv.) Huttie concluded Mr. Morales's excessive force claims were "Unsubstantiated." I find this very odd because earlier in the report, he quoted a potion DDOC Use of Force Policy that said.

"The use of force must be reasonable under the circumstances, and should be used only when no other reasonable alternatives is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use force. The use of force may not be used as a retaliatory or disciplinary measure."

277.    Immediately following the unsubstantiated finding, Investigator Huttie says:

"However, what appeared to be unusual in this incident was how quickly Sergeant Kirk Neal resorted to using pepper spray and elevating this into a physical confrontation. His decision triggered multiple officers to also engage Mr. Morales physically. Mr. Morales posed no immediate physical threat. Mr. Morales was the only inmate on the floor at the time. My review of grievance reports against Sergeant Neal from 2014 to 2022 show a pattern of excessive inmate complaints with alleged verbal and physical confrontations. ███████████████, a 2019 performance evaluation, and a 2019 210 investigation for unprofessional conduct raise behavioral concerns."[171]

278.    In my opinion, Inv. Huttie's statement completely contradicts his unsubstantiated finding because he himself says Sgt. K. Neal escalated the situation by resorting to OC too quickly and

---

[167] *See* DOC_SCI_0039255
[168] *See* DOC_SCI_0039255
[169] *See* DOC_SCI_0039254
[170] *See* DOC_SCI_0039254
[171] *See* DOC_SCI_0039258

87

elevating this into a physical confrontation when "Mr. Morales posed no immediate physical threat." Reasonable alternatives were available before using force, and Inv. Huttie points this out when he says "I believe interpersonal skills would seem more prudent given that Mr. Morales posed no immediate physical threat." Clearly, Inv. Huttie and I agree there were reasonable alternatives to the use of force on Mr. Morales, so therefore, the use of force was unnecessary. Unnecessary force is, by nature, excessive.

279. In my opinion, this was an unnecessary use of force with no observable justification. The way the Defendant Correctional Officers circled and flanked Mr. Morales gave the impression that this was a set-up. Cpl. K. Neal who sprayed the OC was reaching for it as soon as he started the dialogue with Mr. Morales. At the same time, other Defendant Officers were positioning themselves. Mr. Mortales maintained the items he had, filling his hands and arms all the way to being taken to the floor, giving no indication of aggression towards anyone.

280. Even if Mr. Morales was verbally resistive or threatening, there was no physical indication of a threat. Mr. Morales had his hands full. Officers could have walked up to him, controlled his arms, and placed him in restraints without using any force. Any dialogue being exchanged lasted mere seconds before force was initiated, and even then, why use the OC when five staff were present? While I believe this was an unnecessary use of force, the use of OC and the forceful takedown with knee strikes makes it excessive force.

281. As with all the incidents I have reviewed, Mr. Morales received no decontamination. This incident does highlight the fact that, based on statements made in the investigation, there is no real decontamination process.

> RN Kathy Morales or RN Wong stated, "There is no actual decontamination other than moving an inmate's clothing and changing him into an orange inmate uniform."[172]

282. Of most significance in the incident investigation is the revelations about Cpl. K. Neal's known pattern of excessive use of force and even ███████████████, as stated in the IA investigation report.

---

[172] *See* DOC_SCI_0039246

88

On January 31, 2022, at 1423, I conducted DEJIS/NCIC/CJIS queries on Sergeant Kirk Neal



Sergeant Neal was involved in other incidents including,

May 22, 2009, Seaford High School criminal mischief, resisting (7109003016) nolle pros.

January 15, 2010, Troop 5 reckless driving 0510-002227 (guilty).

June 5, 2021, at 1132, Sergeant Neal reported to Troop 5 (0521035526) that inmates Luke T. Erixson sent a threatening Facebook post to Sergeant Neal. Erixson was arrested on 12-5-21. I provided investigator Alan Clark a copy of this complaint as Erixson is part of a DOC lawsuit.

*Figure 4 DOC_SCI_0039238*

283.    These are the statements made by the supervisor of defendant K. Neal and fellow defendants.

Sgt. Neal's supervisor S/Lt. Adrienne Hanna said she noted in his performance review he needed improvement in communications and interpersonal relations. She was made aware that during that same evaluation period Lt. Amos Callaway was conducting a 210 package on, then Corporal Neal for unprofessional conduct, ███████████████████


███████████████████ [173]

Sgt. Brock Spicer was present for Mr. Morales's assault. He said Sgt. Neal does have a reputation for having too many use of force reports.[174]

---

[173] *See* DOC_SCI_0039244
[174] *See* DOC_SCI_0039248

89

Lt. Dean Blades SCI Grievance Officer confirmed Sergeant Kirk Neal has been named in many grievances and staff complaints.[175]

Sgt K. Neal's arrest record DOC_SCI_0039287 - [297]

284.    This entire incident is another example of Defendant Correctional Officers failing to use common correctional practices by using personal communication and non-force options to resolve situations. Instead, they appear to be trained or allowed to use force whenever they encounter the slightest verbal resistance, which is supported by the Management Defendants.

285.    In my opinion, Defendant Neal and other Defendant Correctional Officers were the aggressors and used excessive and unnecessary force on Mr. Morales.  In addition, it is my opinion that the Defendant Correctional Officers inflicted unnecessary pain and suffering on Mr. Morales by failing to decontaminate.

**Timothy Newcomb Summary**

286.    Mr. Newcomb alleged he was assaulted by staff when refusing to provide urine for testing. He said he received a shoulder injury during the incident. IA Investigation indicates there is a record an existing injury in his criminal history.[176]

287.    RN Reyes-Moran remembered Newcomb complained about his head and eye. She did not see any injuries.[177]

288.    RN Stevens does recall the incident and that Sgt. Charles uses a lot of profanity, "which may have antagonized the inmate."[178]

289.    IA Investigation summary says Newcomb was only held in D-Seg for 5 days as a result of his infraction.[179]

---

[175] *See* DOC_SCI_0039239
[176] *See* DOC_SCI_0001229 & 0001243
[177] *See* DOC_SCI_0001237
[178] *See* DOC_SCI_0001240
[179] *See* DOC_SCI_0001243

90

290.    The video shows Sgt. Charles talking to Newcomb while he is seated at a table. At 2:58, the Sgt. puts restraints on Newcomb, and he is escorted to the front of the unit.[180]

291.    The video shows the Nurse, Officer, and Newcomb in front of the unit. There was some discussion, and then the officer moved behind where Newcomb was seated. Newcomb got up and took a step towards the nurse. The officer put his arm under Newcomb's restrained arms and forcefully spun him to the ground. Newcomb's left temple hit the ground hard.[181] Contrary to what the nurse says in her interview, she was looking directly at the event. The officer keeps his arm under Newcomb's and, while on the ground, appears to be wrenching it, pushing Newcomb's face to the ground. Other staff responded and lifted Newcomb into the come-along escort technique.

292.    I do have concerns about the initial takedown, which was very forceful. It appeared overly aggressive, but the video had no audio, so I could not determine what dialogue was being exchanged. Because Newcomb was already restrained, I question why the officer didn't use light escort techniques to get Newcomb seated again. From the video, it appears the only technique used by the officer was an aggressive take-down, which appeared to cause injury when Newcomb's head impacted the hard floor.

293.    There were no apparent issues with the escort or him being placed in a holding cell. As with several incidents reviewed, Defendant Correctional Officers appear overly aggressive and resort to more drastic force techniques instead of dialogue or light escort techniques. Because of incidents like this, I question the training being provided by Management Defendants.

294.    In my opinion, Defendant Correctional Officer Mitchell used excessive and unnecessary force on Mr. Newcomb while he was already restrained.

**Reuel Ray Summary**

295.    It appears Mr. Ray was the subject of a cell extraction. Video prior to him being removed from the cell does indicate non-compliance by Mr. Ray, but it should be noted he was seeking a

---

[180] *See* VIDEO391_Newcomb 00326888 12.06.21 - 1621 - Pretrial HU3 Cam #3
[181] *See* VIDEO383_Newcomb 00326888 12.06.21 - 1619 - Pretrial HU3 Cam #1, @ 05:32

91

mental health evaluation just prior to the incident.[182] Staff attempted to gain his compliance on a couple of occasions, and Mr. Ray continued to resist directives. A tactical cell extraction team was assembled with standard protective gear. At the cell front, based on his non-compliance, OC was dispensed with an OC device that dispenses a fog from an attached wand. The devices are specifically designed for cell extraction and other barricade suspect situations where it is necessary to dispense OC through small openings. This is a standard correctional tool.

296.    Based on my experience, the need for cell extraction is justified. However, I do have some concerns about the incident.  The OC was dispensed into the cell, and the initial attempt with the OC wand device appeared to be ineffective because the officer then dispensed a second burst using a personal carry OC canister. Only approximately 22 seconds had passed before the entry team entered the cell.[183] Based on my experience, when using an OC product that is not sprayed at the suspect but instead used to fill a space the suspect occupies, the OC fog is most effective when given a few minutes to take effect. It is during this pause period most suspects become compliant. The entry into the cell was too fast and did not allow time for the product to work and Mr. Ray to be compliant.

297.    Once the entry team enters the cell, Mr. Ray can be seen with both hands raised above his head facing away from the entry team.[184] This is typically considered to be the surrender position and demonstration that the suspect has become compliant. Defendant Correctional Officers could have paused and issued verbal directives to complete the restraining process.  The best video of the cell entry has no audio, so I cannot hear if any verbal resistance is offered. In the handheld video of the cell entry, most dialogue is unintelligible because of the barking K-9s present.[185] Another common approach to these situations that I am most familiar with is directing the suspect to the cuff/feeding port[186] where they can be restrained before opening the cell door. It does not appear from this video and others this is a standard practice used by Defendant Correctional

---

[182] *See* DOC_SCI_0001839 & 0001851
[183] *See* VIDEO245_Ray 00570699 02.09.22_Station_ @ 34:54 – 35:30
[184] *See* Ibid., @ 35:32
[185] *See* VIDEO243_Ray 00570699 02.09.22_Bodycam_ @ 1:00 - 2:00
[186] Note: A cuff/Feeding port is generally a small secure opening midway in the door that allows staff to feed and restrain an incarcerated person more safely. Using the cuff port to restrain an individual before opening the cell door provides maximum safety for staff and the incarcerated.

92

Officers. This approach is the safest way to restrain someone without having to enter the cell and use more force.

298.    Because the entry team leader initiated the entry, they entered and took Mr. Ray to the ground to apply the restraints. It is difficult to determine what transpired in the cell because there are now five bodies in the cell: Mr. Ray and four entry team members. I have personally been involved in numerous cell entries, and I know that once entry is made, the chances of injury for staff and the incarcerated increase exponentially. Significant adrenaline is involved because of the inherent risk of these situations. I have also had many experiences in training as the person being subdued and know that when a group of people descend on you, your fight or flight instincts kick in. Even if you intend to be compliant, having four individuals on you and trying to pull your limbs in different directions is overwhelming. Your defensive actions are always perceived as resistance. Because of the lack of video inside the cell, I can't determine Mr. Ray's level of resistance, but I do know Mr. Ray assumed the surrender position immediately after the team entered the cell.

299.    As an example, imagine having four people on top of you. One of the people kneels on the back of your leg or shin, causing pain, and you respond to this by trying to move your hands to where the pain is; this movement is certainly perceived as resistance by others who don't know you are in pain. This causes them to respond more aggressively in their actions, all around elevating the situation's intensity. Add to this the threatening barking of the K9 in the background, and it becomes even more chaotic.[187]

300.    Mr. Ray appeared to be fully restrained[188] approximately one minute after the entry team entered.[189] Next, the entry team drags Mr. Ray inside the cell by his restraints, which would be very painful.[190] To remove him from the cell, they lift him by his limbs face down, take him outside the cell, and then down a hallway into a sally port, where they place him on the floor. Mr. Ray can be heard stating he can't breathe,[191] which he continues to state throughout the movement to medical. I have concerns about carrying an individual in full restraints in this way; there is a

---

[187] Note: The use of K9s in cell entries is not unique to DDOC, but in any jurisdiction, I question the benefit provided versus the detriment caused by the savage barking, which significantly compromises effective communication between officers and the suspect.

[188] Note: Fully restrained would mean the person has their arms and legs in restraints.

[189] VIDEO243_Ray 00570699 02.09.22_Bodycam_ @ 1:12 – 2:17

[190] See Ibid., @ 2:21

[191] See Ibid., @ 3:34

93

significant risk of injury to the incarcerated person and even the staff. Common correctional practice is that once someone is fully restrained, allow them to walk and be escorted, or if someone is refusing to walk, wheelchairs, gurneys, and restraint chairs can be used for transportation. Caution must be used when using a gurney not to place the individual face down because positional asphyxia[192] can occur, so common practice would dictate using the recovery position[193] if using a gurney. The DDOC policy speaks to this by stating.

> "The DOC also prohibits the use of restraint techniques that cause or could cause partial or complete impairment of respiratory exchange, such as the "hogtie" position, or certain restraints on the neck."[194]

In my opinion, the method of restraint and transport used on Mr. Ray by Defendant Correctional Officers is contrary to DDOC policy.

301.    Eventually, Mr Ray is placed face down on a gurney for the remainder of the movement. Mr. Ray's physical details were not provided in the reviewed documents. From my observations of him, he appears to be obese, which is a known predisposing factor to positional asphyxia. Throughout the movement of the gurney, he continues to state he can't breathe. At one point during the movement, Mr. Ray's breathing becomes shallow, prompting one of the officers to pause the movement and bend down close to his face. He pronounces, "He's breathing, let's go."[195]

302.    I can see the need for Mr. Ray's cell extraction. My concerns are primarily with the approaches taken and the failure use common correctional practices that would have significantly reduced the risk of injury for Mr. Ray and the staff involved. My concerns also include the apparent lack of knowledge or indifference to the risk of positional asphyxia.

---

[192] *See* https://www.ojp.gov/pdffiles/posasph.pdf - National Institute of Justice Program, "The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind-the-back handcuffing combined with placing the subject in a stomach-down position."

[193] Note: The recovery position is when the individual is allowed to lay of their side, which prevents them from having breathing troubles caused by their own body weight compressing their lungs and not allowing full breaths.

[194] *See* DDOC Use of Force Policy 8.30, Pg 2, ¶ 3

[195] *See* Ibid., @ 7:05

94

303.    As with all incidents reviewed, I find Defendant Correctional Officers indifferent to the individuals involved because they fail to offer decontamination to individuals exposed to OC.

304.    In my opinion and based on the fact Mr. Ray had assumed the surrender position when staff entered the cell, the force used was unnecessary. Further, Defendant Corrections Officers caused unnecessary pain and suffering in their escort by failing to follow their training on proper lift and carry techniques.

### Jacob Reece Summary

305.    Mr. Reece had a medical incident while in his assigned living unit. Medical and security staff responded appropriately, and he was moved to the medical area unrestrained. In the medical area, he appeared mildly combative, and officers were required to hold him down and place him in restraints. He was transported to a nearby medical facility, where he remained for several days.

306.    On day one of his hospital stay, he was transitioned from hard restraints to soft restraints. There were several notations in the Hospital Watch Officer's logbook of Mr. Reece being resistive. Based on my experience, this can cause injury to the wrist area of the restrained individual. On-duty staff requested and received permission to transition to soft restraints to preclude further injury. From my review of the video and documents provided I have no concerns with this incident.

### Charles Robinson Summary

307.    There is no video of the actual deployment of OC. Based on staff reports submitted related to this incident It appears Mr. Robinson was using the shower at a time, but it was not allowed. He may have failed to leave immediately when directed to do so, and the Correctional Officer Defendant deployed OC on Mr. Robinson. In all other ways, Mr. Robinson is compliant with staff for the duration of the incident.

308.    My concern with this incident is about the necessity to use force, OC, simply because someone is "slow-walking" their exit from the shower. If the Defendant Officer who deployed the OC had informed Mr. Robinson, he would have received a disciplinary report if he hadn't gotten

95

JA_01907

dressed and exited the shower, which would have been a more appropriate response in my experience. The officer should have called for his partner and waited for them to arrive, reaffirming the directive. This incident also indicates to me that the use of force is the primary response of Correctional Officer Defendants to passive resistance. Force should only be used as a last resort when alternatives have been ineffective.

309.    Mr. Robinson's actions were minor offenses that would have merited a disciplinary report, not a use of force. In my opinion, it is likely that the Defendant Corrections Officer used unnecessary force on Mr. Robinson.

**Warren Selby Summary**

310.    The video review of the use of force on Mr. Selby appears consistent with the description provided by the Defendant Officer involved. Mr. Selby was on the phone when the officer approached. It took 15 seconds from the time the officer began active dialogue to the time he sprayed him with OC. The officer took Mr. Selby to the ground and restrained him without the assistance of others, which is an indicator of compliance by Mr. Selby.

311.    My concern with this use of force incident, like others, is how quickly Correctional Officers Defendants resort to the use of OC spray. It did not appear any warning was given that force would be used if Mr. Selby continued not to comply. In a situation like this, I would expect a correctional officer to take a step back, call for backup, give directives, and perhaps draw the OC while giving the warning. Then, if non-compliance continues, use the OC spray. Based on the officer's statement, there is no indication these steps were taken. These steps are crucial in avoiding the use of force. By taking these actions, the incarcerated individual should recognize the situation has changed, and he is no longer engaged in a conversation and his compliance is necessary.

312.    My other concern relates to the failure to decontaminate after using OC spray.

313.    In my opinion, Defendant Corrections Officer used unnecessary force on Mr. Selbey.

96

**Jamal Solomon Summary**

314.    Mr. Solomon is seated in a dining area with four or more officers present. It appears one staff member directs him to leave the area, but he continues to linger. Based on hand gestures, several more directions are given, and the officer is trying to reason with him. The officer reaches for his OC canister, and Mr. Solomon reaches for the neck of his T-shirt, which he pulls up to his face.

315.    The appearance of this incident is that Mr. Solomon had ample warning of what could happen and chose not to follow directions, knowing he would be sprayed with OC. The officer appears to engage him in dialogue and, I assume, a warning.

316.    Mr. Solomon said he had a conflict with another individual in the housing area he was being assigned. The officers present all indicate Mr. Solomon did not specifically state this; he just refused to move. In my own experience, I am aware of numerous situations where incarcerated individuals intentionally disregard orders from staff to be placed in a segregated setting because of a known conflict with other incarcerated individuals. They generally avoid disclosing who the threatening individual is so they are not labeled as an informant, thus saving face with the rest of the incarcerated population.

317.    It does appear Mr. Solomon was inviting the use of force; however, he also appeared to be a non-moving resistor. As with other incidents, there was no decontamination.

318.    In my opinion, this was another instance of using force on a non-moving resistor. However, it also appears the Defendant Corrections Officer did attempt de-escalation and perhaps a warning to avoid the use of force. Mr. Solomon gave the impression he wanted the Defendants to use OC on him.

97

**George Sturgis Summary**

319.    Absent video or any other information, there is not much I can opine about this case. The investigation seems to have been thoughtful and contained information and analyses from different sources.

**Shamir Sudler Summary**

320.    There was no video of the actual use of force inside the shower area. The IA Investigation and officer statements explain that no showering is allowed after a "Code Red" is called. My assumption is that this is the DDOC term for a no-movement time for the incarcerated.

321.    The video of the shower entrance showed both officers arriving at 00:13 and the female officer standing outside until 00:30, when she stepped in. At 00:52, she stepped out wearing her mask. At 1:01, an unidentified inmate exited the shower area. At 1:14, officers escorted Mr. Sudler out of the shower area in restraints.

322.    The entire duration of the officer's contact with Mr. Sudler in the shower area was approximately one minute, which does indicate there was some level of dialogue, but no audio is available. Like other incidents, this is a low-level disciplinary issue, and my only concern is why it has to result in the use of force. It is disappointing the IA Investigator did not interview the other incarcerated person who was present when the use of force occurred. My other concern relates to the failure to decontaminate after using OC spray.

323.    In my opinion it is likely Defendant Corrections Officers used unnecessary force on Mr. Sudler.

98

**Charles Turner Summary**

324.    The assault on Mr. Turner is an example of the overly aggressive culture that appears to exist at SCI. Mr. Turner arrived at SCI 2-3 days before his assault. On the day of the assault, Mr. Turner's group (lower section of the unit) was coming to the end of their recreation period. Typically, the incarcerated would be given a 5-minute warning when the recreation period is ending. Correctional Officer Defendants' accounts of whether this happened on this day vary, so there is no certainty.

325.    In the video, officers can be seen clearing the dayroom and instructing incarcerated individuals back to their cells.  Mr. Turner is attempting to turn in a commissary order and approaches the officer stationed at the podium. She points and directs him to a locked box on the wall where he is to deposit his order.[196] Mr. Turner goes to the box and is in the process of depositing the slip; at the same time, other incarcerated are moving back to their cells.

326.    Mr. Turner is facing away from the day room looking at the box which is affixed to the wall. Corporal (Cpl.) Kraft who is 15-20 feet away, sees him and walks briskly towards Mr. Turner. As soon as Cpl. Kraft begins his movement towards Mr. Turner, he retrieves his OC canister from its holder on his waist; he has it in his right hand when he reaches Mr. Turner, who has remained facing the wall this entire time.[197]  As soon as he reaches Mr. Turner, who still has his back to Cpl. Kraft, Kraft reaches in front of Mr. Turner and sprays the OC in his face without any observable warning.[198]  It should be noted that in the Internal Affairs investigation Cpl. Kraft said, "he (Turner) turned around, and you can see he knows I (Corporal Kraft) am addressing him."[199] There is no indication of this in the video.

327.    Mr. Turner offers no resistance and appears startled by what is happening. Cpl. Kraft sprays Mr. Turner a second time on the opposite side of his face and then Cpl. Kraft performs an arm-bar takedown, tripping and striking Mr. Turner's upper shoulder area to force him to the prone position on the ground. Cpl. Kraft then places his knee and body weight on Mr. Turner's left shoulder and

---

[196] *See* VIDEO331_Turner 00187612 02.24.21_Station_ @ :12
[197] *See* VIDEO332_Turner 00187612 02.24.21_Station_ @ :27
[198] *See* Ibid., @ :28
[199] *See* DOC_SCI_0001267-8

99

twists his arm into an awkward position behind his back. At the same time, two other officers join in, one directly over Mr. Turner, applying downward pressure. A third and fourth officer then engages; Mr. Turner has at least three officers applying downward pressure on him, and the fourth manages his right arm.  Cpl. Kraft applies a wrist restraint on Mr. Turner's left wrist; Cpl. Kraft then spins his entire body and twists Mr. Turner's arm in the opposite direction.[200]

328.    At 1:04, it appears Mr. Turner has both of his wrists restrained; two of the officers, including Cpl. Kraft, see something outside of the camera view and depart in that direction. One of the officers remaining on top of Mr. Turner adjusts his position, putting his upper body weight on Mr. Turner's neck. The other officer present put his body weight on the officer, applying neck pressure. They remain there for several seconds, and eventually, Mr. Turner is lifted to his feet and escorted out of the area. The majority of the video provided does not have audio. However, handheld video taken in the holding area does. Throughout this video Mr. Turner expresses disbelief about being sprayed for putting paper in a box. He also expressed pain in his shoulder during the medical exam before being placed in segregation. He says he has a pre-existing injury from the streets (meaning before incarceration). There was emphasis put on this fact in the IA investigation. I am not expressing an expert medical opinion, only stating what I saw in the video; if I had a pre-existing shoulder problem and was subjected to what Mr. Turner was subjected to, I imagine it certainly would have aggravated my injury.

329.    The IA investigation determined Mr. Turner's allegation was founded, which I most certainly agree with. Additionally, the disciplinary report submitted by Cpl. Kraft resulted in a not guilty finding, in part because statements by the officer involved conflicted with video evidence. In my opinion the assault on Mr. Turner by the Correctional Officer Defendants involved was unjustified and excessive. It is my opinion the Management Defendants allow culture at SCI to be overly aggressive and tolerant of abuse of the incarcerated.

330.    In the IA investigation, it was indicated that Cpl. Kraft received some type of discipline related to this incident, but it is not stated what that discipline was. The most telling part for me was that he was still a corporal over a year later when Corporal Kraft was interviewed about this incident.

---

[200] *See* VIDEO332_Turner 00187612 02.24.21_Station_ @ :47

100

331.     In my opinion, Defendant Kraft used unnecessary and excessive force on Mr. Turner. It is also my opinion that the Defendant Correctional Officers inflicted unnecessary pain and suffering on Mr. Turner by failing to decontaminate.

### Donald White Summary

332.     Based on the IA investigation, I have no concerns about this incident. Based on my experience with COVID-19 response and emergency response, the observations and analysis conducted by the investigator are consistent with standard correctional practices.

333.     I would also like to note that the absence of video for the riotous incident is not surprising, given that no fixed video camera was installed at the time of the incident. Also, in an initial emergency response to a riotous situation, the primary objective is to regain order and control, so no handheld cameras would be expected to be immediately deployed.

### Bradley Zahner Summary

334.     The video shows Mr. Zahner exiting his cell to attend mealtime. He is a few seconds behind the rest of the people in his group. When a Correctional Officer Defendant sees him coming ten seconds late[201], he approaches him, walking right into his personal space. Mr. Zahner has a plate of food in his hands, and the officer knocks it out of his hands and begins reaching for his OC. Mr. Zahner has his head down and is stepping away from the officer in a submissive way. The officer then sprays Mr. Zahner in the face from inches away.[202] Mr. Zahner is walking backward and bending down, and the officer puts his body weight on Mr. Zahner, taking him to the ground.[203] Another officer arrives to assist.

335.     While the Correctional Officer Defendants grapple with Mr. Zahner, he has his arm protecting his face and does not appear to be fighting back in any way.[204] Mr. Zahner is pinned to

---

[201] *See* IA ZAHNER, DOC_SCI_00020071, Ten second
[202] *See* VIDEO343_Zahner 00595661 05.03.21_Station_, @ 1:11 – 1:17
[203] *See* Ibid., @1:18 – 1:20
[204] *See* Ibid., @ 1:23

101

the ground with the full body weight of the first officer, who is very heavy set. The newly arriving officer is able to place a wrist restraint on Mr. Zahner's left wrist, then the officer tries to pull Mr. Zahner's arm behind his back in an unnatural fashion, and when this doesn't work, he elbows Mr. Zahner in the back of the head.[205] The newly arriving officer reaches to his hip and then moves his hand to Mr. Zahner's facial area.[206] It appears a second burst of OC was used. Two more Defendants arrive, and one of them retrieves a canister of OC and almost places it on a food tray nearby.[207]

336.    After Mr. Zahner is restrained, there are now four officers with hands on him; two of the officers grab Mr. Zahner by his wrist and drag him for several feet until he can get his feet under him.  Mr. Zahner is escorted out of the area. During the long escort, one of the escorting officers uses a wrist tension technique while they are walking [208]which is probably unnecessary based on the situation.  Mr. Zahner is taken to the holding area. When he is removed from the holding area, he has blood on his face as well as OC residue. It also appears he soiled himself during the assault.

337.    Mr. Zahner is strip searched and not allowed to decontaminate in the shower area. He is then escorted to medical. The nurse cleans the blood off his face and examines a wound above his left eye. No bandage or dressing is applied. He is then placed in a holding cell.

338.    In the IA Investigation about this incident, the investigator determined all actions of Defendant Correctional Officers were "well within consistent the guidelines of DOC policy"[209]

339.    The video shows Mr. Zahner leaving the cell approximately ten seconds after his cellmate without a mask on. The officer present gives some direction. Mr. Zahner goes back in the cell and reemerges a few seconds later with his mask on. It appears this is what he thought he was instructed to do. Based on the officer's hand gestures, the officer appears to see him and tells him to lock up. Mr. Zahner continues to walk towards the feeding line and grabs a food plate. Within five seconds, the officer knocks the plate out of his hands and starts stepping toward him while taking out his

---

[205] *See* Ibid., @ 1:34
[206] *See* Ibid., @ 1:46 – 1:55
[207] *See* Ibid., @ 2:05
[208] *See* VIDEO337_00595661 05.03.21, @ 1:33
[209] *See* DOC_SCI_0002077

102

OC and spraying him. It does not appear Mr. Zahner had any time to comply before the assault by the officer began. When the officer knocked the plate out of his hands, Mr. Zahner was retreating.

340.    Appropriate actions by the officer when confronted with a non-compliant person would be to maintain a safe distance and continue giving verbal directives. In this case, another staff member only a few feet away was aware of the situation and could come to provide assistance and backup. The first officer could have stepped back and pulled out his OC, allowing Mr. Zahner to make a choice. If that didn't work, he could have given a warning stating return to your cell now, or force will be used against you. He did none of these and was aggressive and unprofessional, which caused this incident to go bad quickly. This entire incident was over a minor disciplinary issue.

341.    Based on this incident and others, it is my opinion Correctional Officer Defendants would benefit greatly from training in de-escalation techniques in order to avoid uses of force.

342.    In my opinion, the Correctional Officer Defendants used unnecessary and excessive force on Mr. Zahner.   It is also my opinion that the Correctional Officer Defendants inflicted unnecessary pain and suffering on Mr. Zahner by failing to decontaminate.

103

## VII.  Signature

343.    I certify that, to the best of my knowledge and belief:

    i.  The statements of fact in this report are true and correct;

    ii.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and are my personal, unbiased, and professional analyses, opinions, and conclusions;

    iii.  I reserve the right to modify or supplement my opinions should additional information become available;

    iv.  I have no personal interest or bias with respect to the parties involved; and

    v.  My compensation is not contingent on an action or event resulting from the analyses, conclusions, or opinions of this report.

**Stephen Sinclair**                                        Dated: 8/14/2024

104

JA_01916

Cheryl D. Wills, MD, LLC

# Psychiatric Expert Report

Davis et al. v. Neal et al.   Case:21-cv-01773-GBW

5247 Wilson Mills Rd, #452, Cleveland, OH 44143

8-15-2024

JA_01917

Cheryl D. Wills, MD, DFAPA

Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation

Case:21-cv-01773-GBW

August 13, 2024

Date: August 15, 2024

To Plaintiffs' Counsel

From Cheryl D. Wills, MD

RE: Davis *et* al. *v.* Neal *et* al.  Case:21-cv-01773-GBW

Dear Plaintiff's Counsel,

Per your request, I examined the mental health of several men remanded to Delaware Department of Correction facilities who reported that they have been subjected to excessive use of force by corrections officers.  The goal was to determine if the events caused emotional harm.

**Biosketch:**

Cheryl D. Wills, MD is a board-certified general, child and adolescent and forensic psychiatrist in private practice. She was on faculty at Case Western Reserve University for 16 years and most recently held the rank of Associate Professor of Psychiatry (2020-2024). She served as Vice Chair for Equity, Diversity and Inclusion and Chief of Child Psychiatry at the MetroHealth System in Cleveland Ohio (2022-2024). Also, she was Director of Child and Adolescent Forensic Psychiatric Services at University Hospitals of Cleveland where she worked for fourteen years.

She earned a BA in biochemistry at Barnard College, Columbia University and M.D. degree at the State University of New York, Upstate Medical University in Syracuse. She completed combined residency and fellowship training in adult, child and adolescent psychiatry at the University of Pittsburgh. She also completed a forensic psychiatry fellowship at Case Western Reserve University.

Dr. Wills has provided psychiatric care to patients in jails, prisons, hospitals, juvenile detention and corrections facilities and community-based jail and prison community reentry mental health programs like Assertive Community Treatment (ACT)

1

JA_01918

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                    August 13, 2024

and Wellness Re-entry Assistance Program (WRAP). She served as Chief of Psychiatric Services for the Louisiana State University Juvenile Corrections program. Her work there was recognized by litigators at the U.S. Dept of Justice, Special Litigation Section, Civil Rights Division, who invited her to consult for them under the Civil Rights of Institutionalized Persons Act (CRIPA).

Dr. Wills has provided expert consultation to various U.S. human rights organizations and attorneys regarding how the conditions of confinement in jails and prisons affect the mental health of individuals and classes of detainees. She is familiar with the standard of psychiatric care in these cases. Also, she served as an expert witness for defense counsel in many cases.

She stays at the forefront of organized psychiatry. In 2023 she completed a second elected term on the American Psychiatric Association Board of Trustees. In that capacity, she made substantial contributions to the organization's Roadmap for the Future of Psychiatry. Dr. Wills was the forensic advisor to two Diagnostic and Statistical Manual of Mental Disorders DSM-5 workgroups (2012-2013). The Manual is used by mental health professionals worldwide.

Dr. Wills is known for her strategic approach to management and ability to forge consensus among disparate stakeholders. She was awarded APA Special Presidential Commendations in 2021 and 2023 for her exemplary service as a Board member, task force chair, and contributor to the Roadmap for the Future of Psychiatry. The recognition is a rare achievement, even for APA Board members.

In 2020-2021, Dr. Wills chaired the Presidential Task Force on Structural Racism, SRTF, which completed a data-driven systematic review of the APA's functioning and governance- including the status of best practices implementation in diversity, equity, inclusion and governance.  This resulted in organization-wide reform and a historic 18 actions approved by the Board. Although each presidential task force is given one year to complete the work, Dr. Wills' team fulfilled the charge in seven months, during the first year of the COVID-19 pandemic.

2

Cheryl D. Wills, MD, DFAPA                Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                         August 13, 2024

Dr. Wills is the Scientific Program Chair for the American Academy of Psychiatry and the Law (2023-2024), is active in the American College of Psychiatrists, represents the APA in the American College of Surgeons Committee on Trauma and is a member of several other professional organizations. She has served on several journal editorial boards. In organized medicine, she has the reputation of being a collaborator and proven leader.

She writes and lectures nationally and internationally about clinical, forensic and administrative mental health, juvenile justice and correctional psychiatry, healthcare management, risk management, the impact of equity, inclusion and diversity on workplace culture, professionalism and other topics.

Dr. Wills has attached a copy of her curriculum vitae which lists my qualifications to perform these evaluations.

**Qualification of Examiner:**

I have attached a copy of my *curriculum vitae* which lists my qualifications to perform these evaluations.

**Statement of Non-confidentiality:**

Each interviewee was informed that his attorney asked me to conduct the interview which would not be confidential. Each was told that although I am a physician, I will not be his physician. Thus, he would not be receiving diagnoses, treatment recommendations, medication of other services from me. Each was advised that the attorney may ask me to prepare a report or testify in a deposition or court. Each detainee was told that questions about the process should be directed to his attorney. Each detainee said he understood and agreed to proceed with the interview.

**Sources of Information:**

1. Individual 60-minute video Interviews of 17 men confined to the Delaware Department of Corrections.
2. A review of the healthcare records of 16 men confined to the Delaware Department of Corrections.

3

Cheryl D. Wills, MD, DFAPA

Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation

Case:21-cv-01773-GBW

August 13, 2024

**Methodology:**

Each detainee was interviewed for about 60 minutes using the standardized psychiatric interview that can be found in various manuscripts and textbooks, including the American Psychiatric Association's **Practice Guidelines for the Psychiatric Evaluations for Adults, third edition**(2016). The diagnoses were made using the criteria in the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-5) (2013) and DSM-5 Text Revision (DSM-5-TR)(2022)depending on when the trauma occurred. With minor exceptions, the diagnostic criteria are the same in both texts.

**Diagnostic Impressions**

All diagnostic impressions are made to a reasonable degree of medical certainty based on training, experience, and knowledge generally accepted in the medical community. They are clinical and scientific opinions but not legal opinions.

**Privacy and Protected Health Information:**

The Health Insurance Portability and Accountability Act requires covered entities, including physicians, to shield identifiable health information from others. As several detainees' health information is disclosed in one report, each will be identified by a letter of the alphabet. The appendix at the end of the report will list their identities.

**Opinions:**

The opinion in this report is expressed to a reasonable degree of medical certainty based on training, experience, and knowledge that is generally accepted in the medical community. It is a clinical and scientific opinion but not a legal opinion.

**The Interviews:**

1. **Interviewee "A,"** ▮▮▮▮▮▮

   Interviewee "A" has a history of schizoaffective disorder (manic depressive or bipolar disorder with severe delusions and hallucinations), posttraumatic stress disorder, anxiety and attention-deficit/hyperactivity disorder. He has had

4

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

several suicide attempts and psychiatric hospitalizations, though none have occurred in penal institutions because he takes his medication daily when he is confined. He told me that he was not acutely mentally ill when the incidents described below occurred.

In 2019 interviewee "A" was housed with a cellmate who had severe mental illness, talked to himself, and struggled with self-care, including basic hygiene and toileting skills. "The C.O.s used to make fun of him. One day, the roommate told Interviewee "A" that he (the roommate) wanted to kill himself. Interviewee "A" reported this to corrections officers who instructed him to complete a sick leave form for the roommate. The form was submitted and Interviewee "A" was packing the roommate's property since it would go with him when he was placed on suicide precautions.

Interviewee "A" recalled that his cellmate returned to the cell with a corrections officer who pepper-sprayed interviewee "A," threw him to the ground, hit him repeatedly, and "threw me out of the cell." He experienced head trauma during the incident.

Interviewee "A" recalled that he was removed from the housing unit and taken to a place where a member of the healthcare team "looked at me and took my blood pressure" but didn't treat him for exposure to pepper spray. (Note: Although victims of head trauma are supposed to be monitored for vomiting, headaches and other symptoms for at least 24 hours after the trauma, the interviewee was not.)

Interviewee "A" was taken to the segregation housing unit. He recalled having migraine headaches and vomiting throughout the night. He said that he sustained two black eyes, a fractured nose, and swelling and bruising of his face and other parts of the body. He completed several sick call requests for medical care, but nobody responded. He wrote several grievances that were ignored. He recalled

5

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

that his family repeatedly called prison administrators and his girlfriend eventually contacted a senator to get help for him.

Interviewee "A" recalled that he was in pain and his injuries were obvious to anyone who looked at him. He said the corrections officers "were hiding me out in solitary until I healed up." Thus, instead of having a disciplinary hearing in 72 hours, it occurred two weeks later.

He said that he was charged with several offenses and recalled that, "They said I put my hands around my cellie's neck." A disciplinary committee member told Interviewee "A" that someone interviewed the cellmate and decided he could not serve as a witness during the disciplinary committee hearing due to "security concerns." Interviewee "A" was found guilty and released from administrative segregation with credit for time served. Several days later, he spoke with the cellmate who said that although the officers wanted him to say that he was choked, he refused because it wasn't true.

The Delaware Department of Corrections Record:
The record includes a medical Sick Call Form dated April 2, 2021, that was completed by "Interviewee A." He says, "I was visibly attacked by CPL Purnell on Sunday Morning. I have head trama [sic], I have migran's [migraine headaches]all day. Sometimes I get sick."

On April 12, 2021 Interviewee "A" completes a mental health Sick Form. "… I am very depressed, [and have been] having a lot of anxiety and night terrors. I feel angry and hopeless a lot."

Mental Health Impact of the Trauma:
Interviewee "A" said that he feared for his safety and for his life when he was being attacked. After the assault, he became socially withdrawn and the PTSD symptoms increased. He had nightmares, intrusive memories and flashbacks of the prison assault that were more prominent than the intrusive

6

memories of past traumas.  He found it hard to sleep and avoided things that reminded him of corrections officers and being assaulted. He becomes "very worried" when he hears corrections officers yelling. He felt emotionally detached, struggled to have positive emotions, became hypervigilant, and was more distracted.

Impression:
It is my opinion with reasonable medical certainty that Interviewee "A" had increased symptoms of posttraumatic stress disorder and depression after he was attacked by corrections officers in April 2021.

He was violently beaten and pepper sprayed and feared for his life during and after the assault by corrections officers. He was deprived of timely, proper medical care for exposure to pepper spray and physical injuries sustained during the attack. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering because of the assault and deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "A" experienced a precipitous and persistent decline in emotional wellness, including intrusive recollections (memories, nightmares and/or flashbacks) of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder symptoms cannot be attributed solely to traumas experienced before the attack.

2. **Interviewee "B"** ▮▮▮▮▮▮

Interviewee "B" has a history of attention-deficit/hyperactivity disorder and posttraumatic stress disorder that predate the assault. The incident occurred on December 4, 2021. Interviewee "B" recalled that "a code red was announced. That means you can't leave the [housing] tier

7

but you can use the bathroom." A corrections officer told Interviewee "B" to get out of the shower. #795035 said that he was getting out but needed to rinse off soap from his body. The officer again said, "Get out of the shower!"

The officer pulled back the shower curtain and pepper sprayed Interviewee "B's" face. He tried to shield his eyes and body with his arm and the shower curtain. The officer "put the can under my face and sprayed again." Next, Interviewee "B" was grabbed by the arm, tossed to the ground and handcuffed. The officers let him put on his pants and then escorted him to a room to change into a segregation housing unit uniform. Then he was taken to the medical room where a health care professional obtained his pulse and blood pressure. He said that his face and eyes were not examined. His eyes and skin were in pain from the pepper spray and physical aggression. He was permitted to shower 24 hours later and the burn diminished but persisted. Then he was escorted to the segregation housing unit.

The Delaware Department of Corrections Record:

According to a December 4, 2021, incident report, there was "an area check during code red…," and someone was in the shower. The Sgt. gave several directives for the detainee to leave the shower. "I pulled back the shower curtain and inmate … [Interviewee "B"] was… still showering…. I pulled out my state issued cap stun and sprayed inmate… [Interviewee "B"] in the face."

Mental Health Impact of the Trauma:

Interviewee "B" said he was stunned and feared for his safety. The trauma, "affected me a lot…. Officers can write up people for not bathing and can mace me for taking care of my hygiene. If y'all [corrections officers] felt I was off-limits, you should have given me an off-limits writeup."

His posttraumatic stress disorder symptoms increased precipitously after the trauma. He has had more negative thoughts and has felt less safe. The focus of the intrusive recollections has been the assault, rather than prior traumas. He avoids things and situations that trigger intrusive memories

8

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

of the trauma. He has been hypervigilant and easily startled, especially when he hears an officer approach or keys jingling. When a corrections officer raises his voice, #795035 becomes anxious and distracted. He fears for his safety, avoids asking for help and sometimes prematurely ends phone calls when an officer approaches "because I lose my train of thought" and fears retaliation.

Impression:

It is my opinion with reasonable medical certainty that

Interviewee "B" had an increase in the severity of his posttraumatic stress disorder because of the shower incident.

He was violently beaten and pepper sprayed and feared for his life during and after the assault by corrections officers. He was deprived of timely and proper medical care for exposure to pepper spray and physical injuries sustained during the attack. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "B" experienced a precipitous and persistent decline in emotional wellness, including intrusive recollections (memories, nightmares and/or flashbacks) of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder symptoms cannot be attributed solely to traumas experienced before the attack.

The trauma makes it difficult for him to ask for help and enjoy phone privileges.

3. **Interviewee "C,"** ▮▮▮▮▮▮▮

   Interviewee "C" has a history of posttraumatic stress disorder and schizoaffective disorder, depressive type (symptoms of schizophrenia and major depressive disorder). He recalled that in March 2020 he filed a grievance after

9

seeing a corrections officer pepper spray someone without cause. "I was sanctioned for 30 days because it [the grievance] was considered a threat." He said that a senior corrections officer retaliated against him by conducting more room searches, aka "shaking my room down," and causing more property damage (ripped bible, magazines, etc.) when inspecting Interviewee "C's" room than occurred during other room inspections.

Interviewee "C" said that he complained several times to senior administrators. He asked to be transferred to a different housing tier. He feared he would "lose control" if assaulted by the officer. Interviewee "C" recalled that the senior officer eventually was told "to stop shaking my room down" and he retaliated by ordering other corrections officers to do it.

Interviewee "C" kept track of the searches and property damage (e.g. ripped bibles and books). Also, he told a member of the mental health team that he was being bullied by corrections officers and struggled with his anger.

Less than one week later, Interviewee "C" was in the yard when he learned from a peer that his room was being inspected again. Interviewee "C" reminded the senior corrections officer, "My room had been shaken down yesterday and today's shakedown seemed targeted. The [senior] officer told me that it was his unit, and he could shakedown whoever [sic] he wanted."

Interviewee "C," who was shirtless, decided to deescalate the situation by returning to the yard. As he approached the yard entryway, the senior officer called him back and told him he would be confined to his cell for the remainder of the day. Interviewee "C" turned to the yard entry shirt to retrieve his shirt which was by the door. He recalled, "The senior officer ordered me to put on the shirt even though" this was not a rule.

The officer stood perpendicular to and behind Interviewee "C," who was putting on the shirt. Interviewee recalled that the senior officer "pulled out a can of pepper spray.

10

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                                Case:21-cv-01773-GBW
                                                                    August 13, 2024

I saw it in my periphery. He sprayed me and I just went blank from there. I remember hitting him [the senior officer] the first time and I remember telling me [myself] to stop." Interviewee "C" had knocked the officer to the ground. Then, Interviewee "C" allowed the officers to handcuff him. "I didn't resist." He recalled that the video of the incident, which he viewed, is five to seven seconds long.

That afternoon Interviewee "C" was transferred to JT Vaughn Correctional Center. He hadn't yet been treated for exposure to pepper spray.  The healthcare professional took vital signs and examined the incision on his eyelid before deciding not to suture it. Regarding the pepper spray, Interviewee "C" said, the healthcare professional "didn't wipe anything off. She just looked at it [the eye]. Then I couldn't get into the shower for 24 hours."

Interviewee "C" recalled not receiving a disciplinary report or hearing regarding the pepper spray incident. He remembered being in the segregation housing unit for seven to eight months without a hearing. This changed when his attorney accepted the case. Two weeks after the attorney signed on, an assault charge was filed against Interviewee "C," who was sentenced to eight years' probation.

Interviewee "C" explained, "You can see from the video that I wasn't a threat to him and he sprayed me for no reason."

The Delaware Department of Corrections Record:

The Delaware Department of Corrections record indicates that on May 13, 2021, Interviewee "C" met with a mental health professional and reported that he was "having issues with these COs [corrections officers]. They're trying to push me" to act out. He had been struggling to contain his anger.

On May 18, 2021, Interviewee "C" was transferred from Sussex Correctional Institution Georgetown to JT Vaughn Correctional Center after an altercation with a corrections officer.

11

JA_01928

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

The record contains no disciplinary report of the May 18, 2021, incident or other disciplinary matters.

Mental Health Impact of the Trauma:

Interviewee "C" described an increase in posttraumatic stress disorder symptoms after the pepper spray incident. The intrusive recollections, avoidance and triggers were disproportionately related to the behavior of corrections officers – e.g. hearing them yell, realizing his room was going to be or had been inspected, hearing doors slam and hearing keys jingle (which indicates that an officer is nearby)- than it was to past traumas. He was hypervigilant and easily startled. He became "highly emotional" and continues to feel emotionally detached from others with whom he is confined.

This was not the case before May 18, 2021. He believes that the symptoms will increase precipitously if he is required to return to SCI Georgetown or to live in a dormitory that lacks closing doors and privacy. He will avoid asking for help to reduce the likelihood of retaliation.

Interviewee "C" explained that the pepper spray wasn't what triggered the trauma. In 1996 he was pepper sprayed by a corrections officer because he wouldn't stop fighting. "I didn't follow a direct order." Despite the discomfort, he knew that the officer's action was justified. He believes that the March 5, 2020, incident represents an unwarranted and excessive use of force that made him fear for his safety and his life. This triggered his hypervigilant reaction to the trauma.

Impression:

It is my opinion with reasonable medical certainty that the pepper spray and restraint incident incited fear and pain that precipitously increased the severity of Interviewee "C's" posttraumatic stress disorder. He feared for his life during and after the assault and it undermined his rehabilitation.

12

JA_01929

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

He was deprived of timely, proper medical care for exposure to pepper spray and physical injuries sustained during the attack episode. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and being deprived of proper medical care. Yet, they ignored the risk.

Interviewee "C" experienced a precipitous and persistent decline in emotional wellness, including intrusive recollections of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder symptoms cannot be attributed solely to traumas experienced before the attack. Because of the assault, returning to Sussex Correctional Institution, Georgetown or being assigned to sleep in a dormitory (where there is less security)will undermine how Interviewee "C' accesses care.'

4.   **Interviewee "D"** ▉▉▉▉▉▉▉**:**

Interviewee "D" has a history of depression, psychosis (hallucinations, paranoid thinking), suicide attempts, psychiatric hospitalizations and posttraumatic stress disorder, PTSD. In February 2022 he was upset and repeatedly asked to speak with a mental health professional. He was impatient, covered the cell window with toothpaste, then tried to remove it when told to do so. "It wouldn't come off so I asked for cleaning supplies."

Then corrections officers restrained him twice. During the second restraint, he was pepper sprayed, tried to protect his face and was "beaten in and out of consciousness by 13" corrections officers. Eventually, he was placed in a cell for the night without being treated for exposure to pepper spray. He spent the night "in pain, and in and out of consciousness. I couldn't see. I was burning all over." He was permitted to take a shower 24 hours later.

13

Cheryl D. Wills, MD, DFAPA                Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                August 13, 2024

The Delaware Department of Corrections Record:

The February 9, 2022, Disciplinary Report indicates that the corrections extraction team removed Interviewee "D" from the cell that had an obstructed window. He was pepper sprayed and "the cell air had begun to hinder" everyone's "vision and breathing" as the team entered the cell. Interviewee "D" resisted being handcuffed but the team succeeded, escorted him to the infirmary to be examined, then put him in a holding cell.

Mental Health Impact of the Trauma:
Interviewee "D" said, "I felt helpless, depressed, anxious [and] like dying." He isolated himself because he feared retaliation from the officers.

The PTSD symptoms increased substantially. He was hypervigilant, easily startled, and unable to have positive thoughts. Intrusive memories of the restraint and assault have been more prominent than persistent intrusive memories of past trauma. He stopped attending GED classes due to fear for his safety. He became depressed again. Eventually, he began to hear voices and attempted to die by suicide.

IMPRESSION:

It is my opinion with reasonable medical certainty that the cell extraction resulted in Interviewee "D" having a severe major depressive disorder episode with psychosis, precipitously increased the severity of the posttraumatic stress disorder and contributed to a suicide attempt.

He was violently beaten and pepper sprayed and feared for his life during and after the assault by corrections officers. He was deprived of timely, proper medical care for exposure to pepper spray and physical injuries sustained during the attack. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and

14

Cheryl D. Wills, MD, DFAPA                Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                    Case:21-cv-01773-GBW
                                                        August 13, 2024

deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "D" experienced a precipitous and persistent decline in emotional wellness, including depression, hallucinations, a suicide attempt, and intrusive recollections (memories, nightmares and/or flashbacks) of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder and other symptoms, including the suicide attempt, cannot be attributed solely to traumas experienced before the attack.

**Interviewee "E"** ▮▮▮▮▮▮▮▮ :

Interviewee "E" said that in July 2020 laundering and hanging one's bed sheets on the cell door to dry was a common practice even though it obstructed the cell window. "When the COs [corrections officers] came around we moved them." One day, when Interviewee "E" was in the gym, someone removed his sheet from the door.

Interviewee "E," who is African American, asked the corrections officer to return the sheet and the officer said he didn't have it. Then Interviewee "E" saw the corrections officer return a sheet to a Caucasian detainee. Interviewee "E" became angry and accused the corrections officer of being a racist.

The corrections officer told Interviewee "E" that his room would be inspected or "shaken down" to see if he had the sheet. The sheet was not found. Then, Interviewee "E's" room was inspected again; he became annoyed and asked to speak with the lieutenant.

Interviewee "E" recalled that without warning the corrections officer pepper sprayed him, then "took me to the ground and hit me. Then several COs [corrections

15

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

officers]" joined in. The officer "got on top," choked him, and punched him in the face.

During the incident, Interviewee "E" was pepper sprayed three times. Eventually, the lieutenant handcuffed him and escorted him to the booking-receiving area of the building. "My pants were down," his genitals were exposed, his eyes and mouth were burning, and he was drooling. "They wouldn't let me pull up my pants and told me not to spit even though I wasn't able to breathe and was choking."

Eventually, they disrobed and strip-searched him. He was evaluated by a nurse who bandaged an incision above his eyebrow. Interviewee "E" spent 24 hours in the segregated housing unit before he was permitted to take a shower.

He spent about one week in administrative segregation. The disciplinary committee found him guilty of assaulting an officer and other offenses. He was transferred from Sussex Correctional Institution, Georgetown to James T. Horn Correctional Center where he spent three years in a segregated housing unit. "I was confined for 23 hours per day." His grievances went unanswered.

The Delaware Department of Corrections Record:

On July 18, 2020, a corrections officer confiscated a bedsheet hanging on a window. Interviewee "E" asked for it and the officer said, "not right now." Interviewee "E" complied but later said that he intended to file a grievance about the sheet, the officer was a racist and he wanted to speak with the lieutenant. Interviewee "E" was escorted from the tier to speak with a sergeant and then returned to the tier. A "Code 6" was called on the tier and Interviewee "E" "was sprayed…"

Mental Health Impact of the Trauma:
Interviewee "E" said that four years after the incident, he continues to have intrusive memories about the incident, including nightmares in which he fears for his safety about three times per week. He tries to avoid situations and

16

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                    August 13, 2024

thoughts that trigger intrusive memories; however, his options are limited since he is in prison.

When he thinks about the incent, he experiences tremors, sweating, rapid heart rate, and shortness of breath. He is distractible, overly vigilant, and easily startled. He often has had urges to self-medicate with substances to alleviate the anxiety, depressed mood, irritability and anger. He feels detached from others and has been unable to have positive emotions.

IMPRESSION:

It is my opinion with reasonable medical certainty that Interviewee "E" developed posttraumatic stress disorder from the restraint. He was violently beaten and pepper sprayed and feared for his life during and after the assault by corrections officers.

He was deprived of timely, proper medical care for exposure to pepper spray and physical injuries sustained during the attack. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "E" experienced a precipitous and persistent decline in emotional wellness, including and intrusive recollections (memories and nightmares) of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder and other symptoms, including the suicide attempt, cannot be attributed solely to traumas experienced before the attack.



17

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024



18

Cheryl D. Wills, MD, DFAPA

Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation

Case:21-cv-01773-GBW

August 13, 2024

19

Cheryl D. Wills, MD, DFAPA          Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                    Case:21-cv-01773-GBW
                                                      August 13, 2024



**Interviewee "G" ▮▮▮▮▮▮▮▮:**
Interviewee "G" has a history of several suicide attempts, depression, psychosis (hallucinations) and posttraumatic stress disorder that predates the assault. In July 2020 when he was confined to a Covid-19 unit in the prison, he cooperated several times when his bunk was reassigned to accommodate peers who required closer observation by the medical team.

When asked to relocate again, because several of his peers refused to do so, Interviewee "G" became upset and told the corrections officer that he wanted to kill himself.

He was told to sit at a table until six to eight more corrections officers arrived. They handcuffed him and were escorting him to the infirmary when one of the officers inflicted pain by squeezing his arm between the biceps and triceps muscles. Interviewee "G" reflexively pulled away. He recalled that a corrections "officer yelled, 'He's resisting!'"

Interviewee "G" recounted, "They put me on the floor and beat, punched, [and] kicked me. They used my head to ram the door twice. One guard said, 'I bet your bitch ass ain't [sic] suicidal now.' They [repeatedly] made me call myself a bitch… and dragged me across the compound." Interviewee "G" begged, "Please stop! Please Stop! I can't breathe! I can't breathe!"  He attributed the shortness of breath to COVID-19 and anxiety.

He recalled, "Finally my legs gave out. They dragged me to the infirmary." They strip-searched him and gave him a

20

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

blanket which he wrapped around his body.  "Then I passed out."

Per Delaware Dept. of Corrections Records:
The medical record indicates that the primary psychiatric diagnosis is bipolar disorder, aka manic-depressive disorder.

The disciplinary report indicates that on July 12, 2020, Interviewee "G" "Was suicidal and he wanted to be off the quad." A corrections official began to place handcuffs on Interviewee "G" and he "swung around in an attempt to elbow" the staff person. Corrections staff "took… [him] to the ground…"

The nurse noted had a one-inch abrasion on Interviewee G's" scalp and abrasions on his left, lip and right forearm. He also had bruising on his left collar bone and his right wrist was swollen and bruised. On July 12, 2020, nursing staff said, that in lieu of "answering any more questions [he] stated 'Just leave me alone so I can heal.'"

Mental Health Impact of the Trauma:

Interviewee "G" reported that after the trauma, the depression, anxiety, and posttraumatic stress disorder worsened precipitously. He had repeated intrusive memories and dreams about the event and experienced sweating, shortness of breath and palpitations when he relived the event. Seeing corrections officers, hearing them yell and seeing them restrain others continues to trigger memories of the incident as does hearing others argue and hearing keys jingle (since corrections officers carry keys).

Interviewee "G" tries to avoid situations that remind him of the trauma and feels detached. He lacked the motivation to engage in pleasant activities and his mood was persistently depressed. He struggled with sleep and concentration and was hypervigilant and easily startled. He recalled being afraid to ask for help because he wanted to avoid additional retaliation. Instead of telling the nurses

21

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

that he was in pain, he insisted that they leave him alone and let him heal.

He said that the assault by corrections officers had greater emotional repercussions than the repeated abuse he had as a child and other trauma he was exposed to in prison. He said that he meets with a therapist because he is "very, very angry and paranoid" and wants to hurt someone because of how he was treated. He refrains from harming others to avoid consequences.

IMPRESSION:

It is my opinion with reasonable medical certainty that Interviewee "G" has had an exacerbation of major depressive disorder, anxiety and posttraumatic stress disorder because of the traumatic assault. He has feared seeking healthcare since the assault due to the potential of retaliation by corrections officers.

He was violently beaten and feared for his life during and after the assault by corrections officers. He was deprived of timely, proper medical care for physical injuries sustained during the attack. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "G" experienced a precipitous and persistent decline in emotional wellness, including and intrusive recollections (memories and flashbacks) of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder and other symptoms, including the suicide attempt, cannot be attributed solely to traumas experienced before the attack.

**Interviewee "H" ███████:**

Interviewee "H" has no prior mental health history. On September 7, 2021, he learned that he was being transferred

22

to a housing area where someone whom he had past conflict with and who threatened him was housed.

Interviewee "H" asked the corrections officer to be assigned to a different area "or there would be trouble." Interviewee "H" didn't want to be labeled a "snitch" because that would increase his risk of being attacked. Consequently, he declined to identify the aggressor on the other unit when the corrections officer instructed him to do so.

Interviewee "H" recalled that the corrections officer gave him two options: disclose the name of the aggressor "or go to the [other residential] tier." If not, then "he was going to spray me, then I'm going to the hole….I said, 'I can't go on the tier."

Three or four corrections officers were present. "They sprayed me" and Interviewee "H" tried to shield his face with his hands. He was handcuffed and escorted elsewhere to be stripped searched.

"They gave me my clothing back and sent me to the hole. I was feeling the burn of the mace….it burned all night. I guess it dried in my hair." Interviewee "H" recalled that the following morning, in the shower, "When the water touched my head, it ran over my face and burned my eyes some more."

The disciplinary committee found Interviewee "H" guilty of "not obeying a direct order" and he was in the segregated housing unit for 15 to 20 days.

Interviewee "H" explained, "In the hole, I felt more secure… because I was by myself… I really didn't want to come out." His family persuaded him to leave the segregated housing unit to avoid other consequences. When I asked Interviewee "H" about protective custody, he said he was and remains unfamiliar with it.

Interviewee "H" was released from the segregated housing unit and moved to the housing tier where the aggressor lived. A different inmate brokered a truce between the two men.

23

Cheryl D. Wills, MD, DFAPA                Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                        Case:21-cv-01773-GBW
                                                          August 13, 2024

Interviewee "H" said, "I gave him my sneakers" in exchange for his safety. Inmate "H" explained that breaking the contraband rule had less severe repercussions than "being called a snitch" or disobeying an order.

Per Delaware Dept. of Corrections Records:
According to the disciplinary Hearing Decision Form, the hearing occurred on September 9, 2021. The corrections officer's testimony is, "Officer states that he [Interviewee "H"] was a passive aggressor and used the minimal forced [sic] needed to handle the situation….[The officer] gave the offender time to give up the person or persons named that he could not be housed with and the inmate refused." Interviewee "H" was found guilty.

Impact of the Trauma:
He said, "The incident is always in my mind…." He felt afraid, helpless, hopeless, fearful and worthless.  "Whenever they feel like you're in the wrong, you can get sprayed." He limits his social interactions to avoid conflict that may result in him being harmed by others. He doesn't believe he can go to corrections officers for help because this may cause greater harm to him.

He remains apprehensive about interacting with others and of being maced. "Sometimes I feel compassion for a person with mental health or other limitations who is being threatened or maced."

He remains unfamiliar with the definition of protective custody and prison protocols for implementation.

IMPRESSION:

It is my opinion with reasonable medical certainty that Interviewee "H" experienced and continues has social anxiety disorder that increases substantially when there is conflict nearby. He struggles with self-advocacy due to not being familiar with protective custody and other protocols and fear of retaliation from corrections officers.

24

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                August 13, 2024

He was pepper sprayed and feared for his life during and after the assault by corrections officers. He was deprived of timely, proper medical care for exposure to pepper spray. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "G" experienced a precipitous and persistent decline in emotional wellness, including apprehension about interacting with others. This undermines his emotional and social growth and renders him institutionalized and a future victim of exploitation. He has a limited understanding of prison protocols but avoids asking corrections staff or his peers about them due to fear. This places him at risk of being exploited by others.

It is concerning that Interviewee "G" had to violate contraband rules for his safety because corrections officers would not help him.

**Interviewee "I"** ▮▮▮▮▮▮▮▮**:**

Interviewee "I" has a history of severe depression, attention-deficit/hyperactivity disorder, and suicide attempts. He received inpatient psychiatric care several times as a minor and residential psychiatric care several times in prison.

On Thanksgiving Day 2021 at Sussex Correctional Institution, Georgetown, Interviewee "I" was in an observation cell awaiting a permanent bed assignment. He asked for toilet paper and "they only gave me a little bit. I used the toilet and" his repeated requests for additional toilet paper were ignored. He "smeared stool on the [cell] window and door."

The next day, while the room was being cleaned, corrections officers handcuffed him and escorted him across the compound to a holding cell in the "X-ray corridor." Interviewee "I" was in pain when he moved his handcuffed wrists from the rear

25

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

to the front of his body and pulled down a plastic light fixture. A corrections officer asked what he was doing. Interviewee "I" said he hadn't had recreation in several days. The corrections officer left the area and then returned with several colleagues.

Interviewee "I" recalled, "Somebody said, 'You're about to get your recreation.' They sprayed me with pepper spray and punched me. This went on for about five minutes. One officer grabbed my penis and said, 'Oh, you want to keep breaking stuff. I'll rip your dick off and put it in your mouth.'"

Interviewee "I" was "trying to get out of the cell because the security cameras were in the corridor. Officers grabbed his neck, torso and one leg. When Interviewee "I" was at the door, an officer repeatedly punched him in the ribs "and you can see it on camera. They called a code. One officer stepped on my back and said, 'Fuck this piece of shit,'" recalled Interviewee "I." The incident ended about that time.

The officers transported Interviewee "I" to the medical unit. His vital signs were obtained and "they dabbed my eyes with cotton. They were supposed to decontaminate me. There [still] are cuts on my head [and]scars" from the incident. They returned him to the original cell where he remained for a week or two.

During the incident, "I felt very out of character, but they pushed me to that point," recalled Interviewee "I".

He had a disciplinary hearing in seven to ten days. "They fabricated the write-up. They said that I was hanging from a light fixture. The light fixture was plastic and I weigh 260 pounds…"  He was found guilty of assault and was required to spend 15 days in solitary confinement and lost all privileges for 90 days.

Per Delaware Dept. of Corrections Records:
There is no documentation of the incident in Interviewee "I's" file or Internal Affairs Unit Report so I reviewed staff interviews in the Internal Affairs Unit Report that

26

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

was completed on April 22, 2022. *(Note that Interviewee "I" said that he was assaulted on Thanksgiving Day 2021.)*

Internal Affairs Investigator David Thomas interviewed Corporal Colby Steele on April 7, 2022, in the presence of his Union Representative.  Corporal Steele reported that on November 25, 2021, he was on post when Interviewee "I" was transported to the building from a different location and placed in a holding cell with his hands cuffed behind the back. "Shortly after… he was beating, banging and kicking in the holding area." Corporal Steele and two sergeants entered the cell, instructed Interviewee "I" "calm down and just hang out." They explained to him that he would be transferred back to the former cell after they cleaned it.

Corporal Steele reported that about five minutes later, "we heard a big bang. The cell was…completely black…. The light was busted," and the light switch was inoperable. "Unbeknownst to the officers… [Interviewee "K"] was able to get his handcuffs in front of his body. The officers saw… [him] hanging from the light from the ceiling."

Sergeant Steven Lawn ordered Interviewee "I" to get down and he "refused to obey the order. Sergeant Steven Long" pepper sprayed Interviewee "I", "who came down… and started swinging at the officers. Corporal Steele backed up and pepper sprayed Interviewee "I." He resisted as "Three correctional officers started to try and get… [him] on the ground." He attempted to get out of the cell. "Corporal Hood responded as backup and" assisted in the physical restraint. Interviewee "I" was resisting when Corporal Steel left the area due to pepper spray exposure.

Sergeant Steven Long, who was interviewed by Investigator David Thomas on April 7, 2022, says that Interviewee "I" had become agitated and "threw feces in the cell." This resulted in him being relocated to Corporal Steele's area so the holding cell could be cleaned. In time, Interviewee "I" was hanging from the light fixture "and trying to rip

27

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

the light all the way down." After Sergeant Long pepper sprayed Interviewee "I," he 'came down and acted like he was going to hit me. There was a 'brief struggle….We tried to hold… [him] down on the ground… he is a strong guy…..Backup finally arrived and I left the area because of the pepper spray."

On April 7, 2022, Sergeant Joseph McCarthy provided Internal Affairs Investigator David Thomas with a similar report. In the presence of the union representative.

Also, Sergeant McCarthy says that after Interviewee "I" was sprayed, he became extremely combative. He wouldn't comply with anything." Also, he "was pushing up against the bench. He was trying to escape from the cell."

Documentations from the "medical review" section of the Internal Affairs Investigation report are copied below. The visits occurred after the November 25, 2021, assault.

> *On November 25, 2021, at 4:46 pm Inmate* ▮▮▮▮ *was taken to the infirmary by officers after an incident in MSB. Robert Webster RN was the nurse who examined the inmate. Inmate* ▮▮▮▮▮▮ *had various cuts and scratches on his face and forehead and a small laceration over his left eye. Inmate* ▮▮▮▮▮ *did not have any further complaints. Inmate* ▮▮▮▮▮ *was cleared for segregated housing.*
>
> *On November 26, 2021, at 12:45 pm Inmate* ▮▮▮▮ *was evaluated by Gregg Drevno, LPCMH, Mental Health Clinician. Inmate* ▮▮▮▮ *confessed to Mental Health Clinician, "I'm losing my mind being here. I might find something sharp in here and use it to hurt myself." According to Mental Health Clinician,* ▮▮▮▮▮▮▮ *current mental health*

28

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

*status had his appearance as disheveled and his mood as irritable. His thought content had suicidal ideations. His insight and judgment were impaired. Inmate ▊▊▊▊▊▊ current risk assessment was moderate.*

Impact of the Trauma:
Interviewee "I" feared for his life during the incident. He said that he needed and needs to maintain a low profile and calm down "because they're going to kill me down here."

Following the incident, "I felt defeated and felt like killing myself." He said that he wasn't himself. His mood was persistently negative, irritable and depressed. Also, he had unprovoked irritability and anger and was hypervigilant. Although he is a Muslim and an athlete he stopped praying and working out and his appetite increased after the assault. I was gaining weight," felt tired all the time and struggled with sleep and concentration.

He continues to have intrusive memories of the incident and felt detached and estranged for several months after the incident. He tries to avoid situations that trigger memories of the assai;t and he has palpitations and breathes more heavily when he has intrusive memories about the incident.

IMPRESSION:
The traumatic restraint and assault of Interviewee "I" by corrections officers resulted in him experiencing a major depressive episode and posttraumatic stress disorder.

He was violently beaten and pepper sprayed and feared for his life during and after the assault by corrections officers. He was deprived of timely, proper medical care for exposure to pepper spray and physical injuries sustained during the attack. His treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and

29

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "I" experienced a precipitous and persistent decline in emotional wellness, including and intrusive recollections of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder and major depressive disorder symptoms cannot be attributed solely to traumas experienced before the attack.

**INTERVIEWEE "J"** ▓▓▓▓▓▓
Interviewee "J" had a history of panic attacks, major depressive disorder severe with psychotic features (hallucinations) and posttraumatic stress disorder before he was traumatized by corrections officers.

In February 2021 corrections officers declined three requests by Interviewee "J" to make a phone call. He decided to make the call anyway. He said that an officer yelled at him, tripped him, beat him, pepper-sprayed him in the face, and handcuffed him before escorting him to the segregation housing unit. He recalled that corrections officers "refused to give me medical attention after the assault. When I asked for medical attention, I was told to 'lay the "F" down and be quiet.'"

He recalled not being able to have clean clothing, take a shower or speak with his family during the three weeks that he was in the segregation housing unit. Interviewee "J" was allowed to speak with his family by phone after the disciplinary hearing. Then he returned to the special housing unit to complete the 30-day sentence that the Disciplinary Committee recommended.

Per Delaware Dept. of Corrections Records:
Sergeant A. Callaway V  says in the February 24, 2021, Incident Report that he heard Interviewee "J" "being disrespectful" and "stating obscenities toward" the police officers who brought him to Sussex Correctional Institution

30

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

– Georgetown to be admitted. Sergeant Callaway says he instructed Interviewee "J" to "follow all orders given by staff. I told  him to face the wall so that I could remove his handcuffs." Interviewee "J" did not follow orders and spoke disrespectfully to the officer, who informed Interviewee "J" "he needed to follow the orders and [or?] I would not have to assist him." After the handcuffs were removed, Interviewee "J" refused to place his hands on the wall as instructed. Also, he resisted the "pat search" that the Sergeant performed. Interviewee "J" would not comply with posing for photographs.

Interviewee "J" asked to use the phone and the Sergeant said, "not right now as we had to get through the intake process." Interviewee "J" placed the hood on his head and required two prompts to remove it.

Sergeant Callaway walked away to complete a different task. Interviewee "J" asked Sergeant Clark to use the phone and was told no. Sergeant Callaway says he instructed Interviewee "J" to sit down and "he continued to walk towards me. Interviewee "J" was told two more times to sit down. Following the first directive, he said he was using the phone. After the second directive Officer Callaway "sprayed him in the facial area with my DOC-issued OC spray." Next, Sergeant Callaway "performed a leg sweep and pinned him to the ground. Two sergeants, Clark and Hastings, approached and assisted with handcuffing and escorting Interviewee "J" to a cell. Their incident reports, which are undated and unsigned, corroborate much of what Sergeant Callaway said.

Lieutenant Outten says in an incident report that he entered the receiving room and saw Interviewee "J" who was handcuffed and in a cell. Two staff were able to complete the strip search and escort him to "THA."  The staff gave Interviewee "J" instructions, opened the cell door and escorted him to the shower. Then they escorted him to the

31

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

receiving medical area for a medical intake. He cooperated with the rest of the intake.

The nurse completed an Incident Report and states that Interviewee "J" didn't express thoughts of harming himself or others and did not have "any visible injury and inmate denies any pain."

Interviewee "J" allegedly violated three conditions: Active Resistance Towards Staff, Disrespect and "Failing to Obey an Officer."

Mental Health Impact of the Trauma:
He recalled that the experience "was horrifying. It hurt, it [his eyes and skin] burned for a couple of days." After the assault, "I had a knot on my forehead, and it messed up my arm a little bit."

Interviewee "H" said, "Mentally, it [the incident] messed my head up…. Every time I come to SCI –[Georgetown], I just get this weird feeling. I typically shut down [and] feel lonely and helpless – down."

He described the following symptoms of major depressive disorder, poor sleep, depressed mood, disinterest in previously enjoyable activities, disinterest in getting out of bed, being unable to focus on anything but the trauma (and fear that it may occur again), fatigue, and decreased concentration. He said that he hadn't persistently had these symptoms before the trauma.

Also, he feared he was going to die during the assault. He used to have dreams about the assault every night. He continues to have intrusive thoughts about and flashbacks of the assault about twice per month. These intrusive memories are mainly about the incident rather than past traumatic events. He persistently had negative thoughts about the world and felt detached. He avoids certain conversations, arguments, loud noises, and seeing others pepper sprayed as they trigger Interviewee "H's" memories

32

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

of the trauma. When he is retraumatized, he has palpitations and nausea.

IMPRESSION:

It is my opinion with reasonable medical certainty that Interviewee "J" developed exacerbations of major depressive disorder and posttraumatic stress disorder after he was subjected to a traumatizing restraint effort that he deemed excessive.

He said that he was violently beaten and pepper sprayed and feared for his life during and after the assault by corrections officers. He was deprived of timely, proper medical care for exposure to pepper spray and physical injuries sustained during the attack.

Interviewee "J's" treatment by corrections staff was grossly deficient and extremely dangerous. They knew that he could have experienced lasting physical and emotional harm, pain and suffering due to the assault and deprivation of proper medical care. Yet, they ignored the risk.

Interviewee "J" experienced a precipitous and persistent decline in emotional wellness, including and intrusive recollections (memories, nightmares and flashbacks) of the assault that substantially overshadowed his memories of traumas that predated the assault. The posttraumatic stress disorder and major depressive disorder symptoms cannot be attributed solely to traumas he experienced before the attack.

**Interviewee "K"** ▮▮▮▮▮▮▮

Interviewee "K" had no mental health history or physical problems before the September 18, 2021, incident at SCI-Georgetown. One or two days earlier the court remanded him there. He said, "I was familiar with the rules because I had been there before." The next morning, Interviewee "K" asked a corrections "officer for toilet paper, a commissary form and a phone log. Every new person gets that when they come in." He was told to wait until the next shift.

33

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

During the recreation break, he noticed that the corrections officer at the podium was displeased with detainees who "ran out to the phone. I waited until the officer… cooled down." Interviewee "K" approached "podium and asked for basic things that new inmates get - toilet paper, a commissary form and a phone log. The officer slammed them down" on the desk. "That's how he gave them to me."

Interviewee "K" walked away before realizing he needed a pen. He returned to the podium and asked the officer for a pen. "The officer slammed it down." Interviewee "K" walked to his cell and "shook the hand of some guy," then heard the corrections officer order him to "lock in, which means I had to go to my cell." His peers were annoyed and feared they would lose recreation and phone privileges, because of "something I did."

Interviewee "K" responded to the officer. "I said, 'for what? I ain't [sic] do nothing.' I just had sat down at a table. Before I got up from sitting down, I heard the Velcro… [and]saw him [the officer] take the mace out of the Velcro [holster]. He got up quickly to go to the cell." While walking, the corrections officer "said, to 'give me my fucking pen.' I gave it to him." Interviewee "K" tried to close the cell door but the corrections officer officer "blocked me."

Interviewee "K" recalled that the officer "said, 'You've been here before. You know how we roll. I told you to lock the fuck in.' I told him that I didn't do nothing. He was nitpicking. Then he just pushed me."

Both men were in the doorway. Interviewee "K" said, "He pushed me towards the window. I backed all the way up to the window. Then he called the code [for assistance] after moving in and out the cell to make it seem like I did something to him- and I didn't touch him. So, I lay down on my stomach with my hands behind my back with my nose touching the floor. The other three COs [corrections

34

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

officers] came in and said, 'What's going on?  He's on the ground.'"

"I had freshly twisted dreadlocks. Then my hair is being pulled and I get kneed in the eye - seven times and I counted it. They're macing me in my mouth, my eyes, my nose and they're steady pulling my hair. Interviewee "K" recalled, "While they were beating in the cell, Sergeant. Barneswell – he weighs about 400 pounds. He stepped on my right shoulder. Then it [the assault] stopped. This is supposed to be on camera because in a code, one CO [corrections officer] has to have a camera."

Then, recalled Interviewee "K," "they forced me [to stand up]. I told them I really couldn't walk. They waited for a gurney. They took me down the hallway. Now, mind you, I'm maced, I'm bloody all over, I'm in pain. They put me in a holding cell. I could barely see. After a while, they walked me to the shower. I'm asking them for water [to drink] because I'm spent and they're forcing me to shower. I have no energy."

He showered, was given water, and met with the nurse. "She asked me if I was okay. She knew I wasn't okay. I could feel it in my face.Then he saw a second nurse who wiped the blood off my face and put a bandage on the gash. She didn't treat me for mace exposure."

Interviewee "K" was transported to the segregation housing unit. He did not have a timely disciplinary hearing. "They hid me until the swelling went down." During the hearing, "They shut down my defense, wouldn't let me tell what happened." They excused the officer who initiated the incident "and gave me the max[imum] punishment."

While in the segregation housing unit a mental health professional stopped at Interviewee "K's" cell. He chose not to disclose his physical and emotional suffering because "there was no privacy. There was nothing they could do." He feared retaliation from corrections officers if they learned about his pain, suffering and view of the assault.

35

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                August 13, 2024

<u>The Delaware Department of Corrections Record:</u>

Interviewee "H" was placed on administrative status on September 18, 2021. Nurse Michelle Gwaltney, RN, says in her September 18, 2021, progress note that when she evaluated Interviewee "K," he lay face down on the gurney. He "was yelling and screaming about being [sic] Sabre Red [pepper spray] [s]prayed in his face… [and]was bleeding from his left forehead." Also, there was swelling around the left eye. She removed the blood and saw a one-half-inch incision on the left side of his head.

A Centurion Referral for Healthcare Services form dated October 15, 2021, indicates that Interviewee "K" is referred for an X-ray of the right shoulder due to an "alleged assault by DOC" (Department of Corrections?). He had pain and reduced range of motion at the shoulder joint.

On September 30, 2021, nurse Jamie L Limanek, RN, says, "Inmate reports that he was 'assaulted' the day after he arrived in the prison. His primary complaints are pain to [in]the left temple area and right shoulder. Inmate states his eye was previously swollen but it's[sic[ gotten better…. He reports his shoulder makes it difficult to sleep at night."

Nurse Limanek says that on examination, Interviewee "K" had a fresh scar on the left side of his head and there was mild swelling "between the eye and hairline." Also, the "inmate had difficulty removing [his] shirt due to shoulder pain." There was tenderness when the nurse touched his right shoulder.

Interviewee "H" submits a mental health sick call request form that is received by staff on September 20, 2021. The interviewee says, "I want to bring to your attention another serious problem ASAP 911. This has something to do with my mental" health.

He meets with mental health counselor, Krysta J. Pritchett, MSW, MHC the next day. Her September 21, 2021 progress note

36

JA_01953

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

is  copied below.

Pritchett Krysta J                    09/21/2021 16:07

Notes : ****VISIT: SICK CALL/SEG ROUND ****
ASSIGNED HOUSING UNIT: MSB      LOCATION OF SESSION: MSB Cellside

GOALS FROM TREATMENT PLAN:N/A

SUBJECTIVE: "I have been here before, I know how this goes" "When I first arrived, I had a lot of requests." "I wanted toilet paper, I needed bed sheets, I needed my phone call." "Every time I asked for something this officer slammed it down as if I were bothering him." "When I finally asked for a counselor slip, he told me my five minutes were up but they couldn't have been because I had just gotten out there." "I went away and began talking to someone for about 30 seconds and next thing I know I was being told to lock in." "I didn't argue, I just walked to my cell." "When I got to my cell, next thing I know another officer runs up on me and pushes me." "I did not budge and after I walked into my cell went to the back of the cell, and laid down on the ground like I know they would ask me to do next." "I saw this officer signal for his others to come help and next thing I know they were all in my cell spraying me, kicking me, punching me, all in a blind spot where there were no cameras." "I talked to some people, this is not right."
S/I: "No"  H/I: "No"  A/V: "No"

On October 6, 2021, Interviewee "K" completes a mental health sick call request form. He says, "For the past 2 week[s] I have been feeling some type of way (explain in person). Also, every [sic] since the 29th of last month (explain in person) things haven't been going right for me. I really need to talk to somebody that's [sic] going to listen ASAP. Please and thank you."

Mental Health Impact of the Trauma:

Interviewee "K" said that he continues to deal with the physical and emotional effects of the trauma. He had several bald spots because the dreadlocks were pulled out of his scalp. Also, he has had chronic physical pain.

He explained, "Since Sgt. Barneswell stepped on my shoulder, I can't play sports like I used to." Also, he had to decline a job offer because the position requires physical labor. "The job paid very well and could have improved my life." The job also included benefits, including health insurance. He has not received medical care for the shoulder because he doesn't have health insurance.

During the trauma and after, he feared for his life. He had dreams and flashbacks of the trauma. Interviewee "K" continues to have frequent intrusive memories of the

37

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                             August 13, 2024

trauma, especially when he has shoulder pain. Other triggers for re-traumatization include yelling and doors slamming. When either occurs, his heartbeat accelerates, he begins to sweat, he breathes more rapidly and he sometimes feels lightheaded. He tries to avoid memories, thoughts and feelings about the trauma. He feared for his life when he was transferred back to SCI Georgetown.

Interviewee "K" obtained a job in a restaurant after he was released from prison. "I liked the job. I was there for about one year." He quit the job because corrections officers often patronized the business. "It's like I'm in prison again. I can't get it out of my mind." (This was the longest he had ever maintained a job and working is an important part of his rehabilitation.)

Interviewee "K" can't block memories of the trauma and feels detached from others. He has persistent negative emotions and beliefs about himself and others. He lacked the motivation to engage in activities that he used to enjoy. He remains angry and irritable and tries to stay to himself to prevent his mood from affecting others. He struggles with sleep and concentration and becomes hypervigilant when he thinks of being assaulted by corrections officers in prison.

Impression:

It is my opinion with reasonable medical certainty that Interviewee "K" developed major depressive disorder and posttraumatic stress disorder after he was violently attacked and deprived of timely, proper medical care for physical injury and exposure to pepper spray by corrections officers on September 18, 2021. He feared for his life during the assault by corrections officers and for the remainder of his confinement.

Interviewee "K" also fears corrections officers in the community, although they have no control over him. The depressive and posttraumatic stress disorder symptoms increased precipitously after he saw several corrections officers patronize the restaurant where Interviewee "K" was

38

JA_01955

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

employed. He was unable to sleep, had anxiety attacks and had an intense fear of being attacked by one of the officers in the restaurant if something went wrong there. He quit the job after several episodes of re-traumatization for his emotional and physical safety.  That was the longest job he had held in his life.

The grossly deficient and inhumane treatment he received by the corrections officers resulted in Mr. K's having chronic bodily pain and physical limitations, facial disfigurement, and partial balding due to dreadlocks being pulled out of his scalp. The attack by corrections officers resulted in injuries that diminished his employability, reduced his income potential, and affected his ability to obtain healthcare services. This increases his emotional distress especially when he has pain or thinks or considers how the attack diminished his quality of life.

### Interviewee "L"

Interviewee "L" has a history of major depressive disorder, anxiety, depression and posttraumatic stress disorder. He said that the symptoms were well-controlled when he experienced a traumatic event at SCI Georgetown in 2021.

He recalled receiving his medication, then going to the restroom to brush his teeth before Corrections "Officer Mitchell came into the bathroom and ordered three guys back to their bunks. He looked at me and I said, 'Yo, can I finish brushing my teeth?' He pulled the strap to remove the mace from the holster. I said, 'What are you going to spray me for, brushing my teeth?' I rinsed my mouth out and that's when he started spraying me. He… jumped on my back and was trying to take me to the ground so I went to the ground. Then he started hitting me with his elbow in [the] back of my head and was telling me to stop resisting, but I wasn't resisting. Then the other guys [corrections officers] came, picked me up by my arm with my hands cuffed behind me, then they walked me off the tier."

They were in the hallway, and "I had snot running down [from my nose], and he [Officer Mitchell] said, 'stop

39

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                                    Case:21-cv-01773-GBW
                                                                      August 13, 2024

spitting.' My face was burning, and I couldn't use my hands because they were behind my back.  Then they took me to" the medical department.

The corrections officers escorted Interviewee "L" to the shower area and then strip-searched him.  "They had me touch my buttocks area then put my hands in my mouth. Then they threw the clean clothes at me.  They got covered with mace, because I had mace all over me." Interviewee "L" recalled that he was permitted to bathe, for the first time, two to three days after the incident.

When Lieutenant Hanna came to the hole for my write-up, she said that she talked with a few people and knew it [the alleged offense] wasn't my fault. She gave me a choice. I could plead guilty and continue the Road to Recovery" rehabilitation program or he could defend himself in front of the Disciplinary Committee and risk getting "kicked out of Road to Recovery, spend more time in prison and take longer to get home. I waited a while to get into the program and it was helping me."

He stayed at SCI Georgetown for "a while" and struggled with the emotional symptoms that began after he was assaulted.

Also, Interviewee "L" said that corrections officers learned that he was a plaintiff in the lawsuit against the Department of Corrections. He explained that this and the assault by corrections officers resulted in Interviewee "L's" bunk area being "shaken down" or inspected more often.

<u>The Delaware Department of Corrections Record:</u>

Interviewee "L" was receiving mental health services, including medication for anxiety. He requested help for anxiety/panic attacks for anxiety, per the January 10, 2016, mental health sick call request form.

40

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

The Disciplinary Report dated October 29, 2021, contains the following report from Corrections Officer Mitchell:

**Violations:** 2.14 Unauthorized Communication, 1.00D Active Resistance Towards Staff, 1.34 Refusal to Lock In, 2.06 Failing to Obey an Order, 2.11 Off-Limits

**Witnesses:** 1. N/A      2. N/A      3. N/A

**Description of Alleged Violation(s)**

On 10/29/2021 at approximately 0002 hours I, C/O Isaac Mitchell was working the Stan Taylor building C-quad. During code red I heard a noise and checked the bathroom area and found two inmates standing around talking during code red. I ordered both inmates to return to their bunks. One inmate returned to his bunk and one inmate, Haymond, Augustine ▓▓▓▓ refused to move and stated "what are you gonna do". I issued multiple orders and the inmate refused to comply. At this time I deployed a burst of oc spray to the inmates facial area. I then orderd the inmate to the ground to secured him in handcuffs. The inmate refused and I had to move the inmate to the ground. Once on the ground, I called a code 6 and after a brief struggle I was able to secure the inmate with handcuffs. Responders then arrived and escorted the inmate off the quad.

**Reporting Officer:** Mitchell, Isaac S (Correctional Officer)

**Immediate Action Taken**

Interviewee "L" met with a mental health professional who determined that he was mentally capable of proceeding with the disciplinary hearing. This is required for detainees who have been identified as having a serious mental illness.

The disciplinary Committee Decision for the November 1, 2021, hearing date contains the following documentation:

41

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

---

**Inmate Present :** Yes    **Reason(If No):** N/A

**Violation :** 1.00D Active Resistance Towards Staff, 1.34 Refusal to Lock In, 2.06 Failing to Obey an Order, 2.11 Off-Limits, 2.14 Unauthorized Communication

**Inmate PLEA :** Not Guilty

**Inmate Statement :** Inmate states that he should have not questioned him. Inmate stated he went to the bathroom and brushed his teeth. Inmate stated that he grabbed his face after being maced.

**Decision :** Guilty

| Violations | Guilty | Not Guilty |
|---|---|---|
| 1.00D Active Resistance Towards Staff | [ ] | [X] |
| 1.34 Refusal to Lock In | [X] | [ ] |
| 2.06 Failing to Obey an Order | [ ] | [X] |
| 2.11 Off-Limits | [ ] | [X] |
| 2.14 Unauthorized Communication | [ ] | [X] |

**Rational :** After reviewing the officer report and the statement from the inmate. The decision was to find him guilty of refusal to lock in. Inmate is going to return to the program to continue his rehabilitation.

**Sanctions:** N/A

**HEARING OFFICER'S SIGNATURE** _____

Hanna Adrienne M

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing to the faciltiy administrator. I also understand that I have 15 days to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [ ]   DO    [X]   DO NOT INTEND TO APPEAL

_____
**INMATE's SIGNATURE**

**ORDER TO IMPLEMENT SANCTIONS**

[X]   Inmate does not wish to appeal          [ ]   Appeal has been denied by Commissioner or Designate

[ ]   Sanctions have been modified            [ ]   Time Limit(15 days since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Start Time | Days | End Date |
|---|---|---|---|---|
| 1. Loss of All Privileges | 11/01/2021 | 18:00 | 30 | 12/01/2021 |

---

Interviewee "L" was found guilty of all but one offense, refusal to lock in. He lost all privileges for 30 days.

Mental Health Impact of the Trauma:

Interviewee "L" recalled that he had a depressed and irritable mood, poor sleep, and lacked interest in activities that he used to enjoy. He was preoccupied with the trauma. "It wouldn't leave my mind." He had fatigue, diminished concentration and decreased appetite.  He also was more distractible, inattentive, impatient and restless than usual and paced more often after he was attacked.

Before the assault, Interviewee "L" felt uncomfortable in crowds and became anxious when he heard loud noises. He said he learned to cope with this in prison. Unfortunately,

42

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

after he was assaulted, he regressed emotionally, and his anxiety increased in response to these triggers.

He described intrusive dreams and flashbacks about the trauma. He would have intense, prolonged anxiety attacks (shortness of breath, chest tightened, "nervous and on edge") that occurred when corrections officers were nearby and Interviewee "L" was preparing to enter or was in the restroom.  His thoughts were persistently negative and he felt emotionally detached from others. Additionally, he was more irritable than usual.

Impression:

It is my opinion with reasonable medical certainty that Interviewee "L" developed new episode of major depressive disorder and a precipitous increase in posttraumatic stress disorder symptoms after he was pepper sprayed and restrained in the prison restroom on October 29, 2021. Interviewee "L" also, was physically assaulted by corrections officers and denied timely treatment for pepper spray exposure. The officers' actions and inaction were grossly wholly inadequate and constituted inhuman treatment of Interviewee "L."

Interviewee "L" and the disciplinary record are consistent. other. Interviewee "L" acknowledged that he could have handled things differently. Despite this, no human being should intentionally be pepper sprayed while brushing his teeth and deprived of timely treatment of pepper spray exposure when care can be easily accessed.

The trauma resulted in unnecessary physical and emotional pain and suffering for Interviewee "L." He continues to have occasional dreams. Also, he fears he will be subjected to more retaliation if he returns to SCI Georgetown. "If I went back there, my mental health would get a lot worse." I also opine that the assault was the major factor that resulted in Interviewee "L's" emotional deterioration in prison after October 29, 2021.

43

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

**Interviewee "M"** ▐▬▬▬▬▌

Interviewee "M" has attention-deficit/hyperactivity disorder and responded well to medication when he was a child. He has not received treatment since he became an adult.

He recalled an incident that occurred in 2020 in Sussex Correctional Institution - Georgetown, where he was a pretrial detainee. He became concerned when corrections officers reassigned him to sleep in a cell closer to the officer's desk. "I don't know why, but they [officers] kept messing with me." One day he lost recreation privileges because he and his two cellmates were talking after midnight.

The following day in the mess hall a corrections officer told  Interviewee "M" not to bang the tray. Then the officer told another officer about the loud noise incident the previous night. After eating, "I went to my cell" per protocol, and one of his cellmates was present.

Interviewee "M" recalled, "The officer came to the cell… closed the door, then opened the door to make sure it didn't lock. He grabbed me and pulled me out of the room. We both fell on the floor. Then I tried to get up and get the camera's eye view" so there would be video evidence of the incident. "Then he just started assaulting me. Once I was on the ground, the other one [officer] came. His partner had his knee in my back then I got maced. That's when they called for more C.O.s. [corrections officers]. They came and I couldn't see nothing [sic]. They put me in the holding cell and turned the heat on. The heat makes the mace [feel] worse."

He said they took him to the medical area. "They told the nurse to tell me that I was fine. I was there for about an hour then they put me in the hole [segregation housing unit].  I asked for toilet paper, and they gave me an empty roll, a tiny piece of soap and a dirty toothbrush.  They didn't give me toilet paper or nothing [sic] that I needed.

44

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

My head was hurting." Despite being maced, he was not permitted to bathe or have a clean uniform.

A few days later, he was transferred to a maximum-security bed at James T. Vaughn Correctional Center. "They gave me medicine for my headaches" and permitted him to take a shower for the first time since the incident.

Interviewee "M" recalled, "I never had a [disciplinary] hearing and they sent me to Vaughn to cover it up." The corrections officer "knew that he was not supposed to come into the room [cell] by himself without backup."

The Delaware Department of Corrections Record:

Interviewee "M's" chart was requested but was not received for review, per the attorney.

Mental Health Impact of the Trauma:

He feared for his life during the assault and thereafter. The trauma "really messed me up bad. I was harmed and I couldn't do anything. If I hit one of them, it would have gotten worse for me. I couldn't do nothing [sic] about it. I felt like less of a man."

Interviewee "M" developed a depressed mood, irritability and disinterest in activities that he used to enjoy. He ruminated over what happened and had increased fatigue and decreased appetite. He was less animated than usual (despite having attention-deficit/hyperactivity disorder).

He said he repeatedly relives the event through dreams. He often has intrusive memories of the incident and marked physiological reactivity (sweating, palpitations, rapid breathing, etc.) that are triggered by loud noises, doors slamming, bright lights, yelling, and the sound of keys jingling. He tries to avoid situations that can trigger intrusive, unwanted memories, including fairs and waterparks. "I used to love going to them."

He had a persistently negative mood, felt detached, and had negative expectations of others. He struggled to have

45

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

positive emotions and struggled with sleep and concentration. Also, he was easily startled.

Impression:

It is my opinion with reasonable medical certainty that Interviewee "M" developed major depressive disorder and posttraumatic stress disorder after he was assaulted by corrections officers. He feared for his life and was denied timely treatment for exposure to pepper spray and his physical injuries.

I also opine that the treatment he received by corrections staff, including being pepper sprayed, physically assaulted and denied timely medical treatment was wholly deficient and contributed substantially to his physical and emotional well-being and rehabilitation. The trauma caused him extreme emotional distress and diminished his quality of life in prison and in the free world.

**Interviewee "N"** ████████

Interviewee "N" had an adjustment disorder with anxious mood after a stray bullet injured his right elbow. The symptoms did not fulfill the diagnostic criteria for posttraumatic stress disorder and he didn't hear voices or see visions. He had several surgeries and extensive physical therapy to restore movement in his right forearm. He was frustrated, but he did not have a major depressive disorder episode. He never made a suicide attempt before he was remanded to  Sussex Correctional Institution - Georgetown in September 2020.

Interviewee "N" recalled that a couple of weeks after he was confined to the prison, "I was told I couldn't come out of the cell" at recreation time as a consequence "for being loud. I went back to my cell upstairs. My cellie [cell mate] decided to stay in the cell, too. We were talking. They [the officers] never let [people on] the downstairs [lower tier] out" of the cells. His cellmate noticed this also.

46

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

A few minutes later, "My cellie told me" that the officers "were coming fast toward our cell. They came to the cell, propped the door open with a book and told my cellie to leave. One officer said to [Interviewee "N"], 'When I tell you to do something, you do it!... Don't be a bitch…' I told him I'm not a bitch. I'm a man. He said, ….I'll show you you're a bitch. He grabbed my shirt [and] had me pinned against a wall. He grabbed me [and] started reaching for my DOC pants. I pushed him off."

"I thought he was going to rough me up. I thought it was a setup like they were going to charge me" with an offense. The corrections officer "grabbed me, s[and] said 'bitch, don't do that…' Then he started hitting me."

Interviewee "N" said, "Once they opened the door, they threw the book back in the room. I ran out of the cell, I ran all around, put my hands up and got on camera. I put my hands up and was going down the stairs and they put me in some type of hold and sprayed me in my face, my nose and my eyes."

"They picked me up off the steps and slammed me to the ground – all three of them. They rammed me into a door jamb. They kept bumping my body into door frames. The officer, Purdy, kept repeating, 'The cameras, the cameras.' Then they threw me into a cell, and they took off the cuffs, they locked the cell, and I tried to use the sink to wash the mace from my face, and there was no water coming out."

"I took my DOC [Department of Corrections] uniform off, dumped it in the toilet water and washed my face [with toilet water]. I put the wet uniform back on to cover myself up and they gave me another one that night or the next day. They let me out to take a shower about 24 hours later."

"My arm was hurting bad…I thought it was broken again." He lost the mobility that he had gained through physical therapy after the surgeries. "It's been locked up this way" since he was assaulted.

47

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

Interviewee "N" remembers, "It seemed like they kept hiding me in the back. They kept me in the hole for 15 days, then they put me back on pretrial, then they told me I had to be on maximum security."

He thought the lieutenant who presided over the Disciplinary Committee "was a good guy, but he was a bad guy too. He said, 'You can't prove it because it wasn't on camera, so we've got to find me [sic] guilty' of Assault on an Officer." Interviewee "N" was transferred to a supermax cell a couple of weeks later.

Department of Corrections Record:

The Incident Reports dated September 16, 2020, contain the description copied below.

| Incident# | | Date: 03/06/2024 |
|---|---|---|
| 80275 | SCI Sussex Correctional Institution | |
| | PO Box 500 | |
| | GEORGETOWN DE, 19947 | |
| | Phone#: 302-856-5280 | |

## INCIDENT REPORT

| Incident# 80286 | Type: Inmate Involved | Incident Date: 09/16/2020 | Time: 18:18 | Confidential: No |
|---|---|---|---|---|
| Group#: 192018 | | | | |
| Short Description: code 11 | | Supplement To: | | PREA: No |

| | | |
|---|---|---|
| Facility: SCI Sussex Correctional Institution | | Followup Required : No |
| Warrant Type: | Warrant #: | Offender States Rape: No |
| Incident Location: PRE-TRIAL | | |
| Location Description: housing unit 4 | | |
| Sexual Allegation: | | |
| Location Category: | | |
| Violated Conditions: | | |

**Description of Incident:**
On the above date and time I Sgt. Rains assigned to housing unit 4. At 1800 hours the rec for upstairs began, when inmate Mcivor-Bosman, Bashan ▮▮▮▮ and inmate ▮▮▮▮ ▮▮▮▮ began yelling. At this point Sgt. Neal then addressed this behavior, and told them to knock it off. Inmate Mcivor the replied in a mocking extreme country accent " Okay master honkey tonk sir." Sgt. Neal then told Mcivor he could lock in for his behavior. Mcivor continued this behavior as he and inmate ▮▮▮▮ both locked in. Both Inmates continued yelling back and forth so Cpl. Purdy and Sgt. Neal went cell side to address the problem. The two inmates were separated as Inmate ▮▮▮▮ was told to have a seat down stairs in the chow hall so he could be addressed after Mcivor. Sgt Neal and Cpl. Purdy addressed Mcivor in the cell and shortly after exited the cell to address Inmate ▮▮▮▮. Inmate ▮▮▮▮ was scheduled to transfer to housing unit two that night so Sgt. Neal told him to come pack up his belongings. At this point inmate Mcivor came busting out the cell as he pushed Sgt. Neal and took off running towards the opposite stair case as he yelled "fuck you pussies." I then came from the officers podium to head him off at the bottom of the stairs. Inmate Mcivor was running down the stairs towards me when I took him to the ground a couple steps up. Sgt. Neal and myself attempted to gain control of inmate Mcivor as he resisted. Sgt. Neal then deployed sabre red to the facial area of Mcivor. Sgt. Neal, Cpl. Purdy and myself then carried him off the steps to the ground to secure him. He continually resisted and after a few moments Sgt. Neal and I were able to control his arms enough to get him Handcuffed. Sgt. Neal and myself then escorted him to the 499 door to the responding staff. E.O.R.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

| Hospitalized : N/A | Med. Treatment Provided : N/A |
|---|---|

48

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

| Incident# |
|-----------|
| 80275 |

**SCI Sussex Correctional Institution**
**PO Box 500**
**GEORGETOWN DE, 19947**
Phone#: 302-856-5280

Date: 03/06/2024

## INCIDENT REPORT

Incident# 80275    Type: FYI                                Incident Date: 09/16/2020    Time: 18:10    Confidential: No
Group#:   192018
Short Description: CODE 11                                                     Supplement To:                        PREA: No

Facility: SCI Sussex Correctional Institution                                  Followup Required :   No
Warrant Type:                                  Warrant #:                      Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: HU4

Sexual Allegation:

Location Category:

Violated Conditions:

**Description of Incident:**
On the above date and time I Cpl. Sharp with K-9 partner Sledge responded to a Code 11 on HU4. As I entered into the Pre-Trial bldg. I saw staff escorting I/M McIver-Bosman, Bashan ▓▓▓▓ to the Receiving Room where he was then seen by medical and changed in to orange. Myself and K-9 Sledge assisted staff escorting I/M McIver-Bosman to MSB THA#2 where he was secured in a cell. I then resumed my normal job duties. EOR

| Injured Persons | Nature of Injury | Location |
|-----------------|------------------|----------|
| N/A | N/A | N/A |

49

Cheryl D. Wills, MD, DFAPA                      Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                August 13, 2024

Incident#
80275

**SCI Sussex Correctional Institution**
**PO Box 500**
**GEORGETOWN DE, 19947**
Phone#: 302-856-5280

Date: 03/06/2024

## INCIDENT REPORT

| Incident# 80282 | Type: Inmate Involved | Incident Date: 09/16/2020 | Time: 18:07 | Confidential: No |
|---|---|---|---|---|

Group#:  192018
Short Description:  code 11                              Supplement To:                    PREA: No

Facility: SCI Sussex Correctional Institution                      Followup Required :  No
Warrant Type:                              Warrant #:            Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: Housing Unit 4

Sexual Allegation:

Location Category:

Violated Conditions:

Description of Incident:
On the above date and time I was assigned to Pre Trial as a rover when a code 11 was called on housing unit 4. I responded to the area and when I arrived I witnessed inmate Mcivor-Bozman Bashan ███████ being escorted to the 499 door by Housing unit 4 staff. Myself and SSGT Psaroudakis took custody of inmate Mcivor Bozman and began to escort him to the receiving room. When we approached the 400 door inmate Mcivor-Bozmans pants fell off so we stopped the escort and pulled the inmates pants up and continued the escort. Inmate Mcivor Bozman tried to struggle with the escort all the way to the receiving room. Once in the receiving room inmate Mcivor-Bozman was seen and cleared by medical staff. Inmate Mcivor Bozman was then changed out into an orange DOC uniform and then escorted to MSB and placed in THA 2.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

50

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

---

| Incident# 80275 | | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280<br>**INCIDENT REPORT** | Date: 03/06/2024 |
|---|---|---|---|

| Incident# 80276    Type: FYI | Incident Date: 09/16/2020    Time: 18:09    Confidential: No |
|---|---|

Group#: 192018

Short Description: Code 11 Response    Supplement To:    PREA: No

Facility: SCI Sussex Correctional Institution    Followup Required : No

Warrant Type:    Warrant #:    Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: Pre-Trial HU4

Sexual Allegation:

Location Category:

Violated Conditions:

Description of Incident:
On 09/16/2020 at approximately 1809 hours I, Cpl. E. Santiago, was assigned to MSB GP3 and responded to a Code 11 in Pre-Trial HU4. When I arrived on the scene inmate Mcivor-Bosman, Bashan SBI ▮▮▮▮▮ was already escorted off the unit. I checked in with Team 1 Leader Lt. Outten and awaited further ordes. End of report.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

---

| Incident# 80275 | | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280<br>**INCIDENT REPORT** | Date: 03/06/2024 |
|---|---|---|---|

| Incident# 80281    Type: FYI | Incident Date: 09/16/2020    Time: 18:09    Confidential: No |
|---|---|

Group#: 192018

Short Description: code 11    Supplement To:    PREA: No

Facility: SCI Sussex Correctional Institution    Followup Required : No

Warrant Type:    Warrant #:    Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: H/U 4

Sexual Allegation:

Location Category:

Violated Conditions:

Description of Incident:
On the above date and approximate time, I Cpl. Thomas responded to a code 11 on H/U#4. Upon arriving, I/M Mcivor-Bosman was being escorted off the unit by responding staff. I followed behind them to the Receiving Room and stood by as he was seen by medical staff and then changed out for housing in THA. I then returned to my assigned post. E.O.R.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

51

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

| Incident#<br>80275 | | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280<br>**INCIDENT REPORT** | | Date: 03/06/2024 |
|---|---|---|---|---|

| Incident# 80277    Type: FYI | | Incident Date: 09/16/2020 | Time: 18:00 | Confidential: No |
|---|---|---|---|---|
| Group#: 192018 | | | | |
| Short Description: Code 11 | | Supplement To: | | PREA: No |

Facility: SCI Sussex Correctional Institution                      Followup Required : No
Warrant Type:                          Warrant #:                  Offender States Rape: No
Incident Location: PRE-TRIAL
Location Description: HU4
Sexual Allegation:
Location Category:
Violated Conditions:

Description of Incident:
On the above date and time, I, Sgt Andrew Cassidy, was assigned to Key South. A code 11 was called on Housing Unit 4. When I arrived to pre-trial I was told to hold at the program counter. I then reported to the Receiving Room to assist in the change out and medical clearance of the offender. Other responding staff escorted inmate MCIVOR-BOSMAN, BASHAN ▓▓▓ to MSB.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

| Incident#<br>80275 | | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280<br>**INCIDENT REPORT** | | Date: 03/06/2024 |
|---|---|---|---|---|

| Incident# 80278    Type: Inmate Involved | | Incident Date: 09/16/2020 | Time: 18:09 | Confidential: No |
|---|---|---|---|---|
| Group#: 192018 | | | | |
| Short Description: CODE 11 | | Supplement To: | | PREA: No |

Facility: SCI Sussex Correctional Institution                      Followup Required : No
Warrant Type:                          Warrant #:                  Offender States Rape: No
Incident Location: PRE-TRIAL
Location Description: HU 4
Sexual Allegation:
Location Category:
Violated Conditions:

Description of Incident:
On Wednesday, September 16, 2020 at approximately 1809 hrs, I CPL R. Sharp responded to a Code 11 called on Pre Trial Housing unit 4. Upon arrival staff members were escorting an inmate (MCIVOR-BOSMAN, BASHAN ▓▓▓ off the unit who was in handcuffs and appeared to be sprayed with OC. I then assisted in escorting the i/m to the receiving room to be seen by the nurse and then changed out into orange. Myself and other staff then escorted the i/m to the Multi-Security building and placed him into THA cell #1 without any incident. EOR.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

52

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

| Incident#<br>80275 | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280 | Date: 03/06/2024 |
|---|---|---|

## INCIDENT REPORT

| Incident# 80280 | Type: Inmate Involved | | Incident Date: 09/16/2020 | Time: 18:09 | Confidential: No |
|---|---|---|---|---|---|

Group#: 192018

Short Description:  code 11 Housing unit 4                    Supplement To:                    PREA: No

Facility: SCI Sussex Correctional Institution                                   Followup Required :  No

Warrant Type:                                   Warrant #:                    Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: Pre-Trial Housing unit 4

Sexual Allegation:

Location Category:

Violated Conditions: Other

Description of Incident:

On the above date and approximate time I LT Outten was team 1 leader when a code 11 was called on housing unit 4. When I arrived to the unit, responding staffs were escorting an inmate in handcuffs later identified as Mcivor-Bosman, Bashan SBI ▮▮▮▮▮ Responding staff escorted inmate Mcivor-Bosman to the receiving room while I continued onto the unit to make sure staff was ok and make sure there wasn¿t any other issues. Staff on housing unit 4 insured they were ok and the unit was secured I went and grabbed the camera to fill the change out process. I had Cpl Purnell, Cpl Mears, Sgt Wilson, Cpl Sharp assist in the change out to DOC orange. This task was completed without incident and inmate Mcivor-Bosman was cleared by receiving room medical staff for housing in MSB THA. At this time staff escorted inmate Mcivor-Bosman from the receiving room to MSB THA and placed him in THA 2 cell 1 without further incident. EOR

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

53

Cheryl D. Wills, MD, DFAPA

Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation

Case:21-cv-01773-GBW

August 13, 2024

| Incident#<br>80275 | SCI  Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280 | Date: 03/06/2024 |
|---|---|---|

## INCIDENT REPORT

| Incident# 80285 | Type: FYI | | Incident Date: 09/16/2020 | Time: 18:20 | Confidential: No |
|---|---|---|---|---|---|
| Group#: 192018 | | | | | |
| Short Description: CRU CLEARANCE | | | Supplement To: | | PREA: No |

| Facility: SCI  Sussex Correctional Institution | | Followup Required : No |
|---|---|---|
| Warrant Type: | Warrant #: | Offender States Rape: No |

Incident Location: RECEIVING ROOM

Location Description: RECEIVING

Sexual Allegation:

Location Category:

Violated Conditions:

Description of Incident:
09/16/2020 at 1820 hours. Inmate Mcicor-Bosman, Bashan SBI# ▮▮▮▮▮ was seen by this nurse Michelle Gwaltney, RN in receiving S/P CODE 1 on HU4 for CRU clearance. Inmate denies any injuries at at this time. Denies any respiratory complaints. Denies any SI/HI . BP 144/86. Inmate cleared for CRU at this time. Watch Commander notified.

| Injured Persons | Nature of Injury | | Location |
|---|---|---|---|
| N/A | N/A | N/A | |

| Hospitalized : N/A | Med. Treatment Provided : N/A |
|---|---|

54

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

| Incident#<br>80275 | | **SCI Sussex Correctional Institution**<br>**PO Box 500**<br>**GEORGETOWN DE, 19947**<br>**Phone#: 302-856-5280** | Date: 03/06/2024 |
|---|---|---|---|

## INCIDENT REPORT

| Incident# 80284 | Type: Inmate Involved | | Incident Date: 09/16/2020 | Time: 18:00 | Confidential: No |
|---|---|---|---|---|---|
| Group#: 192018 | | | | | |
| Short Description: | | | Supplement To: | | PREA: No |

Facility: SCI Sussex Correctional Institution

Warrant Type:                                    Warrant #:

Incident Location: PRE-TRIAL

Location Description: Hu#4 upstairs walkway

Sexual Allegation:

Location Category:

Violated Conditions:

Followup Required : No

Offender States Rape: No

**Description of Incident:**

On the above date and approximate time RP was working Housing unit #4. Upstairs rec had started and RP could hear I/m's being loud and shouting coming from upstairs. At this time Sgt Neal then told them to stop playing around and being loud. Rp then looked up to see who he was speaking to. I/m Mclvor-Bosman, Bashan ▓▓▓▓▓ then started yelling loudly in a country voice " yes sir, mr honky tonk " . Sgt Neal then told him to lock in. His cell mate I/m ▓▓▓▓▓▓▓▓▓ followed him into the cell. As soon as the cell door was closed there was yelling and screaming coming from the cell. RP decided to go see what was going on and Sgt Neal followed. Upon arriving at cell 447 Rp observed I/m's Mclvor-Bosman and ▓▓▓▓ seemed to be in and argument. RP then asked for the cell door to be opened and told I/m ▓▓▓▓ to go downstairs and have a seat at a table. RP told I/m Mclvor-Bosman he needed to check his attitude and the way he was acting. I/m Mclvor-Bosman started trying to explain himself by saying " hear me out, just hear me out for a second. At the end of the day I am a man and I will do what I have to do to make my time go by and I dont have to listen to you all or shit from my cellie ". Rp then stopped him and explained how the housing rules work and that we wont put up with it and all the pointless yelling and acting up needs to stop. I/m Mclvor-Bosman again started going on and on about how he was a man. Rp then turned to Sgt Neal and decided to exit the cell since I/m Mclvor-Bosman wasnt listening at all. When exiting the cell Sgt Neal told I/m ▓▓▓▓ to come back upstairs and pack his belongings since he was already going to be transfered to housing unit 2 anyway. As RP turned to look towards Sgt Neal Rp observed I/m Mclvor-Bosman run out of the room and push Sgt Neal towards the steps yelling " Fuck you pussies " and ran down the upstairs walk towards the other set of stairs. Rp then ran down the steps to cut him off before he got down them. At this time Sgt Rains tackled I/m Mclvor-Bosman on the steps. I/m Mclvor-Bosman refused to give up his hands and Sgt Neal deployed his sabre red to his facial area. Rp then pressed the man down button on Sgt Rains radio and helped Sgt Rains and Sgt Neal take I/m Mclvor-Bosman off the steps and to the floor where handcuffs were put on him. Sgt Neal and Sgt Rains then escorted I/m Mclvor-Bosman towards the 499 door where responding staff took him off the unit. EOR

| **Injured Persons** | **Nature of Injury** | **Location** |
|---|---|---|
| N/A | N/A | N/A |

Hospitalized : N/A        Med. Treatment Provided : N/A

55

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

| Incident#<br>80275 | | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280 | | Date: 03/06/2024 |
|---|---|---|---|---|

## INCIDENT REPORT

| Incident# 80283 | Type: Inmate Involved | Incident Date: 09/16/2020 | Time: 18:06 | Confidential: No |
|---|---|---|---|---|
| Group#: 192018 | | | | |
| Short Description: Code 11 | | Supplement To: | | PREA: No |

Facility: SCI Sussex Correctional Institution      Followup Required : No

Warrant Type:                    Warrant #:           Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: HU4 Upstairs

Sexual Allegation:

Location Category:

Violated Conditions: 1.00A Assault On Staff
                     1.06 Threatening Behavior
                     2.05 Disrespect
                     2.06 Failing to Obey an Order

**Description of Incident:**
On September 16th, 2020 I Sgt K. Neal was assigned to Pre-Trial Housing Unit 4. At 1800 hours upstairs rec was beginning when Inmate McGivor-Bosman, Bashan (SBI# ██████) and Inmate ████████████ came out playing around with each other and yelling. I then told them to knock it off and Inmate McGivor then said "Okay master honkey tonk sir." I then told McGivor he could lock in for being disrespectful, and Inmate ████████████ just turned around and locked in with him. When Inmate McGivor and Inmate ████ got into the room they began yelling and screaming and we couldn¿t tell if they were yelling at each other or at us. Cpl Purdy and I then decided we wanted to go up there and talk to both of them and see what the issue was. When reaching the cell door Inmate ████████ and McGivor were yelling at each other and we couldn¿t make out what they were saying towards each other. Cpl Purdy then opened the door and I instructed Inmate ████████ to go have a seat in the day room so we could talk to McGivor and then talk to him. Cpl Purdy then entered the room and began talking to Inmate McGivor about his behavior. Inmate McGivor then began to say "At the end of the day I'm a man you feel me I can do what I need to do to make my time be what it is, I don¿t have to listen to yall or fuck with my cellies." Cpl Purdy then began to tell him about the rules and regulations and how he needs to act and how talking shit with his cellies needs to stop. Inmate McGivor then kept talking about his status and how he was man. When Cpl Purdy and I realized that he wasn't listening and that he was going to continue to cause problems with his cell mate we exited the cell and I told Inmate ████ to go upstairs to pack his stuff because he was leaving anyway to transfer to Housing Unit 2. When I opened the cell door and stood on the door to hold his for ████ Inmate McGivor then pushed me in the side of my body and took off running yelling "Fuck you Pussies." I then chased after Inmate McGivor and he ran all the way to cell 459 and began to to go down the stairs. Inmate McGivor continued saying "Fuck you Pussies! Sgt Rains then took Inmate McGivor down to the ground on the stairs. I then began to grab his arms and he would not give up his hands. I then sprayed Inmate McGivor in the facial region. Sgt Rains, Cpl Purdy and I then carried him down the stairs to the ground and we then grabbed his arms placed them behind his back and cuffed him. Sgt Rains and I then escorted him to the 499 door where responders then took him off the Unit. No further Incident Occurred/End of Report.

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

56

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

| Incident#<br>80275 | | SCI Sussex Correctional Institution<br>PO Box 500<br>GEORGETOWN DE, 19947<br>Phone#: 302-856-5280 | Date: 03/06/2024 |
|---|---|---|---|

### INCIDENT REPORT

| Incident# 80279    Type: Staff Involved | | Incident Date: 09/16/2020 | Time: 18:10 | Confidential: No |
|---|---|---|---|---|

Group#:  192018

Short Description: code 11 hu4 | Supplement To: | PREA: No

Facility: SCI Sussex Correctional Institution | Followup Required :  No

Warrant Type: | Warrant #: | Offender States Rape: No

Incident Location: PRE-TRIAL

Location Description: hu4

Sexual Allegation:

Location Category:

Violated Conditions:

**Description of Incident:**
On the above date and time a code 11 was called on hu4 I responded to the unit and once there staff from hu4 was brining inmate Mcivoe-Bosman, Bashan ▮▮▮▮ to the 499 door myself and Cpl. Mears took custody of inmate Bosman and started to take him to the R/R Inmate Bosman pants came down causing him to fall forward pulling both myself and Cpl mears almost to the floor. Once we cleared the 400 door I halted the escort to pull up inmate's pants and once they were back up we continued to take him to R/R medical and back -up staff took over and I restuned to my duty post.EOR

| Injured Persons | Nature of Injury | Location |
|---|---|---|
| N/A | N/A | N/A |

The Disciplinary Committee hearing occurred on September 21, 2020. Inmate "N's" account of events and the outcome of the hearing is shown below.

57

| DR# | | |
|---|---|---|
| 26324 | | |

**SCI Sussex Correctional Institution**
**PO Box 500**
**GEORGETOWN DE, 19947**
**Phone No. 302-856-5280**

Date: 03/05/2024

## DISCIPLINARY HEARING DECISION

Inmate : ~~Mcivor-Bosman, Bashan~~          SBI#: ▮▮▮▮    Type: Class1

Institution: SCI Sussex Correctional Institution          Hearing Date: 09/21/2020    Time: 08:55

Inmate Present : Yes        Reason(If No): N/A

Violation :  1.00A Assault On Staff, 1.06 Threatening Behavior, 2.05 Disrespect, 2.06 Failing to Obey an Order

Inmate PLEA :  **Not Guilty**

Inmate Statement :  Inmate Bosman states I went to dinner, they told my celly to dump his tray but they never made me. Purtdy told me I was lucky because he saw me eating. Me and my celly were laughing about the situation. When rec came they told me to lock back in. Then they came back to the room and told my celly to come out. Then Neal started talking shit and hit me in my chest twice. I then made the decision to that I needed to get on camera so I ran out of the cell. They then chased me down the steps.

Witness Name: Brian, Crapper

Testimony : N/A

Decision : **Guilty**

| Violations | Guilty | Not Guilty |
|---|---|---|
| 1.00A Assault On Staff | [X] | [ ] |
| 1.06 Threatening Behavior | [X] | [ ] |
| 2.05 Disrespect | [X] | [ ] |
| 2.06 Failing to Obey an Order | [X] | [ ] |

Rational : Rp finds inmate guilty on all charges. Video evidence and Officers report supports the charges.

Sanctions: N/A

**HEARING OFFICER'S SIGNATURE** _____

Long Matthew E

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer. I may appeal the decision of a Class I Hearing to the faciltiy administrator. I also understand that I have 15 days to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [ ]    DO      [X]    **DO NOT INTEND TO APPEAL**

_____
**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[X]    Inmate does not wish to appeal          [ ]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified          [ ]    Time Limit(15 days since hearing) for appeal has expired

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Start Time | Days | End Date |
|---|---|---|---|---|
| 1. Disciplinary Detention | 09/21/2020 | 18:00 | 15 | 10/06/2020 |
| 2. Loss of All Privileges | 09/21/2020 | 18:00 | 45 | 11/05/2020 |

## Mental Health Impact of the Trauma:

Interviewee "N" lost mobility in his arm, which he had gained through physical therapy after several surgeries. This affects his efforts to perform chores and to earn a higher salary for performing physical labor.

58

JA_01975

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

He recalled that the assault "kind of f-cked me up." He feared for his life and felt betrayed and worthless. While in the segregation housing unit, he slept poorly during the day and was awake all night. His mood was depressed, he had mood swings, irritability and a decreased appetite with weight loss. He lost interest in activities he used to enjoy, and was not motivated to engage in self-care. He had repetitive thoughts, fatigue and poor concentration.

Interviewee "N" recalled feeling paranoid, helpless and hopeless in solitary confinement. He heard voices telling him that his situation would never improve and that should "just give up." In response, he made several suicide attempts. "I was desperate enough to die, but I didn't want to die." He recalled that he was placed on suicide precautions but received no counseling or medication for his declining mental health.

Being locked down for all but 150 minutes per day was very stressful. He was a nineteen-year-old pretrial detainee and was "in a maximum-security cell for two years…" During recreation time "they let you spend time in the cage with one other person. I was shackled when I wasn't in the cell or cage and I had phone calls three times per week."

He often had nightmares about the assault. He had flashbacks and intrusive memories that were triggered by hearing yelling or an officer opening the cell door without notice." Crowds and the sound of jingling keys also trigger intrusive memories. He avoids watching or reading about anything on social media or the television about being touched, molested or incarcerated. He has physiological reactivity (rapid breathing, rapid heart rate, shortness of breath, lightheadedness/dizziness, etc.).

He avoids crowds, arguments, and yelling. He had persistent and exaggerated negative emotions and beliefs about the world that preceded the several suicide attempts. He felt detached from others and was incapable of experiencing positive emotions. He was hypervigilant and easily startled.

59

JA_01976

His arm was in constant pain. He was prescribed amitriptyline (Elavil), an antidepressant that often is used for pain management. "It made me go to sleep and eat too much." " He worried about not being sufficiently alert to defend himself. Despite the pain, he stopped taking the medication. "I felt very uneasy with people in command because they" intentionally hurt him without cause."

Impression:

It is my opinion with reasonable medical certainty that Interviewee "N" suffered emotional and physical distress on and after September 19, 2020, when corrections officers pepper sprayed and physically assaulted him. They also denied him proper medical care for exposure to pepper spray and physical injuries.

The trauma resulted in emotional distress that was more severe than it was after he had a gunshot wound in the right elbow. The corrections officers' attack, unlike the firearms injury, resulted in Interviewee "N" having several suicide attempts in response to command hallucinations, major depressive disorder with psychotic features (hallucinations)and posttraumatic stress disorder.

The symptoms persisted throughout Interviewee "N's" imprisonment, and he continues to have emotional distress, though less severe, although he is not in prison.

Interviewee "N" worked hard to regain the functioning of his right elbow and forearm after several surgeries and extensive physical therapy due to the firearms injury. The right elbow pain and mobility increased precipitously after he was assaulted on September 19, 2020. The daily pain and restricted range of motion in his right elbow and forearm affect him daily and are a trigger for intrusive memories and heightened anxiety related to the assault. The physical pain and suffering also can contribute to increasing the severity of major depressive disorder symptoms.

The pain and mobility concerns have had an adverse effect on his quality of life. His employability is diminished due

60

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

to the right forearm functional impairment and pain. His ability to enjoy activities in loud settings and public settings, especially crowds, is restricted due to posttraumatic stress disorder. He limits what he views on television and the Internet because he doesn't want to trigger intrusive memories and heightened anxiety due to posttraumatic stress disorder.

I also opine the corrections team's failure to facilitate treatment for Interviewee "N" after the assault was cruel and represents grossly deficient care that resulted in his unnecessary pain and suffering. Interviewee "N" lacked the capacity to seek competent medical care for himself and was at the mercy of the corrections officers who harmed him.

Additionally, it is interesting that Interviewee "N's" file contains 13 Incident Report accounts of the September 20, 2020, incident, including one authored by a nurse and two by Corporal Sharp. The other files I reviewed contained no or one account of each incident.

**Interviewee "O"** ▮▮▮▮▮▮▮▮

Interviewee "O" has a seizure disorder, attention-deficit/hyperactivity disorder and schizoaffective disorder, bipolar type (symptoms of schizophrenia and bipolar 1 disorder). He has been admitted to a psychiatric hospital three times and has had three suicide attempts.

Interviewee "O" recalled, "I was on the SMI or serious mental illness list" at the time of the traumatic event. This means he was supposed to be interviewed by a mental health professional to determine if he was mentally capable of participating in a Disciplinary Meeting. Also, "They are not supposed to put people on the SMI [serious mental illness] list in the hole," aka segregation housing unit.

In 2021, "I had an interview with the ACLU about" conditions here. "Shortly after… I started catching bogus write-ups for nothing." Interviewee "O" said that before the ACLU interview, "I hadn't had a write-up in almost 20 years."

61

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

He recalled that in 2021, "I was on a religious diet… and was fasting during the day. They let me bring meals to the room to store them so I could eat when I broke the fast." Despite this, the corrections officers "kept writing me up for this, and I had more bogus write-ups" than he ever had in prison.

Also was on a medication protocol that involved medical monitoring for ten minutes after he ingested the dissolvable controlled medication. "The protocol is that they put it on your tongue. If it doesn't dissolve in 10 minutes, they give you something to drink."

One day, Sergeant Hudson instructed the nurse to remove the medication from Interviewee "O's" mouth because "He thought had been trying to divert it. It had been six minutes. The nurse hadn't given me something to drink yet. I was found guilty… but won my appeal," recalled Interviewee "O"

"Three days later, the same Sergeant Hudson wrote me up for the same thing again. They took me to the holding area. No mental health professional interviewed me before the hearing" and he had been hearing voices. "I had my hearing, I was found guilty, and they took me to the hole."

Interviewee "O" recalled, "They put me in a cell in the hole with feces and urine on the mattress. I told them [about it] and they said, 'Oh well' and shut the door."

While in isolation, Interviewee "O" felt stressed, and the voices became stronger. They advised him to end his life because things wouldn't get better. Interviewee "O" said he felt "kind of out of it. About 30 minutes later, I tried to hang myself with a sheet" that he tied to a vent in the wall.

Interviewee "O" said, "Officer Neal saw me hanging. He opened the door about two inches and sprayed mace in the room – while I was hanging!" Soon, several corrections "officers rushed into the room, and instead of cutting me down, they lifted me and tackled me to the ground. I was kind of unconscious."

62

JA_01979

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

Interviewee "O" recalled, "When I first came awake, I had jaw pain. I remember waking up and Sergeant Neal picked me up and slammed me to the ground again. Then they picked me up and told me to sit up because the nurse was coming. They made me stand up and walked me to the gurney with the sheet still around my neck. They took me to the infirmary."

"I had to be seen by a doctor," explained Interviewee "O". "I told the doctor that something was wrong with my jaw. It felt like it was broken. I had a contusion on my head [scalp] and there was something wrong with my left wrist. It felt like it was broken. It was swollen and there was a big lump." A member of the healthcare team wrapped up the wrist.

The doctor didn't examine his jaw, he recalled. "She didn't even have me try to move it. All she did was look at it and said that it was not swollen." He wasn't treated for exposure to pepper spray.

"They put me in a psychiatric care observation room, aka the 'buck-naked room,' for three days. They made me sit down on the fiberglass bed that had mace on it. My stuff [genitals] was burning. I asked for a washcloth and they wouldn't give it to me."

"I sat there for three days." The psychiatric medication was adjusted. He was allowed to shower on the fourth day and escorted back to the segregation housing unit thereafter. "At that point, they still hadn't taken me to the hospital. I was complaining that I couldn't eat, and my jaw hurt." He explained, "Usually when you're in the hole, they don't get any medical attention. They don't pick up sick calls."

He returned to the general population unit after being in the segregation housing unit for about one week. Then, "about 24 hours went by, and they sent me to the hospital. My face was swollen so bad…. I had to have surgery for my infected, broken jaw. They had to cut it open and sew and drill two drains into my mouth."

63

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

The following day he was discharged from the hospital with instructions to return to be evaluated in one week. He was admitted to the prison infirmary, where he "stayed for three days. "I still had the drains in my mouth. They never took me back to the hospital. They let the dentist here remove the stitches and one of the two drains.

"They transferred me]from the infirmary] to the general population. I didn't feel safe. I had mental health issues" and the inmates or corrections officers "could have jumped me. I was weak and couldn't protect myself. I had a drain in my mouth. I was on heavy medication." The second drain eventually came out on its own.

Interviewee "O" recalled that despite his physical and mental vulnerability He was not offered protective custody. A mental health counselor visited him weekly.

The Delaware Department of Corrections Record:

On November 21, 2021, Interviewee "O" submits a medication Sick Call Request Form because he was "not receiving any mental health meds [medications]." (*Note: There is a reasonable likelihood that Interviewee "O" may have been decompensating psychiatrically because he lacked access to his medication.)cw*

On November 24, 2021, Mental Health Professional Gregg Drevno, LPCMH, MHC says that staff reported that Interviewee "O" attempted suicide on November 23, 2021, and had past attempts by cutting his wrists and hanging himself."

The December 30, 2021, 9:45 AM Disciplinary Report is authored by Sgt. D. Duperon who says that he and SGT Hudson found evidence that Interviewee "O" and a peer had been fighting in the bathroom. The Disciplinary Committee found Interviewee "O" guilty of Fighting and Failing to Obey an Order. He was confined to his room for 10 days and lost all privileges for 30 days.

The Disciplinary Hearing note says that Interviewee "O's" "mental health was taken into consideration during the

64

JA_01981

Cheryl D. Wills, MD, DFAPA                 Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                August 13, 2024

hearing." (*Note: I was unable to locate a form that indicates that a mental health professional evaluated Interviewee "O" to determine his fitness to meet with the Disciplinary Committee. This is important in view of his Serious Mental Illness classification and the suicide attempt on November 24, 2021.*)cw

On December 30, 2021, Nurse Samuel Crawford, LPN takes Interviewee "O's" vital signs and clears him for admission to the Segregation Housing Unit. (*There is no notation about Interviewee "O's" mental health classification or recent suicide attempt.*)cw

Mental Health Clinician Terrence Wright says in his December 30, 2021, progress note that Interviewee "O" "was found in the cell with a sheet tied around his neck."

Nurse Morgan G. Kapela, RN says in her January 17, 2022, progress note that Interviewee "O" reported for an ultrasound. He was "experiencing left side facial/neck swelling and [a ] right foot open wound. He reports pain with difficulty eating, swallowing and breathing. Dr. Gamez made aware and referred him to the emergency department.

Nurse Shelley Anderson, RN says in her January 18, 2022, progress note, that Interviewee "O's was sent to the emergency department at Beeb Hospital because his face was swollen and he had difficulty breathing." Beeb Hospital transferred him to Christina Care Maxillofacial Surgery. Interviewee "O" required surgery for three facial abscesses.

Dr. Jazon Gamez, MD says on January 20, 2022, that Interviewee "O" is in the infirmary following dental surgery that involved placing drains in the face to facilitate drainage of fluids from the abscesses.

On January 30, 2022 at 4:00 PM, Nurse Katherine Morales/Moore, RN says that Interviewee "O" is in the infirmary after having treatment for three facial abscesses and would "remain in [the] infirmary until cleared by medical/completion of IV antibiotics."

65

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

On February 3, 2022, Nurse Jamie Limanek also says that Interviewee "O" states that on December 30, 2021, he was attempted suicide "by hanging and an officer, 'Grabbed me and body slammed me on my neck.'" The nurse makes a routine referral for a spinal x-ray of Interviewee "O's" neck and chest in view of his complaint of neck and mid-back spinal discomfort.

On February 7, 2022, Interviewee "O" submits a medical Sick Call Request form. He says, I "feel like my neck is broken from being picked up and slammed [sic] by Officer Sgt. K. Neal and nurses [sic] Sema and another nurse keep refusing Motrin 600 mg at [the] window when I [am] supposed [to[ have my own cards… but need to be seen."

On February 28, 2022, Interviewee "O" says in a mental health Sick Call Request that he is "Stressed out and kinda [sic] need to talk and decompress."

On April 12, 2022, Interviewee "O" says on a mental health Sick Call Request Form that he is "stressed out, worried, paranoid and concerned and [I] need to talk to a clinician…"

> On October 12, 2202, Interviewee "O" says in the mental health Sick Call Form that he has been "feeling mentally broken and drained. I start crying out of nowhere. Then, the next moment, I'm bouncing all over the place. I feel like DOC [the Department of Corrections] is trying to kill me. They were in the cell that's empty next to me [my assigned cell] messing with the vent. They put a microphone in the vent!! And I think the CIA is behind this in some way. This is what they want!!!"

> Mental Health Impact of the Trauma:

> He said, "The experience made me terrified. I have nightmares. I am in fear – can't stand to have anyone behind me. I've become severely isolated… I fear the officers completely."

66

He feared being assaulted by officers and inmates, especially after the surgery. "They knew I was injured. I had drains in my mouth." He had reoccurring dreams, flashbacks and intrusive memories. Loud noises, shaking keys, and corrections officers entering his room without warning triggered intrusive thoughts and anxiety.

He was emotionally numb and isolated himself. He lacked the motivation to interact with others. He stayed in the room instead of socializing with others. "I ate chow and went back to my room. I took a shower, then went back to my room and sat on the bed." He recalled that he didn't socialize or interact with others unless he had to. "I didn't go to groups, even though I knew I could earn good time credits towards an early release from prison. I was too afraid."

He struggled with sleep. He had a depressed mood, irritability, sadness, and fatigue, with decreased concentration and appetite. He was easily startled and hypervigilant.

The symptoms persisted after he was released from prison. He was required to enroll in the "TASC" program for behavioral health services. He distrusted the program because it was court ordered. They would not permit him to receive psychiatric care from his psychiatrist of 10 years. "I had to see the "TASC" psychiatrist. He feared the psychiatrist and refused the recommended medication. "There was no trust."

He reported that he became sufficiently overwhelmed to self-medicate with drugs to get rid of "the sight of what happened, the daydreams, the nightmares." This, he recalled, contributed to his return to prison.

Presently, he feels as if he is back where it happened. This time, however, he is in a dormitory setting. "I can't stand it when people come behind me. I need to have my back to the wall all the time. I fear they will attack me again

67

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

– the officers, because they remember that I'm part of the lawsuit."

He doesn't feel comfortable in prison and worries about his safety. I'm in a dorm. I have no protections."

<u>Impression:</u>

It is my opinion with reasonable medical certainty that Interviewee "O" experienced unnecessary emotional and physical pain and suffering due to grossly deficient and physically aggressive treatment of him by corrections officers. Failure to provide timely treatment for pepper spray exposure also is an example of woefully inadequate care that caused physical and emotional pain and suffering. This contributed to Interviewee "O" becoming depressed, attempting to end his life on December 30, 2021, and having posttraumatic stress disorder.

On December 30, 2021, Interviewee "O" likely had impaired reality testing and may not have been suited to placement in a segregation housing unit. Note that seven weeks prior, he submitted a Sick Call Request because he was not receiving prescribed psychiatric medication. He had impaired reality testing (psychosis) at that time. Also, a few days later, he attempted to end his life. That occurred and six-and-one-half weeks before the December 30, 2021, suicide attempt. This, too, suggests he had impaired reality testing and was psychiatrically unstable.

He was written up for fighting on the day of the suicide attempt. This suggests that he wasn't stable, given his history in the previous two months. Moreover, he had a classification of serious mental illness, SMI and should have been assessed for mental stability to proceed with the disciplinary process. I could find no indication that he was.

Interviewee "O" described experiencing emotional and physical pain and suffering because of the treatment he received.

68

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

There were notes in the chart suggesting that Interviewee "O" denied intentionally trying to end his life when he was evaluated after a suicide attempt. As the mental health counselor noted in the chart, each attempt should still be treated as a real attempt, until proven otherwise. It is not unusual for a person who attempts suicide to deny it afterward. All attempts should be taken seriously. Punitive responses represent inhumane treatment.

**Interviewee "P"** ▆▆▆▆▆▆▆

Interviewee "P" has attention-deficit/hyperactivity disorder, social anxiety. He had auditory hallucinations (heard voices) when he was in the segregation housing unit and was unable to sleep. Several years ago, after witnessing a homicide, he had symptoms of posttraumatic stress disorder but did not meet the full diagnostic criteria.

Interviewee "P" recalled that on March 17, 2020, he and about 20 of his peers were assigned to work in the laundry. There was one restroom in the laundry. He went on a restroom break that morning and realized "There was no toilet paper left." He asked a corrections officer for a roll to place in the bathroom. "I showed Corporal Johnson the empty roll so he would know I wasn't lying. He said, 'I already gave you [one of the inmates] a roll of toilet paper this morning. Make that work.' I asked him again and was told 'No.' I walked to the office and asked the boss, Sergeant Jones," for a roll of toilet paper. "He outranks Corporal Johnson. [Corporal] Johnson sees me asking [Sergeant] Jones for toilet paper. Jones runs around the corner [towards the office]screaming, using lots of colorful language." Sergeant Jones ordered "me not to ask the boss 'for toilet paper after I said no. Get the f_ck in the office, Get the f_ck in the office!' He looked at the boss for input then Johnson put his hands on me and pushed me into the office." The push was forceful.

"In the office, [Sergeant] Jones told [Corporal] Johnson to cool it. [Corporal] Johnson kept yelling, telling me to go

69

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

back to the housing unit. Then [Sergeant] Jones told me not to go to the housing unit. [Corporal] Johnson wanted to write me up. [Sergeant Jones] said 'Go back to your workstation. They spoke privately, and [Sergeant] Jones tried to mediate a resolution, but [Corporal Johnson] continued to be unreasonable and then changed the story. 'I didn't tell you to go without toilet paper. I told you to wait.'"

The Delaware Department of Corrections Record:

No documentation of the March 17, 2020, incident was in Interviewee "P's" file.

Mental Health Impact of the Trauma:

Interviewee "P" explained that recalling the incident "makes me anxious, sad [and] angry. I have a strong sense of justice. I get emotional when I feel someone is being mistreated. I don't act on this, but it affects me deeply." He became preoccupied with going to work and fearing what would happen to him. He said that he may have reacted to the situation more than most people because he felt violated by Corporal Jones, then ignored by the corrections administrative team.

Interviewee "P" liked the laundry job and Sergeant Jones. "He was one of the fair ones." Despite this, "It was a stressor to log in every day and see him [Sergeant Johnson]. Ultimately, [after about one month]I left [the laundry] and took another job."

Interviewee "P" said that he "wrote letters to the warden and deputy warden," as did his then-girlfriend. "I did my due diligence to make sure everybody was aware." To his knowledge, there was not an investigation. Not long after the incident, Sergeant Jones retired, and Corporal Johnson was promoted. He has been promoted twice since" the March 17, 2020, incident.

Impression:

70

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

It is my opinion with reasonable medical certainty that Interviewee "P" was traumatized by Corporal Johnson's intentionally cruel and abusive verbal and physical actions. Interviewee "P" felt anxious and overwhelmed and feared retaliation from Corporal Johnson after the incident. This resulted in Interviewee "P" leaving the laundry position, although he felt comfortable with the senior supervisor and the job assignment. Interviewee "P" was trying to gain control of his emotions, which at that time met the criteria for an adjustment disorder with mixed emotional features. He did not meet the criteria for posttraumatic stress disorder, major depressive disorder or an anxiety disorder. Interviewee was retraumatized when Corporal Jones received a promotion soon after the March 17, 2020, incident.

### Interviewee "Q" ▬▬▬

Interviewee "Q" is being treated for bipolar disorder and posttraumatic stress disorder. He recalled that on July 15, 2021, "at about 5-6 PM, they [the officers] called for diabetics"  to receive their medication. "I was on the phone and there was a new officer on the pod. I had time" before the medication distribution would end. "I went to finish my conversation on the phone. I heard jingling keys. He [the corrections officer] maced me, grabbed one of my arms and took me down. I put my right hand down to brace myself and then they [hand]cuffed me and took me to the receiving room to see the nurse. They were really aggressive and had my hand propped up behind my back so I couldn't breathe."

"The nurse asked me a couple of questions. Then they strip-searched me and took me to the hole. I never had a chance to get the mace off me." He was permitted to take a shower the following morning."

Interviewee "Q" "was in the hole only for that night. They brought me back [to the general population] by lunchtime. The only reason they brought me back, the other officers told me, was that the [new] officer was wrong. They saw the

71

Cheryl D. Wills, MD, DFAPA
Davis *et al. v.* Neal *et al.*

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

cameras." Interviewee "Q" accepted a write-up for disobeying orders and lost all privileges for five days.

<u>The Delaware Department of Corrections Record:</u>

Corrections Officer Isaac Mitchell's description of the July 15, 2021, incident is copied below.

**Violated Conditions:** 2.06 Failing to Obey an Order

**Description of Incident:**
On 7-15-21 I (C/O Mitchell, Isaac) was working the 1600-0000 shift at Program Building on Bay 3 when at approximately 1820 inmate Selby, Warren (SBI- ████ was called for diabetics. Inmate Selby was still on the phone after multiple announcements for diabetics over intercom as well as myself. Inmate Selby acknowledged it was time for him to leave for diabetics but refused to get off the phone. I walked over to Inmate Selby and ordered him to get off the phone and he responded to me with "I'm not wasting a phone call". I again ordered Inmate Selby to hang up his phone call and he still refused. I then delivered a short burst of my state issue saber red as inmate Selby was being a non-moving resister and took Inmate Selby to the ground, controlling the speed of his decent. I then order inmate Selby to put his hands behind his back which he did. A code 11 was called by Staff working Program control. I then cuffed inmate Selby and escorted him off the tier and handed him off the responding staff. Inmate Selby is being written up for 2.06 (failing to obey an order). //EOR//

The nursing report of the July 15, 2021, incident is copied below.

**Description of Incident:**
Segregation Clearance: Nurse Assessment

Subjective Injury Report: Denies medical distress at this time aside from discomfort to eyes related to OC Spray 'hello¿.
Subjective Mental Health Report: IM denies suicidal and homicidal ideations, denies audio/visual hallucinations.

Objective: On the above date and approximate time, IM ████ SELBY, WARREN was seen following a CODE 11 on his housing unit during which OC Spray was used.

a. Vital Signs: BP:155/90, P:105, Sp02: 98% RA, RR: 21, T: 97.8
b. Injury assessment: IM opened eyes without assistance, sclera irritated WNL s/p spray. IM breathing unlabored, denies difficulty. Lungs clear to auscultation. AO x4. Accommodations for medication administration made if needed.
c. Use of Force: SPRAY, HANDS CUFFED IN BACK
d. Suicide Risk Assessment Score (to be scanned in): 3

On September 29, 2021, Interviewee "Q" had an x-ray of the right wrist completed by TridentCare Imaging. Also, he has a history of bipolar 1 disorder and posttraumatic stress disorder.

72

Cheryl D. Wills, MD, DFAPA                    Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                              Case:21-cv-01773-GBW
                                                                    August 13, 2024

Mental Health Impact of the Trauma:

During the interview, Interviewee "Q" "feared for my life. I didn't know what they were going to do to me."

These days, "I'm just nervous around them [the officers]. I just avoid them, stay away, because I don't know how they're going to act."

"I had one or two dreams about it." He has had more frequent intrusive memories of the incident. His heart rate and breathing rate accelerate. He is overly vigilant and isolates himself in his room after work, bathing and meals. Instead, he should be participating in programming to earn good time credits to obtain an early release date.

Intrusive memories, rapid heart rate and sweating can be triggered by yelling, the sound of keys jingling, slamming doors or someone "walking up on me from behind" without announcing themselves. During my interview with Interviewee "Q" a corrections officer entered the interview room without knocking first and politely asked a question about the interview schedule. "Interviewee "Q" said, "Just like that, my heart started pounding." He knows that the officer meant no harm, but "I can't help it.' Hypervigilance and an exaggerated startle response are criteria for posttraumatic stress disorder.

Exposure to triggers can cause him to have intense or prolonged stress. He had persistent negative emotions and felt detached after the trauma. This persists but has improved with time. Also, he lacked motivation to enjoy life, was irritable and struggled with sleep and concentration.

Impression:

It is my opinion with reasonable medical certainty that Interviewee "Q" developed posttraumatic stress disorder after he was assaulted, restrained and forced to have extended exposure to pepper spray when he should have been accessing his diabetes medications. The new officer knew that spraying pepper spray onto the Interviewee's face was

73

Cheryl D. Wills, MD, DFAPA                Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                          Case:21-cv-01773-GBW
                                                  August 13, 2024

a cruel and brutal intervention that could result in harm. All officers knew that failing to treat Interviewee "Q" for pepper spray exposure as per policy would have resulted in unnecessary harm befalling Inmate "Q."

Also, detainees have the right to refuse treatment. Thus, even if Interviewee "Q" chose to refuse treatment, there was no reason for him to be treated so brutally.

**Opinion:**

The opinion in this report is expressed to a reasonable degree of medical certainty based on training, experience, and knowledge that is generally accepted in the medical community. It is a clinical and scientific opinion but not a legal opinion.

1. Beating and pepper spraying detainees are forms of violence. Each detainee feared for his safety and life during and after the assault by corrections officers.

2. Depriving detainees of timely decontamination from pepper spray exposure was a deliberate and reprehensible action that the corrections officers knew would compromise each detainees' health and increase his physical and emotional pain and suffering. The practice is inhumane and woefully deficient care.

3. The violent restraints caused physical and emotional pain and suffering and a precipitous and persistent decline in emotional wellness for each detainee in the report.

   a. fourteen of seventeen interviewees had new onset or an exacerbation of posttraumatic stress disorder symptoms.

      i. Each detainee who had posttraumatic stress disorder before the traumatic incident experienced a precipitous increase in intrusive recollections (memories, nightmares and/or flashbacks) of the assault that substantially overshadowed the memories of past traumas. Thus, the posttraumatic stress disorder symptoms cannot

74

Cheryl D. Wills, MD, DFAPA
Davis *et* al. *v.* Neal *et* al.

Independent Psychiatric Expert Evaluation
Case:21-cv-01773-GBW
August 13, 2024

be attributed solely to traumas experienced before each assault.

b. Eleven of seventeen detainees had new onset or an exacerbation of major depressive disorder symptoms after being harmed by corrections officers.

c. Several detainees had significantly elevated anxiety symptoms and one developed social anxiety disorder after being harmed by corrections officers.

d. Two detainees began to hear voices (auditory hallucinations) after being assaulted by corrections officers. Both detainees heard voices in the past, but they had resolved long before the assault occurred. before but they had resolved. The stress of the detainees being attacked was sufficient for the voices to return.

e. The trauma affected how several detainees access health care and ask for help in the Delaware Department of Corrections, especially in Sussex Correctional Institution, Georgetown.

f. All detainees said that they fear the corrections officers and no longer believe that they are safe in prison. Several detainees limit their time out of the cell because of this fear. Many become anxious when they hear officer voices, arguments among detainees, the sound of keys jingling, etc.

g. The emotional numbing, depression, anxiety and avoidance, among other behaviors, due to the trauma have contributed to their institutionalization.

h. In some cases, the mental health consequences of the assault made it difficult for the detainees to have sufficient motivation and confidence and to feel safe

75

enough to participate in programs that could help them obtain an earlier release date.

i. The physical and emotional toll on detainees of the brutal behavior by corrections officers continues to affect several of the detainees in the free world.

    i. One had to leave his restaurant job of one year because the posttraumatic stress disorder symptoms would return whenever a corrections officer dined there.

    ii. Two have physical injuries sustained during encounters with corrections officers that restrict their employability, earnings potential and quality of life.

    iii. The posttraumatic stress disorder and depressive symptoms affect them when they interview for jobs, try to date, or try to establish relationships with others in the free world.

    iv. At least two avoid going to places where there are crowds, loud noises, arguing, or loud music. They are unable to attend sporting events, state fairs, carnivals, concerts, family reunions and other activities because of the mental health sequelae of the abuse they experienced.

**Limitations of Report:**

The opinions in this report are based on information provided to me. Should additional information become available that alters my opinion, I deserve the right to submit an addendum.

Respectfully submitted,

*[signature: Wills]*

Cheryl D. Wills, MD, DLFAPA

76

Cheryl D. Wills, MD, DFAPA                                  Independent Psychiatric Expert Evaluation
Davis *et* al. *v.* Neal *et* al.                                              Case:21-cv-01773-GBW
                                                                                    August 13, 2024

## APPENDIX 1: Identity of Interviewees

**A.** Interviewee "A"       - Nathan Lewandowski ███████
**B.** Interviewee "B"       - Shamir Sudler ████████
**C.** Interviewee "C"       - Neki Gibbs ███████
**D.** Interviewee "D"       - Ray Reul ███████
**E.** Interviewee "E"       - Keith Campbell ████████
**F.** Interviewee "F"       - ███████████████████
**G.** Interviewee "G"       - Richard Edwards ████████
**H.** Interviewee "H"       - Jamal Solomon ███████
**I.** Interviewee "I"       - Kevin Ignudo ███████
**J.** Interviewee "J"       - Nasier Gibbs ███████
**K.** Interviewee "K"       - Isaac Montague █████████
**L.** Interviewee "L"       - Augustine Haymond █████████
**M.** Interviewee "M"       - Laquan Johnson ████████
**N.** Interviewee "N"       - Bashan McIvor-Bosman ██████████
**O.** Interviewee "O"       - Richard Maddox █████████
**P.** Interviewee "P"       - Justine Erskine █████████
**Q.** Interviewee "Q"       - Warren Selby ████████

77